**No. 23-2979**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES MILLER, *et al.*,

Plaintiffs–Appellees,

vs.

ROB BONTA, in his official capacity as
Attorney General of the State of California, *et al.*,

Defendants–Appellants.

**On Appeal from the United States District Court
for the Southern District of California**
Case No. 3:19-cv-01537-BEN-JLB
Hon. Roger T. Benitez

## APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY PENDING APPEAL AND FOR AN INTERIM ADMINISTRATIVE STAY

GEORGE M. LEE
SEILER EPSTEIN LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
(415) 979-0500
gml@seilerepstein.com

JOHN W. DILLON
DILLON LAW GROUP APC
2647 Gateway Road, Suite 105
Carlsbad, CA 92009
(760) 642-7151
jdillon@dillonlawgp.com

October 26, 2023              *Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rule of Appellate Procedure, Plaintiffs-Appellees James Miller, *et al*. submit this corporate disclosure and financial interest statement.

San Diego County Gun Owners PAC is a membership organization, with no parent corporation, nor has it issued any stock.

California Gun Rights Foundation is a non-profit foundation with no parent corporation, nor has it issued any stock.

Firearms Policy Coalition, Inc., is a non-profit corporation with no parent corporation, nor has it issued any stock.

Second Amendment Foundation, Inc., is a non-profit corporation with no parent corporation, nor has it issued any stock.

PWGG, L.P. is a limited partnership with no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

Gunfighter Tactical, LLC is a limited liability company with no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

## **TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

II. PROCEDURAL HISTORY ..................................................................2

    A. DISTRICT COURT PROCEEDINGS ....................................................2

    B. TRIAL AND JUDGMENT ................................................................3

    C. APPEAL AND REMAND ................................................................3

III. ARGUMENT ................................................................................5

    A. THE APPLICABLE STANDARD OF REVIEW ......................................5

    B. THE STATE HAS FAILED TO MAKE A STRONG SHOWING IT IS
       LIKELY TO SUCCEED ON THE MERITS. ........................................6

           1. HELLER AND BRUEN ESTABLISH THAT PLAINTIFFS ARE LIKELY
               TO SUCCEED ON APPEAL. ....................................................6

               (a) The Plain Text of the Second Amendment................................7

               (b) History Provides No Justification For The State's "
                    Assault Weapons" Ban. ....................................................8

               (c) Arms in Common Use Cannot Be Both
                    "Dangerous and Unusual." ..............................................11

               (d) Semiautomatic Firearms the State Deems "Assault
                    Weapons" Are "In Common Use." ....................................13

               (e) The State's Historical Analogues Provide No Support
                    to a Ban on a Class of Firearms................................14

    C. THE STATE HAS FAILED TO SHOW IT WILL BE IRREPARABLY
       INJURED ABSENT A STAY. ..........................................................17

    D. THE BALANCE OF EQUITIES LEANS AGAINST A STAY OF THE
       DISTRICT COURT'S DECISION PENDING APPEAL. ......................21

IV. CONCLUSION ............................................................................22

iii

## TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ................................................21

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ..........................................9, 11, 12

*County of Santa Clara v. Trump*, 250 F.Supp.3d 497 (N.D. Cal. 2017)................21

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ......................................*passim*

*Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020).........................................6, 17, 18

*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017)....................................20

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ......................5

*Elrod v. Burns*, 427 U.S. 347 (1976)......................................................................20

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)..........................................21

*Grace v. District of Columbia*, 187 F.Supp.3d 124 (D.D.C. 2016) .......................20

*Index Newspapers LLC v. United States Marshals Service*,
    977 F.3d 817 (9th Cir. 2020) .................................................5, 6, 20, 21

*Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017),
    vacated and remanded sub nom. *Trump v. Int'l Refugee Assistance*,
    138 S.Ct. 353 (2017).........................................................................................21

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ............................................17

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)...............................................20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) ...*passim*

*Nken v. Holder*, 556 U.S. 418 (2009)..............................................................*passim*

*Range v. Att'y Gen. U.S.*, 69 F.4th 96 (3d Cir. 2023) (en banc).............................11

*Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959 (9th Cir. 2002).........................21

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ...........................................................10

**Statutes**

Cal. Pen. Code § 30515 ........................................................................12

Cal. Pen. Code § 32310 ........................................................................19

**Rules**

Fed. R. Civ. Pro. 65 ...............................................................................3

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

The "irreparable injury" that the State seeks to avoid, necessitating its emergency motion, is that it will be brought into line with 44 other states that do not have any restrictions on the possession of common, modern semi-automatic firearms with features it characterizes as "assault weapons."

Plaintiffs-Appellees James Miller, *et al.* oppose Appellants' stay motion. Twice now, the district court has ruled that California's assault weapons ban is unconstitutional. Twice now, and under two different standards of judicial review, the State has failed to justify this unconstitutional ban. The district court review included a full bench trial on the merits with briefing, supplemental briefing, lay and expert witnesses, and a full evidentiary record. The district court did not enjoin California's assault weapons ban as part of a preliminary injunction on a partial record. The State has had two chances to meet its burden and make the required showing, but failed to do so.

The State failed to meet its burden primarily because the firearms deemed "assault weapons" are indisputably common and ordinary semi-automatic firearms.

Appellees have been denied their fundamental Second Amendment right to keep and bear these common firearms. The continuation of this violation of their constitutional rights cannot continue without disregarding the Second Amendment and the controlling authority of *District of Columbia v. Heller,* 554 U.S. 570 (2008)

and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022). The district court, after an initial bench trial, followed by additional briefing and the submission of voluminous evidence on remand, found that the State had failed to meet its heavy burden to provide any Founding Era analogous laws or regulations that would justify the State's ban.

Therefore, the State has not met its burden to satisfy the factors required for the issuance of a stay pending an appeal under *Nken v. Holder*, 556 U.S. 418, 426 (2009). The State's burden is aptly described as a "heavy burden of showing not only that the judgment of the lower court was erroneous on the merits, but also that the applicant will suffer irreparable injury if the judgment is not stayed pending appeal." *Nken*, 556 U.S. at 439 (Kennedy, J., concurring). The State has not shown irreparable harm and a strong likelihood of success on appeal and irreparable harm, which represent the first two *Nken* factors that "are the most critical." *Nken*, 556 U.S. at 434.

Appellees respectfully request that this Court deny the stay and allow the appeal to proceed.

## II.   PROCEDURAL HISTORY

### A.   DISTRICT COURT PROCEEDINGS

Plaintiffs filed this action on August 15, 2019, and moved for a preliminary injunction on December 6, 2019. (ECF No. 22).

The district court scheduled an evidentiary hearing commencing on October 19, 2020, at which time both Plaintiffs' and Defendants' witnesses were produced and examined. See Transcripts at ECF Nos. 58 and 59; Witness List at ECF No. 56.

At the conclusion of the evidentiary hearing, the district court consolidated Appellees' pending preliminary injunction motion with the trial on the merits, pursuant to FRCP 65(a)(2). See ECF No. 55; Tx of 10/22/21 Hearing at 115.

## B.   TRIAL AND JUDGMENT

Trial commenced on February 3, 2021. Before trial, the parties submitted extensive pre-trial memoranda of contentions of fact and law (ECF Nos. 65, 66), proposed findings of fact and conclusions of law (ECF Nos. 85-87), witness and exhibit lists, and expert witness deposition transcripts (ECF Nos. 89-90, 95, 98). Approximately 14,000 pages of evidence and testimony were submitted to the district court. See ECF No. 115 at 33. On June 4, 2021, the district court issued its first decision (ECF No. 115) and entered judgment. (ECF No. 116).

## C.   APPEAL AND REMAND

 The State appealed the district court's first judgment on June 10, 2021. (ECF No. 117). On June 21, 2021, this Court issued an order staying the district court's judgment pending resolution of *Rupp v. Bonta*, No. 19-56004. (ECF No. 123). On August 1, 2022, following *Bruen*, this Court granted the State's motion to vacate the

judgment and remand for further proceedings. consistent with the Supreme Court's decision. (ECF No 124).

On remand, the district court ordered the parties to file briefs addressing the *Bruen* decision (ECF No. 125) and they did so extensively. *See* ECF Nos. 129, 130, 136, 137, 156, and 157.

The district court ordered the State to compile a survey of relevant laws and regulations that it believed justified the "assault weapons" ban. The court also established a broad time frame, namely, laws or regulations from the time of the adoption of the Second Amendment and continuing twenty years after the Fourteenth Amendment. (ECF No. 161). The State responded to the district court's order by submitting two lists of 316 purported laws and regulations, both from the pre-Founding Era through 1888 (ECF No. 163-1) and from 1889 through the 1930s (ECF No. 163-2), which they claimed supported its modern-era firearm ban.

The district court then issued an order directing the State to file a brief identifying the *most relevant* historical laws or regulations that were proper historical analogues and relevantly similar to a statewide prohibition on a class of firearms. (ECF No. 164). In response, the State filed a five-page brief in which it identified alleged "prohibitions on the possession of trap guns," "including New Jersey's 1771 prohibition on the setting of trap guns" as the most "relevantly similar" analogues to the modern assault weapons ban. (ECF No. 168, at pp. 3-5).

The district court thus gave the State considerable time and leeway to satisfy its burden under *Bruen*. The court carefully reviewed the State's historical surveys, all the declarations of the State's experts and historians, and numerous cited sources. On October 19, 2023, the district court issued a second 79-page decision applying the standard set by *Bruen*. (ECF No. 175) ("Decision").

### III. ARGUMENT

#### A. THE APPLICABLE STANDARD OF REVIEW

"'A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Index Newspapers LLC v. United States Marshals Service*, 977 F.3d 817, 824 (9th Cir. 2020) (citation omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken,* 556 U.S. at 433–434.

A party seeking a stay of a judgment pending appeal is required to show factors similar to those of a preliminary injunction. The moving party must make a strong showing that: (1) they are likely to succeed on the merits; (2) they will be irreparably injured absent a stay; (3) the stay will not substantially injure the other parties interested in the proceeding; and (4) the public interest supports the stay. *Nken*, 556 U.S. at 426. Of these four factors, the first two "are the most critical," and the "mere possibility" of success or irreparable injury is insufficient to satisfy them. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018).

**B.  THE STATE HAS FAILED TO MAKE A STRONG SHOWING IT IS LIKELY TO SUCCEED ON THE MERITS.**

The first factor under *Nken* is whether the moving party has demonstrated a *strong* showing that they are likely to succeed on the merits of the appeal. The "strong likelihood" that the movant must make to secure a stay is more demanding than the showing of the likelihood of success on the merits required to secure a preliminary injunction. *Doe #1 v. Trump*, 957 F.3d 1050, 1062 (9th Cir. 2020). Under all of these standards, the State has failed to meet its burden.

In deciding whether a party has demonstrated a strong likelihood of success, this Court must review the district court's factual findings for clear error, conduct a *de novo* review of the district court's legal findings, and consider the scope of the stay under a *deferential* abuse of discretion standard. *Index Newspapers*, 977 F.3d at 824 (citing cases). The voluminous record before the district court illustrates that the State has failed to meet its "heavy burden."

**1.  *Heller* and *Bruen* Establish That Plaintiffs Are Likely to Succeed on Appeal.**

In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Here, the Second Amendment's plain text covers the conduct at

issue, *i.e.*, the acquisition, possession, transfer, and use of common, modern semiautomatic firearms that the State defines as "assault weapons." Therefore, it falls on the State to justify the firearms ban as consistent with historical tradition rooted in the Founding Era. After a trial on the merits, and additional briefing and evidence on remand, the court found the State had failed satisfy its burden, ruling in part that *Bruen* and *Heller* have already established that there is no tradition of banning commonly owned and possessed firearms. Decision at 16-28.

### (a) The Plain Text of the Second Amendment

The first question is whether "the Second Amendment's plain text covers [the] conduct" that is proscribed by the law. *Bruen*, 142 S. Ct. at 2117. The Supreme Court has left no doubt as to the meaning of "arms" in the Second Amendment: "'[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581. It includes "[w]eapons of offence, or armour of defence." *Id.* (internal quotation marks omitted). "[T]he Second Amendment's definition of 'arms'" thus covers all "modern instruments that facilitate armed self-defense," "even those that were not in existence at the time of the founding.'" *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).

The district court agreed, concluding, "[a]s to the types of weapons the Second Amendment protects, *Bruen* echoes *Heller*, *McDonald*, *Caetano*, *Miller*, and Blackstone, pronouncing that 'the Second Amendment protects the possession and

use of weapons that are 'in common use at the time.'" Decision at 18. Contrary to this finding, the State argues that "assault weapons" are somehow not "arms" presumptively protected by the plain text of the Second Amendment. Motion at 14. However, beyond the general claim that "the textual right is not unlimited" and that other courts have held otherwise, the State provides no evidence or argument that the firearms at issue do not fall under the explicit definition of "arms" protected by the Supreme Court in *Heller*. (Decision at 17-19).

      **(b)**     **History Provides No Justification For The State's "Assault Weapons" Ban.**

As "[t]he Second Amendment's plain text thus presumptively guarantees" the right to keep and bear the firearms at issue in this case under *Bruen*, the inquiry then shifts from text to history, and the burden is on the State to "justify its regulation by demonstrating it is consistent with the Nation's historical tradition of firearms regulation." 142 S. Ct. at 2130, 2135. This is the standard set forth by *Heller* and *Bruen*, and it is the standard applied by the district court. Decision at 16-38. At trial and on remand, the State failed to meet its burden.

In *Heller*, the District of Columbia enacted a ban on the possession of handguns. As *Bruen* would later make explicit, *Heller* began by analyzing the text of the Second Amendment. *See Heller*, 554 U.S. at 576–600. It then proceeded to analyze the history of the Second Amendment and firearm regulation, which it considered a "critical tool of constitutional interpretation," that allowed the Court to

assess "the public understanding of [the Second Amendment] in the period after its . . . ratification." *Id*. at 605. The *Heller* Court concluded that history disclosed an "important limitation on the right to keep and carry arms," namely, that "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" showed that "the sorts of weapons protected were those 'in common use at the time.'" *Id*. at 627 (emphasis added). This was, the Supreme Court explained, a rule developed from "the historical understanding of the scope of the right." *Id*. at 625 (emphasis added). And lest there be any doubt that this conclusion was part of *Heller*'s binding holding, remember, the case was about the validity of a ban on a type of "arm," and, after elucidating this historical limitation on the right, the Supreme Court held that the handguns subject to the ban were not "dangerous and unusual weapons" that could lawfully be banned—an easy task in that case given that "handguns are the most popular weapon chosen by Americans for self-defense in the home [so] a complete prohibition of their use is invalid." *Id*. at 629.

In the period after *Heller* and before *Bruen*, the Supreme Court decided *Caetano v. Massachusetts*, 577 U.S. 411 (2016), another arm ban case, this time about stun guns. In resolving that case in a short *per curiam* opinion, the Court returned to *Heller*'s controlling "in common use" versus "dangerous and unusual" distinction to vacate the judgment holding that the ban was constitutional. *Caetano*, 577 U.S. at 412 (per curiam). Justice Alito, in his concurrence, set forth a rationale

for finding the law unconstitutional, similarly focusing on the controlling "in common use at the time" language from *Heller*, which he understood to "reflect[] the reality that the founding-era militia consisted of citizens 'who would bring the sorts of lawful weapons that they possessed at home to militia duty,' and that the Second Amendment accordingly guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes.'" *Id*. at 416 (Alito, J., concurring).

In *Bruen*, the Supreme Court reiterated that *Heller's* textual and historical analysis is controlling. *Bruen* corrected more than a decade's worth of misinterpretation of *Heller* by the lower courts, doing away with the interest-balancing regime that the circuit courts had developed and making the structure of *Heller*'s text-and-history analysis explicit. *Bruen*, 142 S. Ct. at 2131. It explained that *Heller*'s finding that firearms "in common use" are protected by the Second Amendment was "[d]raw[n] from . . . historical tradition" and comported with the enactments of colonial legislatures that *Bruen* analyzed in its own historical review. *Id*. at 2143; *see also Teter v. Lopez*, 76 F.4th 938, 950-51 (9th Cir. 2023).

Thus, applying *Bruen*'s methodology to California's ban on common, modern semiautomatic firearms defined by the State as "assault weapons," the focus now shifts to the Second Amendment's history, and the Supreme Court has already done the historical spadework. *Bruen* leaves no doubt that this Court is bound to follow

the same historical tradition that controlled *Heller* and *Caetano*. Although in other types of Second Amendment challenges, the historical analysis will involve the government seeking to demonstrate, through reference to historical statutes and regulations, that a challenged law "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id*. at 2127, here, that work has been done. *See also Range v. Att'y Gen. U.S.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc) (applying *Bruen* in challenge to law banning possession of firearms by criminal offenders).

Thus, the question presented is whether common semi-automatic firearms defined by California as "assault weapons" are "dangerous and unusual weapons?" The answer to that question is a resounding "no" as the Supreme Court has already addressed bans on types of arms.

### (c)   Arms in Common Use Cannot Be Both "Dangerous and Unusual."

The Supreme Court has three times answered the specific question of what historical traditions of firearms regulation can support modern day bans on certain types of "arms." Those cases establish that states can only ban arms that are *both* "dangerous and unusual." The semiautomatic firearms at issue in this case are not both "dangerous and unusual." To the contrary, the district court found, based on the evidence, that common, modern semiautomatic firearms are "widely owned by law-abiding citizens across the nation." Decision at 2-3.

As properly applied by the district court, Supreme Court precedent states that "this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Thus, an arm that is "in common use" for lawful purposes by definition does not fall within this category and cannot be banned. *Bruen*, 142 S. Ct. at 2143. And when assessing whether a firearm is "in common use," the Supreme Court has made clear that the Second Amendment focuses on the practices of the American people nationwide, not just in California. *See id*. at 2131 ("It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *See Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("[S]tun guns are widely owned and accepted as a legitimate means of self-defense across the country.").

Further, despite the State's assertions that "assault weapons covered by Section 30515 are most suitable for offensive use…," courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. Decision at 75. While the Court in *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," it held that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629.

12

The district court properly applied this framework and found the State could not show that firearms defined as "assault weapons" are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. And that ends the inquiry. Arms commonly owned by law-abiding citizens for lawful purposes *cannot* be banned.

### (d) Semiautomatic Firearms the State Deems "Assault Weapons" Are "In Common Use."

This case is thus reduced to the following, straightforward inquiry: Are the firearms banned by California "in common use," according to the lawful choices of contemporary Americans? According to the district court's findings, the answer is "yes." The State, which bears the burden of proving that they are not, *Bruen*, 142 S. Ct. at 2135, failed to make the showing necessary to justify its ban and even concedes in their motion that so-called "assault weapons" are commonly owned. See Motion, p. 14. According to the district court:

> An expert witness for the State suggests that although such rifles number more than 24.4 million among Americans, a smaller number of people (7.9 million) might own most of them. Seven million nine hundred thousand persons is still a large number of citizens choosing to own AR-15 type firearms. When the Supreme Court vacated Caetano's conviction for mere possession of a stun gun, 200,000 owners of stun guns was all it took.

 Decision at 70.

The State's attempt to claim that these firearms are somehow not in common use because they are not "commonly *used* for self-defense" by being fired (Motion

13

at 14) is a frivolous claim that the district court explicitly addressed and rejected. Decision at 71-73. Just as they chose handguns in *Heller*, the American people in large numbers have chosen to arm themselves for their protection with common, modern semiautomatic firearms the State defines as "assault weapons." Because the firearms at issue are "in common use" and typically possessed by law abiding citizens for lawful purposes, California's ban violates the Second Amendment.

### (e) The State's Historical Analogues Provide No Support to a Ban on a Class of Firearms.

As stated, the Supreme Court has largely conducted the historical analysis and only arms that are both "dangerous and unusual," and thus, not "in common use," can be banned. Nonetheless, the district court still thoroughly reviewed and considered the State's submitted survey of historical laws and properly determined whether these were analogous laws and regulations that would justify the current ban based on the controlling precedent found in *Heller* and *Bruen*.

Apart from the fact that the State has offered nothing in its motion that would adequately challenge the factual findings of the district court, the State also has not raised a meaningful *legal* challenge to the district court's decision. The *application* of the *Bruen* standard to the facts of this case is not challenged in the State's motion.

First, the State' offers no evidence that disputes or calls into question the district court's findings that:

Prior to the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, …. In fact, prior to California's 1989 ban, so-called "assault weapons" were lawfully manufactured, acquired, and possessed throughout the United States. Before the *Bruen* decision, the State had unpersuasively argued that its laws are analogous to a handful of state machinegun firing-capacity regulations from the 1920s and 1930s and one District of Columbia law from 1932 — a law that the Supreme Court ignored while dismantling the District of Columbia's handgun ban in *Heller*.

Decision at 16.

The State's motion also fails to identify any evidence questioning the district court's findings that:

It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind. Based on a close review of the State's law list and the Court's own analysis, there are no Founding-era categorical bans on firearms in this nation's history. Though it is the State's burden, even after having been offered a clear opportunity to do so, the State has not identified any law, anywhere, at any time, between 1701 and 1868 that prohibited simple possession of a gun.

Decision at 28.

The State argued that the best analogue for its "assault weapon" ban are trap gun laws. (ECF No. 168). However, the district court found that other than the single law referenced by the State from 1771, "trap guns were not prohibited by law in the District of Columbia or 36 of the 37 states, until 1873. California waited to enact its own trap gun law until 1957." As the district court noted, "If this is what a national

tradition of trap gun regulation looks like, it is a strange look, indeed." Decision at 42.

Second, the State's reliance on decisions in other circuits upholding so-called assault-weapons bans is not persuasive. Motion at 12-15. The six cases relied on by the State are all appeals from preliminary injunctions. *Id*. Unlike this case, none of these cases had the benefit of a trial on the merits, followed by additional briefing and evidence on remand.

Moreover, that lower courts have issued preliminary orders contrary to the district court's decision is unconvincing. Before *Heller*, almost every circuit interpreted the Second Amendment incorrectly, and before *Bruen*, almost every circuit misapplied *Heller,* and applied the wrong standard of review. Contrary to the State's claims, mere reliance on the early results of preliminary injunction cases *does not* demonstrate likelihood of success on the merits, irreparable injury, or a clearly erroneous lower court decision. As found by the district court in this case, the State failed to show any historically analogous laws or regulations outright prohibiting the keeping or possessing of guns. No laws of any kind. Decision at 28, and 29-36. The State does not seriously challenge the district court's findings.

The State misleads this Court, stating that the district court "acknowledged that assault weapons "clearly represent[] a dramatic technological advancement" and that California was 'attempting to address a modern societal concern of mass

shootings." Motion at 10. The district court said no such thing. In fact, the district court stated:

> On one hand, a modern rifle like the AR-15 clearly represents a dramatic technological advancement when compared to a musket. On the other hand, the lever-action repeating Henry and Winchester rifles that were popular at the time of the Fourteenth Amendment were also dramatic technological advancements in firearms. These popular lever-action rifles had large tubular magazines and could be fired multiple times in succession very accurately and quickly. Yet, there are no state prohibitions on the possession or manufacture of these lever-action rifles in the State's law list.

Decision at 39.

Here, there is no "dramatic technological advancement" when it comes to these challenged arms that would warrant a "more nuanced" analysis under *Bruen*. Despite this fact, the district court still gave the State the benefit of the doubt and considered the various historical laws the State offered as justification for its ban. Nevertheless, the court properly found that the State's laws were insufficient.

## C. THE STATE HAS FAILED TO SHOW IT WILL BE IRREPARABLY INJURED ABSENT A STAY.

A party seeking a stay must show it will suffer irreparable harm without the stay. Failure to do so results in denial of the motion "regardless of the [moving party's] proof regarding the other stay factors." *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011); *Doe #1*, 957 F.3d at 1061.

Although the four *Nken* factors are presented here in the traditional order, this Court has recently stated that this second requirement—the showing of irreparable

injury—is the most important factor. *Doe #1*, 957 F.3d at 1062. Indeed, the entire premise of the State's motion is that unless a stay is granted, "the district court's permanent injunction will allow a sudden surge of long-prohibited assault weapons into the State with features serving specific, combat-functional ends" (Mot. at 23), and that "it would be impracticable if not impossible for the State to restore the status quo and remove all those weapons from the State." *Id*.

The State's assertions are misleading. The district court found that prohibited rifles with "features" are no more dangerous or capable of use in mayhem than are permitted "featureless" rifles. "[T]hese prohibited rifles are virtually the same as other lawfully possessed rifles. They have the same minimum overall length, they use the same triggers, they have the same barrels, and they can fire the same ammunition, from the same magazines, at the same rate of fire, and at the same velocities, as other rifles." Decision at 3.

Moreover, the State's irreparable injury burden must be higher than showing that there will be a "sudden surge" of these firearms into California. The mere fact that more of these firearms will *legally enter* into the State does not in and of itself cause *any* harm, let alone irreparable harm. The State must show that this influx will actually lead to irreparable harm.

Simply assuming that it will prevail, the State asserts it "would be impracticable if not impossible for the State to restore the status quo and remove all

these weapons from the State." Motion at 23. The State further argues that its "prior experience in *Duncan* underscores these risks," as "'high-capacity magazines flooded into California' after the same district court immediately halted enforcement of California Penal Code section 32310 and delayed entering a stay for a week in 2019." *Id*.

First, the State claims that millions of "high-capacity magazines" entered California during the period in which the district court's decision in *Duncan* was not stayed, but fails to provide any evidence that this influx *actually resulted* in any increase in crime. In fact, four years since this influx of millions of high-capacity magazines, the State has failed to show injury. The State makes no evidentiary showing, likely because these millions of lawfully acquired magazines continue to be lawfully owned and used by millions of law-abiding gun owners in California. See Motion at 23 (stating that many "magazines" remain "in the State to this day"). The same is true for the State's so-called "assault weapons." The mere fact that law-abiding gun owners will go through background checks and lawfully acquire these firearms causes no injury to the State.

The State's other claims regarding irreparable injury fare no better. The State's claim that "assault weapons in general are used disproportionately in crime relative to their market presence" is both misleading and insufficient. The district court found that:

> The United States Department of Justice reports that in the year 2021, in the entire country 447 people were killed with rifles (of all types). From this one can say that based on a national population of 320 million people in the United States, rifles of any kind (including AR-15s) were used in homicides only 0.0000014% of the time….

Decision at 7. Simply put, the State's claims are factually incorrect, and provides no support for its irreparable harm claim. The district court also commented on the rarity of the use of modern semiautomatic firearms in violent crimes within this state, finding that in California, "with a population close to 39 million people, murder by knife occurs seven times more often than murder by rifle[s]" of *any* kind. Decision at 8.

On the other hand, irreparable injury to Plaintiffs and other similarly situated Californians is undeniable if this Court should stay the district court's decision. "'It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'" to a party seeking to uphold an injunction. *Index Newspapers*, 977 F.3d at 837–38, citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) and *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023). The loss of Second Amendment rights constitutes irreparable injury. *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1135 (S.D. Cal. 2017), citing *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016) and *Ezell v. City of*

*Chicago*, 651 F.3d 684, 699, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law").

A party "can suffer a constitutional injury by being forced to comply with an unconstitutional law or else face financial injury or enforcement action." *County of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537 (N.D. Cal. 2017). These concerns are not insubstantial. Facing felony charges and convictions for merely possessing a firearm that may have the "wrong" grip angle is not a minor burden.

### D. THE BALANCE OF EQUITIES LEANS AGAINST A STAY OF THE DISTRICT COURT'S DECISION PENDING APPEAL.

Where, as here, the government fails to satisfy the first two *Nken* factors, the Court need not reach the final two factors—harm to other parties and to the public interest. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1014–15 (9th Cir. 2020). And where the government is a party to this type of motion, the injury-to-others and the public-interest factors merge. *Index Newspapers*, 977 F.3d at 838, citing *Nken*, 556 U.S. at 435.

On balance, the public interest favors "the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Heller*, 554 U.S. at 634-35. "[U]pholding the Constitution undeniably promotes the public interest." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017); *see also Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) ("'it is always in the public interest to prevent the violation of a party's constitutional rights.'").

21

## IV. CONCLUSION

For the foregoing reasons, the State's emergency motion for a stay pending appeal should be denied.

October 26, 2023

**DILLON LAW GROUP APC**

*/s/ John W. Dillon*
JOHN W. DILLON

**SEILER EPSTEIN LLP**

*/s/ George M. Lee*
George M. Lee

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I am counsel of record for Plaintiffs-Appellees in the above action. I hereby certify that the foregoing APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY PENDING APPEAL AND FOR AN INTERIM ADMINISTRATIVE STAY complies with the type-volume limitation of Ninth Circuit Rule 27-1, because it contains 5,202 words, excluding the items exempted by Fed. Rule App. P. 32(f). This Opposition complies with the typeface and type style requirements of Fed. R. App. Pro. 32(a)(6) because it has been prepared in Times New Roman, a proportionally spaced type font using 14-point font.

Dated: October 26, 2023            **DILLON LAW GROUP APC**


*/s/ John W. Dillon*
JOHN W. DILLON

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished to all participants by and through the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 26, 2023

/s/ John W. Dillon
JOHN W. DILLON