No. 23-2979

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES MILLER, ET AL.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, ET AL.,

*Defendants-Appellants.*

**On Appeal from the United States District Court for the Southern District of California**
No. 3:19-cv-01537-BEN-JLB
The Honorable Roger T. Benitez, Judge

## APPELLANTS' OPENING BRIEF

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ANNA FERRARI
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3479
John.Echeverria@doj.ca.gov
*Attorneys for Defendants and Appellants*

December 1, 2023

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Jurisdictional Statement .............................................................................3

Statement of the Issues ...............................................................................4

Addendum of Statutory Provisions ............................................................4

Statement of the Case .................................................................................4

    A.    History of the Development of Assault Weapons ................................4

    B.    California's Regulation of Assault Weapons .....................................10

    C.    Procedural History ............................................................................14

        1.    Pre-*Bruen* Proceedings ...........................................................14

        2.    Post-*Bruen* Proceedings .........................................................16

Summary of the Argument .........................................................................18

Standard of Review ...................................................................................20

Argument ...................................................................................................20

I.    Plaintiffs Have Not Established That the Challenged Categories of Assault Weapons Are Presumptively Protected by the Second Amendment .......................................................................................21

    A.    "Arms" ...............................................................................................22

    B.    "Common Use for Self-Defense" .....................................................24

    C.    "Most Useful in Military Service" ....................................................31

II.    California's Restrictions on the Challenged Categories of Assault Weapons Are Consistent with This Nation's Historical Tradition ..............33

    A.    This Case Implicates *Bruen*'s "More Nuanced" Approach to the Historical Inquiry ...........................................................................33

    B.    The Record Reflects a Robust Tradition of Regulating Particular Weapons That Threaten Public Safety .............................37

        1.    The tradition of restricting and prohibiting especially dangerous weapons pre-dates the founding ..............................38

i

# TABLE OF CONTENTS
## (continued)

**Page**

    2.    Throughout American history, governments have restricted and prohibited especially dangerous weapons as they proliferated and imperiled public safety ...................... 40

    3.    The assault weapons restrictions challenged here are consistent with this Nation's historical tradition .................... 47

  C.    The District Court's Historical Analysis Was Flawed ....................... 51

III.  The District Court's Permanent Injunction and Judgment Should Remain Stayed ............................................... 55

Conclusion ............................................................... 57

Statement of Related Cases ...................................... 58

Certificate of Compliance ....................................... 59

Certificate of Service ............................................. 60

# TABLE OF AUTHORITIES

**Page**

CASES

*Bevis v. City of Naperville* (*Bevis I*)
__ F. Supp. 3d __, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ...............*passim*

*Bevis v. City of Naperville* (*Bevis II*)
__ F.4th __, 2023 WL 7273709 (7th Cir. Nov. 3, 2023)...........................*passim*

*Brown v. Maryland*
25 U.S. (12 Wheat) 419 (1827) .........................................................................43

*Caetano v. Massachusetts*
577 U.S. 411 (2016)........................................................................................30

*Clark v. Cmty. for Creative Non-Violence*
468 U.S. 288 (1984)........................................................................................21

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*
(*DSSA*)
__ F. Supp. 3d __, 2023 WL 2655150 (D. Del. Mar. 27, 2023) ................*passim*

*District of Columbia v. Heller*
554 U.S. 570 (2008)...................................................................................*passim*

*Edmo v. Corizon, Inc.*
935 F.3d 757 (9th Cir. 2019) ...........................................................................20

*Friedman v. City of Highland Park*
784 F.3d 406 (7th Cir. 2015) ....................................................................28, 29

*Gallinger v. Becerra*
898 F.3d 1012 (9th Cir. 2018) ...........................................................................9

*Grant v. Lamont*
2023 WL 5533522 (D. Conn. Aug. 28, 2023)..................................................39

*Hanson v. District of Columbia*
__ F. Supp. 3d __, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ........................35

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Hartford v. Ferguson*
  __ F. Supp. 3d __, 2023 WL 3836230 (W.D. Wash. June 6, 2023)...........*passim*

*Herrera v. Raoul*
  __ F. Supp. 3d __, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ...........34, 45, 54

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) .........................................................6, 13, 25, 29

*McCullen v. Coakley*
  573 U.S. 464 (2014)...............................................................................37

*McDonald v. City of Chicago*
  561 U.S. 742 (2010)..........................................................................44, 48

*Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*)
  __ F. Supp. 3d __, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) ...............*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*
  142 S. Ct. 2111 (2022).......................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*
  646 F. Supp. 3d 368 (D.R.I. 2022) ...................................................23

*Or. Firearms Fed'n v. Kotek*
  2023 WL 4541027 (D. Or. July 14, 2023)..................................*passim*

*Schaffer ex rel. Schaffer v. Weast*
  546 U.S. 49 (2005)............................................................................21

*Staples v. United States*
  511 U.S. 600 (1994)............................................................................6

*Teter v. Lopez*
  76 F.4th 938 (9th Cir. 2023) ........................................................39, 40

*United States v. Alaniz*
  69 F.4th 1124 (9th Cir. 2023) ....................................................24, 27

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Cox*
  906 F.3d 1170 (10th Cir. 2018) ..........................................................23

*United States v. Wood*
  299 U.S. 123 (1936)............................................................................38

CONSTITUTIONAL PROVISIONS

United States Constitution
  Second Amendment.................................................................*passim*
  Fourteenth Amendment .........................................................*passim*

STATUTES AND BILLS

**Federal**

United States Code, Title 28
  § 1291.....................................................................................................4
  § 1331.....................................................................................................3

National Firearms Act of 1934,
  Pub. L. No. 73-474, 48 Stat. 1236 (1934) .........................................47

Violent Crime Control and Law Enforcement Act of 1994,
  Pub. L. No. 103-322, 108 Stat. 1796 (1994) ....................................10

**California**

1989 Cal. Stat. 60....................................................................................10

1999 Cal. Stat. 1781 ...............................................................................11

2020 Cal. Stat. 1663 ...............................................................................15

California Penal Code
  § 16740..................................................................................................11
  § 30505(a) .............................................................................................11
  § 30510(b) .............................................................................................10
  § 30510(c) .............................................................................................10

## TABLE OF AUTHORITIES
### (continued)

Page

§ 30515.................................................................................................*passim*
§ 30515(a)(1).......................................................................................*passim*
§ 30515(a)(2).......................................................................................*passim*
§ 30515(a)(3).......................................................................................*passim*
§ 30515(a)(4).......................................................................................*passim*
§ 30515(a)(5).......................................................................................*passim*
§ 30515(a)(6).......................................................................................*passim*
§ 30515(a)(7).......................................................................................*passim*
§ 30515(a)(8).......................................................................................*passim*
§ 30515(a)(9).............................................................................................15
§ 30515(a)(10)...........................................................................................15
§ 30515(a)(11)...........................................................................................15
§ 30515(e)..................................................................................................27
§ 30600........................................................................................................3
§ 30600(a)..................................................................................................14
§ 30605........................................................................................................3
§ 30605(a)..................................................................................................14
§ 30625......................................................................................................14
§ 30800...................................................................................................3, 14
§ 30900(a)(1)............................................................................................11
§ 30900(a)(2)............................................................................................11
§ 30915...................................................................................................3, 14
§ 30945...................................................................................................3, 14
§ 32310.................................................................................................11, 56

**Connecticut**

1832 Conn. Acts 391, ch. 25....................................................................42

1836 Conn. ch. 1, § 20...............................................................................42

**Illinois**

H.B. 5471, Pub. Act 102-1116 (Ill. 2023)...............................................10

**Massachusetts**

1750 Mass. Acts 544, ch. 17, § 1..............................................................41

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

1771-1772 Mass. Province Laws 167, ch. 9 ..........................................42

1782-1783 Mass. Acts 120, ch. 46 ........................................................42

1786 Mass. Acts 87, ch. 38 ...................................................................41

**Missouri**

1821 Me. Laws 98, ch. 25, § 1 ..............................................................42

**New Hampshire**

1825 N.H. Laws 73, ch. 61 ...................................................................42

**New Jersey**

An Act Against Wearing Swords (1686), reprinted in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881) ...............................................................40

An Act to Describe, Apprehend and Punish Disorderly Persons § 2 (1799), reprinted in *Laws of the State of New Jersey* 474 (Nettleton ed., 1821) ......................................................................41

**New York**

1763-1775 N.J. Laws 346, ch. 539, § 10 ........................................41, 42

1772 N.Y. Laws 682 .............................................................................42

1784 N.Y. Laws 627, ch. 28 .................................................................42

1849 N.Y. Laws 403 .............................................................................44
   § 1 ....................................................................................................44
   § 2 ....................................................................................................44

**Ohio**

1788-1801 Ohio Laws 321 ....................................................................41

## TABLE OF AUTHORITIES
### (continued)

Page

**Vermont**

1849 Vt. Acts & Resolves 26, No. 36 §§ 1-2 ..........................................................44

**Washington**

Wash. Rev. Code ..........................................................................................10
   § 9.41.010(2) ..........................................................................................10
   § 9.41.390 ..............................................................................................10

**England**

7 Rich. 2, ch. 13 (1383) ..................................................................................39

33 Hen. 8, ch. 6 (1541) ..................................................................................39
   § 1 ........................................................................................................39
   § 18 ......................................................................................................39

1 Wm. & Mary, ch. 2, § 7 (1689) .........................................................................38

REGULATIONS

California Code of Regulations, Title 11
   § 5471(ii) ..............................................................................................13
   § 5499 ...................................................................................................10

COURT RULES

Ninth Circuit Rules
   Rule R. 28-2.7 ..........................................................................................4

Federal Rules of Civil Procedure
   Rule 65(a)(2) ...........................................................................................15

Federal Rules of Evidence
   Rule 201 ................................................................................................20

# TABLE OF AUTHORITIES
### (continued)

**Page**

OTHER AUTHORITIES

Alcohol, Tobacco, and Firearms, *Firearm Commerce in the United States* 16, https://tinyurl.com/3u7u9u5f ............................................................ 30

Bartocci, *The Assault Rifle: Comparison of the Soviet AK47 to the German StG44,* Small Arms R., Apr. 2007, https://tinyurl.com/2kaf8nyw ..................................................................... 5

Blackstone, *Commentaries on the Laws of England* (1769) ............................. 38, 39

Duggan, *Police Identify 2 AR-Style Rifles, Handgun as Weapons Linked to Lewiston Mass Shooting*, Portland Press Herald, Oct. 30, 2023, https://tinyurl.com/mum2rssx ..................................................... 36

Foster-Frau et al., *Terror on Repeat*, Wash. Post, Nov. 16, 2023, https://tinyurl.com/3x2zbrfe .................................................................... 9

Frankel et al., *The Gun that Divides a Nation*, Wash. Post, Mar. 27, 2023, https://tinyurl.com/26tpcmav ....................................................... 5

Juggernaut Tactical, AR-15 CA Pistol, https://tinyurl.com/347mvmsf .............. 50

Kirkpatrick et al., *The Blast Effect*, Wash. Post, Mar. 27, 2023, https://tinyurl.com/4vfz4y4b ................................................................... 7

Mizokami, *The StG-44: Nazi Germany's Assault Rifle that Help Inspire the M4 Carbine*, Nat'l Interest, Oct. 6, 2018, https://tinyurl.com/ytycfndw ..................................................................... 5

NSSF, Commonly Owned, July 20, 2022, https://tinyurl.com/yc8kd6ps ................................................................... 6

Palmetto State Armory, Complete AR-15 Pistols, https://tinyurl.com/ptrm5mr2 .................................................................... 8

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* (1782) ...................................... 38

# TABLE OF AUTHORITIES

**Page**

White, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023, https://tinyurl.com/4ks2z9ah..................36

# INTRODUCTION

California prohibits certain defined categories of assault weapons because of the grave threat they pose to public safety—especially in mass-shooting situations—but allows law-abiding residents to purchase and possess a range of other semiautomatic rifles, semiautomatic pistols, and shotguns. The plaintiffs in this case challenge California's restrictions on eight defined categories of assault weapons. This Court previously remanded the case to the district court to apply the Second Amendment framework announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Following that remand, the district court again struck down each of the challenged provisions in a decision that ignored *Bruen*'s central lessons.

As the Supreme Court recognized, the "right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). It is not "a right to keep and carry any weapon whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Certain weapons and instruments are not presumptively protected by the Second Amendment and "may be banned." *Heller*, 554 U.S. at 627; *see, e.g.*, *id.* at 625 ("short-barreled shotguns"); *id.* at 627 ("M-16 rifles and the like"). And even assuming a weapon is presumptively protected, the government may regulate that weapon in ways that are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*,

1

142 S. Ct. at 2130.  That analogical inquiry is not meant to impose a "straightjacket" on the States, *see id.* at 2133, and it is by necessity conducted at a higher level of generality when the States are regulating exceptionally dangerous weapons technologies that did not exist until the twentieth century, *see id.* at 2132.

Federal courts across the Nation have applied *Bruen* in suits challenging assault weapons regulations similar to those at issue here, and have held that those challenges are unlikely to succeed.  Many of those courts have recognized that assault weapons are not presumptively protected by the Second Amendment because their features were developed for, and are most suitable for, offensive uses instead of self-defense, and because of their close relationship with M16 rifles and other military weaponry.  Other courts have held that modern assault weapons regulations are consistent with our Nation's long tradition of restricting and prohibiting particular weapons technologies that are especially dangerous and present an emerging threat to public safety.  Some have done both.

The district court's contrary approach below conflicts with Supreme Court precedent and would hamstring the ability of the States to protect the safety of their communities.  In the district court's view, the mere fact that a small subset of American gun owners collectively own millions of AR- and AK-platform rifles establishes that *all* of the prohibited assault weapons (even semiautomatic pistols and shotguns with certain features qualifying them as assault weapons) are

presumptively protected. But the proper inquiry requires "examin[ing] the character" and objective qualities of each particular "*type of weapon at issue*," *Heller*, 554 U.S. at 622, and the Supreme Court has concluded that certain types of weapons may be banned without considering their prevalence or popularity, *see id.* at 621-623, 625, 627. As to *Bruen*'s analogical inquiry into historical traditions, the district court effectively demanded that the government identify a historical precursor that was "a dead ringer" for modern assault weapons restrictions— exactly what the Supreme Court disclaimed. *Bruen*, 142 S. Ct. at 2133. Under the district court's skewed understanding of doctrine and history, it appears that no prohibition of any new and dangerous weapons technology would ever be viewed as "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. This Court should reverse that misguided judgment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' federal constitutional claims under 28 U.S.C. § 1331. On October 19, 2023, the district court declared California Penal Code Sections 30515(a)(1) through (8), 30800, 30915, and 30945 unconstitutional in their entirety and permanently enjoined enforcement of California Penal Code Sections 30600, 30605, and 30800 as applied to each category of "assault weapons" defined in Section 30515(a)(1) through (8). 1-ER-

80–81.  The Attorney General appealed on the same day.  8-ER-1960–1961.[1]  This

Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether California's restrictions on each separate category of rifles, pistols,

and shotguns that are defined as "assault weapons" under California Penal Code

Section 30515(a)(1) through (8) violate the Second Amendment.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief.

Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.   History of the Development of Assault Weapons

The plaintiffs in this case seek to permanently enjoin eight separate features-

based definitions of "assault weapons" in California Penal Code Section

30515(a)(1) through (8), and a range of California statutes and regulations

restricting the defined assault weapons.  Those categories of weapons have their

roots in military weapons technology, and are defined by the presence of combat-

oriented features that make them particularly deadly in mass shootings.

*Assault Rifles.*  The world's first mass-produced assault rifle, the German

Sturmgewehr 44, was developed during World War II.  *See* Mizokami, *The StG-*

---

[1] The district court entered a separate judgment on November 7, 2023.  1-ER-2.

4

*44: Nazi Germany's Assault Rifle that Help Inspire the M4 Carbine*, Nat'l Interest, Oct. 6, 2018, https://tinyurl.com/ytycfndw. It was a "select-fire" rifle, meaning that it could operate in semiautomatic or fully automatic mode. *Id.* It used a high-velocity, intermediate-caliber cartridge, and had a pistol grip, wooden stock, and a 30-round detachable magazine. *Id.* Those features made it more controllable in rapid, sustained fire. *See id.* The Sturmgewehr 44 led to the development of the AK-47, an assault rifle with similar features designed for Soviet soldiers. *See* Bartocci, *The Assault Rifle: Comparison of the Soviet AK47 to the German StG44*, Small Arms R., Apr. 2007, https://tinyurl.com/2kaf8nyw.

In the late 1950s, the AR-15 rifle was invented in response to the U.S. military's request for a lightweight, high-velocity rifle that could compete with the AK-47, operate in both semiautomatic and automatic modes, and penetrate "a steel helmet or standard body armor at 500 yards." *See* 5-ER-1147.[2] The Army adopted the AR-15 as an infantry weapon and renamed it the M16. 5-ER-1148. It quickly became the military's standard service rifle. Frankel, *supra* note 2. The M16 is a select-fire, "modern military assault rifle" "designed for killing or disabling the enemy." 6-ER-1409. Its "military configuration" includes the ability to accept a

---

[2] *See also* Frankel et al., *The Gun that Divides a Nation*, Wash. Post, Mar. 27, 2023, https://tinyurl.com/26tpcmav.

30-round detachable magazine, a folding or telescoping stock, a pistol grip, and a flash suppressor. *Id.*; 2-ER-163–165.

Gun manufacturers later began to sell the semiautomatic version of the M16 as the "AR-15." 6-ER-1220; *see also Staples v. United States*, 511 U.S. 600, 603 (1994) (describing the AR-15 as "the civilian version of the military's M-16 rifle"). Throughout the 1980s, manufacturers marketed AR- and AK-platform semiautomatic rifles to the civilian market by emphasizing their military lineage and similarity to the M16. 5-ER-1144; *see Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017) (en banc) ("Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess."), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

AR- and AK-platform rifles did not sell in substantial numbers until recently. 3-ER-377.[3] In 1990, annual domestic production of AR-platform rifles (excluding exports) was 43,000 units; by 2011, it was 653,000; and in 2013, after the 2012 massacre at Sandy Hook Elementary, the number increased to 1,882,000.[4] Even today, however, AR- and AK-platform rifles collectively make up no more than 5% of the total civilian gun stock in the United States and are possessed by a concentrated group of gun owners. 3-ER-519–520; 5-ER-1168–1169; *Bevis v. City*

---

[3] *See also* NSSF, Commonly Owned, July 20, 2022, https://tinyurl.com/yc8kd6ps.

[4] *See* NSSF, *supra* note 3.

of Naperville (*Bevis I*), __ F. Supp. 3d __, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17, 2023), *aff'd by Bevis v. City of Naperville* (*Bevis II*), __ F.4th __, 2023 WL 7273709 (7th Cir. Nov. 3, 2023).

Present day AR- and AK-platform rifles, like their military counterparts, often combine detachable magazines with features that make them more lethal and effective offensive weapons. They are typically chambered in .223-caliber rounds, which the rifles can fire at velocities exceeding 3,000 feet per second. 3-ER-376; 6-ER-1212. Those rounds "readily penetrate" the body armor typically worn by law enforcement. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), __ F. Supp. 3d __, 2023 WL 2655150, at *10 (D. Del. Mar. 27, 2023); 6-ER-1213. Projectiles fired from AR- and AK-platform rifles rotate and tumble upon striking a target, producing "'explosive' effects." 7-ER-1748–1751. On human impact, they can tear through flesh, tissue, and bone, causing a cavity along the trajectory of the projectile and damaging surrounding tissue displaced by the kinetic energy of the projectile. *Id*.; Kirkpatrick et al., *The Blast Effect*, Wash. Post, Mar. 27, 2023, https://tinyurl.com/4vfz4y4b. Gunshot wounds caused by AR- and AK-platform rifles tend to be more complex to treat and to have higher complication rates than wounds from other weapons. 5-ER-1063; *DSSA*, 2023 WL 2655150, at *10.

***Assault Pistols.*** Modern assault pistols are semiautomatic versions of submachine guns. *See* 7-ER-1587. Like assault rifles, assault pistols can feature a second handgrip, a barrel shroud, and the capacity to accept a detachable magazine at a location other than the grip. *See* Cal. Penal Code § 30515(a)(4). A second handgrip or barrel shroud can help a shooter hold a pistol with two hands during rapid fire to counter muzzle rise. 6-ER-1223. Pistol variants of assault rifles (such as "AR-15 pistols" and "AK-47 pistols") can include a pistol grip beneath the action, a flash suppressor, and a forward grip. *See* 6-ER-1223; *see, e.g.*, Palmetto State Armory, Complete AR-15 Pistols, https://tinyurl.com/ptrm5mr2.

***Assault Shotguns.*** Shotguns are firearms that typically fire shells containing projectiles. 6-ER-1224. Semiautomatic shotguns that qualify as assault weapons share many of the same features as assault rifles, including a pistol grip beneath the action, an adjustable stock, and the ability to accept detachable magazines. These features can help a shooter conceal the shotgun or fire more accurately and rapidly. *See* 3-ER-377–380; 6-ER-1225. A shotgun with a revolving cylinder that rotates mechanically with each shot enables a shooter to fire multiple, repeated blasts without reloading, *see* 6-ER-1225, consistent with "a military or law enforcement application," 7-ER-1622–1623.

***Modern Trends in the Use and Regulation of Assault Weapons.*** Assault weapons technology allows lone gunmen to direct more lethal fire for longer

8

periods with fewer pauses to reload. *See* 3-ER-596, 600–602. Various forms of assault weapons have been used in mass shootings. 6-ER-1337–1341; 6-ER-1226 (discussing assault rifle and assault pistol used in 1999 Columbine shooting); 7-ER-1689 (discussing assault pistols used in 1993 mass shooting in San Francisco).[5] And when assault weapons are paired with large-capacity magazines, "more shots are fired, and more fatalities and injuries result than when shooters use other firearms and magazines." *Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (citation omitted). On average, a mass shooter using an assault weapon and a large-capacity magazine inflicts 180% percent more deaths and injuries than a shooter using another type of firearm with a large-capacity magazine—and over 430% more deaths and injuries than a shooter without an assault weapon or a large-capacity magazine. *See* 5-ER-1028; *see also Bevis I*, 2023 WL 2077392, at *14. All told, three-quarters of mass shootings resulting in the deaths of 10 or more victims from 2012 to 2022 involved the use of assault weapons. *See* 3-ER-516. Assault weapons also pose a disproportionate and severe threat to law enforcement. *See* 7-ER-1655; 7-ER-1723–1726; *Bevis I*, 2023 WL 2077392, at *15.

---

[5] *See also* Foster-Frau et al., *Terror on Repeat*, Wash. Post, Nov. 16, 2023, https://tinyurl.com/3x2zbrfe.

9

Beginning in 1994, a federal statute prohibited the possession and transfer of "assault weapons," defined by certain qualifying features, including the capability to accept detachable magazines, a pistol grip beneath the action of a rifle, a flash suppressor, or a telescoping stock.  6-ER-1425.  That ban expired in 2004, *see* 108 Stat. 2000, but 10 states and the District of Columbia restrict semiautomatic weapons defined by statute as "assault weapons."  *See* 4-ER-638; *see also* H.B. 5471, Pub. Act 102-1116 (Ill. 2023); Wash. Rev. Code §§ 9.41.010(2), 9.41.390.

## B. California's Regulation of Assault Weapons

The California Legislature enacted the Assault Weapons Control Act in 1989, after two shootings in which lone gunmen used semiautomatic rifles to kill 21 people at a McDonald's in San Ysidro and 5 children at an elementary school in Stockton.  6-ER-1226; 4-ER-638.  California originally restricted certain semiautomatic firearms identified by make and model, which were defined as "assault weapons."  1989 Cal. Stat. 60, 64; *see* Cal. Penal Code § 30510(a)-(c).[6] Those weapons typically combined the capacity to accept detachable magazines with other combat-oriented features, such as pistol grips, flash suppressors, or adjustable stocks.  6-ER-1210–1211.  The Legislature found that "the proliferation and use of" those weapons "poses a threat to the health, safety, and security of all

---

[6] Plaintiffs do not challenge the make-and-model definitions of an assault weapon in California Penal Code Section 30510 or California Code of Regulations title 11, Section 5499.

10

citizens of this state." Cal. Penal Code § 30505(a); *see id.* (noting assault weapons' "high rate of fire and capacity for firepower").

After that law took effect, gun manufacturers began to produce "copycat" weapons to evade the restrictions. 6-ER-1396. The Legislature amended the law to address that problem by adding eight features-based definitions of "assault weapon," codified in Penal Code Section 30515(a)(1) through (8). 1999 Cal. Stat. 1781, 1805 (S.B. 23).[7] The same amendments also restricted magazines capable of holding more than ten rounds of ammunition, defined as "large-capacity magazines." 1999 Cal. Stat. at 1785, 1793, 1794; *see* Cal. Penal Code §§ 16740, 32310.[8]

Under Section 30515(a)(1), a semiautomatic centerfire rifle qualifies as an assault weapon if it lacks a fixed ammunition magazine (and thus is capable of accepting a detachable magazine) and is equipped with one of the following components: a pistol grip that protrudes conspicuously beneath the action of the rifle; a forward pistol grip; a thumbhole stock that enables the shooter to place the

---

[7] As with the original 1989 law, the 1999 amendments authorized individuals who owned firearms that qualify as assault weapons under the new definitions of Section 30515 to keep them if registered. 1999 Cal. Stat. at 1810; Cal. Penal Code § 30900(a)(2); *see id.* § 30900(a)(1).

[8] A different appeal currently pending before this Court presents a Second Amendment challenge to California's restrictions on large-capacity magazines. *See Duncan v. Bonta*, No. 23-55805.

11

thumb of the trigger hand within the stock; a folding or telescoping stock attached to the receiver that allows for shoulder firing; a grenade or flare launcher; or a flash suppressor. A semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped with a fixed magazine capable of accepting more than ten rounds or if it has an overall length of less than 30 inches. Cal. Penal Code § 30515(a)(2)-(3).

A semiautomatic pistol that lacks a fixed magazine qualifies as an assault weapon under Section 30515(a)(4) if it is equipped with any of the following features: a threaded barrel to which a shooter can attach a flash suppressor, a forward handgrip, or a silencer; a second handgrip; a barrel shroud that enables the shooter to grasp the barrel while firing without burning the non-shooting hand; or the capacity to accept a detachable magazine outside of the pistol grip. *See* 3-ER-381. A semiautomatic pistol also qualifies as an assault weapon if it is equipped with a fixed magazine capable of accepting more than ten rounds. Cal. Penal Code § 30515(a)(5).

A semiautomatic shotgun qualifies as an assault weapon if it is equipped with an adjustable stock and a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a vertical handgrip, Cal. Penal Code § 30515(a)(6), or if it lacks a fixed magazine, *id.* § 30515(a)(7). A shotgun also qualifies as an assault weapon if it is equipped with a revolving cylinder that holds

the ammunition and mechanically rotates with each shot. *Id.* § 30515(a)(8); Cal. Code Regs. tit. 11, § 5471(ii).

The eight categories of prohibited assault weapons in Section 30515(a)(1) through (8) are "substantially similar to weapons" listed in Section 30510 "but differ[] in some insignificant way, perhaps only the name of the weapon." 6-ER-1396. The prohibited features "serve specific, combat-functional ends." 6-ER-1441; *see* 6-ER-1409 (describing "military features," like pistol grips and telescoping stocks, that "are carried over to the semiautomatic versions of the original military rifle"). They are "designed to achieve their principal purpose— 'killing or disabling the enemy' on the battlefield." *Kolbe*, 849 F.3d at 125. The "net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." 6-ER-1442–1443; *see* 5-ER-1028.

Semiautomatic centerfire rifles, semiautomatic pistols, and shotguns without any of the prohibited features generally are not considered assault weapons under California law. *See* Cal. Penal Code § 30515(a)(1)-(8). And some semiautomatic weapons are allowed even if they have those features: semiautomatic centerfire rifles and semiautomatic pistols with a fixed magazine holding 10 or fewer rounds; semiautomatic rimfire rifles; and semiautomatic shotguns with a fixed magazine and either a pistol grip or an adjustable stock (but not both). *See id.* Law-abiding

13

California residents may purchase and possess such "featureless" firearms, including certain California-compliant AR-platform rifles. *See* 3-ER-377, 383–407.

If a firearm qualifies as an assault weapon under Section 30515, California generally prohibits its manufacture, distribution, transportation, importation, sale, lending, or possession. Cal. Penal Code §§ 30600(a), 30605(a). The possession of a prohibited assault weapon is a public nuisance, and the weapon is subject to seizure and destruction by law enforcement. *Id.* § 30800. Assault weapons acquired through bequest or inheritance must be rendered permanently inoperable, sold to a licensed firearms dealer, or removed from the State. *See id.* § 30915. Assault weapons that are registered with the California Department of Justice may be possessed but are subject to restrictions. *Id.* § 30945. Law enforcement agencies and the military are exempt from the restrictions on the purchase, importation, and possession of assault weapons. *Id.* § 30625.

## C. Procedural History

### 1. Pre-*Bruen* Proceedings

Plaintiffs filed this lawsuit in 2019, initially challenging only California Penal Code Section 30515(a)(2) and (a)(5). Dkt. 1 at 2.[9] At plaintiffs' request, the case

---

[9] Unless otherwise noted, "Dkt." refers to the district court docket below in No. 19-cv-01537, and "C.A. Dkt." refers to the docket in this Court in No. 23-2979. Pincites are to the pagination included in the ECF header for the docket entry.

14

was transferred to the district court presiding over *Duncan v. Becerra*, a lawsuit

challenging California's separate restrictions on large-capacity magazines, on the

ground that the two cases involve "substantially the same facts and questions of

law." Dkt. 4 at 2; *see* Dkt. 6.

The operative amended complaint expanded the scope of plaintiffs' claims to

challenge each of the features-based definitions of "assault weapon" in Section

30515(a)(1) through (8), as well as a range of California statutes and regulations

addressing assault weapons. Dkt. 9 at 41-42.[10] Plaintiffs moved for a preliminary

injunction in December 2019. Dkt. 22. The district court consolidated that motion

with a trial on the merits. *See* Fed. R. Civ. P. 65(a)(2). After expedited discovery,

the court held a two-day bench trial in 2021. Dkt. 96, 97. Later that year, the court

permanently enjoined each of the challenged provisions. Dkt. 115, 116. The

Attorney General appealed that judgment. Dkt. 117. This Court stayed the

injunction pending appeal and held the appeal pending resolution of a related case,

*Rupp v. Bonta*, No. 19-56004, and the appeal in *Duncan*, No. 19-55376. *See*

Dkt. 123.

---

[10] Plaintiffs do not challenge additional definitions of "assault weapon," in Section
30515(a)(9) through (11), that the Legislature added in 2020. *See* 2020 Cal. Stat.
1663, 1708-1709.

### 2. Post-*Bruen* Proceedings

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen* announced a standard for evaluating Second Amendment claims "centered on constitutional text and history."  142 S. Ct. 2111, 2128-2129 (2022).  Under the *Bruen* framework, the initial inquiry is whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 2129-2130.  If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.

After the Supreme Court issued that decision, this Court remanded the case to the district court for further proceedings consistent with *Bruen*.  C.A. No. 21-55608, Dkt. 27.  The district court ordered the parties to file supplemental briefs in light of *Bruen*, but declined to reopen discovery.  Dkt. 131, 161, 164; *see* 2-ER-317.  The supplemental briefs filed by the Attorney General applied the *Bruen* standard to the categories of assault weapons challenged by plaintiffs and addressed relevant historical traditions.  *See* Dkt. 137, 157, 163, 167, 168, 170.

In October 2023, without scheduling any evidentiary hearings or holding a new trial, the district court again permanently enjoined the challenged restrictions in their entirety.  1-ER-80–81.  As to *Bruen*'s initial inquiry, the court held that "possess[ing] and carry[ing] firearms deemed 'assault weapons'" under Section

16

30515 is conduct covered by the text of the Second Amendment.  1-ER-20.  While acknowledging that assault weapons are "useful for war" and "reasonably related to militia use," the court concluded that they "are not useful solely for military purposes."  1-ER-15.  It also held that "firearms like the AR-15" are "commonly-owned for lawful purposes," relying on estimates of the number of AR- and AK-platform rifles owned in the United States.  1-ER-20; *see* 1-ER-4–6.  The court did not separately assess whether each category of firearms defined as an "assault weapon" under Section 30515(a)(1) through (8) is commonly owned, but nonetheless asserted that the semiautomatic pistols and shotguns defined as assault weapons are also "common weapons."  1-ER-7.

As to the inquiry into historical tradition, the district court discounted or disregarded each of the analogues identified by the State.  1-ER-21–22, 24, 28.  It concluded that there were "relatively few gun restrictions" during "the most important period of history."  1-ER-29.  The court acknowledged that assault weapons could "represent[] a dramatic technological advancement" and that California was "attempting to address a modern societal concern of mass shootings."  1-ER-41.  But it asserted that a "historical twin" for the challenged restrictions was not "unimaginable," 1-ER-40—positing, for example, that early States could have "prohibit[ed] private possession of canons [sic] or Gatling guns," but did not.  *Id.*

17

After reaffirming "all of its relevant findings of fact and conclusions of law from its prior decision," 1-ER-17; *see* Dkt. 115 (prior decision), the court again held that California's restrictions on each category of weapons defined as "assault weapons" under Section 30515(a)(1) through (8) violate the Second Amendment, 1-ER-80. It entered judgment and issued a permanent injunction. *Id.*; 1-ER-2.

The Attorney General appealed and sought a stay pending appeal. 8-ER-1960–1961; C.A. Dkt. 6. A motions panel of this Court entered an administrative stay and expedited briefing and argument. C.A. Dkt. 13; *see also* C.A. Dkt. 22.

## SUMMARY OF THE ARGUMENT

Under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the threshold inquiry is whether plaintiffs have carried their burden to establish that the Second Amendment presumptively protects a right to manufacture, import, purchase, and possess each of the eight categories of assault weapons at issue. They have not. Plaintiffs have not established that any (let alone all) of the prohibited assault weapons are in "'common use' today for self-defense." *Id.* at 2134. In applying that concept to determine whether a weapon is within the scope of the Second Amendment, the Supreme Court has examined the objective characteristics of the weapon. And the assault weapons at issue here are defined by tactical and combat-oriented features that make them especially lethal as *offensive* weapons, but ill-suited for "ordinary self-defense needs." *Id.* at 2156.

18

Indeed, the AR-platform assault rifles that were the central focus of the district court's analysis are derived from M16 rifles used by the military—which "may be banned." *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

Even assuming that the categories of assault weapons desired by the plaintiffs are presumptively protected, California's restrictions are justified because they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Modern assault weapons represent "dramatic technological changes" (*id.* at 2132) from historic firearms, and they have created an "unprecedented societal concern[]" (*id.*) about mass shootings in which lone gunmen use assault weapons to kill or injure large numbers of civilians in minutes. Each of those considerations "require[s] a more nuanced approach" (*id.*) to the analogical inquiry described in *Bruen*—because governments in the historic periods most relevant to that inquiry did not have to confront these weapons or the carnage they produce. But throughout our Nation's history, governments have restricted or outright prohibited other especially dangerous weapons technologies after they began to imperil public safety—while preserving a wide range of weapons for self-defense. As federal courts across the Nation have recognized, modern prohibitions on assault weapons impose a comparable burden on the right of armed self-defense to their historical precursors and are comparably justified.

19

## STANDARD OF REVIEW

On appeal of a decision granting permanent injunctive relief, this Court reviews the district court's legal determinations de novo and its findings of adjudicative fact for clear error. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784-785 (9th Cir. 2019); *cf.* Fed. R. Evid. 201 advisory committee's note to subdivision (a) (discussing the distinction between "adjudicative" and "legislative" facts).

## ARGUMENT

The Second Amendment "codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). "[L]ike most rights, the right secured by the Second Amendment is not unlimited.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *Heller*, 554 U.S. at 626). It has never been understood as "a right to keep and carry any weapon whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Certain weapons and instruments "may be banned." *Heller*, 554 U.S. at 627. And the analytical framework announced in *Bruen* did not change that: the Court did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). A proper application of that framework confirms that California's restrictions on the categories of semiautomatic rifles, semiautomatic pistols, and

20

shotguns that qualify as assault weapons under Penal Code Section 30515(a)(1)

through (8) are consistent with the Second Amendment.

## I. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE CHALLENGED CATEGORIES OF ASSAULT WEAPONS ARE PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT

The threshold question under the *Bruen* framework is whether plaintiffs have

carried their burden to establish that "the Constitution presumptively protects"

their proposed course of conduct. *Bruen*, 142 S. Ct. at 2130; *cf. Schaffer ex rel.*

*Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005); *Clark v. Cmty. for Creative Non-*

*Violence*, 468 U.S. 288, 293 n.5 (1984). To answer that question, the Court

addresses whether "the Second Amendment's plain text covers [the] conduct."

*Bruen*, 142 S. Ct. at 2129-2130. That inquiry considers "the normal and ordinary

meaning of the Second Amendment" as well as its "historical background." *Id.* at

2127 (internal quotation marks omitted).

The Second Amendment's text protects "the right of the people to keep and

bear Arms." The meaning of the term "Arms" is broad. *See Heller*, 554 U.S. at

581. But the Supreme Court has emphasized that not every "*type of weapon*" is

"eligible for Second Amendment protection." *Id.* at 622. In determining what

types of weapons are within the scope of the Second Amendment right, the

Supreme Court has pointed to several related principles: only "weapons 'in

common use' today for self-defense" are eligible for protection, *Bruen*, 142 S. Ct.

at 2134; and "weapons that are most useful in military service . . . may be banned,"
*Heller*, 554 U.S. at 627; *see also id.* (discussing "the historical tradition of
prohibiting the carrying of 'dangerous and unusual weapons'"); *infra* pp. 38-39 &
note 18. Those considerations establish that the assault weapons at issue here are
not presumptively protected by the Second Amendment.

### A.    "Arms"

The meaning of the term "Arms" is "fixed according to its historical
understanding." *Bruen*, 142 S. Ct. at 2132. Arms are "'[w]eapons of offence, or
armour of defence.'" *Heller*, 554 U.S. at 581; *see id.* ("'any thing that a man wears
for his defence, or takes into his hands, or useth in wrath to cast at or strike
another'"). The district court assumed that each of the eight categories of assault
weapons challenged here qualifies as an "Arm." *E.g.*, 1-ER-75. And there is no
doubt that semiautomatic rifles, pistols, and shotguns generally constitute
"[w]eapons of offence." *Heller*, 554 U.S. at 581. But the district court's analysis
ignored the particular provisions of the challenged statute.

Some of the categories challenged by plaintiffs address features that are
inherent to the defined assault weapon. *See, e.g.*, Cal. Penal Code § 30515(a)(3)
("A semiautomatic, centerfire rifle that has an overall length of less than 30
inches."). Other categories, however, define prohibited weapons based on tactical
accessories that can easily be added to or removed from a weapon—and when they

are removed, the (now-)featureless weapon may be possessed and used under California law.  *See id.* § 30515(a)(1), (4), (6) (defining certain assault weapons based on the presence of particular accessories or removable features); *supra* pp. 13-14; *Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*), __ F. Supp. 3d __, 2023 WL 4975979, at *5 (D. Conn. Aug. 3, 2023) (describing "accessories to firearms banned" by Connecticut assault weapon law).

For those latter categories, the practical effect of Section 30515 is to prohibit the use of the *accessories* in conjunction with certain firearms.  That is relevant to the "arms" inquiry because "there was a clear distinction" at the founding "between 'Arms' and 'accoutrements.'"  *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387 (D.R.I. 2022); *see* 2-ER-148.  "Arms" was "used as a general term for weapons."  2-ER-141.  But it did "not include" accessories like scabbards, holsters, cartridge boxes, or cartridge cases, which were instead "included in the category *accoutrements*."  *Id.*  The accessories that qualify a firearm as an assault weapon under Section 30515(a)(1), (4), and (6) are properly understood as "accoutrements"—not "arms" in themselves.  *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself . . . .").

### B. "Common Use for Self-Defense"

Even assuming that each of the definitions in Section 30515(a)(1) through (8) regulates "Arms," that would not establish that the regulated weapons are presumptively protected by the Second Amendment. The Supreme Court has emphasized that "individual self-defense is 'the *central component*' of the Second Amendment." *Bruen*, 142 S. Ct. at 2133. Courts must therefore assess whether a weapon is "'in common use' today for self-defense" in determining whether it is presumptively protected. *Id.* at 2134; *see id.* at 2162 (Kavanaugh, J., concurring) (emphasizing this "important limitation"); *Heller*, 554 U.S. at 624; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

In making that assessment in *Heller*, the Supreme Court did not merely consider the prevalence of handguns (which was undisputed). It examined the objective features of handguns to explain why they qualify as a "self-defense weapon." 554 U.S. at 629. The Court explained that handguns are "easier to store in a location that is readily accessible in an emergency" due to their small size. *Id.* They are also "easier to use for those without the upper-body strength to lift and aim a long gun"; they "can be pointed at a burglar with one hand while the other hand dials the police"; and they "cannot easily be redirected or wrestled away by an attacker." *Id.* In the same opinion, the Court recognized that other types of weapons fall outside the scope of the Second Amendment—"such as short-barreled

24

shotguns," and "M-16 rifles and the like"—without *any* discussion of their popularity or prevalence. *Id.* at 625, 627. What mattered to the Court was an "examin[ation]" of "the character of the weapon." *Id.* at 622; *see id.* at 623 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

The objective characteristics of the assault weapon categories at issue here show why the defined weapons are ill-suited to "ordinary self-defense." *Bruen*, 142 S. Ct. at 2156. The whole point of self-defense is to ward off attackers and protect the lives of victims and their families. But in "self-defense situations, too much firepower is a hazard." 8-ER-1944. "[R]ounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials." *Kolbe*, 849 F.3d at 127 (citation omitted). Firing an assault weapon in close quarters thus imperils "others in the household, passersby, and bystanders." 8-ER-1944; 7-ER-1493; *see NAGR*, 2023 WL 4975979, at *21.

The record reflects that assault weapons were created not for self-defense, but as offensive weapons "designed and developed for a specific military purpose— laying down a high volume of fire over a wide killing zone." 6-ER-1423; 2-ER-166. AR-platform rifles, for example, have a military pedigree; they are nearly identical to the M16 in every material respect except the M16's fully

25

automatic capability; and when used in configurations that are defined as prohibited assault weapons, they combine the capacity for sustained rapid semiautomatic fire with features that increase their lethality or concealability. *See supra* pp. 4-9; *see also* 6-ER-1214–1220; 3-ER-377–381; 7-ER-1535.[11]

Those features do not merely affect the "looks" of firearms. 1-ER-5. They are instead "the specific functional design features" that military weapons employ to enhance their "anti-personnel function" and effectiveness in combat operations. 6-ER-1423; *see also* 6-ER-1409. For instance, pistol grips, flash suppressors, and barrel shrouds enable more lethal rapid fire by enhancing control and countering muzzle rise. 6-ER-1409–1410; 2-ER-164–165; 3-ER-377–381; 6-ER-1215. Flash suppressors, adjustable stocks, and silencers can make a weapon more concealable and help hide the location of a shooter. 3-ER-378–379; 2-ER-165–166; 6-ER-1218, 1223. And the ability to accept detachable magazines (or the presence of a fixed magazine holding more than 10 rounds) enables a shooter to maintain sustained fire for a longer time without pausing to reload. 6-ER-1214. Those objective characteristics demonstrate why courts have repeatedly rejected

---

[11] When used in semiautomatic mode, the M16 has the same rate of fire and the same range as AR-platform rifles. 2-ER-163. And U.S. military personnel are instructed to use select-fire weapons like the M16 in semiautomatic mode, for greater accuracy in combat. 3-ER-600; 2-ER-163.

arguments that assault weapons are in common use for self-defense. *See*, *e.g.*, *Bevis II*, 2023 WL 7273709, at *12; *NAGR*, 2023 WL 4975979, at *24.[12]

In reaching a different conclusion, the district court below relied primarily on its own assessment that AR-platform rifles are "massively popular" and "commonly owned." *See, e.g.*, 1-ER-15, 76. It viewed "the very large number of AR-15s owned by citizens who are not using them to commit crimes" as "sufficient evidence of common use for lawful purposes." 1-ER-73. And it assumed that the same conclusion applied to each one of the eight categories of assault weapons challenged by plaintiffs, *see* 1-ER-7—even though five of those categories apply to pistols and shotguns, not rifles. *See* Cal. Penal Code § 30515(a)(4)-(8).

That analysis was flawed. Even if the district court's "numbers-only" approach to the common use inquiry were appropriate, *but see infra* pp. 28-31, treating every category of assault weapon as the same would not be a valid method of constitutional inquiry—or a legitimate basis for enjoining *all* of Section "30515(a)(1) through (8)." 1-ER-80; *cf.* Cal. Penal Code § 30515(e) (severability

---

[12] The Seventh Circuit "assume[d] without deciding" in *Bevis II* that the "common use" inquiry belongs at the second part of the *Bruen* inquiry. 2023 WL 7273709, at *14. That aspect of the Seventh Circuit's decision is inconsistent with how the Supreme Court has articulated the inquiry, *supra* pp. 24-25, and contrary to this Court's precedent, *see Alaniz*, 69 F.4th at 1128.

provision).[13]  Plaintiffs offered hardly any evidence about rifles other than AR- and AK-platform rifles—and no evidence at all concerning the prevalence of semiautomatic pistols and shotguns that qualify as assault weapons under Section 30515(a)(4) through (8).[14]  And the Attorney General's evidence shows that assault pistols and assault shotguns are owned at dramatically lower rates than assault rifles.  8-ER-1951 (just 8.8% of assault weapons registered by non-police in California are pistols and 1.9% are shotguns).

In any event, a numbers-only approach cannot be squared with how the Supreme Court has examined whether weapons are in common use for self-defense.  *Supra* pp. 24-25.  And it would not make for a sensible or administrable constitutional standard.  A rigid reliance on ownership estimates and assessments of "popular[ity]" (1-ER-76) would lead to "circular" and "absurd" results.  *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *see also Bevis II*, 2023 WL 7273709, at *15.  It would allow the government to ban any

---

[13] *See Hartford v. Ferguson*, __ F. Supp. 3d __, 2023 WL 3836230, at *3 (W.D. Wash. June 6, 2023) ("It is wholly unclear whether *all* of the weapons (like conversion kits or semiautomatic pistols) regulated by HB 1240 are 'in common use' based on the Plaintiffs' scant submission."); *DSSA*, 2023 WL 2655150, at *5-6 (plaintiffs failed to show that "assault pistols" are in common use today for self-defense).

[14] *See also* Dkt. 115 at 26 (district court's 2021 decision, noting that "there is very little evidence regarding the commonality of AK-47 rifles, or semiautomatic shotguns, or 'assault pistols'").

28

new weapon before it became widespread and then point to the scarcity of that weapon as the very reason why the ban is constitutional. *But see Friedman*, 784 F.3d at 409 ("A law's existence can't be the source of its own constitutional validity."). On the other hand, if an unprotected weapon (like the M16) became lawful in some parts of the country, all it would take to establish a presumptive constitutional right to possess that weapon would be an aggressive marketing (or giveaway) campaign. *See Kolbe*, 849 F.3d at 141 (without statutes prohibiting short-barreled shotguns and machineguns "they too could be sufficiently popular to find safe haven in the Second Amendment").

The district court's order illustrates the perils of a numbers-only approach. The court relied on a recent industry estimate that 24 million AR- and AK-platform rifles are in domestic circulation. 1-ER-6. As the State's expert explained, however, that estimate includes sales to law enforcement agencies—and it includes weapons that California does *not* define as assault weapons. 3-ER-519; *see* 1-ER-6. The court also accepted survey data indicating that 24 million Americans have owned an AR- or AK-platform rifle. 1-ER-70. But it failed to account for evidence showing that those rifles are (at most) 5% of the total civilian gun stock in the United States today—owned by less than 10% of American gun owners and just 2% of all Americans. *See* 3-ER-519–520; *Bevis I*, 2023 WL 2077392, at *16; *NAGR*, 2023 WL 4975979, at *20 n.25.

To support its numbers-only approach, the district court invoked (*see* 1-ER-72) Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), which observed that a "relevant statistic" in that case was "that '[h]undreds of thousands of [t]asers and stun guns have been sold to private citizens.'" But even Justice Alito did not invoke a numbers-only approach: he also stressed that the case involved non-lethal weapons that were "widely . . . accepted as a legitimate means of self-defense across the country." *Id.* In any event, the opinion for the Court certainly did not endorse converting Second Amendment analysis into a mere counting exercise. *See id.* at 411-412 (per curiam). And for good reason. If the fact "that 'approximately 200,000 civilians owned stun guns'" (*id.* at 420 (Alito, J., concurring)) alone entitled that weapon to constitutional protection, that would prove far too much: There are over *700,000* federally registered machineguns in the United States.[15] But the Supreme Court has pointed to machineguns as the paradigmatic example of a weapon that is not in common use for self-defense—emphasizing that it would be "startling" to conclude that "restrictions on machineguns [are] unconstitutional." *Heller*, 554 U.S. at 624.

---

[15] *See* U.S. Bureau of Alcohol, Tobacco, and Firearms, *Firearm Commerce in the United States* 16, https://tinyurl.com/3u7u9u5f (741,146 registered machineguns in the United States in May 2021).

As the district court noted, some modern gun owners may express a desire to possess assault weapons for self-defense, and an assault weapon could conceivably be used in a self-defense situation. *E.g.*, 1-ER-7–8 (discussing anecdotes of gun owners reportedly using AR-platform rifles for self-defense). But the same could be said of a short-barreled shotgun or an M16 rifle—neither of which is protected by the Second Amendment. *See Heller*, 554 U.S. at 625, 627; *see also Bevis II*, 2023 WL 7273709, at *12. Nor would it make sense to define the metes and bounds of the Second Amendment based on the subjective preferences of certain modern gun owners. That approach would be limitless: "If the subjective intent of an individual were enough to show that a firearm or firearm accessory is used for . . . self-defense[,] then nearly every firearm or firearm accessory purchased in this country would satisfy that test." *Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027, at *30 (D. Or. July 14, 2023).

### C.   "Most Useful in Military Service"

Relatedly, the firearms defined as assault weapons under Section 30515 "are most useful in military service." *Heller*, 554 U.S. at 627 (weapons that are most useful in military service—including "M-16 rifles and the like—may be banned"). That conclusion was the basis for the Seventh Circuit's recent decision rejecting a motion to preliminarily enjoin Illinois' ban on assault weapons. *See Bevis II*, 2023

31

WL 7273709, at *12-14.  And it is supported by the history of the development of assault weapons and their objective characteristics.  *See supra* pp. 4-9, 13.

The term "Arms" covers "weapons that were not specifically designed for military use and were not employed in a military capacity."  *Heller*, 554 U.S. at 581.  But the categories of assault weapons prohibited by California "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual defense."  *Bevis II*, 2023 WL 7273709, at *12.  "Indeed, the AR-15 is almost the same gun as the M16 machinegun"—they "share the same core design, and both rely on the same patented operating system."  *Id.*; *see id.* (the "only meaningful distinction . . . is that the AR-15 has only semiautomatic capability"); *see supra* p. 13.  In addition to sharing many of the same features, both AR-15 assault rifles and the M16 "use the same ammunition, deliver the same kinetic energy (1220-1350 foot-pounds), the same muzzle velocity (2800-3100 feet per second), and the same effective range (602-875 yards)."  *Bevis II*, 2023 WL 7273709, at *13.  Assault pistols and assault shotguns are also similar to their military counterparts.  *See also* 7-ER-1612; 7-ER-1587.  As the Seventh Circuit recognized, such weapons are "not protected by the Second Amendment, and therefore may be regulated or banned."  *Bevis II*, 2023 WL 7273709, at *14; *accord NAGR*, 2023 WL 4975979, at *24-25.

32

## II. CALIFORNIA'S RESTRICTIONS ON THE CHALLENGED CATEGORIES OF ASSAULT WEAPONS ARE CONSISTENT WITH THIS NATION'S HISTORICAL TRADITION

Even if the Court holds (or assumes) that the categories of assault weapons challenged here are presumptively protected by the Second Amendment, California's restrictions are justified because they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127; *see id.* at 2130. The historical analysis required by *Bruen* is not meant to impose "a regulatory straightjacket." 142 S. Ct. at 2133. The government must justify a regulation by establishing that it falls within a historical tradition of laws that are "relevantly similar," in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 2128, 2132, 2133. There is no need to identify "a historical *twin*" or "a dead ringer" for purposes of that "analogical inquiry." *Id.* at 2133. And when the challenged regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," that "may require a more nuanced approach." *Id.* at 2132. Applying that framework here, California's modern restrictions on assault weapons are constitutional.

### A. This Case Implicates *Bruen*'s "More Nuanced" Approach to the Historical Inquiry

It should not be controversial that the "nuanced" approach described in *Bruen* is appropriate here. 142 S. Ct. at 2132. Assault weapons both represent "dramatic

technological changes" and "implicate 'unprecedented societal concerns.'"  *DSSA*,

2023 WL 2655150, at *10 (citation omitted); *see also Herrera v. Raoul*, __ F.

Supp. 3d __, 2023 WL 3074799, at *7 (N.D. Ill. Apr. 25, 2023); *Hartford*, 2023

WL 3836230, at *5; *NAGR*, 2023 WL 4975979, at *27-29; *see also* 1-ER-41

(district court's acknowledgment that "a modern rifle like the AR-15 clearly

represents a dramatic technological advancement when compared to a musket").

Assault weapons differ profoundly from technologies available at the time of

the founding and the ratification of the Fourteenth Amendment.  "[L]arge-capacity

repeating firearms" of any kind were "extremely rare" in 1791 and were "likewise

uncommon" in 1868.  *Kotek*, 2023 WL 4541027, at *37-38; *DSSA*, 2023 WL

2655150, at *10; *see* 4-ER-653–663 (describing lack of viable, commonly

possessed multi-shot firearms before the late nineteenth century).  At the founding,

most gun owners used single-shot, muzzle-loading, flintlock firearms that had to be

reloaded manually, round by round—a "time-consuming process that required skill

and experience."  3-ER-574.  Even a trained soldier could fire just two to three

shots per minute in combat.  2-ER-180; *see* 3-ER-574–575.  Those weapons were

also "liable to misfire."  3-ER-574.  And when fired (or misfired) once, they were

no better than a "club[] in hand-to-hand combat."  *Id.*

The early repeating rifles invoked by plaintiffs below (*see* Dkt. 156 at 15-16)

did not become commercially available in any significant numbers until the 1880s.

34

4-ER-661; *Hanson v. District of Columbia*, __ F. Supp. 3d __, 2023 WL 3019777, at *13 (D.D.C. Apr. 20, 2023); *cf.* 4-ER-873. To fire multiple rounds with one of those rifles, a shooter had to "manipulate a lever in a forward-and-back motion before each shot." 4-ER-660. And when the magazine was empty, it had to be "manually reloaded, one round at a time." *Id.* At the time when the Fourteenth Amendment was ratified, repeating rifles were mostly exported or purchased by the military. *See* 4-ER-889. They made up less than 0.2% of all firearms in the United States in the early 1870s. *Hanson*, 2023 WL 3019777, at *13.

Semiautomatic weapons and detachable magazines did not emerge until around the turn of the twentieth century. *See* 4-ER-662. The AR-15 and similar semiautomatic rifles were not invented until the mid-twentieth century and only began to enjoy commercial popularity in the twenty-first century. *See supra* pp. 5-6. Those new technologies dramatically reduced "the time and effort involved in reloading" and enabled a rapid "rate of shooting [that] would have been impossible" with the technologies available when the Second and Fourteenth Amendments were ratified. *Kotek*, 2023 WL 4541027, at *38, *39.

The emergence of those technological advancements has contributed directly and substantially to the unprecedented rise in shootings in which lone gunmen use "semiautomatic handguns and rifles with large capacity magazines" to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in

a standoff." 3-ER-601. Notwithstanding plaintiffs' arguments to the contrary, *see* Dkt. 156 at 21-23, that is a distinctly new and modern phenomenon: In the three decades after World War II, there were three shootings in which a lone gunman killed 10 or more victims. 3-ER-516. From 2012 to 2022, there were sixteen such shootings—all but four involving assault weapons. *Id.* And those figures do not account for further bloodshed occurring after the record was compiled.[16] "Mass shootings are on the rise" and "[a]ssault weapons are used disproportionately in" those incidents. *Hartford*, 2023 WL 3836230, at *5; *see* 6-ER-1340. That is an unprecedented societal concern if ever there was one.

*Bruen* explains why these considerations warrant a more nuanced approach. When a technology or societal concern has "persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. But the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in

---

[16] *See* Duggan, *Police Identify 2 AR-Style Rifles, Handgun as Weapons Linked to Lewiston Mass Shooting*, Portland Press Herald, Oct. 30, 2023, https://tinyurl.com/mum2rssx (noting that Lewiston shooter used an AR-10-style rifle); White, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023, https://tinyurl.com/4ks2z9ah (describing pistol used in the Monterey Park shooting that "has several features that make it an illegal assault weapon in California").

36

1791 or the Reconstruction generation in 1868." *Id.* at 2132. When legislatures

charged with protecting the safety of their communities enact laws addressing

novel firearms technologies or new societal concerns, it stands to reason that there

will be no historical precursors addressing the same technologies and concerns.

*Cf. McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (governments do not "regulate

for problems that do not exist"). Without "a nuanced approach," *Bruen*'s

"analogical inquiry" would unduly constrain legitimate regulatory efforts in

precisely the way that the Supreme Court warned against. 142 S. Ct. at 2132,

2133.

### B.   The Record Reflects a Robust Tradition of Regulating Particular Weapons That Threaten Public Safety

As the Supreme Court has recognized, the Second Amendment does not

protect "any weapon whatsoever." *Heller*, 554 U.S. at 626. And there is a robust

tradition—pre-dating the founding—of regulating and even banning weapons with

features that make them particularly dangerous or susceptible to criminal misuse,

especially after those weapons have proliferated in the commercial market to the

point that they present a substantial threat to public safety. California's restrictions

on the categories of assault weapons challenged here fit within that tradition.

### 1. The tradition of restricting and prohibiting especially dangerous weapons pre-dates the founding

In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599). That "*pre-existing* right" was "not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace. 1 Blackstone, *Commentaries on the Laws of England* 139 (1769).[17] The English Bill of Rights—"the predecessor to our Second Amendment"—guaranteed a right for certain subjects to "have Arms for their Defence suitable to their Conditions, *and as allowed by Law*." *Heller*, 554 U.S. at 593 (quoting 1 Wm. & Mary, ch. 2, § 7 (1689)) (emphasis added); 1 Blackstone, *Commentaries* 139. The phrase "as allowed by law" authorized governments to "restrain the use of *some particular sort of arms*." Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (1782).

In discussing "limit[s] on the right to keep and carry arms," the Supreme Court pointed in particular to the long "historical tradition of prohibiting the

---

[17] *See generally United States v. Wood*, 299 U.S. 123, 138 (1936) ("Undoubtedly, as we have frequently said, the framers of the Constitution were familiar with Blackstone's Commentaries.").

carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see Bruen*, 142 S. Ct. at 2128. Such weapons "fall outside of the Second Amendment's protections." *E.g.*, *Kotek*, 2023 WL 4541027, at *34 (citing *Bruen*, 142 S. Ct. at 2128).[18] Blackstone elaborated on that tradition in the leading historical treatise cited by *Heller* on this point. He explained that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace . . . and is particularly prohibited." 4 Blackstone, *Commentaries* 148 (1769). Consistent with that tradition, and without interfering with the public carry of other weapons for self-defense, *see Bruen*, 142 S. Ct. at 2142, the Crown restricted especially dangerous weapons like crossbows and launcegays to preserve the public order, *id.* at 2140; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen. 8, ch. 6, §§ 1, 18 (1541).[19]

---

[18] A three-judge panel of this Court recently held that this aspect of Supreme Court precedent is only relevant "in the second prong of the *Bruen* analysis." *Teter v. Lopez* 76 F.4th 938, 949-950 (9th Cir. 2023), *pet. for rehearing en banc filed*, No. 20-15948 (9th Cir. Sept. 20, 2023). That is not the best understanding of *Bruen* or *Heller*. *See, e.g.*, *NAGR*, 2023 WL 4975979, at *17 (analyzing as part of *Bruen*'s threshold inquiry); *Grant v. Lamont*, 2023 WL 5533522, at *5 (D. Conn. Aug. 28, 2023) (same); *Kotek*, 2023 WL 4541027, at *34 (same). The Attorney General discusses the "dangerous and unusual" issue in this section of the brief in light of *Teter*, but is arguing for a different approach before the en banc Court in *Duncan*.

[19] The district court reasoned that assault weapons fail the "'dangerous *and* unusual' test" because "all firearms are dangerous" and assault weapons are "no more dangerous than other arms the State does not ban." 1-ER-11–12. As already

### 2. Throughout American history, governments have restricted and prohibited especially dangerous weapons as they proliferated and imperiled public safety

That English tradition continued in America throughout each of the periods that *Bruen* identified as relevant to its historical inquiry. *See* 142 S. Ct. at 2142-2156. During the colonial and founding era, most violent crimes were committed with weapons such as clubs, dirks, and daggers. 3-ER-574–581; *Bevis I*, 2023 WL 2077392, at *10 ("As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons."). State and colonies responded by "singl[ing] out weapons that posed a particular danger for regulation or prohibition." 3-ER-431. In 1686, for example, after a period of internal "'strife and excitement,'" *Bruen*, 142 S. Ct. at 2144, East New Jersey prohibited the concealed carrying of "pocket pistol[s], skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons." An Act Against Wearing Swords (1686), reprinted in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881). Other colonies and early States prohibited the carrying of clubs and

---

discussed, however, the assault weapons at issue here are all defined by features that make them exceptionally dangerous. *See supra* pp. 11-13; *cf. Teter*, 76 F.4th at 950 (examining whether butterfly knives have "uniquely dangerous propensities").

40

similar weapons increasingly used as fighting instruments.  4-ER-668; *see Bevis I*, 2023 WL 2077392, at *11 (detailing restrictions).[20]

Many of these colonial- and founding-era restrictions focused on weapons other than firearms because guns were not "the primary weapon of choice for those with evil intent during this period."  3-ER-428; *Bevis I*, 2023 WL 2077392, at *10. The guns available at the time "took too long to load"; they could not be kept pre-loaded because black powder was "corrosive" and "attracted moisture"; and therefore they were "seldom used to commit crimes."  3-ER-427; *see* 4-ER-652–653; 3-ER-575–576, 579.  But when technologies or practices associated with firearms posed an unusual danger to public safety, colonies and early States responded by regulating or prohibiting them.  In 1771, for instance, New Jersey prohibited the keeping of firearms configured as "trap guns," which used string or wire so that a loaded firearm would discharge automatically when a trap was sprung.  *See* 1763-1775 N.J. Laws 346, ch. 539, § 10 ("Penalty for setting loaded Guns"); 4-ER-671–672.  "Those who set gun traps typically did so to defend their

---

[20] *See*, *e.g.*, 1750 Mass. Acts 544, ch. 17, § 1 (prohibited the carry of "clubs and other weapons" in a group of 12 or more); 1786 Mass. Acts 87, ch. 38 (prohibited being armed with a club or other weapon while rioting); 1788-1801 Ohio Laws 321, 323 (prohibited the carry of any "dangerous weapon" while committing a burglary); An Act to Describe, Apprehend and Punish Disorderly Persons § 2 (1799), reprinted in *Laws of the State of New Jersey* 474 (Nettleton ed., 1821) (prohibited the carry of any pistol, hanger, cutlass, bludgeon, or other "offensive weapon" with intent to commit assault).

41

places of business, properties, or possessions." 4-ER-673. But that dangerous

weapon configuration "[i]nevitably . . . wound up hurting or killing innocent[]"

bystanders who set off the trap. *Id.*; 1763-1775 N.J. Laws 346, ch. 539, § 10

(declaring that the setting of any trap gun was "most dangerous"). Several other

States and territories followed New Jersey's lead in the nineteenth century.

4-ER-728–729.

Colonies and early States also heavily regulated gunpowder to prevent mass

fatalities as a result of explosions or fires. *See Kotek*, 2023 WL 4541027, at *40.[21]

Those laws typically prohibited certain methods of storing gunpowder, restricted

the quantity that could be stored in a particular location, and allowed government

officials to remove it when necessary to prevent explosions. *See* 3-ER-433–436.

For instance, New York prohibited all persons (other than shopkeepers and

retailers) "to have or keep in any Place within two Miles of" of New York City

Hall "more than Six Pounds of Gun-Powder," and gave city officials broad

authority to transfer powder to the public magazine for safe storage. 1772 N.Y.

Laws at 683. While such regulations "necessarily affected the ability of gun

owners to use firearms for self-defense" by restricting the availability of

---

[21] *See, e.g.*, 1771-1772 Mass. Province Laws 167, ch. 9; 1772 N.Y. Laws 682; 1782-1783 Mass. Acts 120, ch. 46; 1784 N.Y. Laws 627, ch. 28; 1821 Me. Laws 98, ch. 25, § 1; 1825 N.H. Laws 73, ch. 61; 1832 Conn. Acts 391, ch. 25; 1836 Conn. Acts 105, ch. 1, § 20.

gunpowder, they were considered to be at the "very core of the police power." 3-ER-434; *see Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 442-443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power.").

As the nineteenth century progressed, States restricted the use or possession of new types of weapons posing particular dangers to public safety. One notorious example was the "Bowie knife," a weapon used by Jim Bowie in a duel in 1827 that became widespread in the 1830s. *See* 4-ER-664; *DSSA*, 2023 WL 2655150, at *11. Bowie knives were "designed expressly for fighting": they had "longer blades than ordinary knives," "crossguards to protect the combatants' hands," and "clip points to make it easier to cut or stab opponents." 3-ER-582. They were "widely used in fights and duels." 4-ER-665; *see Kotek*, 2023 WL 4541027, at *41. By 1840, at least five States or territories had enacted laws restricting the carrying of Bowie knives or other fighting knives. 4-ER-731–734; *see, e.g.*, 4-ER-837 (1838 Tennessee statute); 4-ER-773 (1839 Alabama statute). Nearly every State enacted a law restricting Bowie knives by the end of the nineteenth century, whether by outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership. 4-ER-668; *see* 4-ER-731–734; 4-ER-773–850 (collecting laws); *see DSSA*, 2023 WL 2655150, at *11-12 (Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society").

43

States also began to regulate new types of "melee weapons" as they became prevalent and imperiled public safety. *DSSA*, 2023 WL 2655150, at *11; 4-ER-668–671. The slungshot, for example, is a hand-held impact weapon with a weighted object at the end of a flexible strap. 4-ER-669. It was developed in the 1840s and soon became "'widely used by criminals and street gang members.'" *Id.* New York and Vermont passed laws in 1849 prohibiting the manufacture, sale, and possession of slungshots. 1849 N.Y. Laws 403, §§ 1-2; 1849 Vt. Acts & Resolves 26, No. 36 §§ 1-2. Forty-two States and the District of Columbia enacted anti-slungshot laws by the end of the nineteenth century. 4-ER-669, 731–734.

These state responses to emerging weapons that posed exceptional dangers were not identical. But a uniform response is neither realistic nor desirable in a federal system where "[s]tate and local" governments may "experiment[]" with reasonable weapons restrictions. *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion). The States' varied approaches all reflect extensive governmental efforts to address the use of especially dangerous weapons in ways that increasingly threatened public safety. 4-ER-664–673. The States routinely "respond[ed] to growing rates of violence and lethality caused by modern innovations in technology and changing patterns of human behavior by regulating the particular kinds of weapons or modes of carry that were most often employed by those causing the violence, while leaving open alternative avenues for lawful

44

possession" of a wide range of permissible weapons "for purposes of self-defense." *NAGR*, 2023 WL 4975979, at *33; *see DSSA*, 2023 WL 2655150, at *12; *Herrera*, 2023 WL 3074799, at *6-7.

And while particular types of firearms were not a frequent subject of regulation during the early period, when they did not present comparable threats to public safety, *see supra* pp. 34, 40, the States responded quickly when advances in firearms technology presented exceptional dangers to society. By the mid-1820s, percussion-cap pistols replaced flint-lock pistols in domestic markets. 3-ER-582. The new pistols could "be kept loaded and carried around for longer periods without risk of corrosion." *Id*. The invention of revolver pistols in the 1830s enabled the firing of six rounds in succession without reloading. 3-ER-549–550; 4-ER-659. Those new technologies led to an upswing in the use of pistols in interpersonal assaults as they became prevalent in civil society. *See* 3-ER-550–551; 3-ER-581–582. Several States promptly responded by enacting laws restricting the carry of concealable pistols. 3-ER-552–562; 3-ER-582–583; 4-ER-727–729.[22]

---

[22] In *Bruen*, the Supreme Court held that those nineteenth century statutes did not support a modern-day law prohibiting a law-abiding citizen from carrying any sort of handgun publicly for self-defense. *See* 142 S. Ct. at 2146-2147; *cf. id.* at 2143 (even assuming "that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today").

45

When automatic and semiautomatic firearm technologies became prevalent and began to imperil public safety in the twentieth century, the States (and the federal government) again swiftly moved to regulate them. *See Kotek*, 2023 WL 4541027, at *23-25. Of course, historical evidence from long after the ratification of the Fourteenth Amendment "cannot provide much insight into the meaning of the Second Amendment [if] it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154. But there is no contradictory earlier evidence here because the emergence of automatic and semiautomatic firearms reflected dramatic technological innovations. *See supra* pp. 34-35. The regulatory response to those uniquely dangerous new weapons was consistent with historical responses to comparably dangerous weapons in earlier eras. *See generally Bruen*, 142 S. Ct. at 2136 ("'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in the Constitution" (citation omitted)).

The first fully automatic handheld firearm marketed for civilian purchase in the United States was the "Tommy gun," a sub-machine gun. 4-ER-640–641. It was developed for military use in World War I and entered the U.S. market in the

---

But *Bruen* did not "decide anything about the kinds of weapons that people may possess," *id.* at 2157 (Alito, J., concurring), and the cited statutes are relevant here as part of the longstanding tradition of States responding to contemporary threats to public safety presented by emerging weapons that are especially dangerous at the time.

1920s. 4-ER-641. As automatic and semiautomatic weapons began to circulate more widely, "their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s." *Id.* The destruction caused by those weapons, including in the infamous St. Valentine's Day Massacre in Chicago in 1929, prompted governments across the Nation to regulate them between 1925 and 1934. 4-ER-642–646; 3-ER-599. In all, 32 States enacted some form of regulation on automatic or semiautomatic weapons. *See* 4-ER-642; *Bevis I*, 2023 WL 2077392, at *12. Congress restricted the possession in the District of Columbia of semiautomatic weapons capable of firing more than 12 shots without reloading. 4-ER-643, 737–738. And Congress also passed the National Firearms Act, which significantly restricted fully automatic weapons nationwide through tax and registration requirements. 3-ER-599; 4-ER-644; *see* Pub. L. No. 73-474, 48 Stat. 1236 (1934).

### 3. The assault weapons restrictions challenged here are consistent with this Nation's historical tradition

The operative inquiry here is whether California's restrictions on the eight categories of prohibited assault weapons challenged by plaintiffs are "relevantly similar" to our Nation's long historical tradition of responding to especially dangerous weapons technologies presenting an emerging threat to public safety. *Bruen*, 142 S. Ct. at 2132. *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment."

47

*Id.* As discussed above, however, it did emphasize the need for a "nuanced approach" in a situation like this one, where the challenged regulations address modern weapons technologies that could not possibly have been restricted or prohibited during the relevant historical periods. *Id.*; *see supra* pp. 33-37. Requiring spot-on "historical precursors," *Bruen*, 142 S. Ct. at 2133, or defining historical traditions too narrowly, would prohibit legitimate state experimentation with reasonable regulations responding to new threats to public safety. *See generally McDonald*, 561 U.S. at 785 (plurality opinion).

Under the proper approach, the "*central* considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133 (internal quotation marks omitted). In both respects, the assault weapons regulations challenged here are consistent with our Nation's historical tradition of responding to particularly dangerous weapons that "circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers." 4-ER-651; *see supra* pp. 40-47.

As to burden, ever since the founding, governments have heavily restricted or prohibited particularly dangerous arms. In the early days, when the "use of guns in homicides" was "infrequent," 3-ER-575, many of those regulations focused on

48

especially lethal knives and blunt instruments often used in fights, murders, and other criminal activities, *see supra* pp. 40, 43-44. But even before the founding there were restrictions and prohibitions on especially dangerous types of firearms or firearm configurations, and as new firearms technologies presented similar concerns they too were restricted or outright prohibited. *See supra* pp. 41-42, 45-47. The specific approaches varied as different concerns arose in different regions, but the common theme is that governments restricted or prohibited weapons that had proven to be especially lethal and prone to criminal misuse—while preserving access to knives, long guns, handguns, and other weapons suitable for self-defense.

The law challenged here imposes a comparable burden on the right to armed self-defense. *See, e.g.*, *DSSA*, 2023 WL 2655150, at *12; *Hartford*, 2023 WL 3836230, at *6; *NAGR*, 2023 WL 4975979, at *33. It prohibits only certain semiautomatic rifles, semiautomatic pistols, and shotguns equipped with tactical features that are not oriented towards self-defense and that make those weapons exceptionally lethal as offensive weapons in the hands of mass shooters. *Supra* pp. 11-13, 22-23; *see, e.g.*, *NAGR*, 2023 WL 4975979, at *33 (assault weapons "are suboptimal for self-defense"); *DSSA*, 2023 WL 2655150, at *12 (prohibited assault weapons are "rarely used defensively"). It allows the purchase and possession of "featureless" semiautomatic AR- and AK-platform rifles and pistols.

*See* Cal. Penal Code § 30515(a)(1), (4); 3-ER-383–407.[23]  It also allows

semiautomatic centerfire rifles with a fixed magazine holding ten rounds or

fewer—even if they contain one of the otherwise prohibited features.  *See* Cal.

Penal Code § 30515(a)(1).  And it allows semiautomatic shotguns with fixed

magazines so long as they do not have both a pistol grip and adjustable stock.  *See*

*id.* § 30515(a)(6), (7).  The challenged restrictions thus preserve a wide array of

options for gun owners who desire semiautomatic weaponry—while prohibiting

the weapons "designed and developed for [the] specific military purpose" of

"laying down a high volume of fire over a wide killing zone" with lethal accuracy.

6-ER-1423; 2-ER-166.[24]

And any modest burden on the right to armed self-defense arising from

California's restrictions on assault weapons is comparably justified when

compared with historical precursors.  *See, e.g.*, *Hartford*, 2023 WL 3836230, at \*6;

*DSSA*, 2023 WL 2655150, at \*12.  The modern societal concern addressed here

involves a grave threat to public safety:  a recent and unprecedented rise in lone

shooters using assault weapons to murder many victims in a matter of minutes.

---

[23] *See, e.g.*, Juggernaut Tactical, AR-15 CA Pistol, https://tinyurl.com/347mvmsf.

[24] California's restrictions are not at all comparable to the D.C. law struck down in
*Heller*, where the Supreme Court rejected the argument that it was permissible to
ban the possession of handguns *altogether*—"the quintessential self-defense
weapon"—so long as the possession of certain long guns remained available.  554
U.S. at 629; *see* 1-ER-12.

50

*See supra* pp. 8-9, 35-36. Most recent mass shootings involving ten or more fatalities are carried out with an assault weapon, 3-ER-516, and when mass shooters use an assault weapon equipped with a large-capacity magazine, they inflict nearly five-times more deaths and injuries than when they do not, 5-ER-1028. The justification for prohibiting the categories of assault weapons at issue here is comparable to the historical justification underlying the long tradition of regulating emerging weapons whose especially dangerous characteristics gave rise to "pressing public safety concerns" about murder and mayhem. *DSSA*, 2023 WL 2655150, at *13; *see NAGR*, 2023 WL 4975979, at *33.

### C. The District Court's Historical Analysis Was Flawed

In reaching a different conclusion about the constitutionality of California's assault weapons restrictions, the district court employed a historical analysis that was deeply flawed. 1-ER-17–57. To be sure, the district court quoted *Bruen*'s statement that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," 1-ER-20, as well as *Bruen*'s directive that States need not identify "a historical twin" or "a dead ringer for historical precursors," 1-ER-21. But it did not heed those words. Instead of seeking a comprehensive understanding of the Nation's historical traditions, the district court ordered the State to identify the single "best historical regulation that is a proper analogue" for the statute challenged here. Dkt. 164. And when it

51

issued its decision, the court emphasized that "[t]here are no founding era dead ringers or historical twins"—while hypothesizing that a "historical twin is not unimaginable" because early States could have "prohibit[ed] private possession of canons [sic] or Gatling guns." 1-ER-40.

The district court faulted the State for supposedly failing to identify a relevant historical tradition, *see, e.g.*, 1-ER-40, but its own analysis ignored historical precursors that are directly relevant to the question of how States may respond to especially dangerous weapons technologies that imperil public safety. For instance, the court refused to "look to knife laws" like restrictions on Bowie knives "when reviewing a restriction about guns." 1-ER-28. But it acknowledged that knives are "'arms' imbued with Second Amendment protection," 1-ER-52, and *Bruen* itself states that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," 142 S. Ct. at 2127; *see id.* at 2132 (the "historical inquiry that courts must conduct will often involve reasoning by analogy"). The district court also rejected any analogy to trap gun laws, *see supra* 41-42, reasoning that trap guns "are not guns at all," but instead "a method by which a gun . . . can be set up to fire indiscriminately." 1-ER-43. Of course, the features-based definitions of assault weapons challenged by plaintiffs here are *also* particularly

52

lethal configurations of guns (which, if devoid of those features, are not prohibited). *See supra* pp. 11-14, 22-23.

As to historical timeframe, the district court discounted evidence of laws from before 1791. *See, e.g.*, 1-ER-30. It reasoned that "British sources pre-dating the Constitution are not particularly instructive" because "the American Revolution was a rejection of British rule." 1-ER-22. That is a surprising assertion given that the Second Amendment "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. The English Bill of Rights "has long been understood to be the predecessor to our Second Amendment," *id.* at 593, and a British tradition that "long predates" the Second Amendment still "illuminate[s] the scope of the right" if it "prevailed up to the period immediately before and after the framing of the Constitution." *Bruen*, 141 S. Ct. at 2136 (internal quotation marks omitted); *see supra* pp. 38-39.

On the other hand, the district court discounted laws enacted after the ratification of the Fourteenth Amendment in 1868 as "not particularly helpful." 1-ER-22; *see* 1-ER-24. That ignored *Bruen*'s teaching that in some circumstances (like this one, *supra* pp. 46-47) post-ratification evidence can help "settle the meaning" of the Constitution. *Bruen*, 142 S. Ct. at 2136. Even as to firearms laws enacted between 1791 and 1868, the district court dismissed the relevance of statutes that restricted pistols on the ground that they "did not *prohibit*" pistols. 1-ER-53 (emphasis added). According to the court, laws regulating the "*use* or

53

*manner* of carrying guns" can never be comparable to restrictions on "possession, manufacturing, giving, lending, [or] offering for sale."  1-ER-24.  But *Bruen*'s framework necessarily involves reasoning by analogy to "relevantly similar" laws, not identical ones.  142 S. Ct. at 2132.

Applying that blinkered approach, the district court never considered the longstanding tradition apparent from a more comprehensive understanding of our Nation's history:  from the founding era to the present, "[f]irearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality."  *DSSA*, 2023 WL 2655150, at *12 (internal quotation marks omitted); *see also Hartford*, 2023 WL 3836230, at *4; *Herrera*, 2023 WL 3074799, at *6-7; *NAGR*, 2023 WL 4975979, at *33; *supra* pp. 40-47.

The district court's approach to Second Amendment analysis would upend that centuries-old tradition.  By discounting or dismissing "well-established and representative historical analogue[s]," *Bruen*, 142 S. Ct. at 2133 (emphasis omitted), the district court concluded that "there were relatively few" relevant restrictions—and no relevant prohibitions—"[d]uring the most important period of history."  1-ER-29; *see* 1-ER-27.  In the district court's view, "the history and tradition of the northern states was to leave firearm ownership and use completely

54

unregulated," 1-ER-33; and "the history and tradition of the southern states was to leave firearm ownership and use mostly unregulated," 1-ER-36. The district court even surmised that some founding-era residents "owned and kept at home cannons, howitzers, grenades, and bombs." 1-ER-51. Under the district court's view of history and *Bruen*, it appears that no state regulation banning *any* firearm—or even cannons and howitzers—would be "consistent with the Nation's historical tradition." *Bruen*, 142 S. Ct. at 2130. That is exactly the kind of "regulatory straitjacket" that the Supreme Court disclaimed. *Id.* at 2133.

## III. THE DISTRICT COURT'S PERMANENT INJUNCTION AND JUDGMENT SHOULD REMAIN STAYED

The motions panel granted an administrative stay of the district court's permanent injunction and judgment. C.A. Dkt. 13 at 1. Its order granting that stay also expedited the appeal, *id.* at 2, and provided that the "administrative stay shall remain in effect until the merits panel decides the appeal or issues an order lifting the stay," *id.* at 1; *see also* C.A. Dkt. 22. For the reasons discussed in the Attorney General's motion for a stay pending appeal, *see* C.A. Dkt. 6, as well as the merits arguments in this brief, this Court should maintain the stay until this appeal is resolved and the mandate has issued. If the merits panel elects to revisit whether the injunction and judgment should remain stayed, however, the Attorney General respectfully requests notice and a further opportunity to brief that issue in light of intervening developments—including the recent decision by the Seventh Circuit in

*Bevis II*.  2023 WL 7273709.  Regardless, if the merits panel were to decide to lift the current stay, the Attorney General requests a further 14-day administrative stay from the date of that decision to preserve an opportunity to seek further relief.  *See* C.A. Dkt. 6 at 4.

The motions panel's order granting an administrative stay also observed (C.A. Dkt. 13 at 1) that this case presents "similarities" to the pending appeal in *Duncan v. Bonta*, No. 23-55805, a challenge to California's restrictions on large-capacity magazines.  *Compare* Cal. Penal Code § 32310 (large-capacity magazine restrictions), *with id.* § 30515(a)(1), (2), (4), (5) (features-based definitions of assault weapons turning in part on the presence of a "fixed magazine with the capacity to accept more than 10 rounds" or the "capacity to accept a detachable magazine").  The plaintiffs in this case acknowledged the similarities between the two cases when they filed a notice in the district court at the outset of the litigation arguing that this case "is related to" *Duncan*; that the two cases involve "substantially the same facts and questions of law"; and that consideration of both cases by Judge Benitez "would effect a saving of judicial effort and avoid or minimize the risk of multiple, inconsistent rulings."  Dkt. 4 at 2, 3.  In light of those similarities and plaintiffs' prior arguments about the interconnected nature of the two cases, the merits panel may wish to consider holding this matter in abeyance pending the Court's resolution of *Duncan*, which will be argued before

56

an en banc panel during the week of March 18, 2024.  *See* C.A. No. 23-55805,

Dkt. 12 at 2.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should

remand for entry of judgment in favor of the Attorney General.

Dated:  December 1, 2023                    Respectfully submitted,


                                            *s/ John D. Echeverria*
                                            _____


                                            ROB BONTA
                                            *Attorney General of California*
                                            MICHAEL J. MONGAN
                                            *Solicitor General*
                                            HELEN H. HONG
                                            *Principal Deputy Solicitor General*
                                            THOMAS S. PATTERSON
                                            *Senior Assistant Attorney General*
                                            MICA L. MOORE
                                            *Deputy Solicitor General*
                                            R. MATTHEW WISE
                                            *Supervising Deputy Attorney General*
                                            ANNA FERRARI
                                            JOHN D. ECHEVERRIA
                                            *Deputy Attorneys General*
                                            *Attorneys for Defendants-Appellants*

## STATEMENT OF RELATED CASES

The Attorney General is aware of the following related cases:

- *Duncan v. Bonta*, C.A. No. 23-55805 (9th Cir.) (en banc):  Appeal from a decision permanently enjoining enforcement of California Penal Code Section 32310, which restricts large-capacity magazines, defined as firearm magazines capable of holding more than 10 rounds of ammunition.  The matter below was transferred to the district court as a case related to *Duncan* at plaintiffs' request. Dkt. 4, 6.

- *Or. Firearms Fed'n v. Kotek*, C.A. No. 23-35540 (9th Cir.):  Appeal from a final judgment upholding Oregon Ballot Measure 114, which imposes restrictions concerning large-capacity magazines, defined under Oregon law as firearm magazines capable of holding more than 10 rounds of ammunition.

Dated:  December 1, 2023                                        *s/ John D. Echeverria*

58

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2979

I am the attorney or self-represented party.

**This brief contains** | 13,050 | **words,** including | | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ John D. Echeverria | **Date** | December 1, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I certify that on December 1, 2023, I electronically filed the foregoing

document with the Clerk of the Court of the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system.  I certify that all other

participants in this case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.

 Dated:  December 1, 2023                          *s/ John D. Echeverria*
                                        _____