No. 23-2979

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

JAMES MILLER, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL
OF THE STATE OF CALIFORNIA, ET AL.,
*Defendants-Appellants*.

————————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:19-cv-01537-BEN-JLB
The Honorable Roger T. Benitez, Judge

————————————

**APPELLANTS' EXCERPTS OF RECORD
VOLUME 2 of 8**

————————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ANNA FERRARI
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3479
John.Echeverria@doj.ca.gov
*Attorneys for Defendants and Appellants*

December 1, 2023

UNCLASSIFIED

| AD NUMBER |
|---|
| AD343778 |
| CLASSIFICATION CHANGES |
| TO:          unclassified |
| FROM:          confidential |
| LIMITATION CHANGES |
| TO:<br>Approved for public release, distribution unlimited |
| FROM:<br>Distribution authorized to U.S. Gov't. agencies and their contractors; Administrative/Operational Use; 31 JUL 1962. Other requests shall be referred to Defense Advanced Research Projects Agency, Arlington, VA. |
| AUTHORITY |
| 31 Jul 1974, DoDD 5200.10; DARPA per DTIC Form 55 |

THIS PAGE IS UNCLASSIFIED

Ex. 1_Echeverria Decl.
Page 2

# CONFIDENTIAL

## AD 343778

# DEFENSE DOCUMENTATION CENTER

FOR

## SCIENTIFIC AND TECHNICAL INFORMATION

### CAMERON STATION, ALEXANDRIA, VIRGINIA



# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 3

NOTICE: When government or other drawings, speci-
fications or other data are used for any purpose
other than in connection with a definitely related
government procurement operation, the U. S.
Government thereby incurs no responsibility, nor any
obligation whatsoever; and the fact that the Govern-
ment may have formulated, furnished, or in any way
supplied the said drawings, specifications, or other
data is not to be regarded by implication or other-
wise as in any manner licensing the holder or any
other person or corporation, or conveying any rights
or permission to manufacture, use or sell any
patented invention that may in any way be related
thereto.

## NOTICE:

THIS DOCUMENT CONTAINS INFORMATION

AFFECTING THE NATIONAL DEFENSE OF

THE UNITED STATES WITHIN THE MEAN-

ING OF THE ESPIONAGE LAWS, TITLE 18,

U.S.C., SECTIONS 793 and 794. THE

TRANSMISSION OR THE REVELATION OF

ITS CONTENTS IN ANY MANNER TO AN

UNAUTHORIZED PERSON IS PROHIBITED

BY LAW.

Ex. 1_Echeverria Decl.
Page 4

# CONFIDENTIAL

### ADVANCED RESEARCH PROJECTS AGENCY
Washington 25, D. C.

20 August 1962

To:      Addressees
From:    OSD/ARPA

Subject:   Field Test Report, AR-15 Armalite Rifle
Enclosure: Final Report, OSD/ARPA Research and Development Field
           Unit - Vietnam

1.  The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam. The results of this evaluation, contained in the attached report, are forwarded for your information.

2.  Because of the controversy which has surrounded this weapon, particular care was exercised to insure that the tests were objective, thorough and adequately documented, and to insure that valid data and conclusions were derived therefrom.

3.  The suitability of the AR-15 as the basic shoulder weapon for the Vietnamese has been established. For the type of conflict now occurring in Vietnam, the weapon was also found by its users and by MAAG advisors to be superior in virtually all respects to the - a. M-1 rifle, b. M-1 and M-2 Carbines, c. Thompson Sub-machine gun and d. Browning Automatic rifle.

4.  Test data derived from recent Service evaluations of the AR-15 in the U.S. support the technical conclusions of the report. The Central Intelligency Agency has conducted similar tests; it is understood that the results of that evaluation are essentially identical to those contained in the report.

5.  Photographs 7 and 8, Appendix D, pictures of Viet Cong KIA showing the wound effect of the AR-15 bullet, were deleted from the attached report by this office.

6.  The conclusions and recommendations of this report have been made available to COMUSMACV and CINCPAC by the originator and to DOD and CIA by OSD/ARPA.

R. C. Phelps
R. C. Phelps
Asst Director, for AGILE

Downgraded at 3 year
intervals; Declassified
after 12 years. DOD Dir 5200.10

**CONFIDENTIAL**

# CONFIDENTIAL

**RESEARCH & DEVELOPMENT FIELD UNIT**
**Advanced Research Projects Agency**
**Office of the Secretary of Defense**
**APO 143, San Francisco, California**

MACRD                                                    31 July 1962

SUBJECT: Report of Task No. 13A, Test of Armalite Rifle, AR-15 (U)


THRU.    Commander (3)
         U. S. Military Assistance Command, Vietnam
         APO 143, San Francisco, California


TO:      Commander in Chief, U. S. Pacific (3)
         c/o Fleet Post Office
         San Francisco, California

         Advanced Research Projects Agency (3)
         Office of the Secretary of Defense
         The Pentagon
         Washington 25, D. C.


1. (C) Forward herewith is the final report of the test of the Armalite Rifle (AR-15). It should be noted that the report proper in its present form reflects the views of the U. S element of CDTC only. It is being handled in this fashion to avoid the inference that the Vietnamese, in seeking a newer weapon, might have influenced the recommendations in the report.

2. (C) However, combat evaluations in Vietnam are necessarily joint ventures and the results must be made known to appropriate GVN authorities. This report will now be coordinated with the Vietnamese element in CDTC and will be officially closed out as a combined report. It is thought that this is unlikely to

ARPA Ref. No. 1543

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 6

CONFIDENTIAL

result in any substantive change in the report as now written.

1 Incl.                                    WILLIAM P  BROOKS,  JR.
  AR-15 Report w/5 Annexes                  Colonel, Arty
                                            Chief
Copies furnished.
  CHMAAG, VIETNAM (4)

DOWNGRADED AT 3 YEAR INTERVAL
DECLASSIFIED AFTER 12 YEARS
DOD DIR 5200.10

CONFIDENTIAL

2

Ex. 1_Echeverria Decl.
Page 7

# CONFIDENTIAL

**RESEARCH & DEVELOPMENT FIELD UNIT**
**Advanced Research Projects Agency**
**Office of the Secretary of Defense**
**APO 143, San Francisco, California**

**REPORT OF TASK NO. 13A**

**TEST OF**

**ARMALITE RIFLE, AR-15 (U)**

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 8

# CONFIDENTIAL

**REPORT OF TASK NO. 13A**
**TEST OF**
**ARMALITE RIFLE, AR-15 (U)**

1. (U) **REFERENCES**.

    a. (U) OSD Message, DEF 907037, DTG 122354Z December 1961.

    b. (U) MACRD Message 367, DTG 050203Z June 1962.

    c. (U) US Army Infantry Board Report of Project 2787, 27 May 1958, Subject: Evaluation of Small Caliber, High Velocity Rifle - Armalite (AR-15).

    d. (U) Final Report, Lightweight High Velocity Rifle Experiment, US Army Combat Development Experimentation Center, Fort Ord, California, dtd 30 May 1959.

    e. (U) Evaluation Report of the Colt Armalite AR-15 Automatic Rifle, US Air Force Marksmanship School, Lackland AFB, Texas, dtd 22 September 1960.

    f. (U) Report No. DPS-96, A Test of Rifle, Caliber .223, AR-15, Aberdeen Proving Ground, Maryland, dtd 9 January 1961.

    g. (U) Fourth Report on the Test of the US Carbine, Cal. .30, M1, ORD Program #4972, Aberdeen Proving Ground, Maryland, dtd 13 Aug 1942.

    h. (U) First Report on Test of Production Models of the Carbine, Cal .30, M2, ORD Program #4972, Aberdeen Proving Ground, dtd 1 Aug 1945.

    i. (U) US Army Infantry Board Supplemental Report of Project No 2787, "Evaluation of Small Caliber, High Velocity Rifles - Armalite (AR-15)", dtd 13 August 1958.

2. (C) **PURPOSE**.

    The purpose of this test was to determine if the AR-15 Rifle is compatible with the small stature, body configuration and light weight of the Vietnamese Soldier and to evaluate the weapon under actual combat

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 9

## CONFIDENTIAL

conditions in South Vietnam. At the request of MAAG, Vietnam, the scope of the test was expanded to include a comparison between the AR-15 and the M2 Carbine to determine which is a more suitable replacement for other shoulder weapons in selected units of the Republic of Vietnam Armed Forces (RVNAF).

3.   (U)   **DESCRIPTION OF MATERIEL:**

The AR-15 Rifle is a lightweight, gas-operated rifle equipped with a 20-round, detachable magazine. It is chambered for Cartridge, Caliber .223. When fired in the rifle, this round gives the 55 grain bullet a muzzle velocity of 3200 feet per second. It has a plastic stock with a rubber butt, assembled in line with the bore. This, in conjunction with its high line of sight and separate hand grip, is designed to minimize rotation about the shoulder during firing. The two piece upper hand guard is made of metal and plastic and is designed for easy disassembly and rapid dissipation of heat. A lever above the grip on the left side of the receiver provides a selector for the trigger safety, semi-automatic and automatic fire. A bolt catch holds the bolt to the rear after the last round has been fired. A cover is provided for the ejection port in the receiver. A three-pronged muzzle attachment, threaded to the barrel, serves as a flash suppressor, grenade launcher, and a front support for a bayonet. The lower part of the front sight is machined to form a bayonet lug. Standard accessories include: Bayonet w/scabbard; bipod w/case; grenade-launching sight; and a cleaning rod. Photographs of the weapon appear in Annex "D".

4.   (C)   **BACKGROUND.**

a.   (U)   The problem of selecting the most suitable basic weapon for the Vietnamese soldier is complicated by his small stature and light weight. The average soldier stands five feet tall and weighs ninety pounds. Principle US weapons presently issued to Vietnamese troops include the M1918A2; the Thompson Sub-Machine Gun, Caliber .45; and the US Carbine, Caliber .30, M1.

b.   (U)   Because of its availability and the results of extensive studies and previous testing by military agencies, the Colt Armalite AR-15 Rifle was selected in July 1961 as the most suitable weapon for initial tests. This weapon was developed by the Armalite Division of Fairchild Aircraft Corporation to meet the military characteristics for a lightweight rifle utilizing the high velocity small caliber principle. It was first tested by the US Army Infantry Board in 1958 (Ref 1.c.). Since then, the weapon

## CONFIDENTIAL

2

Ex. 1_Echeverria Decl.
Page 10

## CONFIDENTIAL

and its ammunition have undergone extensive engineering and service tests by: Aberdeen Proving Ground; the Combat Development Experimentation Center, Fort Ord, California; and the US Air Force at Lackland Air Force Base, Texas, (Refs 1.d., 1.e., 1.f.). The rifle, with several modifications resulting from these tests, is presently being manufactured by Colt's Patent Firearms Manufacturing Company, Hartford, Connecticut. (Prior to completion of this report, the U. S. Air Force adopted the AR-15 as its basic shoulder weapon, replacing the M2 Carbine, the Browning Automatic Rifle and the M3 Sub-Machine Gun).

c.   (C)  Based upon favorable observations of the AR-15 by both US Advisors and RVNAF Commanders following limited firing demonstrations conducted in Vietnam during August 1961, weapons were requested in numbers sufficient to conduct a full scale combat evaluation of the AR-15 by selected units of the RVNAF.  In December 1961, the Secretary of Defense approved the procurement of 1000 AR-15 Rifles, necessary ammunition, spare parts and accessories for evaluation.

d.   (C)  OSD/ARPA negotiated a contract with the firm of Cooper-MacDonald, Inc., Baltimore, Maryland, for procurement and air shipment of all materiel.  The first shipment was received on 27 January 1962 and subsequent increments arrived approximately every three weeks until the contract was fulfilled on 15 May 1962.  Operational evaluation and testing began on 1 February and terminated on 15 July 1962.

5.   (C)  SUMMARY OF TESTS:

a.   (C)  General.

(1)  (C)  To accomplish the stated purpose of this test, it was divided into two parts.  One part was a combat evaluation of the AR-15 in which the weapons were issued to specially selected ARVN Units for use in their operations against the Viet Cong.  Along with the rifles and ammunition, Vietnamese Unit Commanders and US Military Advisors were given weapon preference and operational questionaires and requested to complete and return them after training and combat use of the AR-15.  Samples of these questionnaires appear as Appendices 1, 2, and 3 of Annex "A".

(2)  (C)  The other part of the test consisted of a comparison between the AR-15 Rifle and the M2 Carbine.  Areas in which the two weapons were compared included:  physical characteristics; ease of disassembly and assembly; marksmanship ability at known distances, semi-automatic and automatic fire; marksmanship ability at unknown distances, semi-

## CONFIDENTIAL

3

Ex. 1_Echeverria Decl.
Page 11

# CONFIDENTIAL

automatic and automatic fire; ruggedness and durability; adequacy of safety features; effects of open storage in a tropical environment; ability to penetrate dense brush and heavy foliage; and, the individual Vietnamese soldier's preference between the two weapons.

    b.  (C) <u>Results, Combat Evaluation</u>.

        (1) (C) For detailed report see Annex "A".

        (2) (C) Summary. The Vietnamese Unit Commanders and US Advisors who participated in the evaluation consider the AR-15 Rifle to be a more desirable weapon for use in Vietnam than the M1 Rifle, BAR, Thompson Sub-Machine Gun, and M1 Carbine for the following reasons:

        (a) (C) It is easier to train the Vietnamese troops to use the AR-15 than the M1 Rifle, BAR, M1 Carbine, or the Sub-Machine Gun.

        (b) (C) The AR-15's physical characteristics are well suited to the small stature of the Vietnamese soldier (see photographs 1 and 2, Annex "D").

        (c) (C) It is easier to maintain the AR-15 both in the field and in garrison than the M1 Rifle, BAR, Sub-Machine Gun, or the M1 Carbine.

        (d) (C) The ruggedness and durability of the AR-15 are comparable to that of the M1 Rifle and superior to that of the BAR, Sub-Machine Gun, and M1 Carbine.

        (e) (C) The AR-15 imposes less logistical burden than any of the four principal weapons presently being used by Vietnamese Forces.

        (f) (C) The AR-15 is tactically more versatile than any present weapon being used by Vietnamese Forces.

        (g) (C) In semi-automatic fire, the accuracy of the AR-15 is considered comparable to that of the M1 Rifle, and superior to that of the M1 Carbine.

        (h) (C) In automatic fire, the accuracy of the AR-15 is considered comparable to the Browning Automatic Rifle and superior to the Sub-Machine Gun.

# CONFIDENTIAL

CONFIDENTIAL

c. (C) <u>Results, Comparison Test of the AR-15 Rifle and the M2 Carbine.</u>

(1) (C) For detailed report see Annex "B".

(2) (C) Summary:

(a) (C) <u>Test #1, Comparison of physical characteristics</u>

(i) (C) The AR-15 is comparable to the M2 Carbine in size and weight.

(ii) (C) The addition of an integral grenade launcher, telescope mount, and an accessory bipod the AR-15 Rifle capabilities that the M2 Carbine does not possess at present and attainment of which would require modification of the weapon (see photograph 3, Annex "D").

(iii) (C) Both the AR-15 and the M2 Carbine are compatible with the light weight and diminutive stature of the Vietnamese soldier (see photographs 4 and 5, Annex "D").

(b) (C) <u>Test #2, Comparative ease of disassembly and assembly.</u>

(i) (C) The AR-15 is simpler than the M2 Carbine and requires less time to disassemble and re-assemble for normal field cleaning (see photograph 6, Annex "D").

(ii) (C) The average Vietnamese soldier can be trained in the disassembly and assembly of the AR-15 in less time than for the M2 Carbine.

(c) (C) <u>Test #3, Marksmanship ability, known distance.</u>

(i) (C) The ARVN soldier's ability to deliver accurate semi-automatic fire at known distances up to 200 meters with the AR-15 and the M2 Carbine is comparable. (It is noted that a higher percentage of test participants fired qualifying scores with both the AR-15 and the M2 Carbine than with the M1 Rifle.)

(ii) (C) The ARVN soldier can deliver far more accurate automatic fire at known distances up to 200 meters with the AR-15 than he can with the M2 Carbine.

CONFIDENTIAL

5

## CONFIDENTIAL

(d)  (C)  Test #4, Marksmanship ability, unknown distance.

(i)  (C)  The ARVN soldier's ability to deliver accurate semi-automatic fire on targets of unknown range using the AR-15 and the M2 Carbine is comparable.

(ii)  (C)  The ARVN soldier can deliver more accurate automatic fire on targets of unknown range with the AR-15 than he can with the M2 Carbine.

(e)  (C)  Test #5, Comparative ruggedness and durability

(i)  (C)  The AR-15 is more durable than the M2 Carbine under conditions that require prolonged firing.

(ii)  (C)  The AR-15 will stand up to rough handling normally encountered in combat situations better than the M2 Carbine.

(f)  (C)  Test #6, Comparison of the adequacy of safety features.

(i)  (C)  The safety features on the AR-15 and the M2 Carbine are comparable with regard to their adequacy and the ARVN soldier's ability to understand how they function.

(ii)  (C)  The location of a single selector switch, which combines the functions of safety and type of fire selector, on the left side of the AR-15's receiver where it is easily accessible to the thumb, enables the ARVN soldier to get the first round off faster with the AR-15 than he can with the M2 Carbine.  He must manipulate the safety selector on the M2 Carbine with his trigger finger, then return it to the trigger to fire.  With the AR-15, he can keep his finger on the trigger while manipulating the safety selector with his thumb.

(g)  (C)  Test #7, Effects of open storage in a tropical environment.

(i)  (C)  The functioning capability of the AR-15 is less affected by prolonged exposure to tropical weather than that of the M2 Carbine.

6

## CONFIDENTIAL

# CONFIDENTIAL

(h) (C) <u>Test #8, Brush penetration</u>

(i) (C) The trajectory of the AR-15 bullet is not significantly affected when fired through dense underbrush at ranges up to 50 meters.

(ii) (C) The AR-15 round will penetrate jungle undergrowth equally as well as the M2 Carbine round at ranges up to 50 meters.

(i) (C) <u>Test #9, Troop opinion poll</u>

(i) (C) The great majority of the ARVN soldiers who participated in the comparison test prefer the AR-15 to the M2 Carbine.

6. (C) <u>DISCUSSION:</u>

a. (C) The extremely mobile type of offensive warfare being stressed by US Advisors in Vietnam and the small stature and light weight of the Vietnamese soldier place a high premium on small, lightweight weapons. In addition, the violent short clashes at close ranges which are characteristic of guerrilla warfare in Vietnam make it highly desirable to have a dependable weapon capable of producing a high rate of accurate and lethal full automatic fire.

b. (C) From the viewpoint of standardization and simplicity of training and the resultant long range reduction of the logistics burden, characteristics of existing weapons were studied to determine if a <u>single</u> weapon could be found that would meet the requirements for a basic shoulder weapon for Vietnamese troops. It is believed that such a weapon should encompass the following desirable characteristics of individual weapons:

(1) The effective range of the M1 Rifle.

(2) The light weight and small size of the M1 Carbine.

(3) The full automatic capability of the BAR.

(4) The simplicity of the SMG.

Other highly desirable, if not mandatory, features would include a bayonet, grenade launching and sniper capability.

7

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 15

**CONFIDENTIAL**

c. (C) The AR-15 appeared to more nearly satisfy the above prescirbed characteristics than any other US weapon. The import of the AR-15 weapon/ammunition weight for units that conduct extended operations without normal resupply capabilities can be seen in comparing the 24 lb. weight of an M1 with a battle load of 220 rounds of ammunition with the 12 lb. weight of the AR-15 with 220 rounds. This weight difference equals approximately 430 rounds of AR-15 ammunition.

d. (C) The Comparison Test (Annex "B") shows the AR-15 to be distinctly superior to the M2 Carbine. Although the M2 Carbine is sufficiently light for use by the Vietnamese soldier, it does not possess the essential characteristics of a basic weapon for offensive warfare. It lacks the effective range of the M1 Rifle and has a high malfunction rate (Ref 1. e. and 1.h.). However, it is apparently available and was considered by MAAG as the prime competitor against the AR-15.

e. (C) The Combat Evaluation (Annex "A") shows that all US Advisors and Vietnamese Commanders who participated in the evaluation prefer the AR-15 to any other weapon with which the RVNAF are now armed. The lethality of the AR-15 and its reliability record were particularly impressive. All confirmed casualties inflicted by the AR-15, including extremity hits, were fatal (see photographs 7 and 8, Annex "D"). The high degree of reliability and trouble-free performance of the weapon reflected in previous test reports (Ref 1.c., 1. d., and 1.f.) was also noteworthy during the testing and evalutaion here. No parts breakage was encountered while firing approximately 80,000 rounds during the Comparison Test. Only two parts have been issued to date to replace breakage for the entire 1,000 weapons. Stoppages on the AR-15 are easily cleared by the individual soldier through the application of "immediate action".

f. (C) A thorough review of the numerous stateside AR-15 test reports referenced in paragraph 1 reveals nothing which would make the foregoing views unsound. The reported poor performance of the AR-15 under cold weather conditions is of no concern in Vietnam. The widely held view that the AR-15 operates poorly under rainy conditions was disproved in the weapon's second test by Aberdeen Proving Ground (Ref 1. f.). Those results were confirmed here during field operations. No deficiencies in the weapon requiring correction prior to adoption were found during the test in Vietnam, although two minor changes are recommended for product improvement. These recommendations appear in Annex "C".

g. (C) The combat evaluation part of this test is somewhat subjective since it is based on the individual judgments of many users. It is

8

**CONFIDENTIAL**

## CONFIDENTIAL

believed, however, that the professional judgments of the senior US Advisors and Vietnamese Commanders of the units testing the weapon, all of whom are mature, experienced soldiers, does provide for a sound combat appraisal.

h.  (C) From an operational viewpoint, it is believed that the tests conducted in Vietnam show the superiority of the AR-15 over the M2 Carbine and over other weapons now issued to RVNAF.  It is believed that the decision as to what units might be issued the AR-15 or which weapons the AR-15 might replace is dependent on cost and logistical factors which are beyond the purview of this unit.

7.  (C)  <u>CONCLUSIONS:</u>  It is concluded that:

a.  (C)  The AR-15 is more compatible with the light weight and small stature of the Vietnamese soldier than the M1 Rifle, the Browning Automatic Rifle, and the Thompson Sub-Machine Gun.

b.  (C)  The AR-15 is superior to the M2 Carbine.

c.  (C)  The M2 Carbine lacks the necessary dependability and versatility for consideration as the <u>basic</u> shoulder weapon for Vietnamese troops.

d.  (C)  The AR-15 is capable of replacing any or all of the shoulder weapons currently being used by the Armed Forces of the Republic of South Vietnam.

e.  (C)  The AR-15 is considered by both Vietnamese Commanders and U.S. Military Advisors who participated in the tests as the best "all around" shoulder weapon in Vietnam.

8.  (C)  <u>RECOMMENDATIONS:</u>  It is recommended that:

a.  (C)  The AR-15 be considered for adoption as the basic weapon for all RVNAF with a view toward improving effectiveness and simplifying training and weapons/logistics systems.

b.  (C)  Priority for adoption of the AR-15 be given to those units which frequently operate in jungle environment for extended periods. because

9

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 17

# CONFIDENTIAL

of the significant operational and logistical advantages accruing to their having the lightest and most effective weapon/ammunition combination available.

c. (D) The M1 and/or M2 Carbine continue to be issued only to those individuals who, because of their duty or position, can function effectively with a weapon best suited for a defensive role.

ANNEXES:
A. Combat Evaluation w/3 Appendices
B. Comparison Test
C. Suggested Corrective Actions
D. Photographs 1 through 8

10

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 18

# CONFIDENTIAL

### ANNEX "A"

### DETAILS OF THE
### COMBAT EVALUATION OF THE AR-15

I.   (C) <u>GENERAL.</u>

Selected Vietnamese Units which had previously been engaged in considerable combat were issued AR-15 Rifles and ammunition for use against the Viet Cong.  In addition, each Unit Commander and US Military Advisor with these units was given questionnaires in which he was requested to evaluate the AR-15 in comparison with the other weapons presently used by the RVNAF.  (See Appendices 1, 2, and 3 for samples of questionnaires. )

II.  (C) <u>DISTRIBUTION OF WEAPONS AND AMMUNITION.</u>

| Unit | AR-15 Rifles | Ammunition |
|------|--------------|------------|
| 7th Infantry Division | 100 | 50,000 rds |
| Rangers | 100 | 50,000 rds |
| Airborne Brigade | 390 | 195,000 rds |
| VN Marines | 100 | 50,000 rds |
| VN Special Forces | 100 | 50,000 rds |
| Special Battalions | 125 | 120,000 rds |
| 5th Infantry Division | 40 | 25,000 rds |
| Father Hoa | 10 | 10,000 rds |
| Total | 965 | 550,000 rds |

III. (C) <u>DETAILS OF TEST.</u>

A.  (C) <u>Purpose:</u>  To evaluate the performance of the AR-15 Rifle under actual combat conditions and to compare this performance to that of the weapons presently being used by the RVNAF.

ANNEX "A"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 19

## CONFIDENTIAL

B. (C) <u>Method:</u> Each Unit Commander and US Military Advisor of those units receiving AR-15 Rifles evaluated its performance in combat and compared it to the performance of those weapons presently being used by the RVNAF.  Areas in which the AR-15 was evaluated and compared included:  training; physical characteristics; ease of maintenance; ruggedness and durability; logistical considerations; accuracy; and tactical versatility. In the questionnaires given them, Commanders and Advisors were instructed to award 5 points to the most desirable weapon, 4 points to the second, 3 points to the third, 2 points to the fourth, and 1 point to the least desirable weapon in each category delineated above.

C. (C) <u>Results:</u> The results from the questionnaires are set forth in the table below and reflect the evaluation of the AR-15 by Commanders and Advisors of most of the different types of tactical units in Vietnam (as listed in paragraph II above).  The figures indicate the total number of points awarded to each weapon by Vietnamese Unit Commanders and U.S. Military Advisors in their joint responses to the questionnaires.

| 1. <u>Training.</u> | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Simplest to train the troops to use | 59 | 44 | 15 | 37 | 55 | 70 |
| b. Simplest to train in functioning | 61 | 50 | 15 | 37 | 47 | 70 |
| c. Simplest to train in disassembly and assembly | 63 | 48 | 14 | 37 | 48 | 70 |
| Total | 183 | 142 | 44 | 111 | 150 | 210 |

| 2. Physical Characteristics | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Easiest for soldier to aim and fire | 60 | 29 | 17 | 42 | 62 | 70 |
| b. Easiest to carry over open terrain | 59 | 29 | 14 | 43 | 64 | 70 |
| c. Easiest to carry through jungle terrain | 59 | 29 | 14 | 45 | 63 | 70 |
| d. Easiest to hold on a target while firing several rounds | 69 | 40 | 24 | 24 | 53 | 70 |
| Total | 247 | 127 | 69 | 154 | 242 | 280 |

2

ANNEX "A"            CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 20

# CONFIDENTIAL

| 3. Maintenance | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Simplest to disassemble and assemble | 65 | 43 | 14 | 39 | 49 | 70 |
| b. Easiest to maintain in the field | 63 | 51 | 16 | 34 | 46 | 70 |
| Total | 128 | 94 | 30 | 73 | 95 | 140 |

| 4. Ruggedness & Durability | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Most rugged weapon | 52 | 59 | 33 | 35 | 31 | 70 |
| b. Had fewest stoppages or malfunctions during firing | 59 | 59 | 20 | 32 | 39 | 70 |
| c. Most reliable under all conditions | 57 | 60 | 28 | 30 | 35 | 70 |
| Total | 168 | 178 | 81 | 97 | 105 | 210 |

| 5. Logistics | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Imposes least logistical burden | 66 | 47 | 17 | 30 | 50 | 70 |
| Total | 66 | 47 | 17 | 30 | 50 | 70 |

| 6. Tactical | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Easiest to employ | 64 | 40 | 18 | 39 | 49 | 70 |
| b. Preferred in ambush/ counter-ambush situations | 69 | 28 | 36 | 48 | 29 | 70 |
| c. Preferred against massed troops | 65 | 32 | 61 | 33 | 19 | 70 |
| d. Tactically most versatile | 69 | 43 | 38 | 29 | 31 | 70 |
| Total | 267 | 143 | 153 | 149 | 128 | 280 |

3

ANNEX "A"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 21

## CONFIDENTIAL

| 7. General | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Preferred by troops | 67 | 28 | 18 | 46 | 51 | 70 |
| b. Preferred by commanders and advisors | 64 | 33 | 21 | 39 | 43 | 70 |
| c. Most suited to VN soldier under present tactical conditions | 67 | 30 | 21 | 42 | 50 | 70 |
| d. Most effective at most common range for engaging VC (0-200 meters) | 63 | 46 | 49 | 22 | 30 | 70 |
| Total | 261 | 137 | 109 | 149 | 174 | 280 |

Recapitulation: In all aspects covered, the total ratings for all weapons were as follows:

| AR-15 | M1Rifle | BAR | SMG | M1Carbine | Maximum Possible |
|---|---|---|---|---|---|
| 1320 | 868 | 503 | 763 | 894 | 1470 |

8. **Accuracy.** Advisors and Unit Commanders were requested to evaluate the accuracy of the AR-15 and compare it with other present weapons in both automatic fire and semi-automatic fire. Their evaluation is reflected in the following table:

| | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine | Max. Poss. |
|---|---|---|---|---|---|---|
| a. Semi-automatic fire | 61 | 62 | | | 45 | 70 |
| b. Automatic fire | 65 | | 57 | 42 | | 70 |

9. **(C) Remarks.** Unit Commanders' and Advisors' remarks concerning the value of the AR-15 to Vietnamese Units and its worth as a combat weapon in the war in South Vietnam as opposed to existing weapons were also requested. Generally, the comments were extremely favorable to the AR-15. All of the comments received are presented below in their entirety and in the form in which they were received.

(1) (C) "On 160900 June 62, one platoon from the 340 Ranger Company was on an operation vic. YT260750 and contacted 3 armed VC in heavily forested jungle. Two VC had carbines, grenades, mines, and one had a

4

ANNEX "A"

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 22

**CONFIDENTIAL**

SMG.  At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC with 3 rounds with the first burst.  One round in the head-took it completely off.  Another in the right arm, took it completely off, too.  One round hit him in the right side, causing a hole about five inches in diameter.  It cannot be determined which round killed the VC but it can be assumed that any one of the three would have caused death.  The other 2 VC ran, leaving the dead VC with 1 carbine, 1 grenade and 2 mines. " (Rangers)

(2. ) (C) "On 9 June a Ranger Platoon from the 40th Inf Regt was given the mission of ambushing an estimated VC Company.  The details are as follows:
    a.  Number of VC killed:  5
    b.  Number of AR-15's employed:  5
    c.  Range of engagement:  30-100 meters
    d.  Type wounds:
        1.  Back wound, which caused the thoracic cavity to explode.
        2.  Stomach wound, which caused the abdominal cavity to explode.
        3.  Buttock wound, which destroyed all tissue of both buttocks.
        4.  Chest wound from right to left, destroyed the thoracic cavity.
        5.  Heel wound, the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip.
These deaths were inflicted by the AR-15 and all were instantaneous except the buttock wound.  He lived approximately five minutes.

The following is a list of minor deficiencies noted during this period:
    a.  The stock and heat deflector will reflect light.  This light is visible for approximately 150 feet at night.
    b.  A brass brush is needed to remove carbon from the bolt carrier. " (Rangers)

(3. ) (C) "72 AR-15 Rifles were carried into this action (airborne assault).  The drop zone was barely acceptable and many troops landed in high trees.  Several LMG's and BAR's were not operational after the drop.  Only one AR-15 was reported slightly damaged (damaged pistol grip) and all were operational.  Throughout the entire operation, which lasted 6 days and covered over 40 kilometers of difficult terrain including dense jungle and frequent water crossings, the weapons (AR-15) held up exceptionally well. " (Airborne Brigade)

5

ANNEX "A"

**CONFIDENTIAL**

## CONFIDENTIAL

(4.) (C) "The AR-15 proved to be an effective weapon on this operation for the following reasons:

a. The weapon held up very well on the paradrop which took place on a small drop zone surrounded by dense forests. Landings of the troopers were much rougher than normal. Many troops landed in high trees. This subjected the individual weapons to a much more severe test than usual. Some of the LMG's and BAR's were not operational after the jump. All AR-15's were functional.

b. Field maintenance on this weapon (AR-15) proved to be much simpler than on the other weapons.

c. While no decisive engagement was made so that the striking power of this weapon (AR-15) could be observed, the troops had great confidence in it and it is my belief that it would have greatly increased our overall firepower had it been tested." (Airborne Brigade)

(5.) (C) "During the period from 16 April to 11 May 1962, the 8th Battalion, Airborne Brigade, participated in two (2) operations of five (5) and four (4) days duration.

The AR-15 was carried during both operations. I was not in a position to observe the engagement of Viet Cong with the AR-15 during either operation although it was fired on different occasions.

The following remarks therefore, are confined to other observations and personal opinions on the AR-15:

a. Maintenance requirements for the AR-15 were negligible. I inspected numerous weapons throughout the entire period stated above and always found the weapons in excellent firing condition.

b. A great simplification in the small arms weapons could be effected by the adoption of the AR-15 to replace the BAR, M1, and Carbine. The effectiveness of the weapon (AR-15), however, I cannot attest to at this time.

c. The troopers have a great amount of respect for the AR-15. If the weapon were adopted as TO&E for Airborne Units, there would be a tremendous psychological uplift in the individual soldier's belief in his ability to shoot and kill. " (Airborne Brigade)

6

ANNEX "A"

## CONFIDENTIAL

# CONFIDENTIAL

(6.) (C) "One company (96 off & EM) completely equipped with the AR-15. Six operations took place prior to any real use of the weapon.

Five VC were hit, all five with body wounds, and all five killed. Four were probably killing wounds with any weapon listed, but the fifth was essentially a flesh wound. The AR-15 made it a fatal wound.

The troops have a great deal of respect for the weapon and prefer it to all others. They take excellent care of it.

One left upper handguard was cracked and broke during routing a stubborn captive from a wooded area. The soldier concerned placed the handguard against a VC head with considerable force." (7th Infantry Division)

(7.) (C) "On 23-24 May 1962, one company completely equipped with AR-15's (87) plus Bn Hq elements was involved in one light and one heavy action. No wounded were captured and all casualties were inflicted with the AR-15. 27 Viet Cong were killed (24 counted by the advisor) and 25 captured. Grenades were used for the first time and were very effectively employed at ranges of 100-500 meters. They served as the real artillery support as we could not get the artillery to fire any closer than 400 meters. About 36 grenades were utilized in the heavy action, all propelled from the AR-15. The troops are very enthusiastic about the weapon and treat it with greater care than usual." (7th Infantry Division)

(8.) (C) "To date, this weapon has been used only for training. The simplicity of construction has reduced training time necessary for maintenance by approximately fifty per-cent. It is believed that this is an ideal weapon for this type weather and terrain." (Special Battalions)

(9.) (C) "On 13 April, 62, a Special Forces team made a raid on a small village. In the raid, seven VC were killed. Two were killed by AR-15 fire. Range was 50 meters. One man was hit in the head; it looked like it exploded. A second man was hit in the chest; his back was one big hole." (VN Special Forces)

(10.) (C) "This weapon is ideal for this country primarily for these reasons:

    a. Durability & ease of maintenance.
    b. Good Accuracy.
    c. Rapid rate of fire.
    d. Light weight (size & shape make it easy for Vietnamese to handle).
    e. Excellent killing or stopping power." (Airborne Brigade)

ANNEX "A"                    CONFIDENTIAL
7

Ex. 1_Echeverria Decl.
Page 25

## CONFIDENTIAL

D.  (C) Analysis: Based on the numerical ratings and the comments of US Advisors and VN Unit Commanders, the AR-15 is the most desirable weapon for use in Vietnam for the following reasons:

1.  Ease of training.

2.  Suitable physical characteristics.

3.  It is easy to maintain.

4.  It is more rugged and durable than present weapons.

5.  It imposes the least logistical burden.

6.  It is the best weapon for all-around tactical employment.

7.  Its semi-automatic firing accuracy is comparable to that of the M1 Rifle, while its automatic firing accuracy is considered superior to that of the Browning Automatic Rifle.

8.  Vietnamese troops, Commanders and US Advisors prefer it to any other weapon presently being used in Vietnam.

APPENDICES:
1.  Weapons Questionnaire
2.  For the RVNAF Unit Commander
3.  Questionnaire for the Senior MAAG Advisor

8

ANNEX "A"

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 26

# CONFIDENTIAL

## WEAPONS QUESTIONNAIRE

Based upon your experience and observation as the Commander or Advisor of a unit of the RVNAF, rate the weapons on the right side of this questionnaire in order of preference with respect to the characteristics and questions listed. Your answers should reflect your opinion as to the value of the weapons to the Vietnamese, not the US Forces.

Rating Key:  5 - first choice          2 - fourth choice
             4 - second choice         1 - last choice.
             3 - third choice

| A. TRAINING | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon is easier to train the troops to use? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon is easier to train the troops in functioning? | ___ | ___ | ___ | ___ | ___ |
| 3. Which weapon is easier to train the troops to disassemble and assemble? | ___ | ___ | ___ | ___ | ___ |

| B. PHYSICAL CHARACTERISTICS | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon, because of its size and shape, is easiest for the soldier to aim and fire? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon, because of size, shape and weight, is easier for the soldier to carry over open terrain? | ___ | ___ | ___ | ___ | ___ |
| 3. Which weapon, because of size, shape and weight, is easier for the soldier to carry in the jungle? | ___ | ___ | ___ | ___ | ___ |
| 4. Which weapon is easiest to hold on a target while firing several rounds? | ___ | ___ | ___ | ___ | ___ |

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL, WHEN FILLED IN

APPENDIX 1, ANNEX "A"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 27

CONFIDENTIAL

| C. MAINTENANCE | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon is simplest to disassemble and assemble? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon is easiest for the troops to maintain in the field? | ___ | ___ | ___ | ___ | ___ |

| D. RUGGEDNESS & DURABILITY | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon is most rugged? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon had the fewest stoppages and malfunctions? | ___ | ___ | ___ | ___ | ___ |
| 3. Which weapon is the most reliable under all conditions? | ___ | ___ | ___ | ___ | ___ |

| E. LOGISTICS | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon imposes the smallest logistical burden? (Consider weight, spare parts, ease of repair, etc.) | ___ | ___ | ___ | ___ | ___ |

| F. TACTICAL | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon is easiest to employ? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 2. Which weapon would you prefer in ambush/counter-ambush situations? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 3. Which weapon would you prefer against mass attacks? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL WHEN FILLED IN
APPENDIX 1, ANNEX "A"    CONFIDENTIAL

2

## CONFIDENTIAL

|  | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 4. Which weapon do you consider most versatile? (Consider all capabilities) | ___ | ___ | ___ | ___ | ___ |

| G. ACCURACY (Rate 5, 4 & 3) | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapon appears most accurate when fired semi-automatically? | ___ | ___ | ___ | ___ | ___ |
| 2. Which weapon appears most accurate when fired automatically? | ___ | ___ | ___ | ___ | ___ |

| H. GENERAL | AR-15 | M1 Rifle | BAR | SMG | M1 Carbine |
|---|---|---|---|---|---|
| 1. Which weapons do the troops prefer? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 2. Which weapon would you prefer for your personal use? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 3. Which weapon do you think is most suited to the Vietnamese soldier under present tactical conditions? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |
| 4. At what range do you think most Viet Cong are engaged? | ___ | ___ | ___ | ___ | ___ |
| 5. Which weapon do you think is most effective at that range? | ___ | ___ | ___ | ___ | ___ |
| 6. If the TO&E of your unit only allowed a single weapon, which one would you choose? | ___ | ___ | ___ | ___ | ___ |
| Why? | | | | | |

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL WHEN FILLED IN

APPENDIX 1, ANNEX "A"   CONFIDENTIAL

3

Ex. 1_Echeverria Decl.
Page 29

# CONFIDENTIAL

I. **REMARKS:**   In the space below, please make any pertinent remarks you may have concerning the AR-15 Rifle, its effectiveness in South Vietnam, its assets or its shortcomings (Continue on back of page if necessary).

Unit_____

Date_____

Signature_____

THIS QUESTIONNAIRE IS CLASSIFIED KIN, CONFIDENTIAL WHEN FILLED IN

APPENDIX 1, ANNEX "A"

# CONFIDENTIAL
4

## CONFIDENTIAL

### FOR THE RVNAF UNIT COMMANDER

**QUESTION NO. 1:**

How many weapons of each of the following types were carried into the combat engagement, how many rounds of ammunition per weapon were carried, and how many rounds fired?

|         | No. Weapons | Ammo rds/weap. | Ammo rds. fired |
|---------|-------------|----------------|-----------------|
| BAR     | _____ | _____ | _____ |
| M1      | _____ | _____ | _____ |
| SMG     | _____ | _____ | _____ |
| Carbine | _____ | _____ | _____ |
| AR-15   | _____ | _____ | _____ |

**QUESTION NO. 2:**

How many VC were killed? _____
wounded? _____

How many of the VC were KIA by the AR-15? _____

How many of the VC were wounded by the AR-15? _____

**QUESTION NO. 3:**

What percentage of the friendly fire was full automatic? _____

What percentage of the AR-15 fire was full automatic? _____

What percentage of the AR-15's had the safety device installed that allowed either full or semi-automatic fire? _____

**QUESTION NO. 4:**

What was the maximum range at which shots were fired at the VC? _____

What was the average range? _____

**THIS QUESTIONNAIRE IS CLASSIFIED KIN CONDIFENTIAL WHEN FILLED IN**

**APPENDIX 2, ANNEX "A"**

## CONFIDENTIAL

# CONFIDENTIAL

**QUESTION NO. 5:**

Were aimed shots fired through light brush? _____

If so, about what percent of the total fire from all weapons (BAR, SMG, M1, Cargine, AR-15) were aimed shots through light brush?

Less than 5% _____          Less than 20% _____

Less than 50% _____          More than 50% _____

In your opinion were shots from the AR-15 missed because of brush deflection? _____

If your answer to this question is yes, is it your opinion that the full automatic feature of the AR-15 and the extra rounds that can be carried for a given weight allowance do or do not compensate for this bruch deflection? Yes_____     No_____     No Opinion_____

**QUESTION NO. 6:**

Were any rifle barrels bent in air drops or other rough handling and hard usage? _____

Were any barrels damaged by being fired with water in the bore?_____

Were there any malfunctions of any type? _____

If yes, please elaborate in the remarks section of this questionnaire.

**QUESTION NO. 7:**

As a unit commander of the RVNAF, how would you rate the AR-15 Rifle in the guerrilla warfare action you expect to fight as compared with the other types of weapons listed?

In each space use:  A - For the AR-15 is better than
                    B - For there is no difference
                    C - For the AR-15 is worse than
                    D - For no opinion

|                     | M1 | BAR | SMG | Carbine |
|---------------------|----|-----|-----|---------|
| Speed of employment |    |     |     |         |
| Accuracy            |    |     |     |         |

2

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN APPENDIX 2, ANNEX "A"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 32

## CONFIDENTIAL

|                          | M1  | BAR | SMG | Carbine |
|--------------------------|-----|-----|-----|---------|
| Striking power           | ___ | ___ | ___ | ___     |
| Fire power               | ___ | ___ | ___ | ___     |
| Reliability              | ___ | ___ | ___ | ___     |
| Field maintenance        | ___ | ___ | ___ | ___     |
| Weight                   | ___ | ___ | ___ | ___     |
| Size                     | ___ | ___ | ___ | ___     |
| Overall                  | ___ | ___ | ___ | ___     |
| Overall for ambushes only| ___ | ___ | ___ | ___     |

**QUESTION NO. 8:**

If the VC tactics grow into large scale attacks and the "human sea" type tactic is used, how would you rate the AR-15 overall against these other weapons? (Same scale as above: A, B, C, D)

| M1  | BAR | SMG | Carbine |
|-----|-----|-----|---------|
| ___ | ___ | ___ | ___     |

**QUESTION NO. 9:**

Would the soldier who carried the AR-15 into this engagement choose it again over the weapon he formerly carried?

|                              | % would choose AR-15 | % would choose other |
|------------------------------|----------------------|----------------------|
| Formerly carried the BAR     | ___                  | ___                  |
| Formerly carried the M1      | ___                  | ___                  |
| Formerly carried the SMG     | ___                  | ___                  |
| Formerly carried the Carbine | ___                  | ___                  |

**QUESTION NO. 10:**

As an RVNAF unit commander, if you had your choice of weapons consisting of all four of the following: BAR, M1, SMG, Carbine or the AR-15, which would be your choice?

OPTION A:  BAR, M1, SMG, Carbine _____.

OPTION B:  AR-15 _____.

3

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN

APPENDIX 2, ANNEX "A"

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 33

# CONFIDENTIAL

If your answer is option A, would you choose to completely replace any of the four weapons with the AR-15?

Would completely replace:    BAR_____.

M1_____.

SMG_____.

Carbine_____.

QUESTION NO. 11:

Please elaborate in the space below or using extra sheets on any point not adequately covered above.

4

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN

APPENDIX 2, ANNEX "A"

# CONFIDENTIAL

# CONFIDENTIAL

### QUESTIONNAIRE FOR THE SENIOR MAAG ADVISOR

1. In the engagement with the VC covered by this questionnaire, how many of each of the following weapons were carried by your unit?

BAR_____   SMG_____   M1_____   Carbine_____   AR-15_____

2. If the AR-15 had not been used, how many of each would have been carried?

BAR_____   SMG_____   M1_____   Carbine_____

3. As a MAAG Advisor to the RVNAF you obtain insight into the combat situation in SVN not available to the CDTC or to other US Government officials. These questionnaires can only gain a little part of the whole individual weapons problem. Some of the questions asked of the RVNAF unit commander are, therefore, repeated here because they are considered of prime importance.

QUESTION: How do you as a MAAG Advisor rate the AR-15 Rifle in the SVN guerrilla war as compared to the following weapons?

|  | BAR | M1 | SMG | Carbine |
|---|---|---|---|---|
| A. The AR-15 is better. | _____ | _____ | _____ | _____ |
| B. No difference. | _____ | _____ | _____ | _____ |
| C. The AR-15 is worse. | _____ | _____ | _____ | _____ |
| D. No opinion. | _____ | _____ | _____ | _____ |
| How would you rate the AR-15 against these weapons for ambushes only? | _____ | _____ | _____ | _____ |
| How would you rate the AR-15 in a "human sea" attack against these weapons? | _____ | _____ | _____ | _____ |

As a MAAG Advisor to RVNAF, if you were to recommend the TO&E of the above weapons or the AR-15 only which would you recommend?_____.

**THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN**

**APPENDIX 3, ANNEX "A"**

# CONFIDENTIAL

**CONFIDENTIAL**

4.  If you would not recommend completely replacing all four of the above weapons with the AR-15, would you recommend completely replacing any one of the four?

    Would recommend completely replacing BAR_____.
    Would recommend completely replacing M1_____.
    Would recommend completely replacing SMG_____.
    Would not completely replace any of these weapons_____.

5.  **Remarks:** In the space below or on additional sheets please elaborate on any points not adequately covered above.

_____
(Signature)

2

THIS QUESTIONNAIRE IS CLASSIFIED KIN CONFIDENTIAL WHEN FILLED IN

APPENDIX 3, ANNEX "A"

**CONFIDENTIAL**

Ex. 1_Echeverria Decl.
Page 36

# CONFIDENTIAL

### ANNEX "B"

### DETAILS OF COMPARISON TEST
### BETWEEN THE AR-15 AND M2 CARBINE

## I. (C)   GENERAL.

Personnel from a Vietnamese company that had just completed advanced individual training were used as test subjects for most of this comparison. The unit of 180 men was divided into two groups of 90 men each. Group A received one M2 Carbine per man, while Group B received an AR-15 for each man. Each group was then given a course of instruction on their respective weapon. The instruction for each was identical in time and scope of material covered. Following this, both groups underwent an identical test program which consisted of:  assembly and disassembly; known distance firing, both semi-automatic and automatic fire; unknown distance firing, semi-automatic and automatic fire; bayonet course; and, infiltration course. This phase lasted for one week (44 hours). At the end of the first week, the two groups traded weapons and the course of instruction and the tests were repeated.

## II. (C)   SUMMARY OF TESTS.

To arrive at a valid conclusion concerning the relative suitability of the AR-15 as opposed to the M2 Carbine for possible use by selected units of the Armed Forces of the Republic of Vietnam, a total of nine tests were conducted. They were:

1. Comparison of Physical Characteristics.
2. Comparative Ease of Disassembly and Assembly.
3. Marksmanship Ability - Known Distance (semi-automatic and automatic fire).
4. Marksmanship Ability - Unknown Distance (semi-automatic and automatic fire).
5. Comparative Ruggedness and Durability.
6. Adequacy of Safety Features.
7. Effects of Open Storage in a Tropical Environment.
8. Comparative Ability to Penetrate Dense Foliage.
9. Troop Preference Poll.

ANNEX "B"

# CONFIDENTIAL

# CONFIDENTIAL

III. (C)   **DETAILS OF TESTS.**

**Test No. 1.  Comparison of Physical Characteristics.**

**Purpose:**   To compare the physical characteristics of the AR-15 Rifle and the M2 Carbine.

**Method:**   Both weapons were weighted and measured and the resulting data recorded.

**Results:**

| a.   Weights (lbs.): | AR-15 | M2 Carbine |
|---|---|---|
| Weapon (less sling, magazine and accessories) | 6.24 | 5.98 |
| Magazine (empty) | 0.18* | 0.25* |
| Magazine (loaded - 20 rds) | 0.68 | - |
| Magazine (loaded - 30 rds) | - | 1.02 |
| Bayonet | 0.62 | 0.72 |
| Bipod | 0.50 | (No Bipod) |
| Sling | 0.19 | 0.07 |

Totals: w/20 rd mag loaded 8.23
w/30 rd mag loaded                              7.79

*Figure not included in totals.

Relative Battle Load (lbs.) - including accessories of sling, bayonet, bipod.

| | | |
|---|---|---|
| Weapon w/12 magazines (240 rds) | 15.71 | |
| Weapon w/8 magazines (240 rds) | | 14.93 |

| b.   Dimensions (inches): | AR-15 | M2 Carbine |
|---|---|---|
| Length of barrel | 20.00 | 18.00 |
| Overall length | 37.50 | 35.58 |
| Overall length w/bayonet | 42.98 | 42.26 |

**ANNEX "B"**              # CONFIDENTIAL

2

Ex. 1_Echeverria Decl.
Page 38

# CONFIDENTIAL

**Analysis:** The Ar-15 and the M2 Carbine are comparable in size and weight and both are compatible with the light weight and small stature of the VN soldier. An integral grenade launcher and telescope mount and an accessory bipod are included in the weapon weight of the AR-15. These are not standard items for the M2 Carbine.

**Test No. 2. Comparative Ease of Disassembly and Assembly.**

**Purpose:** To compare the ease of disassembly and assembly of the AR-15 Rifle and the M2 Carbine and the difficulties of training encountered therein.

**Method:**

a. Each group of test subjects received a two hour period of instruction in the disassembly and assembly of their respective weapons. After completing this instruction, test personnel selected random samples of 10 men and had them disassemble and reassemble their weapons. This procedure was repeated with each group until 100 men had been tested with each weapon. Times were recorded by Non-Commissioned Officers and the weapons were inspected for proper assembly by Test Committee Cadre.

b. For the purpose of this test, both weapons were disassembled only as far as was necessary for field cleaning, i.e., "field stripped".

**Results:**

|  |  | AR-15 | M2 Carbine |
|---|---|---|---|
| a. | Average time required for disassembly & assembly. | 1 min. 17 sec. | 3 min. 17 sec. |
| b. | Could not reassemble (percent) | 0% | 19% |
| c. | Reassembled improperly (percent) | 4% | 10% |
| d. | Number of parts handled by soldier in field stripping | 7 | 11 |

**Analysis:**

a. The AR-15 is simpler and requires less time to disassemble and assemble for normal field cleaning.

ANNEX "B"

# CONFIDENTIAL

3

# CONFIDENTIAL

b.  The average Vietnamese soldier can be trained in the disassembly and assembly for field cleaning of the AR-15 in a shorter time than for the M2 Carbine.  This is further emphasized by the fact that all test subjects had previously received 12 hours of instruction on the M1 Carbine while undergoing basic combat training.

### Test No. 3.  Marksmanship Ability, Known Distance.

Purpose:  To compare the ability of ARVN soldiers to deliver accurate semi-automatic and automatic fire on targets at known ranges using the AR-15 and the M2 Carbine.

Method:

a.  Each group of test subjects received 10 hours of preliminary marksmanship training on their respective weapon.  Upon completion of formal instruction, zeroing of weapons and practice firing at 26, 100 and 200 meters, each group fired a qualification course for test purposes. Each test participant completed this qualification course with both the AR-15 and M2 Carbine.

b.  In semi-automatic fire, the course fired for the test was the standard ARVN M1 rifle qualification course.  The scores obtained by the test subject with both weapons in this firing were compared with each other and with previous scores fired by the test subjects in qualifying with the M1 Rifle while undergoing Basic and Advanced Individual Training.

c.  In automatic fire, the test subjects engaged the standard ARVN silhouette target at ranges of 75, 100 and 200 meters.  Each individual fired a total of 40 rounds from each range.  Scores were computed on the basis of 5 points per target hit and an average of 50% hits was used as the basis for qualification.

d.  Throughtout all firing, stoppages or malfunctions due to mechanical failures were noted and recorded.

e.  Throughout all firing, observations concerning the adequacy of safety features and the ARVN soldier's ability to understand them were recorded.

4

ANNEX "B"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 40

CONFIDENTIAL

| Results: | AR-15 | M2 Carbine | M1 Rifle |
|---|---|---|---|
| Semi-automatic: | | | |
| Percent qualified | 26% | 27% | 15% |
| Automatic: | | | |
| Percent qualified | 71% | 7% | |

Analysis:

a.  The ability of the ARVN soldier to deliver accurate semi-automatic fire on targets of known range with the AR-15 and the M2 Carbine is comparable.  Test participants, as a group, fired a higher percentage of qualifying scores with both the AR-15 and M2 Carbine than they had previously fired with the M1 Rifle.

b.  The ARVN soldier's ability to deliver accurate automatic fire on targets of known range is far greater with the AR-15 rifle than with the M2 Carbine.

Test No. 4.  Marksmanship Ability, Unknown Distance.

Purpose:  To compare the ARVN soldier's ability to deliver accurate semi-automatic and automatic fire on targets of unknown range using the AR-15 Rifle and the M2 Carbine.

Method:

a.  The standard ARVN Transition firing course was used for this test.

b.  Semi-automatic fire.  Each man received 40 rounds to engage 20 targets at varying ranges from 50 to 250 meters.  For a first round hit, he was awarded 10 points.  For a second round hit, he was awarded 5 points.  Qualification score for the course was 100 points.

c.  Automatic Fire.  Each man received 80 rounds to engage 20 targets in short bursts.  Targets were located at varying ranges from 50 to 250 meters.  Scores were computed on the basis of 5 points per target hit.  Qualification score for the course was 100 points.

d.  Throughout all firing, stoppages or malfunctions due to mechanical failures were noted and recorded.

5

ANNEX "B"

CONFIDENTIAL

## CONFIDENTIAL

e.  Throughout all firing, observations concerning the adequacy of safety features and the ARVN soldier's ability to understand them were recorded.

**Results:**

|  | AR-15 | M2 Carbine |
|---|---|---|
| Semi-automatic run: | | |
| Percent qualified | 23% | 22% |
| Automatic run: | | |
| Percent qualified | 23% | 15% |

**Analysis:**

a.  The ARVN soldier's ability to deliver accurate semi-automatic fire on targets of unknown range using the AR-15 and the M2 Carbine is comparable.

b.  The ARVN soldier's ability to deliver accurate automatic fire on targets of unknown range is greater with the AR-15 than with the M2 Carbine.

**Test No. 5.  Comparative Ruggedness and Durability.**

**Purpose:**  To compare the ruggedness and durability of the AR-15 Rifle and the M2 Carbine.

**Method:**

a.  Concurrent with all other testing, observations concerning the ruggedness and durability of each weapon were recorded.  During all firing excercises, any stoppage or malfunction of either weapon caused by mechanical failure was noted and recorded.

b.  Fifty AR-15 Rifles and fifty M2 Carbines were each run through the standard ARVN Bayonet Assault Course twice.  At the completion of the course, the weapons were inspected and "dry fired".  Any deficiencies noted were recorded.

c.  Fifty AR-15 Rifles and fifty M2 Carbines were each run through the standard ARVN Infiltration Course twice.  At the completion of the course, the weapons were inspected and "dry fired".  Any deficiencies noted were recorded.

6

ANNEX "B"

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 42

# CONFIDENTIAL

**Results:**

a. After the first week of firing, seven M2 Carbines were eliminated from the test. Six of these would not fire automatically because of defective disconnector springs; the other would not fire at all because of a broken disconnector pin. In contrast, all AR-15's functioned properly throughout the entire test period.

b. After negotiating the Bayonet Assault Course the second time, two M2 Carbines were eliminated from the test because of broken stocks. No AR-15 Rifles were damaged.

c. Both the M2 Carbine and the AR-15 were carried through the Infiltration Course twice without adverse effect.

**Analysis:**

a. The AR-15 is considered to be more rugged and durable than the M2 Carbine under conditions which require prolonged firing.

b. The AR-15 will stand up to rough handling normally encountered in combat situations better than the M2 Carbine.

**Test No. 6. Comparison of the Adequacy of Safety Features.**

**Purpose:** To compare the adequacy of the safety features of the AR-15 Rifle and the M2 Carbine with respect to their function and location and the ARVN soldier's ability to understand them.

**Method:**

a. Concurrent with all firing and tests in which ARVN soldiers handled the AR-15 and M2 Carbine, test committee cadre made observations concerning the adequacy of the safety features with respect to their function and location and the soldier's ability to understand them.

**Results:**

a. No misfires occurred throughout the firing that were attributable to improper functioning of the safety mechanism on either the AR-15 or the M2 Carbine.

b. The ARVN soldiers had no difficulty in understanding the function and operation of the safety mechanisms on either weapon.

7

ANNEX "B"              CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 43

# CONFIDENTIAL

## Analysis:

a.  The safety features on the AR-15 and the M2 Carbine are considered comparable with regard to function and the ARVN soldier's ability to understand them.

b.  The location of a single selector switch which combines the functions of safety selector and rate of fire selector, on the left side of the receiver where it is easily accessible to the thumb, enables the ARVN soldier to get the first round off faster with the AR-15 than he can with the M2 Carbine. With the M2 Carbine, he must manipulate the safety selector with his trigger finger, then return it to the trigger to fire.  With the AR-15 he can keep his finger on the trigger while manipulating the safety selector with his thumb.

### Test No. 7.  Effects of Open Storage in a Tropical Environment.

**Purpose:** To determine the effects of open storage in a tropical climate on the AR-15 Rifle and the M2 Carbine and compare the results of such storage on each weapon.

### Method:

a.  Two AR-15 Rifles and two M2 Carbines were stored in the open for a period of two weeks without any care or maintenance.  At the end of the storage, the weapons were examined and pertinent observations recorded.

### Results:

a.  M2 Carbines:

1.  Because of rust and sand which had collected in the receivers, operating handles on both weapons could not be operated manually and force was required to open the bolts.

2.  The operating slide stops would not function properly because sand and grit had fouled the operating slide stop springs.

3.  Both magazines were rusty and had collected enough sand to prevent them from operating properly without first being thoroughly cleaned.

4.  The chambers and bores of both weapons were rusty.

8

ANNEX "B"

# CONFIDENTIAL

# CONFIDENTIAL

5. The rear sights on both weapons could not be adjusted for windage due to the collection of rust and grit on the windage screws.

6. Approximately twenty minutes were required to clean each weapon before test personnel considered it safe to fire.

b. AR-15 Rifles:

1. The charging handles on both weapons were difficult to operate because sand had collected within the receiver.

2. The bolt and bolt carriers of both weapons were rusty.

3. The chambers and bores of both weapons were rusty.

4. Approximately five minutes were required to clean each weapon before test personnel considered them safe to fire.

Analysis: The AR-15 Rifle, because it has fewer moving parts, will function more readily than the M2 Carbine after extended periods of storage in the open under tropical conditions.

Test No. 8. Brush Penetration.

Purpose: To determine whether dense brush and undergrowth affects the trajectory of the AR-15 bullet and to compare its ability to penetrate heavy foliage with that of the M2 Carbine.

Method:

a. Silhouette targets were positioned behind dense underbrush which generally consisted of bamboo saplings, bush, grass and vines. From a distance of 15 meters, both the AR-15 Rifle and the M2 Carbine were fired at the targets.

b. The distance was then increased to 50 meters and the targets were fired upon again. (Beyond 50 meters it was impossible to distinguish a target, so this was considered an acceptable maximum distance for the test).

c. Procedures a and b above were repeated several times with foliage of varying density.

9

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 45

## CONFIDENTIAL

**Results:**

| Type of Underbrush | Range | No. of rounds fired | No. of hits | |
|---|---|---|---|---|
| | | | AR-15 | M2 |
| Light underbrush | 15 meters | 6 | 6 | 6 |
| Moderate underbrush & bamboo thicket | 15 meters | 6 | 6 | 6 |
| Heavy underbrush & bamboo thicket inter-woven with vines | 15 meters | 6 | 6 | 6 |
| Light underbrush | 50 meters | 6 | 6 | 6 |
| Moderate underbrush & bamboo thicket | 50 meters | 6 | 6 | 6 |
| Heavy underbrush & bamboo thicket inter-woven with vines | 50 meters | 6 | 6 | 5 |

**Analysis:**

a. The trajectory of the AR-15 bullet is not significantly affected when fired through dense underbrush at ranges up to 50 meters.

b. The AR-15 round will penetrate jungle undergrowth equally as well as the M2 Carbine round at ranges up to 50 meters.

**Test No. 9.  Troop Preference Poll.**

**Purpose:** To obtain subjective data concerning the ARVN soldier's individual preference between the AR-15 Rifle and the M2 Carbine.

**Method:** Upon completion of all tests by participating personnel, each individual present for duty (158) was questioned with regard to preference between the two weapons.

**Results:**

a. Thought the AR-15 had the best "feel"     129
   Thought the M2 Carbine had the best "feel"          29

10

ANNEX "B"

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 46

CONFIDENTIAL

b. Thought the AR-15 had the best sight      66
   Thought the M2 Carbine had the best sight          92

c. Thought the AR-15 would stand up best under
   combat conditions                          107
   Thought the M2 Carbine would stand up best
   under combat conditions                           51

d. Preferred the AR-15 grip                    129
   Preferred M2 Carbine grip                          29

e. Thought AR-15 easier to load               120
   Thought M2 Carbine easier to load                  38

f. Thought AR-15 easier to get ready to use    81
   Thought M2 Carbine easier to get ready to use      77

g. Thought AR-15 easier to disassemble        140
   Thought M2 Carbine easier to disassemble           18

h. Liked the AR-15 better from recoil standpoint  106
   Liked M2 Carbine better from recoil standpoint     52

i. Thought AR-15 easier to get back on target
   after firing a round                       117
   Thought M2 Carbine easier to get back on
   target after firing a round                        41

j. Thought AR-15 more dependable              107
   Thought M2 Carbine more dependable                 51

k. Thought AR-15 best all around weapon for
   Infantry use                               100
   Thought M2 Carbine best all around weapon
   for Infantry use                                   58

l. Thought AR-15 climbed least when fired auto-
   matically                                  117
   Thought M2 Carbine climbed least when fired
   automatically                                      41

11

ANNEX "B"

CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 47

## CONFIDENTIAL

| | | | |
|---|---|---|---|
| m. | Thought AR-15 more accurate when fired full automatic | 136 | |
| | Thought M2 Carbine more accurate when fired full automatic | | 22 |
| n. | Would prefer AR-15 in combat | 130 | |
| | Would prefer M2 Carbine in combat | | 28 |

Analysis:

a. The majority of test subjects preferred the AR-15 Rifle to the M2 Carbine in all aspects covered by the poll, except for the sights. Further questioning of the subjects by test committee personnel disclosed that this preference was due to greater familiarity with carbine-type sights, not because of an inability to understand the AR-15 sights. This is not considered a shortcoming of the weapon but a matter of training and familiarization.

12

ANNEX "B"

## CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 48

## CONFIDENTIAL

### ANNEX "C"

### SUGGESTED CORRECTIVE ACTIONS

| DEFICIENCY/ SHORTCOMING | SUGGESTED CORRECTIVE ACTION | REMARKS |
|---|---|---|

### SECTION I

This section contains deficiencies requiring elimination in order to make the item acceptable for use on a minimum basis.

| None | None | None |
|---|---|---|

### SECTION II

This section lists those deficiencies and shortcomings in the item which were discovered during test and satisfactorily corrected prior to completion of the test. They no longer represent a defect in the item tested. The correction must be applied to the production model of this item.

| None | None | None |
|---|---|---|

### SECTION III

This section contains shortcomings which are desired to be corrected as practicable, either concurrent with elimination of deficiencies in Section I, or in production engineering or by product improvement.

| | | |
|---|---|---|
| 1. The upper hand guard is hard to grip when hands are sweaty. | Roughen surface. | Ltr. from OSD/ ARPA on 11 Jul 62 states that manufacturer is now moulding "checkering" on upper hand guards. |
| 2. The weapon cleaning rod is of minimum length and hard to grip. | Add one (1) additional section and provide "T" shaped handle. | |

ANNEX "C"

## CONFIDENTIAL

# CONFIDENTIAL

### ANNEX "D"

### PHOTOGRAPHS

This Annex contains miscellaneous photographs which visually depict

pertinent aspects of the evaluation of the AR-15 conducted in South Vietnam.

PHOTOGRAPHS:

1. VN Soldier with AR-15 and M1 Rifle
2. VN Soldier with AR-15 and BAR
3. M2 Carbine and AR-15 Rifle with Accessories
4. VN Soldier with AR-15 and M2 Carbine
5. M2 Carbine and AR-15 Rifle
6. M2 Carbine and AR-15 Rifle "Field Stripped"
7. VC Casualty by AR-15 - 150 Meters
8. VC Casualty By AR-15 - 15 Meters

ANNEX "D"

# CONFIDENTIAL

Ex. 1_Echeverria Decl.
Page 50



**ER_132**





Carbine, Cal. .30, M2, w/standard accessories

Colt, Armalite Rifle, AR-15, w/standard accessories.

PHOTOGRAPH 3, AR-15 (?)



Assault Position with Carbine.

Assault Position with AR-15.

Ex. 1_Echeverria Decl.
Page 54





PHOTOGRAPH 6, ANNEX "D"

Ex. 1_Echeverria Decl.
Page 56

1    ROB BONTA
    Attorney General of California
2    MARK R. BECKINGTON
    Supervising Deputy Attorney General
3    ROBERT L. MEYERHOFF
    Deputy Attorney General
4    State Bar No. 298196
     300 South Spring Street, Suite 1702
5     Los Angeles, CA 90013-1230
     Telephone: (213) 269-6177
6     Fax: (916) 731-2144
     E-mail: Robert.Meyerhoff@doj.ca.gov
7    *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8    *State of California*

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                 CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,** | Case No. 17-cv-1017-BEN-JLB |
| | **DECLARATION OF DENNIS BARON** |
| Plaintiffs, | Courtroom:   5A<br>Judge:      Hon. Roger T. Benitez<br>Action Filed: May 17, 2017 |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,** | |
| Defendants. | |

## DECLARATION OF DENNIS BARON

I, Dennis Baron, declare under penalty of perjury that the following is true and correct:

1. I have been retained by the State of California to provide expert opinion and testimony regarding Corpus Linguistics research. I am being compensated at a rate of $350 per hour.

2. I have evaluated the historical use of the terms *arms* and *accoutrements* in order to show that large-capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

## BACKGROUND AND QUALIFICATIONS

3. I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and

1    law. I have also published books on language reform, on usage, and on gender in

2    language.

3            4.      Most relevant for this report, I published two books on language and

4    law: *The English-Only Question: An Official Language for Americans?* (Yale Univ.

5    Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free*

6    *Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author

7    on what came to be called "the Linguists Brief" in *District of Columbia v. Heller*

8    (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in

9    his dissent. I was a co-author on another brief by professors of linguistics and

10   corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843,

11   2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted

12   directly from my essay "Corpus evidence and the meaning of 'bear arms'"

13   (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical

14   meaning and the Second Amendment at the Federalist Society at the Univ. of

15   Chicago Law School, at the Neubauer Symposium on Historical Semantics at the

16   Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University,

17   and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've

18   also written opinion essays on historical meaning and the Second Amendment for

19   the *Washington Post* and the *Los Angeles Times*. And I have submitted a

20   declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et*

21   *al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.). In the

22   past twenty years I have been an expert consultant in perhaps a dozen cases

23   involving document interpretation.

24           5.      My forthcoming essay, "Look It Up in Your *Funk and Wagnalls*: How

25   Courts Define the Words of the Law," an analysis of how courts incorporate

26   information from dictionaries and digitized corpora as they ascertain legal meaning,

27   will appear in the next issue of the academic journal of the Dictionary Society of

28   North America, *Dictionaries*.

2

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

Ex. 1_Echeverria Decl.
Page 4

6.     This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

<strong>OPINIONS</strong>

**I.   SUMMARY OF CONCLUSIONS**

7.     Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements*. Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements*. A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

8.     Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the

3

different accessories that officers and the rank and file soldiers were also required to have.

## II.   THEORY AND METHODOLOGY

9.     Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did not typically involve legal issues. Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers. Scholars plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt. Soon, in addition to solving literary mysteries, the methodologies developed by corpus linguists were successfully applied in a number of criminal cases in the US and in England involving, for example, the authorship of a ransom note or an email.

10.   Lexicographers, who began compiling large analog databases of text in the late 19th century, began to digitize their libraries of paper data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

11.     As a graduate student at the Univ. of Michigan in 1970, I coded analog texts from the *Oxford English Dictionary* files to help build the computerized database for the Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to the language of the Founding Era. Today, major dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The great dictionary makers of Europe use similar databases in their own work.

4

1    12.   Over the past twenty years, Legal Corpus Linguistics (LCL) has

2    developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized

3    corpora of current and historical English to establish meaning—often referred to as

4    Original Public Meaning (OPM)—in statutes and in the Constitution. The promise

5    of LCL attracted jurists as well as scholars with a specific interest in language and

6    law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a

7    person who knowingly possesses and conveys firearms in a vehicle, including in its

8    glove compartment or truck, can be deemed to be within the scope of the statutory

9    phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper

10   databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to

11   clarify the meaning of the words *carry*, *vehicle*, and *weapon*. In her dissent, J.

12   Ginsburg expressed skepticism that either dictionary evidence, or Breyer's

13   innovative newspaper searches, were useful in determining what Congress intended

14   by the verb *carry* in the law in question. Her critique did not deter courts from

15   performing other computerized data searches to determine legal meaning. In 2012,

16   Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the

17   first jurist to use a general internet search in order to determine a word's meaning in

18   a statute. Not satisfied with the dictionary definition that the government relied on

19   in the case before him, Posner ran a Google search to confirm that the word *harbor*

20   in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed,

21   but rather 'hide, conceal from view,' as he felt it must mean in the context of the

22   statute (*United States v. Costello*, 2012). Subsequent research by trained corpus

23   linguists pointed out that a more-structured internet search revealed that *harbor* can

24   indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from

25   the authorities.' But in the context of the Immigration Act, *harbor* appears

26   alongside other terms involving secret, illegal activity, and so even though, using

27   more rigorous parameter's showed that Posner's Google search may have been

28   flawed, his understanding of the word *in context* seems clearly to be correct.

5

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

**ER_143**

13.   More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of historical text data.

14.   In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

15.   Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth

6

1   century, the Corpus of Historical American English (COHA), which was initially

2   developed at BYU as well but is now independent of that institution, currently

3   contains 475 million words of text from 1820–2020. The size of these databases

4   continues to grow as more works are digitized, coded, and added to the corpora.

5      16.   Critics of LCL have complained that databases like COFEA and COEME

6   contain only texts written by "elites," whose language may differ from that of

7   "ordinary people" who do not write at all, or who for various reasons do not write

8   texts likely to be included in the available corpora. It is certainly the case that many

9   printed books and periodicals, along with documents like the Constitution, its

10   amendments, and state and federal statutes, tend to be written by educated

11   specialists and professional writers, and although ordinary people are expected to

12   understand the language of the Constitution, the Declaration of Independence, and

13   other founding documents, as well as the laws that govern the nation, such texts

14   typically require specialized knowledge. A reading-difficulty formula like the

15   commonly-used Flesch-Kincaid scale suggests that the Declaration of

16   Independence and the Constitution require a fifteenth-grade reading level, while

17   according to one comprehensive study, *Adult Literacy in America* (US Department

18   of Education, 1993), the average American today tends to have a seventh-grade

19   reading level.

20      17.   In order to counter any "elite" bias that may be found in databases like

21   COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases

22   covering the period 1750–1900, focusing for this report on the Founding Era and on

23   the period of Reconstruction after the passage of the Fourteenth Amendment. Print

24   technology remained relatively static between the 1450s, when printing presses first

25   appeared in Europe, and the early 19th century, when the Industrial Revolution

26   drastically changed print technology. The first printing press was adapted by

27   Gutenberg from the design of the traditional wine press, and printing was a slow

28   and labor intensive process. As a result, newspapers in the founding era were small,

1   averaging four to eight pages. Publication was less frequent as well. Papers tended

2   to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the

3   Founding Era and later, during Reconstruction, provided average Americans with

4   their principal access to all the critical events and documents of their time, along

5   with coverage of local and international news. Even though newspaper subscribers

6   tended to be "elites," newspaper content was widely shared by word-of-mouth:

7   ultimately, most Americans in the Founding Era, including those who would be

8   classified as illiterate or poorly educated by today's standards, got their news from

9   newspapers.

10      18.   The invention of the steam engine in the 19th century, along with growth

11  of paper mills that facilitated the production from wood pulp of large and

12  inexpensive rolls of newsprint, led to a revolution in print technology. This led to

13  an explosion in the size of newspapers and the frequency of their publication, to the

14  point where, at their height, papers in big cities were publishing several editions a

15  day. This growth in newspapers, along with a substantial increase in periodical and

16  book production, paralleled a growth in literacy in the US and Europe that tracked

17  the industrial revolution and the subsequent rise in universal public education. By

18  the end of the Civil War, there were more readers than ever, and they demanded

19  more reading material.

20      19.   As for the question of "elites," as the principal means of communicating

21  news and information, the newspapers of the 18th and 19th centuries embodied

22  much of the language of the "ordinary people" who read them. Newspapers also

23  provide researchers with more data for the 19th century than a corpus like COHA,

24  which covers the same period but tends to focus on literary and specialized texts

25  rather than material for the general reader.

26      20.   Since the 1960s, database compilers have been able to track

27  contemporary spoken English more successfully, though for obvious reasons, none

28  of the databases for the Founding Era and for the post-Civil War period cover the

1  spoken language of Americans. Although scholars can reconstruct some of that oral

2  language, we are always doing so through the lens of print versions purporting to

3  represent or comment on ordinary speech.

4       21.   The newspaper databases I have examined are Readex Historical

5  American Newspapers; Chronicling America (newspapers digitized by the Library

6  of Congress); the British Newspaper Archive (digitized by the British Library); and

7  two private subscription services, newspapers.com and newspaperarchive.com. For

8  this report, newspapers.com provides the most-complete picture of the language of

9  the Founding Era newspapers as well as the ordinary language of the later 19th

10  century.

11       22.   All the databases contain some duplicates. COFEA and COEME digitize

12  multiple editions of the same work; and the newspaper databases contain a number

13  of duplicate stories because, particularly in the period of newspaper growth during

14  the 19th century—in an age before the wire services and syndication appeared, and

15  before the larger papers began to set up news bureaus in key areas around the

16  country and around the world—newspapers routinely printed each other's stories,

17  sometimes acknowledging their source and sometimes not. Still, the databases often

18  offer more insight into the meaning of words and phrases than simply going to a

19  dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Easterbrook

20  and Richard Posner have warned their colleagues not to make a fortress of the

21  dictionary. The corpora are by necessity incomplete. LCL doesn't replace

22  dictionary look-ups, but it does provide an important supplement to them.

23  **III.   THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES**

24       23.   I was asked to look at the meaning of *arms* and *accoutrements*, along

25  with the phrase *arms* and *accoutrements,* current in the Founding Era and during

26  the period immediately following the adoption of the Fourteenth Amendment,

27  focusing on whether the word *accoutrements* may be considered analogous to the

28  present-day use of the term *magazine* in reference to firearms.

9

24.  In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.  The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines*, are not arms in and of themselves.

26.  The *Oxford English Dictionary* (OED), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

27.  *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here

10

---

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

1  Wellington, recognized by all as a consummate soldier who would soon defeat
2  Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms*
3  and *accoutrements*.

4      28.   The term *accoutrement-maker*, though not defined separately by the
5  *OED*, is illustrated with examples referring to a manufacturer of military
6  accessories rather than arms; and the term *accoutrement shop* has this 1831
7  example where guns and accoutrements are differentiated: "The crowd was so great
8  in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops
9  in the vicinity of the Palais Royal." [*United Service Jrnl*. i. 325]

10     29.   The *OED* definitions are instructive. But in order to determine more
11 specifically what the term *accoutrements* refers to, I consulted two digitized
12 historical databases, or corpora. A COFEA database search for the occurrence
13 *accoutrements* within 6 words of *arms* returned 873 hits (including a small number
14 of duplicates). A similar search of COEME returned 126 hits, the earliest from
15 1656. I determined that the two search terms, *arms* and *accoutrements*, often appear
16 together as a single phrase, *arms and accoutrements*, typically in military contexts
17 having to do with an army or militia unit. *Accoutrements* often occurs in a list
18 alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,*
19 though when *ammunition* is not listed separately, the term *accoutrements* will
20 generally include *ammunition. Accoutrements* sometimes occurs in a list alongside
21 *clothing,* suggesting it may not always include uniforms (this finding informs the
22 *OED* definition: military equipment other than arms and uniforms). But
23 occasionally, *accoutrements* may include items classified as part of a uniform
24 (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where
25 the term usually refers to clothing associated with particular professions or
26 activities). In sum, in the vast majority of examples, *accoutrements* functions as a
27 catch-all term for military equipment *separate* from, and not including, *arms*.

28

11

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

Ex. 1_Echeverria Decl.
Page 13

**ER_149**

(69 of 289), Page 69 of 289 Case: 23-2979, 12/02/2023, DktEntry: 26.3, Page 69 of 289

Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21254   Page 17 of 76
Case 3:17-cv-01017-BEN-JLB   Document 118-2   Filed 11/10/22   PageID.8480   Page 13 of 21

30.   But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military
> *accoutrements*, such as paper-caps, paper-belts, wooden swords,
> &c. were beating up for recruits in Parliament-street, Boston. [*The*
> *American jest book*: Part I[-II], 1789; emphasis added; here military
> accoutrements includes toy swords.]

31.   This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements
> provided by the militia law.

32.   But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements

> **1780**: arms, ammunition, accoutrements, drums and fifes in
> possession of the respective regiments.

> **1795**: you will march . . . with arms and accoutrements in good order.
> If any volunteer should want arms and ammunition, bring them
> forward, and they shall be supplied as well as possible. [COEME;
> the other examples are from COFEA]

> **1798**: To hold his powder and his ball, his gun, accoutrements

12

---

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

1    and all . . . [This example rhymes because it's from a poem,

2    indicating that the idiomatic phrase arms and accoutrements has

3    become part of the general language available not just to military

4    specialists but also to poets and novelists.]

5        33.   A second COFEA search, for *accoutrements* alone, returned 1,235 hits.

6 COEME yields 771 hits. These searches add a number of non-military contexts,

7 where accoutrements refers to religious gear (robes, mitres, and so on) as well as

8 other sorts of fancy or special clothing. These non-military examples do not

9 reference weapons, ammunition, or other military equipment.

10      34.   I supplemented my COFEA search with a search of the newspaper

11 database, newspapers.com, for the Founding Era period, 1750–1800. The

12 newspaper databases do not permit the kind of collocate searches that COFEA,

13 COEME, and COHA allow. Entering two search terms returns results in which

14 either one or both terms occur on the same page, though not necessarily in the same

15 sentence, or even in the same article, and not necessarily as linked terms. There are

16 1,392 hits for *accoutrements*. There are 692 matches for the exact phrases *arms and*

17 *accoutrements*.

18      35.   Here's a mid-18th century British example from the newspapers.com

19 corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

20      36.   This Militia shall receive their Arms, Accoutrements, and

21    Ammunition from the Ordnance. *Derby Mercury*, 1756.

22      37.   Similarly, there's this "ploughshares into swords" example of a

23 Cambridge University library to be converted to a military barracks:

24    [T]he new Building intended for a publick Library . . . may be

25    converted into a Barrack, and be supplied with Provisions, Arms,

26    and Accoutrements, at the Expence of the University. 1756

27      38.   A search of the Readex database of America's Historical Newspapers

28 returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early

1     example from the colonial period appeared in the **Boston Evening Post** in 1750. It

2     distinguishes *arms* from uniforms, accoutrements, and other military equipment:

3        All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely

4        Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions,

5        and all other Things necessary for a Gentleman Ranger.

6        39.    This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that

7     arms and accoutrements are distinct categories in the new nation as well:

8        The militia . . . must be considered as the palladium of our security . . . .

9        The formation and discipline of the militia of the continent should be

10        absolutely uniform; and that the same species of arms, accoutrements, and

11        military apparatus, should be introduced in every part of the United States.

12        40.    The text of a bill in Congress to establish a uniform militia appeared in

13     the *New York Journal*, in 1790. It confirms the Founding-Era sense that *arms,*

14     *ammunition,* and *accoutrements* make up distinct and separate elements of a

15     soldier's kit:

16        There shall be appointed an adjutant general for each state . . . whose duty

17        it shall be to . . . report[] the actual situation of their arms, accoutrements,

18        and ammunition. . . Every non-commissioned officer or private . . . for

19        appearing at such meeting or rendezvous without his arms, ammunition, or

20        accoutrements, as directed by this act, shall pay the sum of twenty-five

21        cents.

22        41.    And this cite from 1868 clearly distinguishes what counts as arms, and

23     what counts, separately, as accoutrements:

24        At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will

25        be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ; 305

26        Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet Scabbards,

27        Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

28        42.    The newspaper data parallels that of COFEA: the phrase *arms and*

1    *accoutrements* is almost always military. The phrase sometimes occurs alongside

2    *ammunition* as a separate list item. *Accoutrements*, when it appears alone, is a more

3    general term, used both for military and other gear, though in non-military contexts

4    it is more directed toward clothing rather than 'equipment' (priests' robes,

5    ministerial garb, fancy ball gowns, badges of office), as is also indicated in the

6    *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of

7    ceremonial gear, and less commonly, nonmilitary tools of the trade.

8       43.  It's clear that *arms and accoutrements* was, during the 18th and 19th

9    centuries, a common military phrase, in both England and America. English often

10    yokes terms commonly found together into idiomatic pairings, sometimes called

11    binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and*

12    *battery* or *breaking and entering*. Such pairs take on the characteristics of a

13    formula, and often appear in the same order (this order may be dictated by logical

14    succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and*

15    *eggs*. And it would be unusual to find *battery and assault*. Such ordered pairs are

16    called "irreversible binomials," though there's nothing but custom (as in *salt and*

17    *pepper*) and sometimes logic (as in breaking and entering) to prevent anyone from

18    reversing the order.

19       44.  The word *accoutrements* typically occurs in a list after *arms* (more rarely,

20    it may occur before *arms* as well), and it is typically a separate category from *arms*

21    (though not always, as the above examples show).

22       45.  There are over 47,000 citations in newspapers.com for *arms* or

23    *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms*

24    *and accoutrements*. Examining a selection of the 15,799 citations of the phrase

25    confirms that both in England and the US, *arms* and *accoutrements* are separate

26    categories. Here is one example from Gloucestershire, in England, dated 1868:

27       [A] letter was received from the Home Secretary, pointing out the danger

28

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

1   of permitting an accumulation of arms and accoutrements to take place in

2   prisons, and requesting, if there were any arms or munitions of war stored

3   in the prison, that they should be removed to the nearest military depot.

4   46.   A similar cite from Iowa in 1868: "Persons having in their possession any

5   arms, accoutrements or ammunition belonging to the State, are requested to return

6   the same at once to the Adjutant General, as proper places have been provided by

7   the State for the safe keeping of all such property."

8   47.   And this, from Stroudsburg, PA, also 1868: "More than half of the

9   Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements,

10   and probably made their way to the gold regions of Colorado and Montana."

11   48.   The circa-1868 data confirmed the Founding Era data that *accoutrements*

12   is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the

13   terms refer to separate categories of equipment.

14   49.   One final note on *accoutrements*. The U.S. Supreme Court's recent

15   decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843,

16   2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the

17   North Carolina Supreme Court affirming Huntley's conviction for carrying a

18   shotgun illegally "to the terror of the people," as forbidden by the Statute of

19   Northampton in 1328. In that decision, the Court states, A gun is an 'unusual

20   weapon,' wherewith to be armed and clad. No man amongst us carries it about with

21   him, as one of his everyday accoutrements—as a part of his dress.

22   50.   In the citation above, *accoutrements* does not refer to weaponry, but to

23   the more general category of 'everyday attire, or clothing.' It may be normal to

24   wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a

25   gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any

26   lawful purpose, "either of business or amusement"—but it's not *normal* or typical

27   to do so. In affirming Huntley's conviction, the Court noted that his purpose in

28   carrying a shotgun was not a legal one.

16

**IV.  SOME HISTORICAL NOTES ON THE USE OF THE WORD MAGAZINE**

51.   Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term magazine in relation to *arms* and *accoutrements*. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED*, in the 18th and early 19th centuries, magazine referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

52.   Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

53.   COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder'

17

1   sense of the word *magazine* to become more common, and even then, text

2   references to ammunition magazines often appear, not in general discourse, but in

3   legislation restricting their size or use.

4       54.   Most militia laws and regulations from the Founding Era specify

5   minimum requirements for soldiers' weapons, ammunition, and accoutrements.

6   Most laws regulating weapons in the mid-19th century restrict or ban specific kinds

7   of weapons, often enumerating them, sometimes in terms we find colorful today but

8   which were common at the time (Arkansas toothpicks, Bowie knives, slung shots,

9   swords in canes, pistols capable of being concealed in a pocket). Occasionally these

10  laws further identified such weapons as those used by "brawlers," thieves, robbers,

11  or others bent on illegal activities. Other weapons restrictions follow the English

12  tradition of limiting possession of weapons by social class, nationality, or race.

13      55.   Although militia laws do specify weapons and other required

14  accoutrements or pieces of military equipment, including horses for the officers,

15  those laws that prohibit certain kinds of weapons during the two critical periods

16  (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one

17  exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles,

18  except by the owner thereof on his removal to reside out of this province, or any

19  gun barrels, gun locks, or bayonets, be carried out of his province, without the leave

20  of the council of safety for the time being." [1776 Md. Laws 146].

21      56.   I surveyed the gun regulations in the Duke Historical Database from the

22  early medieval period through 1885 to see what terminology was used. None of the

23  laws that prohibit weapons, aside from the Maryland statute above, specifies a gun

24  part or ammunition case or accoutrements of any kind. Although many present a list

25  of banned or prohibited weapons—usually without defining them [the assumption

26  is that the reader knows what they refer to], none of the laws mention cartridge

27  boxes, bullets, barrels, or other parts of any weapons.

28

57.   Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

58.   Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

59.   A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

60.   Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

61.   The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

19

Ex. 1_Echeverria Decl.
Page 21

## V.   CONCLUSION

62.   In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

63.   But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

64.   In addition, 'bullet holders,' whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

65.   To repeat, there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November _7_, 2022, at _Champaign_, _IL_


_____
Dennis Baron

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  State Bar No. 261579
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 510-3479
    Fax:  (415) 703-1234
8   E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity* [1]

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      WESTERN DIVISION

13

14

| | |
|---|---|
| **STEVEN RUPP; STEVEN DEMBER; CHERYL JOHNSON; MICHAEL JONES; CHRISTOPHER SEIFERT; ALFONSO VALENCIA; TROY WILLIS; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | 8:17-cv-00746-JLS-JDE<br><br>**SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF COLONEL (RET.) CRAIG TUCKER**<br><br>Courtroom:   8A<br>Judge:          The Honorable Josephine L. Staton<br><br>Action Filed:  April 24, 2017 |

---

[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California. Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as the defendant in this case.

1

## SUPPLEMENTAL EXPERT REPORT AND DECLARATION OF COLONEL (RET.) CRAIG TUCKER

I, Colonel (Ret.) Craig Tucker, declare under penalty of perjury that the following is true and correct:

1.    I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report and declaration on the purpose, use, and features of certain semiautomatic firearms. This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

## PROFESSIONAL QUALIFICATIONS

2.    I am a Colonel, US Marine Corps, (Retired). I served as an infantry officer in the Marine Corps for 25 years. I have commanded infantry units from platoon to regiment. I commanded Regimental Combat Team -7 (RCT-7) in Iraq from February 2004 to April 2005. During my time in Iraq, I commanded 22 different US Marine, US Army, and Iraqi Army battalions and exercised tactical control over Naval Special Warfare and US Special Forces, and supported National Tier 1 assets. I commanded the Regiment in both Fallujah battles and numerous smaller battles. I was the target of 9 assassination attempts and was wounded in Husaybah Iraq in July 2004. Upon my return from Iraq, I was assigned to the US Marine Corps National Training Center and was responsible for training and certifying units for combat in Iraq and Afghanistan.

3.    I have received two Legion of Merit awards for exceptional meritorious conduct in the performance of outstanding combat services, the Military Order of the Purple Heart, the Navy Commendation Medal for Heroic Action, the Combat Action Ribbon, and seven Sea Service Deployment Ribbons, among other awards.

2

4.    After I retired from military service in 2006, I served as an Assistant Deputy Administrator for the Office of Secure Transportation (OST), National Nuclear Security Agency.  OST is a paramilitary organization consisting of federal agents armed with M4s.[2]  I was also the Department's Render Safe program in Albuquerque NM.

5.    In 2012, I joined Innovative Reasoning LLC, which provides professional support services to the U.S. Department of Defense and other government clients.  While at Innovative Reasoning, I developed training programs and planning capabilities for the Marine Corps, and I developed and taught a training course on tactical decision-making for law enforcement officers.

6.    Through my military service, I gained extensive knowledge and familiarity with the full range of US combat weapon systems.  The automatic rifle is the foundational combat weapon system.  Ground and aviation weapon systems are specifically designed to support the automatic rifle.  My primary purpose in the latter stages of my career was coordinating, and teaching others to coordinate, air and ground weapon systems to support the rifleman and his automatic rifle.

7.    I have fired the Colt AR-15 5.56 rifle and the Smith and Wesson 5.56 AR rifle.  Both are advertised as the civilian version of the M16 combat rifle.  In addition to my automatic rifle experience, I have extensive experience with the AK-47, having been on the receiving end of hundreds of 7.62 rounds; an experience best typified during the Battle of Hit when a single individual with one rifle and apparently inexhaustible supply of 7.62 ammo and magazines kept nine Marines pinned down for 15 minutes until a LAV-25 20mm chain gun solved the problem.  I have extensive experience with the Colt 1911 .45 caliber semi-automatic and the Berretta .9m semi-automatic pistol and used both weapons in Iraq.

---

[2] The M4 is a gas-operated, magazine-fed carbine.  It is the shortened version of the M16 assault rifle.

3

8.     I currently serve as a trainer and planner for the City of Albuquerque's Office of Emergency Management.

9.     I hold a B.S. in Criminal Justice from the University of Dayton, a Master of Military Art and Science from U.S. Army Command and General Staff College and the U.S. Army School of Advanced Military Studies, and a Master's degree in National Security and Strategic Studies from the College of Naval Warfare, where I graduated with the highest distinction.

10.    A copy of my curriculum vitae is attached as **Exhibit A** to this Report.

11.    I have been retained by the California Department of Justice to serve as an expert witness in this case.  I am being compensated at a rate of $200 per hour.

### OPINIONS

12.    I have reviewed the statutory definitions of an "assault weapon," as defined under California's Assault Weapons Control Act (AWCA) in California Penal Code section 30515(a).[3]  Under Penal Code section 30515(a), a semiautomatic centerfire rifle that does not have a fixed magazine qualifies as an assault weapon if it has any of the following features:  (1) a pistol grip that protrudes conspicuously beneath the action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4) a grenade or flare launcher; (5) a flash suppressor; or (6) a forward pistol grip.[4]  A semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped with a fixed magazine with the capacity to hold more than 10 rounds or has an overall length of less than 30 inches.[5]  I have also reviewed the list of rifles that qualify as "assault weapons"

---

[3] See Cal. Penal Code § 30515, https://bit.ly/3CtxfEj.

[4] Cal. Penal Code § 30515(a)(1)(A)-(F).

[5] Cal. Penal Code § 30515(a)(2)-(3).

4

1   under California Penal Code § 30510(a), which have many of the same features and

2   accessories listed in § 30515(a).

3       13.     I am familiar with the features, accessories, and capabilities of rifles

4   regulated by Penal Code § 30515(a).  The AR-15, like the M4, is an offensive

5   combat weapon system.  The only difference is the AR-15 cannot fire on full-auto

6   (continual shots fired in succession so long as the trigger is pulled) or burst (several

7   shots fired in succession with a single pull of the trigger)—a picayune difference

8   that cannot serve to support a non-combat role for the AR-15.  In my experience,

9   soldiers are trained to set select-fire weapons to semi-auto mode, so that a single

10   round is fired with each pull of the trigger.  An M4 or M16 on full-automatic is an

11   area fire weapon: the auto rate of fire makes the weapon too difficult to control on a

12   point target.  Rifle fire on full automatic is not aimed fire, uses an excessive amount

13   of ammunition and will damage the weapon if used too often.  In fact, in my 14

14   months of combat, I did not once see an M4 or M16 fired on full auto.  Semi-auto

15   function is used almost exclusively in combat.  When operated in semi-auto mode,

16   the AR-15 and M4 share the same rates of fire, the same maximum effective range,

17   the same maximum range, use the same magazines designed for combat and the

18   same ammunition.  The AR-15 and M4 are both designed to fire a .223 round that

19   tumbles upon hitting flesh and rips thru the human body.  A single round is capable

20   of severing the upper body from the lower body, or decapitation.  The round is

21   designed to kill, not wound, and both the AR-15 and M4 contain barrel rifling to

22   make the round tumble upon impact and cause more severe injury.  The

23   combination of automatic rifle and .223 round is a very efficient killing system.

24   The same can be said of the AR-15.

25       14.     Automatic rifles, like the M-16 and its more modern carbine variant

26   M4, are functionally similar to semiautomatic rifles regulated under California's

27   AWCA and  often are equipped with the very same features, like pistol grips and

28   adjustable stocks.  It is my opinion, based on my military service, that these

5

Ex. 2_Echeverria Decl.
Page 28

**ER_163**

1   features, individually and in combination, make semiautomatic rifles more lethal
2   and most useful in combat settings, as described in more detail below.

3        15.   Detachable magazines:  In order for a rifle to qualify as an assault
4   weapon under California Penal Code § 30515(a), the rifle must have the capability
5   of accepting a detachable ammunition magazine (by not having a fixed magazine).
6   Detachable magazines improve the killing efficiency of automatic rifles, allowing
7   the combat rifleman to efficiently carry a combat load of 120 rounds in four 30-
8   round magazines, to rapidly change magazines in combat, and to increase killing
9   efficiency by significantly reducing reload time.  Changing magazines during
10  intense combat is the most important individual skill taught to Marines.  During
11  intense combat, the detachable magazine provides a rifleman the capability to fire
12  120 rounds on semi-automatic in three minutes at a high-sustained rate of 45 rounds
13  per minute.  In a civilian self-defense context, by contrast, an individual would not
14  have a need for such a high rate of fire.

15       16.   Pistol grip protruding beneath the action of a rifle:  I am a 15th Award
16  Expert on the M16 and M4.  I carried an M4 every day for 14 months during my
17  time in command of RCT-7 in Iraq.  I used an M4 in combat, and I killed with it.
18  The pistol grip beneath the action of an automatic rifle serves only two purposes.
19  First, the pistol grip allows the rifleman to pull the rifle into her shoulder with each
20  shot, an action which increases stock weld, reduces semi-automatic/automatic
21  recoil, and reduces barrel rise.  Stock weld or cheek weld refers to the firmness of
22  the contact between the rifle stock, the shooter's cheek, and the shooter's shoulder.
23  A firm stock weld is required for effective semi-automatic and automatic rapid fire.
24  Absent any pistol grip, a semi-automatic rifle would be difficult to operate when
25  fired rapidly, as the rifle barrel would seesaw up and down with each shot fired in
26  succession.  Second, the pistol grip functions as a hand rest to reduce hand/finger
27  fatigue during long combat engagements.  Both actions increase the killing
28

6

1   efficiency of automatic rifles and are necessities in sustained combat operations of
2   weeks or months when firing a rifle rapidly.

3        17.   Forward pistol grip:  The forward pistol grip provides leverage to
4   tighten a stock weld on short barrel automatic weapons and reduces recoil and
5   barrel rise on short barrel automatic rifles.  Forward pistol grips were added to the
6   M4 to increase M4 killing efficiency.

7        18.   Folding stock:  A folding stock causes weapon instability.  For that
8   reason, folding stock automatic rifles are designed for military personnel, whose
9   primary weapon is vehicle or air-mounted (tank, Bradly, Apache), who may be
10  required to escape from a mangled vehicle, or who may need to abandon a
11  destroyed weapon system and need a substitute weapon for offensive combat.
12  Outside of the military context, folding stocks that are not properly locked in place
13  can cause significant safety risks to the shooter due to recoil.

14       19.   Grenade or flare launcher:  A Marine Corps fireteam consists of a
15  fireteam leader, a rifleman, an assault gunner, and a grenadier.  The grenadier is
16  armed with a grenade launcher.  The grenadier uses the grenade launcher to
17  suppress or kill human beings so the rest of the fireteam can maneuver into position
18  to kill those humans with automatic rifle fire.  The launcher is a separate weapon
19  system attached to as few rifles as possible dependent on the combat mission.  In
20  my experience, grenade launchers attached to rifles are cumbersome, difficult to
21  aim, difficult to carry, and are not as effective as a standalone grenade launcher.
22  They have no legitimate use in self-defense.

23       20.   Flash suppressor/flash hider:  The purpose of the flash suppressor is to
24  reduce combat signature by cooling and dispersing burning gases.  This makes it
25  more difficult for the enemy to pinpoint a rifleman's location, especially in low
26  light conditions.  The flash suppressor facilitates night combat operations by
27  reducing muzzle flash and mitigating muzzle flash impact on night vision goggles.
28

7

Ex. 2_Echeverria Decl.
Page 30

1   This accessory serves specific combat-oriented purposes and is not needed for self-

2   defense.

3       21.   Fixed magazine with the capacity to accept more than 10 rounds:

4   Automatic rifles are offensive combat weapons systems designed to kill efficiently

5   and effectively. Any increase to magazine capacity increases the killing efficiency

6   of the automatic rifle. A 30-round fixed magazine can fire more rounds in a given

7   amount of time than three 10-round detachable magazines, which would need to be

8   reloaded to fire the same number of rounds, slowing down the rate of fire.

9   Similarly, a 100-round drum magazine can fire more rounds in a given period of

10  time than ten 10-round detachable magazines. As noted above in connection with

11  detachable magazines, an individual using a rifle in self-defense would not need

12  such a high, continuous rate of fire.

13      22.   The AR-15 is an offensive combat weapon no different in function or

14  purpose than an M4. In my opinion, both weapons are designed to kill as many

15  people as possible, as efficiently as possible, and serve no legitimate sporting or

16  self-defense purpose. Self-defense and military combat are different. The weapons

17  and accessories needed in one may not be needed or appropriate in the other. For

18  instance, when I was serving in the military, I carried my M4 for offensive combat

19  and a handgun for self-defense. Defensive combat is generally up close and very

20  personal. At that range, it is very difficult to use a rifle as a defensive weapon,

21  except as a blunt force instrument. My 9mm pistol was the self-defense weapon of

22  choice, and we were trained to expend only 1-2 rounds per adversary in pistol

23  combat. The features identified in California Penal Code § 30515(a) enhance the

24  lethality of both semiautomatic and automatic rifles and are most appropriate for

25  combat applications when used in conjunction with those types of weapons

26  systems.

27

28

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed on January 6, 2023 at Sandia Park, New Mexico

3

4

5   _____

6   Col. (Ret.) Craig Tucker

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

# EXHIBIT A

Ex. 2_Echeverria Decl.
Page 33

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

**CITY OF ALBUQUERQUE OFFICE OF EMERGENCY MANAGEMENT (07/2021-PRESENT)**

- Training and Education Coordinator/Acting Senior OEM Planner
  - Coordinate with County and State agencies to develop training and exercise programs that prepare the City of Albuquerque to mitigate, respond to, and recover from disasters.
  - Develop response plans for wildfire, flood, earthquake, and weapons release and test the plans in tabletop exercises and drills.
  - *In coordination with Albuquerque Public Schools developed and executed a school drill assessment/evaluation program.*
  - *Created, developed, and initiated training for APS, APD, and AFR on a doctrinal, best-practices-based approach to "Command and Control, Active Shooter, in a School, School in Session"*
  - Develop a training and exercise program to meet FEMA National Qualification Standards.
  - Serve as the Operations Chief for EOC activations and training.
  - Responsible for Plans updates and revisions, including a rewrite of the CABQ Comprehensive Emergency Management Plan.
  - Write and manage OEM Grants, including SHSGP, EMPG and Hazard Mitigation Grants.

**RAVENSWOOD SOLUTIONS INC. (10/2019 – 06/2021)**

- Program Manager, US Marine Corps Operations
  - Provide subject matter expertise and develop capture plans to provide live, virtual, and constructive capabilities in support of the Commandant's Planning Guidance.

  - Project Manager for Ravenswood Solutions live-instrumented training and AAR support to MAGTF Warfighting Exercise-20 (MWX 20), the largest instrumented exercise in USMC history.

  - Co-authored White Paper on the application of machine-learning and Artificial intelligence to support unit readiness reporting.

  - Provided subject matter expertise to support ML/AI Wargaming prototype development.

-

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Project Director, Middle East Operations

  - Lead planner and primary proposal author of a of a multi-corporation proposal to develop an 800-structure urban live fire and maneuver range in a Gulf Coast Coalition country.

  - Lead planner and primary proposal author of a multi-corporation proposal to develop a comprehensive training program for an emergent Marine Corps in a Gulf Coast Country.

- Program Manager, National Security Operations

  - Provide subject matter expertise, develop, and supervise training services in support of Department of Energy nuclear security and non-proliferation operations.

- Independent Contractor (01/2022 – 06/2022)

  - Acted as the Ravenswood Solutions Inc. US Marine Corps subject matter expert.

  - Acted as the Ravenswood Solutions Inc., training and leadership subject matter expert.

**INNOVATIVE REASONING, LLC  (08/2012 - 09/2019)**

- Director, Studies and Analysis

  - Provided analyses, recommendations and participated as the senior tactical SME in support of the following Marine Corps Combat Development Command requirements.

    - Development of the U.S. Marine Corps post-war on terror Training Strategy.

    - Development of an adaptive planning capability employing multi-agent modeling, experiential learning theory, and machine learning.

    - Improving Small Unit Leader Decision-making through training in Recognition Primed Decision-making and experiential learning theory.

    - Chaired US Marine Corps 3d Annual Maneuver Warfare Conference (2018).

- Director, Federal Programs

  - Provided direction, supervision, and oversight to 5 program managers assigned to DOD and Department of Energy contracts in the United States and overseas.

Page **2** of **6**

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Program Director, Law Enforcement Tactical Decision-making
  - Created, certified, and taught tactical decision -making courses focused on making decision in high risk, low occurrence, fast moving circumstances with risk of death, serious injury.
  - Developed and taught 400+ series of National Incident Management Courses to support local law enforcement requirements.

**DEPARTMENT OF ENERGY (09/2006 – 07/2012)**

  - Render Safe, Program Manager (SES)
    - Responsible for the Department of Energy (DOE) operational elements conducting nuclear counterterrorism and nuclear accident response in support of Tier 1 elements.
    - Responsible for organizing, resourcing, developing, and executing crisis response render-safe operations in support of Presidential and National Security policy.

  - Assistant Deputy Administrator (SES), Office of Secure Transportation (OST)
    - Responsible for the safe and secure transportation of nuclear weapons, materials, and components in the continental United States.
    - Acted as the Senior Energy Official and National Nuclear Security Administration Incident Commander for incidents involving OST assets and during DHS-directed NIMS National Training Programs
    - Provided leadership, vision, and direction to a 1000+ mixed para-military and civilian workforce.
    - Developed and implemented innovative security practices focused on intelligence-driven operations, leadership, and performance-based approach to training. Resulting security Doctrine provided a blueprint for significant changes to DOE physical security doctrine.
    - Provided astute and responsible management of a $270 million budget.

**UNITED STATES MARINE CORPS (06/1981- 08/2006)**

  - Director of Training, Tactical Training Exercise Control Group (TTECG) (07/2005-08/2006)
    - Selected by the Commandant to rebuild and lead the Marine Corps

Page **3** of **6**

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

Service-level pre-deployment training program.

- Responsible for the successful integration of emergent and innovative urban operations with conventional combined arms operations. Trained organizations from the US and numerous allied countries.

- Managed a training budget of $30 million. Developed and implemented new approaches to training to maximize effective use of increased training budget. Increased the number of Marines/units trained per year and successfully integrated complex, multi-discipline training requirements into a coherent, effective training program

o Commanding Officer, Regimental Combat Team 7 (RCT-7) (06/2003 - 07/2005)

- Commanded U.S. Marine Corps Regimental Combat Team 7 during Operation Iraqi Freedom II.  Tour included 14 months of continuous combat command in Al Anbar Province.

- Commanded RCT-7 during major urban combat operations to include battles of Fallujah I, Al Fajr (Fallujah II), Husaybah, Ramadi, and Hit.

- Developed and implemented successful strategic plans for reconstruction of western Iraq; managed over $200 million in construction and procurement contracts. Responsibilities included establishing border security, counter-terrorism operations, infrastructure development, and security forces training.

- Acted as Superintendent for an elementary school system consisting of 12 elementary schools throughout Al AnBar province. Constructed the schools, hired teachers, hired administrators, and provided safety and security for students, teachers, and staff.

- Responsible for the Force Protection and security of US bases and approximately 20,000 military and contractor personnel.

o Director of Operations, Training and Education Command (06/2002-05/2003)

- Responsible for the Marine Corps' training programs, with an 80,000+ personnel annual throughput.

- Developed and successfully initiated programming and procurement for the Marine Corps' 10-year range modernization and instrumentation plan. Established and chaired Range Instrumentation Working Group.

- U.S. Marine Corps Service-level representative to the OSD working group responsible for developing training transformation strategies.

Page **4** of **6**

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Successfully led USMC effort to meet the congressionally mandated requirement to replace Vieques Island with a CONUS based amphibious live-fire training capability within the year.

o Commander, 2nd Battalion, 7th Marine Regiment,

o Director of Operations, 7th Marine Regiment.

o Director of Operations, 13th Marine Expeditionary Unit (13th MEU).

- Responsible for leadership and performance of a task-organized team with 1000+ members.

- Served as primary planner in Naval and Joint crisis action planning and execution, to include the development of training plans, equipment procurement, and exercise development for the organization's worldwide contingency operations.

o Operations Planner, I Marine Expeditionary Force (I MEF). Primary planner and architect for a multi-national effort to rewrite the operations plan for defense of the Republic of Korea.

o Commander, Presidential Security Force, Camp David, MD

- Commanding Officer of Marine Corps Detachment responsible for the security of the Presidential Retreat at Camp David.
- Successfully balanced a 33% reduction in force structure with implementation of an innovative physical security plan that integrated personnel reductions, new technologies, and manpower, while increasing the security posture.

o Commanding Officer:
- Weapons Company, Marine Infantry Battalion. (1988-1989)
- Infantry Company, Marine Infantry Battalion. (1986-1988)
- Guard Company, Nuclear Weapons Security, Adak, AK. (1984-1986)
- Headquarters Company, Supply Battalion. (1983-1984)

**AWARDS**
(2) Legions of Merit with Combat Valor device, Purple Heart, Navy Commendation Medal for Heroic Action, Combat Action Ribbon, (7) Sea Service Deployment Ribbons, numerous other awards, and

Page **5** of **6**

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289
decorations.


**PAPERS**
- "On Demand Readiness for Army Commanders Through AI and Machine Learning" (2020) (White Paper for Army Applied Laboratory and the Office of Naval Research. (co-authored with SOMETE Technology and Lockheed Martin)

- "Band of Brothers: The 2D Marine Division and the Tiger Brigade in the Persian Gulf War" An Analysis of the Impact of Organizational Culture on Tactical Joint Warfare (School of Advanced Military Studies, US Army Command and General Staff College)

- "False Prophets: The Myth of Maneuver Warfare and the Inadequacies of FMFM 'Warfighting'" (School of Advanced Military Studies, US Army Command and General Staff College,

- "Towards an Intellectual Component to Joint Doctrine: The Philosophy and Practice of Experiential Intelligence" (Naval War College)


**EDUCATION**
- B.S. Criminal Justice, University of Dayton
- MMAS, U.S. Army Command and General Staff College
- MMAS, US Army School of Advanced Military Studies
- MA, National Security and Strategic Studies, College of Naval Warfare (Highest Distinction)

**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>           Plaintiffs,<br><br>      v.<br><br>TINA KOTEK, et al.,<br><br>           Defendants,<br><br>      and<br><br>OREGON ALLIANCE FOR GUN SAFETY,<br><br>           Intervenor-Defendant. | Case No. 2:22-cv-01815-IM (lead case)<br>     3:22-cv-01859-IM (trailing case)<br>     3:22-cv-01862-IM (trailing case)<br>     3:22-cv-01869-IM (trailing case)<br><br>**DECLARATION OF KEVIN SWEENEY** |

**Page 1 -  DECLARATION OF KEVIN M. SWEENEY**

| | |
|---|---|
| MARK FITZ, et al., | |
| | Plaintiffs, |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| | Defendants. |
| KATERINA B. EYRE, et al., | |
| | Plaintiffs, |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| | Defendants, |
| and | |
| OREGON ALLIANCE FOR GUN SAFETY, | |
| | Intervenor-Defendant. |
| DANIEL AZZOPARDI, et al., | |
| | Plaintiffs, |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| | Defendants. |

## DECLARATION OF KEVIN M. SWEENEY

I, Kevin M. Sweeney, declare the following:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.   I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts in common use

**Page 2 -   DECLARATION OF KEVIN M. SWEENEY**

Ex. 3_Echeverria Decl.
Page 42

dating from the 1600s, 1700s, and early 1800s.  During these years, in my own research on material culture, I made use of colonial-era probate inventories to study such topics as home furnishings in an effort to discover what types of possession were commonly found in households, to measure changes in standards of living, and to gain insights into domestic architecture.[1]  I also examined critically and wrote about the strengths and weaknesses of these sources, their usefulness and pitfalls.[2]  For decades, historians who are aware of these records' usefulness and their limitations have used estate inventories to study agricultural changes in England, wealth and social structures in England and its colonies, the institution of slavery in colonial American and the lives of slaves, and household possessions in America, England, and France.[3]

3.     My current research on seventeenth and eighteenth-century firearms and militias utilizes similar types of methodologies, documentary sources, and period artifacts.  This project, which has been going on for over a decade, was initially inspired by my skepticism of the controversial claims and pretended use of evidence from probate inventories in Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000).  As part of my on-going project, I have given papers at the annual meetings of the American Historical Association and the Organization of American Historians, at conferences on firearms and society at Stanford and Wesleyan Universities, and elsewhere, and published two essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and

---

[1] Kevin M. Sweeney, "Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800 in *Material Life in America, 1600-1860,* Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-261-290.

[2] Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987*, Peter Benes, editor (Boston: Boston University Press, 1989), 32-40.

[3] Some notable examples which also contain informed observations on the use of probate inventories, their biases, and how to deal with the biases see: James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994); Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650-1720* (Princeton: Princeton University Press, 1982), esp. 49, 282-286171-174; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake & Lowcountry* (Chapel Hill: University of North Carolina Press, 1998); Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990). esp. 19-20; Lorna Weatherill, *Consumer Behaviour & Material Culture in Britain 1660-1760*, 2nd. ed. (London: Routledge, 1996), esp. 201-207.

**Page 3 -  DECLARATION OF KEVIN M. SWEENEY**

Militias in Seventeenth- and Eighteenth-Century England and America" (2019). A third essay is forthcoming on **"Revolutionary State Militias in the Backcountry and Along the Frontiers,"** and I am currently working on a fourth essay as well as working on a book-length manuscript. My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

4.      I have been retained by the State of Oregon Defendants to provide an expert opinion on repeating firearms in eighteenth-century America. I make this declaration on the basis of my training, professional expertise, and research. For my work in this case, I am being compensated at a rate of $50 per hour.

5.      During the 1700s, most gun owners in the British American colonies and in the newly independent republic of the United States possessed and used single shot, muzzle-loading, flintlock firearms. As Harold Peterson stated in his classic 1956 book -- *Arms and Armor in Colonial America, 1526-1783:*"The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons. In 1783, almost a hundred years later, the period ended with the same weapons [i.e. muzzle-loading smooth-bore muskets and pistols] still supreme, and without even any notable improvements in their design or construction."[4] Peterson continued: "Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it."[5]

6.      Evidence compiled during a decade of research using eighteenth-century probate inventories, militia muster lists, newspapers, and other documentary sources confirms the validity of Peterson's basic conclusions while offering three minor modifications. First, these weapons described by Peterson [i.e., the muzzle-loading smooth-bore musket and pistol] were still "supreme" in 1800 and probably as late as 1810. Second, most muzzle-loading, flintlock long arms that were privately owned and used during this period were not muskets, but lighter firearms that were usually cheaper and had narrower bores than did muskets. Finally, it is more accurate to

---

[4] Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.: Stackpole Publishing 1956), 221.

[5]      *Ibid.*, 221.

**Page 4 -   DECLARATION OF KEVIN M. SWEENEY**

say that repeaters had *occasionally* appeared on the scene and not "frequently" as Peterson believed. Here, he was probably misled by the preference that private collectors and institutional collections had (and still have) for obtaining rare examples of unusual or innovative firearms.

**I.      Firearms Owned By Eighteenth-Century Americans**

7.      Today, we tend to refer to any muzzle-loading eighteenth-century gun as a musket, and this is what Peterson did in the statement quoted above. However, Peterson knew better, as did Ben Franklin. In the mid-1740s, Franklin informed the readers of his Philadelphia newspaper that a "Musket" was "the Name of a particular Kind of Gun."[6] An eighteenth-century musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for attaching a bayonet. It weighed about 10 to 11 pounds and was .69 caliber in its bore if French or .75 caliber if English, with an average barrel length of 44 inches.[7] On a battlefield, a musket was more than just a firearm: because of its weight and sturdy construction and because of its bayonet, a musket also functioned as a club and a spear. These capabilities were integral to its role as an eighteenth-century military arm. The combination of these features and capabilities made a musket "a Universal Weapon."[8]

8.      Eighteenth-century muskets did have two serious drawbacks which they shared with all flintlock, muzzle-loading smoothbores. First, their accuracy and range were limited. The round ball fired by these weapons was not very aerodynamic, and this produced a great deal of drag that reduced its velocity. A musket's smooth-bore barrel also lacked rifling, which were spiral grooves cut inside the barrel. When a ball traveled down a barrel with rifling, the grooves imparted a spin to the ball that stabilized and flattened its trajectory, increasing its distance and accuracy. (The effect of rifling on a rifle ball's flight can be compared to throwing a spiral pass

---

[6]      "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[7] Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121-141.

[8] Stuart Reid, *The Flintlock Musket: Brown Bess and Charleville 1715-1865*(Oxford: Osprey, 2016), 61, 55-60.

**Page 5 -   DECLARATION OF KEVIN M. SWEENEY**

in football which also flattens trajectory and improves accuracy.)  While a smooth-bore musket may have been just as accurate as an eighteenth-century muzzle-loading rifle at distances of up to 50 yards, most authorities agree that a musket was not very accurate at ranges beyond 100 yards.[9]  Today, pistols and most long arms other than shotguns have rifled barrels.

   9.   Loading and reloading eighteenth-century muskets was a complicated and relatively slow process by today's standards.  To load a musket, a shooter held it in front of him parallel to the ground, pulled back the gun's cock to its half cock position to prevent a premature discharge, and then took from a cartridge box an individual paper cartridge that contained a pre-measured load of gunpowder and a ball.  Next one opened the priming pan, bit the cartridge and poured a small amount of powder into the priming pan which was then closed shut.  Following this, the shooter placed the musket upright on the ground and poured the remainder of the cartridge's gun powder down the barrel, and then crammed the paper cartridge with its ball into the barrel.  (The cartridge's paper wrapper served as wadding, holding the ball in place.)  A ramrod was used to push the cartridge paper and ball down the barrel, after which the ramrod was recovered and secured in its resting place under the barrel.  The musket was then raised, placed on full cock, aimed, and the trigger pulled.  Pulling the trigger released the cock, which held a flint that moved forward, striking a steel frizzen, creating sparks that ignited the powder in the priming pan which in turn ignited the charge of powder placed in the barrel, creating an explosion that—finally—discharged the musket ball.  As a rule, a musket could realistically be loaded and fired two or three times a minute in combat by well-equipped and trained soldiers.[10]

   10.   The process of loading and reloading a musket took even longer if instead of using a prepared paper cartridge, one used gunpowder from a powder horn to prime the pan and

---

   [9] Reid, *Flintlock Musket*, 34.  For a claim that a rifle had an advantage over a musket at distances greater than 50 yards see John F. Winkler, *Point Pleasant, 1774: Prelude to the American Revolution* (Oxford: Osprey, 2014), 29.  For a claim that a rifle and a musket were equally accurate at 100 yards see Alexander Rose, *American Rifle, A Biography* (New York: Delta Trade Paperbacks, 2009), 20.

   [10] Jeremy Black, *European Warfare, 1660-1815* (New Haven: Yale University Press, 1994), 40; Hew Strachan, *European Armies and the Conduct of War* (London: George Allen & Unwin, 1983), 17.

**Page 6 -   DECLARATION OF KEVIN M. SWEENEY**

then poured into the horn's measuring cap the amount of powder needed to charge the barrel. With this procedure one also had to remove an individual musket ball from a shot pouch and place it in the barrel after pouring down the measured charge of powder.  The ball was then rammed home.  Using this method of loading not only took longer, but also lacked the wadding provided by a paper cartridge which helped hold the ball in place.  According to the results of one modern test, wadding also increased a smoothbore's muzzle velocity by about 30%.[11]  Most hunters, backwoods men with muzzle-loading rifles, and many colonial militiamen lacked cartridge boxes and paper cartridges and instead used powder horns and shot bags.

11.     Even with these drawbacks, colonial governments and later state governments armed troops with these muskets during the French and Indian War (1754-1763) and the Revolutionary War (1775-1783).  There really weren't serious alternatives.  As a result, the British Ordnance Office loaned colonial governments 22,000 muskets to arm provincial troops raised for active service in the field during the French and Indian War, and at least 100,000 European muskets—most of them French—were imported during the American War for Independence.[12]  During the French and Indian War, the British also sent muskets to arm Georgia and North Carolina militiamen who lacked arms, and state governments sometimes provided arms for mobilized militiamen during the Revolutionary War.[13]

12.     As a rule, American colonists preferred lighter firearms that were better suited than muskets for pest control, birding, or hunting.  Especially popular in New England were locally made or imported smoothbore and fusils that weighed only 6 to 7 pounds and had narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[14]  The narrower

---

[11] Glenn Foard, *Battlefield Archaeology of the English Civil War* British Series 570 (Oxford: British Archaeological Reports, 2012), 105.

[12] De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120-123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484-485.

[13] Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, eds. *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of Massachusetts Press, 2013), 335, 348, 351-352.

[14] Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150-166.

Page 7 -   **DECLARATION OF KEVIN M. SWEENEY**

bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced the weight of the lead ammunition one carried.[15]  Some New England fowlers could outrange muskets and some were modified to carry a bayonet.[16]  However, because of their lighter weights and sleeker construction, they were not necessarily as sturdy or as "soldier-proof" as a musket nor as effective as a club.

13.    Many residents living in the colonies stretching from New York to Virginia owned "trade guns."  These were inexpensive, muzzle-loading, single shot, smooth-bore firearms designed and produced for trade with Native Americans.  Some of these guns weighed as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[17]  Because of these features, they were much easier to handle than a musket and employed about half the weight of lead and powder than compared to a musket for each shot.  However, these light, often cheaply constructed firearms did not function well as clubs and were not designed to carry a bayonet.

14.    In the backcountry of Pennsylvania and the colonies further south there was a distinct minority of men who owned more expensive locally made long rifles.  As a rule, these firearms weighed from 7 to 8 pounds, had .58 to .62 caliber bores—though some were even smaller—and barrels averaging 42 inches in length, and fired projectiles weighing much less than musket balls.[18]  Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them.  However, they took more time to reload because riflemen had to use powder horns and bullet pouches instead of paper cartridges, and reloading became harder as

---

[15] Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121-122; Neumann, *Battle Weapons of the American Revolution*, 206-210.

[16] Douglas D. Scott, et al., "Colonial Era Firearm Bullet Performance: Live Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36; Tom Grinslade, *Flintlock Fowlers: The First Guns Made in America* (Texarkana, Texas: Scurlock Publishing 2005), 59,72, 73, 75.

[17] M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 203-205.

[18] Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215-225.

**Page 8 -  DECLARATION OF KEVIN M. SWEENEY**

Ex. 3_Echeverria Decl.
Page 48

gunpowder residue built up in the grooves of the barrel's rifling.[19]  Additionally, these long rifles were not designed to take a bayonet, and they could break if used as a club.

15.    Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[20]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and as a result, they were often made in pairs "so that the owner might have two shots at his command."[21]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen.[22]  As it was, period pistols were discharged in close proximity to their targets because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[23]

16.    Civilian officials and military officers generally had a low opinion of trade guns, fowlers and even the period's American-made long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[24]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian

---

[19] John W. Wright, "The rifle in the American Revolution," *American Historical Review* Vol. 29, No. 2 (January 1924), 293-299.

[20] Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[21] Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[22] For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd ed. (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[23] Scott, et al., "Colonial Era Firearm Bullet Performance," 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

[24] "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265-266.

**Page 9 -   DECLARATION OF KEVIN M. SWEENEY**

(103 of 289), Page 103 of 289 Case: 23-2979, 12/02/2023, DktEntry: 26.3, Page 103 of 289

Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21290   Page 53 of 76
Case 2:22-cv-01815-IM   Document 124   Filed 02/06/23   Page 10 of 27

Trade," and not muskets.[25]  Later, George Washington referred to such smooth-bore long arms as "trash or light arms."[26]  Over the course of the Revolutionary War, he and his officers even phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[27]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[28]

17.      Data drawn from group of probate inventories of males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners (Table 1).  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms. Even cursory descriptions of firearms as "a gun" can be revealing when combined with the price that individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at £1 (i.e. 20 shillings), which was the usual cost of a single shot muzzle loading firearm. Such weapons would have been affordable given the fact that a daily wage during the period for unskilled day labor usually varied between 1 and a half and 2 shillings.  While there was an obvious preference for long arms, muskets and rifles constituted a minority of such weapons.

18.      The more expensive guns found in these 3,249 eighteenth-century probate inventories were also likely to be some type of muzzle loading, single-shot long arms.  As a rule, rifles were valued at £2 to £3, which was twice or three times the cost of common muzzle-loading smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, was the period's more realistic provision for being able to

---

[25] "Blair Report," 171.

[26] General George Washington to Gentlemen, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[27] Wright, "Rifle in the American Revolution," 297-298.

[28] Thomas Jefferson, *Notes on the State of Virginia*, edited by William Peden (New York: W. W. Norton, 1982), 88.

**Page 10 - DECLARATION OF KEVIN M. SWEENEY**

readily discharge more than one shot.  Only one gun found in this database of 3,249 probate inventories may have been a repeater: an "air gun" owned by Philippe Guillaume Chion [Philip Williamson?], Charleston merchant, who died in 1797.[29]  However, as is noted below in paragraph 40, not all air guns available in America were repeaters.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 1.9% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 532 | 32.0% | 0.2% | 2.3% | 5.1% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 459 | 62.9% | 3.7% | 4.1% | 23.3% |
| Totals | 3249 | 46.6%* | 1.4%* | 2.0%* | 7.8%* |

**Note: *The percentages at the bottoms of the columns are not averages of the percentages in the columns, but percentages of the total of 3249 inventories found in each category: 1514 inventories with firearms, 45 inventories with muskets, 66 inventories with rifles and 254 inventories with pistols. Sources:  The sources for the probate inventories used in this table are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.**

19.     Partial militia returns from the state of Virginia dating from 1781 to 1784 provide additional evidence that American consumers preferred smoothbore firearms that were not muskets.  Even though state law required "every militia-man to provide himself with arms [i.e. muskets] usual in regular service [i.e. the Continental Army] . . . this injunction was always in

---

[29] Inventory of Philippe Guillaume Choin, 1797, South Carolina Inventories and Appraisement Books, Vol. C, 1793-1800, 212-213. at Fold 3 by Ancestry https://www.fold3.com/publication/700/south-carolina-estate-inventories-and-bills-of-sale-1732-1872. <Accessed online 1/23/2023 at 6:00 P.M.>

**Page 11 - DECLARATION OF KEVIN M. SWEENEY**

differently complied with."[30]  Most did not own muskets, even in wartime.  Only about 16.7% of the privately owned long arms were muskets, while another 20.3% were rifles owned by residents of the state's western counties.[31]  By contrast, 63.0% of the privately owned long arms were smoothbores that were not muskets.[32]

**Table 2:  Partial Virginia Militia Returns Indicating Types of Arms in Use, 1781-1784**

| Year | Number of Counties | Number of public muskets | Number of private muskets | Number of private long arms* | Number of private rifles | Number of private pistols | Total Number of Guns |
|------|------|------|------|------|------|------|------|
| 1781 | 27 | 1502 | 1333 | 4225 | 1293 | 204 | 8557 |
| 1782 | 10 | 565 | 242 | 2113 | 767 | 60 | 3747 |
| 1784 | 15 | 541 | 441 | 1260 | 392 | 68 | 2702 |
| ALL | 52 | 2608 | 2016 | 7598 | 2452 | 332 | 15006 |

**Note:** **\*Number of "private long arms" are privately owned long arms that were not muskets and not rifles.**
**Sources:** **Militia Returns 1777-1784, microfilm, Accession 36929; State Government Records Collection; "General Return of Arms, Accoutrements, and Military Stores, 19th May, 1784," Accession 36912, House of Delegates, Executive Communications, Library of Virginia, Richmond**

20.    A large portion of the firearms used in eighteenth-century America would have been imported from England.  At the time, most English firearms were fabricated by large-scale putting-out systems that obtained barrels from one set of suppliers, got gunlocks from other sources, and assembled the parts at yet another site where the firearms also would have been stocked by craftsmen who were woodworkers.  By the mid-eighteenth-century, gun manufacturing in Birmingham, England involved "at least thirty different 'sub-trades' or manual

---

[30]  Jefferson, *Notes on the State of Virginia*, 88.

[31]  Calculated from data in Table 2.

[32]  *Ibid.*.

**Page 12 - DECLARATION OF KEVIN M. SWEENEY**

(106 of 289), Page 106 of 289 Case: 23-2979, 12/02/2023, DktEntry: 26.3, Page 106 of 289

Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21293   Page 56 of 76
Case 2:22-cv-01815-IM   Document 124   Filed 02/06/23   Page 13 of 27

manufacturing processes."[33] In particular, this is how firearms were made for the British army and for the export trade to Africa and England's colonies.[34]

21.     Other than American long rifles and some New England fowlers, most eighteenth-century firearms used by colonists were not likely to have been custom made or "one-off" products. During the years from 1756 to 1763, at least 36,592 firearms were imported into the thirteen American colonies from England for civilian customers.[35]  Another 18,900 trade guns were imported to sell to Native American customers.[36]  Advertisements indicate that urban gunsmiths in the colonies sold imported firearms and made use of imported gunlocks and barrels. Most of the pistols sold in the colonies were not produced in the colonies.[37]  A rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms.[38] When it came to his gunsmithing business, this skilled craftsman may have had more in common with a twentieth-century TV repairman than he did with Samuel Colt or Eli Whitney.

## II.     References to Repeating Arms in Eighteenth-Century Media

22.     So, how common were repeating weapons in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Information drawn from eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5,000 newspapers, with 450 dating from before 1800— tells much the same story.[39]  This newspaper database was searched by entering the terms "gun,"

---

[33] David Williams, *The Birmingham Gun Trade* (Stroud, Gloucestershire, Eng.: The History Press, 2009), 21.

[34] Williams, *Birmingham Gun Trade*, 21-24; De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I: Andrew Mowbrey, 2009), 93-102.

[35] Bailey*, Small Arms*, 237.

[36] De Witt Bailey, "The Wilson Gunmakers to Empire, 1730-1832" American Society of Arms Collectors *Bulletin* No. 85, 19.

[37] Jeff Kinard*, Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 46.

[38] Susan McGowan, "Agreeable to his Genius: John Partridge Bull (1731-1813), Deerfield, Massachusetts" (M.A. thesis, Trinity College, 1988), 5, 39-40, 74-75.

[39] *America's Historical Newspapers* (Chester, VT: Readex, 2004).

**Page 13 - DECLARATION OF KEVIN M. SWEENEY**

"musket," "fowler," "rifle," "pistol," "shot" and "militia," The search turned up 9 references to what appear to be repeating guns. To the information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777. This makes a total of 10 references to eighteenth-century repeaters in the period from 1720 to 1800.

23. What do these period references to repeating guns tell us about their features and how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America? The earliest known reference in an American newspaper to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723: "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once. This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730. This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty. There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[40]

---

[40] John Pimm's 1715 revolver with a hand rotated cylinder and flint priming system bears an apparent resemblance to a modern Smith & Wesson .38 caliber revolver. Brown, *Firearms in Colonial America*, 255-256. Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed. The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint. The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel. He then pulled back the hammer by hand. Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball. To fire again, the shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer and repeated the process outlined above. Primm's pistol could deliver six shots after being loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in Germany between 1490-1530. Brown, *Firearms in Colonial America*, 50. However, they remained rare in the American colonies, expensive, and suffered from mechanical problems because of the inability of gunsmiths to fit together the moving parts with enough precision to prevent loose powder from jamming the cylinder or producing an accidental discharge of the six chambers simultaneously. Brown, *Firearms in Colonial, America*, 50-51; Graeme Rimer, et al., *Smithsonian Firearms: An Illustrated History,* (New York: D. K. Publishing 2014), 56. The revolver patented by Samuel Colt in 1836 and produced in his factory in Paterson, New Jersey

**Page 14 - DECLARATION OF KEVIN M. SWEENEY**

24.     The next reference in an American newspaper to a repeating firearm is contained in an advertisement in the March 2, 1730 issue of Boston's *New-England Weekly Journal*.  It was for a firearm employing an uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at once Loading."  This advertisement also makes clear the novelty of such a repeating firearm.  Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the gun and 2 shillings—the equivalent of a day's wage of unskilled labor—to see it fired.  Basically, this gun was being used in an eighteenth-century version of a sideshow.  There is no indication that Miller was producing or selling such firearms.

25.     However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson advertised for sale a gun capable of firing 9 bullets in rapid succession.  It was "A handy Gun of 9 and a half Weight; having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow as you please, which one turn with Handle or the Said Gun, it doth charge the Gun with Powder and Bullet, and doth prime and shut the Pan, and cock the Gun."  The advertisement provides a spot-on description of three repeating firearms found in the collections of the Milwaukee Public Museum, Royal Armouries Museum in Leeds, and the Victoria and Albert Museum in London that were all produced sometime around 1690 by John Cookson, an English gunsmith.[41]  These were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10 pounds when loaded with 9 balls and powder charges.

26.     Cookson's English repeater employed what was known as the Lorenzoni breech-loading system.[42]  This system placed at the breech-end of the barrel a complex and delicate

---

employed percussion caps in its priming system and remains the first practical revolver to enter production.  The cylinder rotated when the gun was cocked and fired when the trigger was pulled.  However, even sales of this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of Colt's first gun manufactory.  See Peterson, *Treasury of the Gun*, 211.

[41] Brown, *Firearms in Colonial America*, 144-146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June 2022), 43-63.

[42] Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot.  His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon earlier innovations by gunsmiths, Peter and Mathias Kaltoff. Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun,* 229-231.

**Page 15 - DECLARATION OF KEVIN M. SWEENEY**

gunlock operated by a handle or lever attached to the left side of the lock. Separate tubes in the stock of the firearm were filled with priming powder, gunpowder for each charge, and 9 to 11 balls. The shooter pointed the gun barrel towards the ground and pushed the handle or lever down and forward, which rotated a mechanism located inside the gun lock that simultaneously brought forward one ball, enough gunpowder to discharge it, and enough primer to set off the charge in the barrel when the trigger was pulled. To recharge and again fire the gun, the shooter again pointed the barrel towards the ground, pushed on the lever and then pulled the trigger. If the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing, flame might leak back and explode the black powder stored in the butt. Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing the fitting precision parts needed to prevent such malfunctions caused by errant sparks.

27.     Sometime before 1701, John Cookson moved to Boston.[43] Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston. There are no surviving eighteenth-century, American-made Cookson repeaters.[44] This is actually not surprising given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[45] The authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[46] The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[47]

---

Today this type of repeating firearm is generally identified by English and American collectors and curators as employing the Lorenzoni system.

[43] Weaver and Godwin, "John Cookson, gunmaker," 51-56, 59-61

[44] *Ibid.*, 56, 60. Weaver and Godwin make clear that the firearm referred to as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was made in the late 1600s by John Shaw, a London gunsmith.

[45] *Ibid.*, 55.

[46] *Ibid.*, 60.

[47] *Ibid.*, 56-57.

**Page 16 - DECLARATION OF KEVIN M. SWEENEY**

Ex. 3_Echeverria Decl.
Page 56

**ER_190**

28.    The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records and correspondence of the Continental Congress.  Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid [sic.] to discharge eight balls one after another, in eight, five or three seconds of time."[48]  He also claimed that such a gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[49] Its stated range was a mere 20 to 30 yards.  On July 10, 1777, Belton demonstrated a firearm that successively discharged 16 bullets.  He also claimed that this weapon could "do execution [at] 200 yards" which would have been a dramatic—and somewhat inexplicable—increase in the weapon's supposed range of 20 to 30 yards.[50]  In any event, Belton and Congress failed to agree on a financial arrangement.  Belton requested the princely sum of £13,000—£1000 from each of the 13 states—to compensate him for inventing this system, though he subsequently reduced his demand to only £500 from each of the states.[51]  There is no documentary or physical evidence indicating that Belton produced any of these firearms in 1777.

29.    The specific design of the firearm that Belton demonstrated in 1777 remains unclear.  There is a brass-barreled, flintlock fusil in the collection of the Smithsonian Institution that has been proposed as the actual gun or a prototype for the gun that Joseph Belton demonstrated in 1777.[52] It is engraved "IOS. BELTON INVENTOR ET ARTIFEX – PHILAL-

---

[48] Quoted in Brown, *Firearms in Colonial American*, 317.  This letter and others are reproduced in their entirety at Joseph Belton to the Continental Congress, April 1, 1777 at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence_ between_John_Belton [sic.]_and_ the_ Continental _Congress.

[49] *Ibid.*

[50] Letter with Enclosure, Joseph Belton to the Continental Congress, July 10, 1777, at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence_ between_John_Belton [sic.]_and_ the_ Continental _Congress.

[51] Joseph Belton to the Continental Congress, May 7, 1777 and Joseph Belton to John Hancock, May 8, 1777 at https://en.wikkisource/ Correspondence_ between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[52] Robert Held, "The Guns of Joseph Belton Part I" *American Rifleman* (March 1987), 36-39, 68-69; *Oregon Firearms Federation v. Brown*, U.S. Dist. Ct. Civ. No. 2:22-cv-01815-IM (lead case), Declaration of Ashley Hlebinsky (ECF 72) at 18, n 24.

**Page 17 - DECLARATION OF KEVIN M. SWEENEY**

Ex. 3_Echeverria Decl.
Page 57

MDCCLVIII [i.e. 1758]".  An additional engraving on the gun refers to "CAPT JOSEPH BELTON OF Philad."[53]  However, the Joseph Belton who arrived in Philadelphia in 1775 and who came into contact with Benjamin Franklin and subsequently other members of the Continental Congress and the Continental Army was a 1769 graduate of the College of Rhode Island, which is today Brown University.[54]  In 1758, this Joseph Belton was not in Philadelphia; he was not a captain; and he was not then a gunsmith.  Despite claims to the contrary, it is unlikely that this particular gun was demonstrated in Philadelphia in July of 1777.[55]

30.     However as Harold Peterson suggested many years ago, it is quite likely that the firearm demonstrated in 1777 employed some version of what is known as a superimposition system.[56]  In the simplest version of a superimposed or superposed system of loading a firearm, a series of alternating powder charges and balls are loaded directly into a gun's barrel.  There is no detachable or integral magazine, just a standard barrel that is loaded from the muzzle in an alternating sequence of gunpowder and balls.  All of these charges were—ideally—set off in order from front to back by igniting the powder charge located behind the ball closest to the muzzle of the gun's barrel.  There is no magazine involved, and the ensuing discharge of balls is uncontrolled after it is initiated.

31.     The superposed system for discharging a succession of balls had been tried as early as 1580 by a German gunsmith working in London.[57]  Today, early flintlock pistols that used a simple superposed loading system are sometimes referred to as "Roman candle pistols" because they employed "the same principle as the firework" which involves setting off "a chain

---

[53] Smithsonian National Firearms Collection, :https://americanhistory.si.edu/collections/search/object,nmah_440031 Accessed 2/2/2013.

[54] Benjamin Franklin to Silas Deane, August 27, 1775 in *Papers of Benjamin Franklin*, Vol. 22, 183-185, especially footnote, 2.

[55] Quite distinct from the questions raised by what is known of Joseph Belton's biography is the claim in Adam Weinstein "I am Tired of Being Tired" December 21, 2018 that his grandfather, Kenneth Weinstein, a gunsmith, fabricated this particular firearm. adamweinstein.substack.com/p/i-am-tired-of-being-tired <Accessed 2/2/2023 at 12:00PM>.

[56] Peterson, *Arms and Armor in Colonial America*, 218.

[57] Peterson, *Treasury of the Gun*, 195.

**Page 18 - DECLARATION OF KEVIN M. SWEENEY**

reaction of multiple discharges."[58]  Other writers also liken flintlock long arms that employed a simple superposed system of multiple charges to "Roman candles".[59]

32.     Later in London, Joseph Belton was involved in producing a sophisticated and controllable version of a firearm employing a superposed system.  In 1784, Belton went to England where he failed to interest the English Ordnance Department in some version of his superposed system.  By 1786, he had entered into a partnership with London gunsmith William Jover (active 1750-1810).  Together they produced for Britain's East India Company a smoothbore repeating firearm with a sliding gunlock, that moved down the barrel to ignite a succession of powder charges that propelled a series of musket balls contained in a replaceable metal magazine holding 7 projectiles.  There are two authentic examples of this particular firearm in the collection of the Royal Armouries, National Firearms Center in Leeds, England.

33.     Belton's 1786 firearm allowed the shooter to control the weapon's discharge and aim each shot, which was not possible with the simpler superposed system.  As the 1786 firearm's moving gunlock lined up with the next powder charge and ball, the shooter primed a pan, pulled back the cock on the sliding gunlock, and then pulled a trigger firing off a single projectile.  Because of the need to cock and prime each time before pulling the trigger and firing the gun, this was not a rapid-fire repeating arm.  This firearm was also something of a challenge to handle.  It weighs 10 pounds unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the Keeper of Firearms and Artillery at the Leeds Firearms Center observes in an on-line video that managing the weapon is "a bit of a three-handed job."[60]

34.     A much cruder version of a firearm employing a superposed system was produced in America in the early 1790s.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and

---

[58] Jeff Kinard, *Pistols: An Illustrated History of their Impact (Santa Barbara*, CA: ABC-CLIO, 2004), 37.

[59] Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[60] Jonathan Ferguson, "Flintlock Repeating – 1786" youtube.com/watch?v=-wOmUM40G2U.  <Accessed online 11/6/2022 at 4:00 P.M>

**Page 19 - DECLARATION OF KEVIN M. SWEENEY**

Ex. 3_Echeverria Decl.
Page 59

philosophic Mr. Chambers of Mercersburg in Pennsylvania." This was Joseph Gaston Chambers (1756-1829). According to the news report, this pistol "discharged six balls in succession, with only one loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger." Later in the year, Chambers attempted to interest the United States War Department in buying long arms employing his version of the superposed system.

35.    A drawing that was probably done later reveals that Chambers's superposed system for a musket employed two gunlocks: one near the front of the barrel and the other in the usual location at the barrel's breech. First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech. This was the reserve shot. Next a succession of 8 special, cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel. Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle, which fired the first cylindrical projectile. A hole in the next projectile carried the charge through it and down its conical tail, which ignited the charge, which propelled the second cylindrical charge, and so on. Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[61] Chamber's system did not employ a detachable magazine, and once initiated, the gun's discharge could not be controlled. A drawing of this firearm is attached as **Exhibit B**.

36.    Chambers's initial efforts to win government interest in 1793 and a patent for his invention were unsuccessful. A demonstration in May of 1793 failed to impress the War Department. Later in 1813, Chambers did secure a patent and supplied the U.S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[62] The Navy's use of these weapons attracted the attention of the British and Dutch governments. However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government. His guns did work, but they could also produce devastating malfunctions. As historian Andrew Fagal has pointed out, cramming the gun's barrel with

---

[61] For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821" pages 2-3 of 6.

[62] Peterson, *Treasury of the Gun*, 197.

**Page 20 - DECLARATION OF KEVIN M. SWEENEY**

projectiles and gunpowder produced what was potentially a pipe bomb.[63]  All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[64]  In the 1820s, the "complexity and inherent dangers" of superposed systems that filled gun barrels with multiple charges of explosive gun powder "led to their wholesale abandonment."[65]

37.    A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use black powder as a propellant.  There are two advertisements—one for a demonstration and one for an auction—that contained references to an air gun able to fire 20 times with a single charging.  The February 10, 1792, issue of New York City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, though in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air.  Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

38.    The air gun demonstrated by Baker appears to have resembled or possibly might have been an actual example of a European air rifle designed by Bartholomeo Girardoni in 1779.  A Girardoni air gun had a magazine with a capacity of 22 balls, each of which was propelled by discharges of compressed air from a replaceable cannister carried in the gun's stock.  The gun

---

[63] Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[64] Peterson, *Treasury of the G*un, 198.

[65] Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" page 2 of 6. <Accessed online 10/25/2022 at 4:55 P.M>  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

**Page 21 - DECLARATION OF KEVIN M. SWEENEY**

Ex. 3_Echeverria Decl.
Page 61

weighed about 10 pounds—which was about the same as a musket—but was shorter, being only four feet in length overall.  As contemporaries in Europe reported, these air guns were not without their problems: "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully."[66]  In the late 1700s, the Austrian Army, which had a peacetime establishment of 304,628 men, purchased 1,500 Girardoni air rifles that, theoretically, could have armed only 0.5% of its soldiers.[67]  As it turned out, "after a while no more than one-third of them were in a usable state," and they were all phased out by 1810 if not before.[68]

39.    The American military's use of a Girardoni air rifle was more limited in number and briefer in its timespan, but is also much better known.  On their 1804-1806 expedition to the Pacific Ocean and back, Lewis and Clark and their "Corps of Discovery" carried with them a single Girardoni air rifle.[69]  While it was occasionally used for hunting, their air rifle was primarily employed to impress Natives that they encountered along the way.  As Private Joseph Whitehouse recorded in his journal: "Captain Lewis took his Air Gun and shot her off, and by the Interpreter, told them that there was medicine in her, and that she could do very great execution."  "They all stood amazed at this curiosity."[70]  Eight decades after John Pimm's repeating firearm had been used to impress Native Americans in Boston, Lewis and Clark—like the showman Philadelphia Gardiner Baker—were still able to exploit the rarity of a repeating gun to awe and entertain.

40.    It is possible that someone in the United States may have been marketing Girardoni air rifles or something very similar to them in the mid-1790s.  An announcement for a public

---

[66] Quoted in Frederick J. Chiaventone, "The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon" *Military Heritage*  Vol. 14  No. 5 (January 2015), 19.

[67] Richard Bassett, *For God and Kaiser: The Imperial Austrian Army* (New Haven: Yale University Press, 2015), 186.

[68] Chiaventone, "Girardoni Air Rifle," 19.

[69] For the identification of the air rifle on the Lewis and Clark Expedition as a Girardoni see Madeline Hiltz, "The Lewis and Clark Air Rifle: A Blast from the Past" *War History on Line* (June 16, 2021) https://warhistoryonline.com/war-articles/lewis-and-clark-air-rifle.html?firefox=1 <Accessed online 1/21/2023, 8:00AM>

[70] Chiaventone, "Girardoni Air Rifle," 66.

**Page 22 - DECLARATION OF KEVIN M. SWEENEY**

auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot." This air gun appears to be a repeating gun because of its reference to a "Magazine." However, one should not automatically assume that all early air guns were repeaters. Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single shot air guns, though some writers erroneously assume that they were repeaters like Girardoni's air rifle.[71] It wasn't until the 1880s that two Michigan companies—the most famous of which was the Daisy Manufacturing Company—would begin marketing the first commercially successful, mass-produced repeating air rifles, aiming them at a youth market, employing a lever-action operating system, and shooting BB-caliber pellets.

41.     Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers. One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia". However, this particular news report has been dismissed as a fabrication.[72] The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina. It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries. Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular, he could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

42.     Ransier appears to be describing imported Belgian or French-made Segales pistols which had four rifled barrels. These were small pistols that had a box lock and a swiveling

---

[71] Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West. <Accessed online on 10/31/2022, at 10:40 A.M> On November 2, 2022, I received an email from Danny McClure, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[72] Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability, as does the fact that it was immediately followed by a news report on a Sea Monster. An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report. Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

**Page 23 - DECLARATION OF KEVIN M. SWEENEY**

breech attached to a cluster of four separate barrels: two upper barrels placed on top of two lower barrels. The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels. Each barrel was loaded separately at the muzzle with powder and ball. The two upper barrels could be fired one at a time by pulling each of the individual triggers in succession or fired simultaneously by pulling both triggers at once (which could be risky). After discharging the two upper barrels, the shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's trigger guard. Once rotated to the upper position, the two barrels formerly in the lower position could now be fired when the triggers were pulled individually or simultaneously. However, as experts have pointed out: "All revolvers, and other multibarrel guns, of the muzzle-loading type were at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others."[73] If this happened, the gun would explode in the shooter's hand.

43.     Finally, something needs to be said about a gun which—ironically—was never found in the 13 Colonies, but has assumed an out-sized importance in the minds of some writing about colonial Americans and their presumed interest in and familiarity with repeating firearms.[74] In the early 1700s, James Puckle, an English lawyer, writer, and part-time inventor created a firearm fed by a 11-shot magazine located at the back of the gun that was rotated by a crank. Rotating the crank aligned a power charge and bullet in the magazine with the weapon's barrel. After locking the magazine and the barrel together, the operator had to manually prime each shot and pull back the cock before pulling the trigger for each discharge of the weapon. Because of the time needed to prime and cock the hammer before each shot and to change the magazine after it was emptied, the gun had a rate of fire of only 9 rounds per minute. It was

---

[73] Rimer, *Smithsonian's Firearms,* 56.

[74] Clayton E. Cramer and Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America" *Willamette Law Review* Vol. 44. No. 4 (Summer 2008), 716-717; David B. Kopel, "The History of Firearm Magazines and Magazine Prohibitions" *Albany Law Review* Vol. 78, No. 2 (2014-2015), 852.

**Page 24 - DECLARATION OF KEVIN M. SWEENEY**

never used in battle.  The company producing it went out of business before 1730.  This gun had no discernable impact on colonial Americans nor on the development of firearms technology.[75]

44.    However, the Puckle gun lives on in the imaginations of some.[76]  Because of its weight, the Puckle gun used a tripod.  Visually the weapon bears an undeniable physical resemblance to certain .30 caliber machine guns used in World War II.  As a result, some refer to it today as "an eighteenth-century machine gun."  It was not a machine gun as we understand and use the term today, in either its mode of operation or its rate of fire.  The machine gun, invented by Hiram Maxim in 1884, used the recoil action of the gun to load it continuously and discharge spent cartridges.  Just pull the trigger and it kept firing bullets as long as the operator's assistant kept feeding it an ammo belt.  Another less common version of the machine gun diverted some of the gasses produced by discharging the weapon into a tube with a piston that automatically and repeatedly loaded the gun and ejected spent cartridges.  (A modern assault rifle uses a similar system that also employs diverted gasses to operate a piston.)  The .30 caliber medium machine gun used by the American army during World War II fired approximately 500 rounds a minute.  The only thing this weapon had in common with the eighteenth-century Puckle Gun was its use of a tripod.

45.    In summary, period probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in Joseph Belton's firearm, and in 1813 the United States Navy purchased 200 muskets and 100 pistols produced by Joseph Gaston Chambers.  However, such superposed systems were in the assessment of military historian Joseph G. Bilby "a developmental dead end."[77]  Well into the third-quarter of the nineteenth century, the American government armed the overwhelming

---

[75] Brown, *Firearms in Colonial America*, 239. Brown appears to misstate the capacity of the magazine as 9-shot, when it was actually a 11-shot magazine.

[76] See note 74 above.

[77] Joseph G. Bilby, *A Revolution in Arms: History of the First Repeating Rifles* (Yardly, Penn.: Westholme Publishing, 2015), 41.

**Page 25 - DECLARATION OF KEVIN M. SWEENEY**

majority of its soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army made only limited use of the much more reliable repeating long arms made by Samuel Colt, the Spencer Arms Company, and the New Haven Arms Company, which was owned by Oliver Winchester and produced a repeater designed by Benjamin Henry.[78]

46.     The earlier lack of enthusiasm for repeating firearms among eighteenth-century Americans is unsurprising given the colonists' demonstrated preferences for inexpensive, light firearms that used less gunpowder and lead than did muskets.  By contrast, most of the period's repeating arms were expensive, heavy, and required greater expenditures—that were often uncontrollable—of gunpowder and lead.  Because repeating firearms contained multiple charges of explosive black powder gunpowder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile.  Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb.  As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[79]  For these reasons, eighteenth-century advertisements and homes were filled with muzzle-loading, single shot firearms.

47.     The fact that some repeating firearms had been produced in Europe for four centuries by 1800 does not necessarily support the conclusion that Americans in the late 1700s would have assumed that such weapons would inevitably become reliable, safe, and widely available.  An individual looking back from 1800 might have been just as likely to conclude that very little progress had been made over the previous four centuries.  It was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder.  The superposed systems employed by Belton and Chambers, the Girardoni air rifle, and the Puckle Gun proved to be dead ends.  Calling these weapons and others like them "eighteenth-century assault rifles" or "an eighteenth-century machine gun" are examples of modern-day

---

[78] Bilby, *Revolution in Arms*, 44-48, 60-91.

[79] Peterson, *Treasury of the Gun*, 233.

**Page 26 - DECLARATION OF KEVIN M. SWEENEY**

rhetoric, not evidence of inevitable developments in firearms technology. As George Basalla, an historian of technology, has cautioned: "All too often it is assumed that the development of technology is rigidly unilinear."[80]

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 5 day of February, 2023.

Kevin M. Sweeney

---

[80] George Basalla, *The Evolution of Technology* (New York: Cambridge University Press, 1988), 189.

**Page 27 - DECLARATION OF KEVIN M. SWEENEY**

1

## Curriculum Vitae: Kevin M. Sweeney

Home Address:  9 Orchard Street,
                 Greenfield, MA  01301

Home Phone:   (413) 774-5027
E-mail:        kmsweeney@amherst.edu

**Education:**  Ph.D. in History   1986, Yale University.
            B.A.  in History   1972, Williams College.

## Employment:

2000-2016   Professor of History and American Studies, Amherst College.
1993-2000   Associate Professor of History and American Studies, Amherst College.
1989-1993   Assistant Professor of History and American Studies, Amherst College.
1986-1989   Director of Academic Programs, Historic Deerfield, Deerfield, Mass.
1985-1986   Assistant Professor, Winterthur Museum, Winterthur, Delaware.
1980-1984   Administrator-Curator, Webb-Deane-Stevens Museum, Wethersfield, Conn.
1978-1980   History Instructor, Westover School, Middlebury, Conn.

## Other Academic Appointments:

2007        Visiting Faculty, American Studies Seminar, American Antiquarian Society, Worcester,
            Mass.
1987-1989   Assistant Professor of American Studies at Smith College under the Five
            College Program.
1985-1986   Adjunct Assistant Professor, Early American Culture, University of
            Delaware.
1982-1984   Visiting Lecturer in American Studies, Trinity College, Hartford, Conn..
1981        Adjunct, Art History Department, University of Hartford.

## Declarations Filed as an Expert Witness:

2022        *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC.
2023        *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland
            Security*, United States District Court, District of Delaware, Case No. 1:22-cv-00951-RGA.

## Academic Honors and Prizes:

2003   Book Prize, New England Historical Association.
2003   Award of Merit, American Association for State and Local History.

**Ex. A - Sweeney Decl.**
**Page 1 of 5**
Ex. 3_Echeverria Decl.
Page 68

1995   Harold L. Peterson Award, Eastern National Parks & Monuments Association.
1986   Jamestown Prize of the Institute of Early American History and Culture,
          Williamsburg, VA.
1986   Frederick W. Beinecke Prize in History, Yale University.
1973   Mary Cady Tew Prize in History, Yale University.
1972   William Bradford Turner Prize in American History, Williams College.
1971   Phi Beta Kappa, Williams College.

**Publications:**

**Books**

With Evan Haefeli, co-editors, *Captive Histories: English, French and Native Narratives
   of the 1704 Deerfield Raid* (Amherst, Mass.: University of Massachusetts Press, 2006).

With Evan Haefeli, *Captors and Captives: The 1704 French and Indian Raid on
   Deerfield* (Amherst, Mass.: University of Massachusetts Press, 2003). Awarded 2003 Book Prize, New
   England Historical Association and 2003 Award of Merit, American Association for State and Local
   History.

**Articles/Book Chapters/Catalogue Essays**

"Revolutionary State Militias in the Backcountry and Along the Frontiers," *The American Revolution on
   the Frontier*, edited by Seanegan Sculley, Sons of the American Revolution 2022 Conference
   Proceedings, (publication forthcoming).

"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in
   Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors *A Right to Bear Arms? The Contested
   Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian
   Scholarly Press, 2019), 54-71.

"Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, editors*, The
   Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of
   Massachusetts Press, forthcoming August 2013), 310-382.

"Mary Rowlandson: Taken by Indians," *American Heritage* 58:5 (Fall 2008): 23-25.

"Early American Religious Traditions: Native Visions and Christian Providence," *OAH Magazine of
   History* (January 2008):8-13.

With Jessica Neuwirth, Robert Paynter, Braden Paynter and Abbott Lowell Cummings, "Abbott Lowell
   Cummings and the Preservation of New England," *The Public Historian* 29:4 (Fall 2007):57-81.

With Evan Haefeli, "*The Redeemed Captive* as Recurrent Political Text*" The New England
   Quarterly* (September 2004):341-367.

"The 1704 French and Indian Raid on Deerfield" *New England Ancestors* 5:1 (Winter 2004): 23-26.

**Ex. A - Sweeney Decl.**
**Page 2 of 5**
Ex. 3_Echeverria Decl.
Page 69

**ER_203**

3

"Regions and the Study of Material Culture: Explorations along the Connecticut River" for *American Furniture*, Luke Beckerdite, editor (Milwaukee, Wis.: Chipstone Foundation/ the University Press of New England, 1995), 145-166.

With Evan Haefeli, "Revisiting *The Redeemed Captive*: New Perspectives on the 1704 Attack on Deerfield" *William and Mary Quarterly* 3rd ser. 52:1(January 1995):3-46. Awarded the 1995 Harold L. Peterson Award, Eastern National Parks & Monument Association, and the 1995 Essay Prize, Society of Colonial Wars.

With Evan Haefeli, "Wattanummon's World: Personal and Tribal Identity in the Algonquian Diaspora, c. 1660-1712" in William Cowan, ed., *Papers of the Twenty Fifth Algonquian Conference* (Ottawa, 1994), 212-224.

"High Style Vernacular: Lifestyles of the Colonial Elite " in *Of Consuming Interests: The Style of Life in Eighteenth-Century America*, edited by Ronald Hoffman, Cary Carson, and Peter J. Albert (Charlottesville: University of Virginia Press, 1994),1-58.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1995.

"Meetinghouses, Town Houses, and Churches: Changing Perceptions of Sacred and Secular Space in Southern New England, 1725-1850" *Winterthur Portfolio* 28:1 (Winter 1994):59-93.

"Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987,* Peter Benes, ed. (Boston: Boston University Press, 1989), 32-40.

"Gentlemen Farmers and Inland Merchants: The Williams Family and Commercial Agriculture in Pre-Revolutionary Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1986*, Peter Benes, ed. (Boston University Press, 1988), 60-73.

"Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800," *Connecticut Antiquarian* 36:2 (1984): 10-39. Revised and reprinted in *Material Life in America, 1600-1860*, Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

"From Wilderness to Arcadian Vale: Material Life in the Connecticut River Valley, 1635 to 1760" and "Gravestones" in *The Great River: Art and Society of The Connecticut Valley, 1635-1820* (Wadsworth Atheneum, Hartford, CT., 1985), 17-27, 485-523.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1985.

"Where the Bay Meets the River: Gravestones and Stonecutters in the River Towns of Western Massachusetts, 1690-1810," *Markers III*, David Watters, ed. (Association for Gravestone Studies, 1985),1-46.

"Mansion People: Class, Kinship and Architecture in Western Massachusetts in the Mid-18th Century," *Winterthur Portfolio* (Winter 1984):231-255.

"Furniture and furniture making in mid-eighteenth-century Wethersfield, Connecticut" *Antiques* 125:5 (May 1984), 1156-1163.

**Ex. A - Sweeney Decl.**
**Page 3 of 5**
Ex. 3_Echeverria Decl.
Page 70

**ER_204**

4

"River Gods in the Making: The Williams Family in Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1981*, Peter Benes, ed. (Boston University Press, 1982), pp. 101-116. Reprinted in a *Place Called Paradise: 1654-2004*, edited by Kerry Buckley (Amherst, Mass.: University of Massachusetts Press, 2004), 76-90.

**Exhibitions:**

2007-2008    Consultant, "Shays's Rebellion," N. E. H. Funded Web-Exhibition, Springfield Technical Community College and Pocumtuck Valley Memorial Association.

2003-2005    Consultant and Contributor, "The Many Stories of 1704," N.E.H. Funded Web-exhibition, Pocumtuck Valley Memorial Association. 2005 Museums and Webs Award Winner; 2005 Award of Merit, American Association for State and Local History; 2007 Merlot History Classics Award and others.

1984-1985    Consultant and Contributor, "The Great River: Art and Society of the Connecticut Valley, - 1820" Catalogue awarded Charles F. Montgomery Prize for 1985 by the Decorative Arts Society; Award of Merit from the American Association for State and Local History, 1986; Honorable Mention, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1986.

1982        Consultant and Contributor, "Two Towns: Concord and Wethersfield - A Comparative Exhibition of Regional Culture, 1635-1850," 1982. N. E. H. Funded Exhibition.

**Films/Videos:**

2012        Contributor, *Cherry Cottage, The Story of an American House*, Dave Simonds, Williamstown, Mass.

2009        Contributor, *The Forgotten War: The Battle for the North Country,* Mountain Lake Public Television, Plattsburg, NY.

2005        Contributor, *Captive: The Story of Esther,* VisionTV and Aboriginal Peoples Television Network, Canada.

2003        Contributor, *New England's Great River: Discovering the Connecticut,* Vermont Public Television, Burlington, VT

**Memberships in Professional and Scholarly Societies:**

American Historical Association.
Colonial Society of Massachusetts.
Massachusetts Historical Society.
Organization of American Historians.
Society of Military Historians

Ex. A - Sweeney Decl.
Page 4 of 5
Ex. 3_Echeverria Decl.
Page 71

**Other Professional Activities**

| | |
|---|---|
| 2008-2010 | Chair, History Department, Amherst College. |
| 2005-2007 | Chair, American Studies Department, Amherst College. |
| 2003-2004 | Consultant, "Remembering 1704: Context and Commemoration of the Deerfield Raid" Pocumtuck Valley Memorial Association and Historic Deerfield, Inc. |
| 1997-2001 | Consultant, "Turns of the Centuries" Project, Pocumtuck Valley Memorial Association. |
| 1997-1999 | Chair, History Department, Amherst College. |
| 1997-1998 | Consultant, Exhibition entitled "Performing Arts: The Refinement of Rural New England," Historic Deerfield., Inc. |
| 1996-1998 | Member, Advisory Committee for the Dickinson Homestead, Amherst College. |
| 1994-1995 | Chair, Committee on Priorities and Resources, Amherst College. |
| 1993-1995 | Chair, American Studies Department, Amherst College |
| 1992 | Consultant, "Forty Acres: A Reinterpretation Initiative," Porter-Phelps-Huntington Foundation, Hadley, Mass. |
| 1991 | Consultant, "Furniture-making in Central New England, 1790-1850," Old Sturbridge Village. |
| 1991-1994 | Member, Five College Standing Committee on American Indian Studies. |
| 1986-1989 | Member, Five College American Studies Steering Committee. |
| 1981-1986 | Member, Advisory Committee for Historic Deerfield. |

1/27/2023

**Ex. A - Sweeney Decl.**

**Page 5 of 5**

Ex. 3_Echeverria Decl.

Page 72

Case 3:19-cv-01537-BEN-JLB   Document 167-1   Filed 02/10/23   PageID.21313   Page 76 of 76

Case 2:22-cv-01815-IM   Document 124-2   Filed 02/06/23   Page 1 of 1



Ex. B - Sweeney Decl.
Page 1 of 1
Ex. 3_Echeverria Decl.
Page 73

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and*
*Allison Mendoza, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES MILLER et al.,** | Case No. 3:19-cv-01537-BEN-JLB |
| Plaintiffs, | **DECLARATION OF JOHN D. ECHEVERRIA RE SUBMISSION OF SURVEYS IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022** |
| v. | |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,** | |
| Defendants. | Dept:          5A |
| | Judge:        Hon. Roger T. Benitez |
| | Action Filed:  August 15, 2019 |

I, John D. Echeverria, declare as follows:

1.      I am a Deputy Attorney General with the California Department of

Justice and serve as counsel to Defendants Rob Bonta, in his official capacity as

Attorney General of the State of California, and Allison Mendoza, in her official

capacity as Acting Director of the Bureau of Firearms ("Defendants"),[1] in the

above-captioned matter.  Except as otherwise stated, I have personal knowledge of

_____
[1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the Attorney General of the State of California, and Allison Menndoza, now Acting Director of the Bureau of Firearms, has succeeded former Acting Director Blake Graham, who in turn succeeding former Director Luis Lopez, who succeeded former Interim Director Brent E. Orick.  Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Bonta and Acting Director Mendoza, in their respective official capacities, are substituted as the defendants in this case.

1

the facts set forth in this declaration, and if called upon as a witness I could testify competently as to those facts.

2.  On December 15, 2022, the Court entered an Order providing that "[t]he state defendants shall create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order." Dkt. 161.  The Order provides:

> The listing shall begin at the time of the adoption of the Second Amendment and continue through twenty years after the Fourteenth Amendment. For each cited statute/law/regulation, the survey shall provide: (a) the date of enactment; (b) the enacting state, territory, or locality; (c) a description of what was restricted (e.g., dirks, daggers, metal knuckles, storage of gunpowder or cartridges, or use regulations); (d) what it was that the law or regulation restricted; (e) what type of weapon was being restricted (e.g., knife, Bowie Knife, stiletto, metal knuckles, pistols, rifles); (f) if and when the law was repealed and whether it was replaced; (g) whether the regulation was reviewed by a court and the outcome of the courts review (with case citation). Defendants may create a second survey covering a time period following that of the first list. If opposing parties cannot agree on the inclusion of a particular entry on the survey, the disagreement shall be indicated and described on a separate list.

3.  On January 4, 2023, undersigned counsel for Defendants emailed surveys of laws that Defendants have determined are relevant to this action.  On January 10, 2023, George Lee, counsel for Plaintiffs in this action, emailed the following response:  "You may indicate to the court that due to the length of defendants' surveys, plaintiffs will reserve all objections to the form of the surveys, and the relevance of the purported statutes contained therein, until the filing of their responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF 161)."

4.  In compliance with the Court's Order, Defendants are hereby submitting Defendant's two surveys of relevant laws.

5.  Attached hereto as **Exhibit 1** is a true and correct copy of Defendants' Survey of Relevant Statutes (Pre-Founding – 1888).

6.  Attached hereto as **Exhibit 2** is a true and correct copy of Defendants' Survey of Relevant Statutes (1889 – 1930s).

7.      The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 11, 2023, at San Francisco, California.

*s/ John D. Echeverria*
John D. Echeverria

3

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)[1,2]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 1 | 1383 | England | 7 Rich. 2, ch. 13 (1383) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay | | |
| 2 | 1396 | England | 20 Rich. 2, ch. 1 (1396) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay | | |
| 3 | 1541 | England | 33 Hen. 8, ch. 6 §§ 1, 18 (1541) | Prohibited possession of any crossbow, handgun, hagbutt, or demy hake.  Exempted subjects living within 12 miles of the Scottish border.  Punishable by forfeiture or payment of 10 pounds. | Pistol; Crossbow | | |
| 4 | 1606 | England | 4 Jac. I, ch. 1 (1606) | Repealed exemption for subjects living with 12 miles of the Scottish border for the keeping of crossbows, handguns, and demy hakes. | Club; Other weapon | | |
| 5 | 1664 | New York | The Colonial Laws of New York from the Year 1664 to the Revolution . . ., at 687 (1894) | Prohibited a slave from possessing or using a gun, pistol, sword, club, or other kind of weapon unless in the presence | Gun; Pistol; Sword; Club; | Unconstitutio nal under the Thirteenth and/or Fourteenth | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 161), Defendants created this survey of statutes, laws, and regulations that Defendants have determined are relevant to this action.  Plaintiffs have indicated that, "due to the length of defendants' surveys, plaintiffs will reserve all objections to the form of the surveys, and the relevance of the purported statutes contained therein, until the filing of their responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF 161)."

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | and at the direction of their Master or Mistress. | Other kind of weapon | Amendments to the U.S. Constitution | |
| 6 | 1686 | New Jersey | The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289-90 (1881) (1686) | Prohibited the carrying "privately" of any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons.  Punishable by fine of 5 pounds for first conviction, and punishable by imprisonment for 6 months and a fine of 10 pounds. | Pistol; Skeines; Stilettoes; Dagger; Dirk; Other unusual or unlawful weapons | | |
| 7 | 1689 | England | English Bill of Rights of 1689, 1 Wm. & Mary ch. 2, § 7 | Provided a right for Protestants to have "Arms for their Defense . . . as allowed by law." | Arms for defense | | |
| 8 | 1750 | Massachusetts | 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 17, § 1 | Prohibited the carrying of a club or other weapon while unlawfully, riotously, or tumultuously assembling. Punishable by seizing the weapon and a hearing before the court. | Club; Other weapon | | |
| 9 | 1769 | England | 1 Blackstone ch. 1 (1769) | Recognized the "fifth and last auxiliary right," which provided that Protestant subjects had the right to "arms for their defence" "such as are allowed by law." | Arms for defense | | |
| 10 | 1771 | New Jersey | 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | Prohibited the setting of any trap gun intended to discharge by any string, rope, or other contrivance.  Punishable by forfeiture of the firearm and fine of 6 pounds. | Trap gun | | |

2

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| 11 | 1783 | Massachusetts – City of Boston | 1783 Mass. Acts 37, § 2 | Prohibited the possession of any "fire arms," and among other devices, loaded with any gun powder.  Punishable by forfeiture and sale at public auction. | Gunpowder | | |
| 12 | 1784 | New York – City of New York City | 1784 Laws of N.Y. 627, ch. 28 | Prohibited any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers.  Punishable by forfeiture and fine. | Gunpowder | | |
| 13 | 1786 | Massachusetts | An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, MA), Nov. 17, 1786, at 1 | Prohibited being armed with a club or other weapon while rioting. | Club; Other weapon | | |
| 14 | 1788 | Ohio [Territory] | 1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . ., ch. 6 | Prohibited the carrying of any "dangerous weapon" that indicates a violent intention while committing a burglary.  Punishable by imprisonment for up to 40 years. | Any dangerous weapon | | |
| 15 | 1792 | Virginia | Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force . . . ., at 187 (1803), §§ 8-9 | Prohibited any "negro or mulatto" from possessing or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |

3

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| 16 | 1797 | Delaware | Del. Laws 104, An Act for the Trial of Negroes, ch. 43, § 6 | Prohibited "any Negro or Mulatto slave" from carrying guns, swords, pistols, fowling pieces, clubs, or other arms and weapons without the master's special license. | Gun; Sword; Pistol; Fowling pieces; Club; other arms and weapons | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 17 | 1798 | Kentucky | 1798 Ky. Acts 106 | Prohibited "negro, mulatto, or Indian" from possessing or carrying a gun, powder, shot, club, or other weapon or ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 18 | 1799 | Mississippi [Territory] | 1799 Miss. Laws 113, A Law for The Regulation of Slaves | Prohibited any "Negro or mulatto" from carrying gun, powder, shot, club, or other weapon. Also prohibits a "negro or mulatto" from possessing a gun, weapon, or ammunition. | Gun; Powder; Shot; Cub; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 19 | 1799 | New Jersey | Charles Nettleton, Laws of the State of New-Jersey, at 474 (1821), [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 20 | 1801 | Tennessee | 1801 Tenn. Act 260-61 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to | Dirk; Large knife; Pistol; | | |

4

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | the  fear or terror of any person," unless a surety is posted. Punishable as for "breach of the peace, or riot at common law." | Other dangerous weapon | | |
| 21 | 1804 | Indiana [Territory] | 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4 | Prohibited a "slave or mulatto" from carrying or possessing a gun, powder, shot, club or other weapon and ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 22 | 1804 | Mississippi [Territory] | 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | Prohibited a "Slave" from keeping or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 23 | 1811 | Maryland | The Laws of Maryland, with the Charter, the Bill Of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments, at 465 (1811) | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment for 3 months to 2 years. | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 24 | 1813 | Louisiana | 1813 La. Acts 172, An Act Against Carrying | Prohibited the carrying of any concealed weapon, including a | Dirk; Dagger; | | |

ER_215

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| | | | Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 | dirk, dagger, knife, pistol, or any other deadly weapon. | Knife; Pistol; Other deadly weapon | | |
| 25 | 1816 | Georgia | Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions, at 599 (1821), Offences Against the Public Peace, (1816) § 19 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment with hard labor for a period of time to be determined by a jury. | Picklock; Key; Crow; Jack; Bit or other implement; Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 26 | 1818 | Missouri [Territory] | Organic Laws:-Laws of Missouri Territory, (Alphabetically | Prohibited "slave or mulatto" from carrying a gun, powder, shot, club or other weapon and | Gun; Powder; Shot; | Unconstitutional under the Thirteenth | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
|  |  |  | Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates, at 374 (1818), Slaves, § 3 | from possessing a gun or ammunition. | Club; Other weapon; Ammunition | and/or Fourteenth Amendments to the U.S. Constitution |  |
| 27 | 1821 | Maine | 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 1 | Prohibited any person from possessing any gunpowder, in any quantity, unless permitted by local rules and regulations. | Gunpowder |  |  |
| 28 | 1835 | Arkansas [Territory] | Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | Prohibited any "slave or mulatto" from keeping or carrying a gun, powder, shot, club, or other weapon. | Firearm; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution |  |
| 29 | 1836 | Massachusetts | Mass. Rev. Stat., ch. 134, § 16 (1836) | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Punishable by finding sureties for keeping the peace for a term up to 6 months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon |  |  |
| 30 | 1836 | Connecticut – Cities of Hartford, New Haven, New | 1836 Conn. Acts 105, ch. 1, § 20 | Authorizing the local court of common counsel to prohibitand regulate the storage of gun powder. | Gunpowder |  |  |

7

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | London, Norwich, and Middletown | | | | | |
| 31 | 1837 | Alabama | 1837 Ala. Acts 7, §§ 1, 2 | Imposed tax of $100 on any person selling, giving, or disposing of any Bowie knife or Arkansas toothpick. Failure to pay the tax was subject to penalty of perjury. | Knife | Tax reduced in 1851. | |
| 32 | 1837 | Arkansas | Josiah Gould, A Digest of the Statutes of Arkansas Embracing All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 1856 380 381–82 (1837) | Prohibited the concealed carrying of any pistol, dirk, butcher or large knife, sword cane, unless "upon a journey." | Pistol; Dirk; Butcher knife; Sword cane | | *State v. Buzzard*, 4 Ark. 18 (1842) (upholding law under the Second Amendment and state constitution); *Fife v. State*, 31 Ark. 455 (1876) |
| 33 | 1837 | Georgia | Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838) | Prohibited any merchant, or "any other person or persons whatsoever," to sell, offer to sell, keep, or have on their person or elsewhere any Bowie knife or "any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence," pistols, swords, sword canes, or spears. Exempted | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear | | *Nunn v. State*, 1 Ga. 243 (1846) (held unconstitutional under Second Amendment). |

8

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | "such pistols as are known as horseman's pistols" from these restrictions.  Punishable by a fine of up to $100-500 for the first offense and $500-1,000 for subsequent offenses. | | | |
| 34 | 1837 | Mississippi | 1837 Miss. L. 291-92 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, dirk knife, Bowie knife, or any other deadly weapon in a fight in which one of the combatants was killed, and the exhibition of any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense. Punishable by liability to decedent and a fine of up to $500 and imprisonment for up to 3 months. | Rifle; Shotgun; Sword cane; Pistol; Dirk; Dirk knife; Bowie knife; Sword; Sword cane; Other deadly weapon | | |
| 35 | 1837 | Mississippi – Town of Sharon | 1837 Miss. L. 294 | Authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 36 | 1837 | Tennessee | 1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 2 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon.  Punishable by fine of $200-500 and imprisonment for 3-6 months. | Bowie knife; Arkansas toothpick; Other knife or weapon | | *Haynes v. Tennessee*, 24 Tenn. 120 (1844) (upheld conviction for unlawful |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | | carrying of a Bowie knife). |
| 37 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Prohibited any merchant from selling a Bowie knife or Arkansas tooth pick.  Punishable by fine of $100-500 and imprisonment for $1-6 months. | Bowie knife; Arkansas toothpick | | |
| 38 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4 | Prohibited the stabbing or cutting of another person with any knife or weapon known as a "Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife," regardless of whether the person dies.  Punishable by imprisonment for 3-15 years. | Bowie knife; Arkansas toothpick; Any knife or weapon that resembles a bowie knife | | |
| 39 | 1838 | Tennessee | Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-38, at 200-01, ch. 137 | Prohibited the sale or transfer of any Bowie knife or knives, Arkansas toothpicks, or "any knife or weapon that shall in form shape or size resemble a Bowie knife or any Arkansas toothpick." | Bowie knife; Arkansas toothpick; Any similar knife | | *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) (upheld under state constitution). |
| 40 | 1838 | Virginia | Acts of the General Assembly of Virginia, Passed at the Session of 1838, at 76-77, ch. 101 (1838) | Prohibited "habitually or generally" carrying any concealed pistol, dirk, Bowie knife, or any other weapon of like kind. | Pistol; Dirk; Bowie knife; Other similar weapon | | |
| 41 | 1839 | Alabama | 1839 Ala. Acts 67, § 1 | Prohibited the concealed carrying of "any species of fire | Knife; Deadly weapon | | *State v. Reid*, 1 Ala. 612 |

10

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." Punished by fine of $50-100 and imprisonment not to exceed 3 months. | | | (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 42 | 1839 | Florida [Territory] | John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840, at 423 (1839), An Act to Prevent any Person in this Territory from Carrying Arms Secretly | Prohibited the concealed carrying of "any dirk, pistol, or other arm, or weapon, except a common pocket-knife." Punishable by fine of $50-500 or imprisonment for 1-6 months. | Dirk; Pistol; Other arm or weapon | | |
| 43 | 1839 | Mississippi – Town of Emery | 1839 Miss. L. 385, ch. 168 | Authorized the town of Emery to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 44 | 1840 | Mississippi – Town of Hernando | 1840 Miss. L. 181, ch. 111 | Authorized the town of Hernando to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 45 | 1841 | Alabama | 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 | Prohibited the concealed carrying of "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any | Knife; Pistol; Air gun; Other deadly weapon | | |

**ER_221**

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | species of firearms, or air gun," unless the person is threatened with an attack or is traveling or "setting out on a journey." Punished by a fine of $50-100. | | | |
| 46 | 1841 | Maine | 1841 Me. Laws 709, ch. 169, § 16. | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to six months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 47 | 1841 | Mississippi | 1841 Miss. 52, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife. | Bowie knife | Tax reduced in 1850 | |
| 48 | 1842 | Louisiana | Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842) | Prohibited the carrying of " any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Punishable by fine of $20-50. | Dirk; Dagger; Knife; Pistol; Other deadly weapon | | |
| 49 | 1845 | Illinois | Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A.D. 1844-45: Together with an Appendix | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force , at 176 (1845), Criminal Jurisprudence, § 139 | | | | |
| 50 | 1846 | North Carolina | 1846 N.C. L., ch. 42 | Prohibited "any slave" from receiving any sword, dirk, Bowie knife, gun, musket, firearms, or "any other deadly weapons of offense" without written permission. | Sword; Dirk; Bowie knife; Gun; Musket; Firearms; Other deadly weapons of offense | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 51 | 1847 | Maine | The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix, at 709 (1847), Justices of the Peace, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to one year. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 52 | 1849 | California – City of San Francisco | 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 | Prohibited the carrying, with intent to assault any person, any pistol, gun, knife, dirk, bludgeon, or other offensive | Pistol; Gun; Knife; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | weapon with the intent to assault another person..  Punished by fine of up to $100 and imprisonment for up to 3 months. | Bludgeon; Other offensive weapon | | |
| 53 | 1850 | Mississippi | 1850 Miss. 43, ch. 1 | Imposed an annual property tax of 50 cents on each Bowie knife. | Bowie knife | Tax increased to $1 in 1854 | |
| 54 | 1851 | Alabama | 1851-52 Ala. 3, ch. 1 | Tax of $2 on "every bowie knife or revolving pistol." | Bowie knife; Pistol | Additional weapons added in 1867. | |
| 55 | 1851 | Illinois – City of Chicago | Ordinances of the City of Chicago, Ill., ch. 16, § 1 | Prohibiting the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent written permission of the authorities.  Punishable by a fine of $25 per offense. | Gunpowder | | |
| 56 | 1851 | Pennsylvania – City of Philadelphia | 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop of Philadelphia, to Convey Certain Real Estate in the Borough of York, and a Supplement to the Charter of Said Borough, § 4 | Prohibited the willful and malicious carrying of any pistol, gun, dirk, knife, slungshot, or deadly weapon.  Punishable by imprisonment for 6 months to 1 year and security for future good behavior. | Pistol; Gun; Dirk; Slungshot; Deadly weapon | | |
| 57 | 1853 | California | S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, | Prohibited carrying of pistol, gun, knife, dirk, bludgeon, or other offensive weapon with intent to assault.  Punishable by fine of up to $100 or imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

14

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Passed at the Sessions of 1850-51-52-53, § 127 | | | | |
| 58 | 1853 | New Mexico [Territory] | 1853 N.M. Laws 406, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, § 25 | Prohibited the carrying of a concealed pistol, Bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon. | Pistol; Bowie knife; Cuchillo de cinto (belt buckle knife); Arkansas toothpick; Spanish dagger; Slungshot; Other deadly weapon | *See also* 1859 N.M. L. 94-96 (same). | |
| 59 | 1854 | Mississippi | 1854 Miss. 50, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, Arkansas toothpick, sword cane, and dueling or pocket pistol. | Bowie knife; Arkansas toothpick; Sword cane; Dueling or pocket pistol | Amended in 1856 to exclude pocket pistols from the tax | |
| 60 | 1854 | Washington [Territory] | 1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 61 | 1855 | California | 1855 Cal. L. 152-53, ch. 127 | Provided that a person who killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon" would pay the decedent's debts and be liable to | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | the decedent's family for liquidated damages. | Other dangerous weapon | | |
| 62 | 1855 | Indiana | 1855 Ind. Acts 153, An Act to Provide for the Punishment of Persons Interfering with Trains or Railroads, ch. 79, § 1 | Prohibited the carrying of any dirk, pistol, Bowie knife, dagger, sword in cane, or any other dangerous or deadly weapon with the intent of injuring another person. Exempted any person who was a "traveler." Punishable by fine up to $500. | Dirk; Pistol; Bowie knife; Dagger; Sword cane; Other dangerous or deadly weapon | *See also* 1859 Ind. L. 129, ch. 78 (same); 1881 Ind. L. 191, ch. 37. | |
| 63 | 1855 | Louisiana | 1855 La. L. 148, ch. 120 | Prohibited the concealed carrying of "pistols, bowie knife, dirk, or any other dangerous weapon." | Pistol; Bowie knife; Dirk; Other dangerous weapon | | |
| 64 | 1856 | Mississippi | 1856-1857 Miss. L. 36, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Dirk knife; Sword cane | Modified in 1861 to preclude collection of the tax during the Civil War (1861-1862 Miss. L. 134, ch. 125) | |
| 65 | 1856 | Tennessee | 1855-56 Tenn. L. 92, ch. 81 | Prohibited the sale or transfer of any pistol, Bowie knife, dirk, Arkansas toothpick, or hunter's knife to a minor. Excepted the transfer of a gun for hunting. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 66 | 1856 | Texas | Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) | Provided that the use of a Bowie knife or a dagger in manslaughter is to be deemed murder. | Bowie knife; Dagger | | *Cockrum v. State*, 24 Tex. 394 (1859) (upheld under Second Amendment and Texas Constitution). |
| 67 | 1858 | Minnesota – City of St. Paul | Ordinances of the City of St. Paul, Minn., ch. 21, § 1 | Prohibited the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent payment of $5 to the City Treasurer and written permission of the authorities.  Authorized any person to "keep for his own use" no more than 1 pound of gun powder or gun cotton at any one time.  Punishable by a fine not to exceed $50 per offense. | Gunpowder | | |
| 68 | 1858 | Nebraska [Territory] | 1858 Neb. Laws 69, An Act to Adopt and Establish a Criminal code for the Territory of Nebraska, § 135 | Prohibited the  carrying of a pistol, gun, knife, dirk, bludgeon or other offensive weapon with the intent to assault a person. Punishable by fine up to $100. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 69 | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23 | Prohibited the selling, giving, or loaning of a concealed pistol, dirk, Bowie knife, brass knuckles, slungshot, colt, cane-gun, or other deadly weapon to a "minor, slave, or free negro." Punishable by fine of $50. | Pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Colt; Cane-gun; | Unconstitutional under the Thirteenth and/or Fourteenth Amendments | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Other deadly weapon | to the U.S. Constitution | |
| 70 | 1859 | Ohio | 1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1 | Prohibited the concealed carrying of any pistol, Bowie knife, or any other "dangerous weapon." Punishable by fine of up to $200 or imprisonment of up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 71 | 1859 | Washington [Territory] | 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 72 | 1860 | Georgia | 1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1. | Prohibited the sale or furnishing of any gun, pistol, Bowie knife, slungshot, sword cane, or other weapon to a "slave or free person of color." Punishable by fine up to $500 and imprisonment up to 6 months. | Gun; Pistol; Bowie knife; Slungshot; Sword cane; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 73 | 1861 | California | William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in | Prohibited the display of any dirk, dirk-knife, Bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of | Dirk; Bowie knife; Sword; Sword cane; Pistol; | | |

18

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., at 334 (1861) | such weapon in a fight. Punishable by a fine of $100-500 or imprisonment for 1-6 months. | Gun; Other deadly weapon | | |
| 74 | 1861 | Nevada [Territory] | 1861 Nev. L. 61 | Provided that the killing of another in a duel with a rifle, shotgun, pistol, Bowie knife, dirk, small-sword, back-sword, or other "dangerous weapon" in the killing of another in a duel is to be deemed murder. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon | | |
| 75 | 1862 | Colorado [Territory] | 1862 Colo. Sess. Laws 56, § 1 | Prohibited the concealed carrying in any city, town, or village any pistol, Bowie knife, | Pistol; Bowie knife; Dagger; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|------------------|
| | | | | dagger, or other deadly weapon. Punished by fine of $5-35. | Other deadly weapon | | |
| 76 | 1863 | Kansas – City of Leavenworth | C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix, at 45 (1863), An Ordinance Relating to Misdemeanors, § 23 | Prohibited the carrying of any concealed "pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city." Punishable by a fine of $3-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Brass; lead or iron knuckles; Other deadly weapon | | |
| 77 | 1863 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 190 (1863), Offences Affecting Public Safety: Carrying Concealed Weapons, § 3 | Prohibited the carrying of a concealed pistol, Bowie knife, dirk, or any other deadly weapon. Punishable by fine of $10-50. | Pistol; Bowie knife; Dirk; Other deadly weapon | | |
| 78 | 1864 | California | Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of | Prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or "other dangerous or deadly weapon." Exempted any peace officer or officer acting under the law of the United States. Punishable by imprisonment for 30-90 days or fine of $20-200. | Dirk; Pistol; Sword cane; Slungshot; Other deadly or dangerous weapon | Repealed 1869-70 Cal. Sess. Laws, ch. 63 (provided that pending cases be heard and tried as if not repealed) | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|----------------------|---------------|-----------------|
|  |  |  | the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon, at 261, § 1 (1868) |  |  |  |  |
| 79 | 1864 | Montana [Territory] | 1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1 | Prohibited the carrying of a concealed "any pistol, bowie-knife, dagger, or other deadly weapon" within any town or village in the territory. Punishable by fine of $25-100. | Pistol; Bowie knife; Dagger; Other deadly weapon |  |  |
| 80 | 1865 | Utah [Territory] | An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866), § 102 | Prohibited the "set[ting] of any gun." Punishable by imprisonment of up to 1 year or a fine of up to $500. | Trap gun |  |  |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------------------|--------------|----------|--------------------------|----------------------|---------------|-----------------|
| 81 | 1866 | New York | Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index, at 2512 (Vol. 3, 1882), An Act to Prevent the Furtive Possession and use of slungshot and other dangerous weapons, ch. 716, § 1 | Prohibited using, attempting to use, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, and any dirk or dagger, or sword cane or air-gun. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Sword cane; Air gun | | |
| 82 | 1866 | North Carolina | 1866 N.C. L. ch. 21, at 33-34, § 11 | Imposed a $1 tax on every dirk, Bowie knife, pistol, sword cane, dirk cane, and rifle cane used or worn during the year. | Dirk; Bowie knife; Pistol; Sword cane; | | |

22

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dirk cane; Rifle cane | | |
| 83 | 1867 | Alabama | 1867 Ala. Rev. Code 169 | Tax of $2 on pistols or revolvers in the possession of private persons, excluding dealers, and a tax of $3 on "all bowie knives, or knives of the like description."  Non-payment was punishable by seizure and, unless payment was made within 10 days with a penalty of an additional 50%, subject to sale by public auction. | Pistol; Bowie knife | | |
| 84 | 1867 | Colorado [Territory] | 1867 Colo. Sess. Laws 229, § 149 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon within any city, town, or village in the territory. Punishable by fine of $5-35. Exempted sheriffs, constables, and police officers when performing their official duties. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 85 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44 (1867), Police Regulations of the State, Offences Against Public | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, dirk, sword cane, Spanish stiletto, belt or pocket pistol, or other knife or weapon.  Also prohibited selling such a weapon or using such a weapon to threaten people. | Bowie knife; Arkansas toothpick; Dirk; Sword cane; Spanish stiletto; Belt; Pocket pistol; Other knife or weapon | | |

23

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Peace, §§ 4746, 4747, 4753, 4757 | | | | |
| 86 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 50 (1867), Police Regulations of the State. Selling Liquors or Weapons to Minors, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 87 | 1868 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4111 (Act of Aug. 5, 1868, at 1) | Prohibited the carrying of any rifle or "shot-gun walking cane." Punishable by fine of $500-1000 and imprisonment of no less than 2 years. | Rifle; Shotgun walking cane | | |
| 88 | 1868 | Florida | Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892), at 2425 | Prohibited the manufacture or sale of slungshots or metallic knuckles. Punishable by imprisonment for up to 6 months or a fine up to $100. | Slungshot; Metallic knuckles | | |
| 89 | 1868 | Florida | 1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, ch. 7, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, billies, firearms or other dangerous weapon if arrested for committing a criminal offence or disturbance of the peace. Punishable by imprisonment up to 3 months or a fine up to $100. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon | | |

24

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| 90 | 1868 | Florida | James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, at 403 (1881), Offences Against Public Peace, § 13 (Fla. Act of Aug. 6, 1868, ch. 1637) | Prohibited the carrying "about or on their person" any dirk, pistol or other arm or weapon, except a "common pocket knife." Punishable by fine up to $100 or imprisonment up to 6 months. | Dirk; Pistol; Other arm or weapon | | |
| 91 | 1869 | Tennessee | 1869-70 Tenn. L. 23-24, ch. 22 | Prohibited the carrying of any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." | Pistol; Dirk; Bowie knife; Arkansas toothpick; Other "deadly or dangerous weapon" | | *Andrews v. State*, 50 Tenn. 165 (1871) (upheld under state constitution) |
| 92 | 1869 | Washington [Territory] | 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 93 | 1870 | Georgia | 1870 Ga. L. 421, ch. 285 | Prohibited the open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of | Dirk; Bowie knife; Pistol; Revolver; | Law enforcement exception added in | *Hill v. State*, 53 Ga. 472 (1874) (upheld |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | justice, or any general election ground or precinct, or any other public gathering," except for militia musters. | Any kind of deadly weapon | 1879. *See* 1879 Ga. L. 64, ch. 266 | under state constitution) |
| 94 | 1870 | Louisiana | 1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . ., § 73 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife or other dangerous weapon on an election day during the hours the polls are open or during registration. Punishable by fine of minimum $100 and imprisonment of minimum 1 month. | Gun; Pistol; Bowie knife; Other dangerous weapon | | |
| 95 | 1870 | New York | "The Man Trap," The Buffalo Commercial, Nov. 1, 1870 | Referenced prohibition on the use of "infernal machines." | Trap gun; Infernal machine | | |
| 96 | 1871 | Arkansas – City of Little Rock | George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City 230-31 (1871) | Prohibited carrying of a pistol, revolver, Bowie knife, dirk, rifle, shot gun, slungshot, colt, or metal knuckles while engaged in a breach of the peace. Punishable by a fine of $25-500. | Pistol; Revolver; Bowie knife; Dirk; Rifle; Shotgun; Slungshot; Colt; Metal knuckles | | |
| 97 | 1871 | District of Columbia | An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872) (Dist. of Col., An | Prohibited the carrying or having concealed "any deadly or dangerous weapons, such as daggers, air-guns, pistols, Bowie knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slungshots, or brass or | Dangerous weapon; Dagger; Air-guns; Pistols; Bowie knife; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Act to Prevent the Carrying of Concealed Weapons, 1871, ch. XXV) | other metal knuckles." Punishable by forfeiture of the weapon and a fine of $20-50. | Razor; Sword-cane; Slungshot; Metal knuckles | | |
| 98 | 1871 | Mississippi | 1871 Miss. L. 819-20, ch. 33 | Imposed property tax on pistols, dirks, Bowie knives, and sword canes. | Pistol; Dirk; Bowie knife; Sword cane | *See also* 1876 Miss. L. 131, 134, ch. 103; 1878 Miss. L. 27, 29, ch. 3; 1880 Miss. L. 21, ch. 6; 1892 Miss. L. 194, ch. 74; 1894 Miss L. 27, ch. 32 | |
| 991 | 1871 | Missouri – City of St. Louis | Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City, at 491-92 (1871), Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10. | Prohibited the carrying of a concealed pistol, or revolver, colt, billy, slungshot, cross knuckles, or knuckles of lead, brass or other metal, Bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon without written permission from the Mayor. Punishable by fine of $10-500. | Pistol; Revolver; Colt; Billy; Slungshot; Cross knuckles; Metal knuckles; Bowie knife; Razor; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |

27

ER_237

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 100 | 1871 | Tennessee | James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code, at 108 (Nashville, 1871) | Prohibited the carrying of a pistol, dirk, Bowie knife, Arkansas tooth pick, or other weapon in the shape of those weapons, to an election site. Punishable by fine of minimum $50 and imprisonment at the discretion of the court. | Pistol; Dirk; Bowie knife; Arkansas toothpick | | |
| 101 | 1871 | Texas | 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons. § 1 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any other kind of knife used for offense or defense, unless carried openly for self-defense. Punishable by fine of $20-100, forfeiture of the weapon, and for subsequent offenses, imprisonment up to 60 days. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any other kind of knife used for offense or defense | | *English v. State*, 35 Tex. 473 (1872) (upheld as constitutional under Second Amendment and Texas Constitution); *State v. Duke*, 42 Tex. 455 (1875) (upheld as constitutional under Texas Constitution) |
| 102 | 1871 | Texas | Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879). Art. 163. | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife, or other dangerous weapon within a half mile of a polling site on an election day. Also prohibited generally carrying a pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass-knuckles; Bowie knife; | | |

28

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | other kind of knife used for offense or defense. Punishable by fine and forfeiture of the weapon. | Other dangerous weapon; Other knife used for offense or defense | | |
| 103 | 1872 | Maryland – City of Annapolis | 1872 Md. Laws 57, An Act to Add an Additional Section to Article Two of the Code of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," to Prevent the Carrying of Concealed Weapons in Said City, § 246 | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon. Punishable by a fine of $3-10. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Razor; Brass; Metal knuckles; Other deadly weapon | | |
| 104 | 1872 | Nebraska – City of Nebraska | Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska, at 36 (1872), Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1 | Prohibited the carrying openly or concealed of a musket, rifle, shot gun, pistol, sabre, sword, Bowie knife, dirk, sword cane, billy slungshot, brass or other metallic knuckles, or any other dangerous or deadly weapons. | Musket; Rifle; Shot gun; Pistol; Sabre; Sword; Bowie knife; Dirk; Sword cane; Billy; Slungshot; Metal knuckles; Other dangerous or | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | deadly weapons | | |
| 105 | 1873 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4110 (Act of Apr. 8, 1873, p. 130) | Prohibited the concealed carrying of any brass knuckles, slungshots, or "other weapon of like kind or description." Punishable by a fine of $20-200 and imprisonment or term of hard labor not to exceed 6 months. | Metal knuckles; Slungshot | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 106 | 1873 | Georgia | R. H. Clark, The Code of the State of Georgia (1873) § 4528 | Prohibited the carrying of any dirk, Bowie knife, pistol, or other deadly weapon to a court, election site, precinct, place of worship, or other public gathering site. Punishable by fine of $20-50 or imprisonment for 10-20 days. | Dirk; Bowie knife; Pistol; Any kind of deadly weapon | | |
| 107 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2, as codified in Mass. Gen. Stat., ch. 164 (1873) § 10 | Prohibited the carrying of a slungshot, metallic knuckles, bills, or other dangerous weapon if arrested pursuant to a warrant or while committing a crime. Punishable by fine. | Slungshot; Metallic knuckles; Billy; Other dangerous weapon | | |
| 108 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2 as codified in Mass. Gen. Stat., ch. 164 (1873) § 11 | Prohibited manufacturing or selling a slungshot or metallic knuckles. Punishable by fine up | Slungshot; Metallic knuckles | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | to $50 or imprisonment up to 6 months. | | | |
| 109 | 1873 | Minnesota | The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota, at 993 (Vol. 2, 1873), Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65 | Prohibited the setting of any spring or trap gun.  Punished by imprisonment for at least 6 months or a fine of up to $500 if no injury results; imprisonment for up to 5 years if non-fatal injury results; and imprisonment for 10-15 years if death results. | Spring gun; Trap gun | | |
| 110 | 1873 | Nevada | Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, | Prohibited dueling and killing a person with a rifle, shotgun, pistol, Bowie knife, dirk, small | Rifle; Shotgun; Pistol; Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Inclusive, at 563 (Vol. 1, 1873), Of Crimes and Punishments, §§ 35-36 | sword, backsword, or other dangerous weapon. | Dirk; Small sword; Back sword; Other dangerous weapon | | |
| 111 | 1873 | Tennessee | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871, at 125 (Vol. 2, 1873), Offences Against Public Policy and Economy, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment for a term determined by the court. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 112 | 1874 | Alabama | 1874 Ala. L. 41, ch. 1 | Imposed $25 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Increased tax to $50 in 1875-76. | |
| 113 | 1874 | Illinois | Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-72 and 1873-74, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874, at 360 (1874), | Prohibited the carrying a concealed weapon, including a pistol, knife, slungshot, brass, steel, or iron knuckles, or other deadly weapon while disturbing the peace. Punishable by fine up to $100. | Pistol; Knife; Slungshot; Other deadly weapon | | |

32

**ER_242**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Disorderly Conduct: Disturbing the Peace, § 56 | | | | |
| 114 | 1874 | New Jersey – City of Jersey City | Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto, at 41 (1874), An Ordinance to Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: §§ 1-2 | Prohibited the carrying of a concealed slungshot, billy, sandclub or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, including a sword in a cane, or air-gun. punishable by confiscation of the weapon and a fine of up to $20. Exempted policemen of Jersey City. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Pistol; Other dangerous weapon; Sword cane; Air gun | | |
| 115 | 1874 | Virginia | 1874 Va. L. 239, ch. 239 | Included the value of all "rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind" in list of taxable personal property. | Rifle; Musket; Other firearm; Bowie knife; Dirk | | |
| 116 | 1875 | Alabama | 1875-1876 Ala. L. 82, ch. 1 | Imposed $50 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added pistol cartridges in 1886 and increased the tax to $300 in 1887. | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 117 | 1875 | Alabama | 1875-1876 Ala. L. 46, ch. 2 | Imposed tax rate of 0.75% of the value of any pistols, guns, dirks, and Bowie knives. | Pistols; Guns; Dirks; Bowie knives | Tax rate reduced to 55 cents in 1882, with additional weapons added. | |
| 118 | 1875 | Arkansas | Act of Feb. 16, 1875, 1874-75 Ark. Acts 156, § 1 | Prohibited the carrying in public of any "pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by a fine of $25-100. | Pistol; Dirk; Butcher knife; Bowie knife; Sword cane; Metal knuckles | | *Wilson v. State*, 33 Ark. 557 (1878) (held unconstitutional). |
| 119 | 1875 | Idaho [Territory] | Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875), § 133. | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by imprisonment for up to 3 months or a fine up to $100. | Pick-lock; Crow-key; Bit; Other instrument or tool; Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 120 | 1875 | Indiana | 1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, and Prescribing Penalties Therefore, § 1 | Prohibited the drawing or threatening to use a pistol, dirk, knife, slungshot, or any other deadly or dangerous weapon. Punishable by fine of $1-500, and potentially imprisonment up to 6 months. | Pistol; Dirk; Knife; Slungshot; Other deadly or dangerous weapon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|----------------------|---------------|-----------------|
| 121 | 1875 | Michigan | 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 122 | 1876 | Alabama | 1876-77 Ala. Code 882, § 4109 | Prohibited the carrying of a Bowie knife, pistol, or air gun, or any other weapon of "like kind or description," unless threatened with or having good cause to fear an attack or while traveling or setting out on a journey. Punishable by a fine of $50-300 and imprisonment or hard labor for no more than 6 months. | Bowie knife; Pistol; Air gun; Other similar weapon | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 123 | 1876 | Colorado | 1876 Colo. Sess. Laws 304, § 154 | Prohibited the carrying with intent to assault another any pistol, gun, knife, dirk, bludgeon, or other offensive weapon. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 124 | 1876 | Georgia | 1876 Ga. L. 112, ch. 128 | Prohibited the transfer of any pistol, dirk, Bowie knife, or sword cane to a minor. | Pistol; Dirk; Bowie knife; Sword cane | | |
| 125 | 1876 | Illinois – Village of Hyde Park | Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws | Prohibited the carrying a concealed pistol, revolver, slungshot, knuckles, Bowie knife, dirk knife, dirk, dagger, or any other dangerous or deadly | Pistol; Revolver; Slungshot; Knuckles; Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments, at 64 (1876), Misdemeanors, § 39 | weapon without written permission from the Captain of Police.  Exempted peace officers. | Dirk; Dagger; Other dangerous or deadly weapon | | |
| 126 | 1876 | Wyoming [Territory] | Wyo. Comp. Laws (1876) ch. 35, § 127, as codified in Wyo. Rev. Stat., Crimes (1887), Having possession of offensive weapons, § 1027 | Prohibited the carrying of a pistol, knife, dirk, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by fine up to $500 or imprisonment up to 6 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 127 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 6, § 4230 | Prohibited the sale, giving, or lending of any pistol, Bowie knife, or "like knife" to any boy under the age of 18. | Pistol; Bowie knife | | *Coleman v. State*, 32 Ala. 581 (1858) (affirming conviction of letting minor obtain a pistol). |
| 128 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4109 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon, unless the person was | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | threatened with, or had good reason to apprehend, an attack, or "while traveling, or setting out on a journey." Punishable by fine of $50-300 and imprisonment of not more than 6 months. | dangerous weapon | | |
| 129 | 1877 | Colorado – Town of Georgetown | Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, at 100, § 9 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon. Punishable by a fine of $5-50. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 130 | 1877 | New Jersey | Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871, at 304 (1877), An Act Concerning Disorderly Persons, § 2 | Prohibited The carrying of "any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." Punishable as a "disorderly person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 131 | 1877 | South Dakota [Territory] | S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. | Prohibited the carrying, "whether concealed or not," of any slungshot, and prohibited the concealed carrying of any firearms or sharp or dangerous weapons. | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 132 | 1877 | Utah – City of Provo [Territory] | Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force | Prohibited carrying a pistol, or other firearm, slungshot, false knuckles, Bowie knife, dagger or any other "dangerous or deadly weapon." Punishable by fine up to $25. | Pistol; Other firearm; Slungshot; Metal knuckles; Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | 105, 106-07 (1877) (Provo, Utah). § 182: | | Dagger; Other dangerous or deadly weapon | | |
| 133 | 1878 | Alabama – City of Uniontown | 1878 Ala. L. 437, ch. 314 | Authorized Uniontown to license dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added dealers of "brass knuckles" in 1884. Similar to law enacted in 1884 authorizing Tuscaloosa to regulate dealers in pistols, Bowie knives, shotguns or firearms, and knives "of like kind or description." 1884-1885 Ala. 323, ch. 197 | |
| 134 | 1878 | Mississippi | 1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, § 1 | Prohibited the carrying of a concealed Bowie knife, pistol, brass knuckles, slungshot or other deadly weapon. Excepted travels other than "a tramp." Punishable by fine of $5-100. | Bowie knife; Pistol; Brass knuckles; Slungshot; Other deadly weapon | Prohibited weapons were expanded in 1896 | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 135 | 1879 | Alabama – City of Montgomery | J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama] (1879), § 428 | Prohibited carrying of a concealed Bowie knife, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon. Punishable by a fine of $1-100. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon | | |
| 136 | 1879 | Idaho – City of Boise [Territory] | Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894, at 118-19 (1894), Carrying Concealed Weapons, § 36 | Prohibited the carrying a concealed Bowie knife, dirk knife, pistol or sword in cane, slungshot, metallic knuckles, or other dangerous or deadly weapon, unless traveling or setting out on a journey. Punishable by fine up to $25 and/or imprisonment up to 20 days. | Bowie knife; Dirk; Pistol; Sword cane; Slungshot; Metallic knuckles; Other dangerous or deadly weapons | | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 137 | 1879 | Louisiana | La. Const. of 1879, art. III | Provided the right to bear arms, but authorizes the passage of laws restricting the carrying of concealed weapons. | Concealed weapons | | |
| 138 | 1879 | Montana [Territory] | 1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23 | Prohibited dueling and killing a person involved with a rifle, shot-gun, pistol, Bowie knife, dirk, small-sword, back-sword, or other dangerous weapon. Punishable by death by hanging. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other |  |  |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | | dangerous weapon | | |
| 139 | 1879 | North Carolina | North Carolina: N.C. Sess. Laws (1879), ch. 127, as codified in North Carolina Code, Crim. Code, ch. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, dagger, slungshot, loaded case, metal knuckles, razor, or other deadly weapon. Exemption for carrying on the owner's premises. Punishable by fine or imprisonment at the discretion of the court. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 140 | 1880 | Ohio | Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880, at 1633 (Vol. 2, 1879), Offences Against Public Peace, § 6892 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, or other dangerous weapon. Punishable by a fine of up to $200 or imprisonment for up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 141 | 1880 | South Carolina | 1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894), § 129 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, metal knuckles, razor, or other deadly weapon. Punishable by fine up to $200 and/or imprisonment up to 1 year. | Pistol; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 142 | 1881 | Alabama | 1880-1881 Ala. L. 38-39, ch. 44 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or | Bowie knife; Pistol; Air gun; | Amended in 2022 to remove | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| | | | | description, pistol, or firearm of "any other kind or description," or air gun.  Punishable by fine of $50-300 and imprisonment of not more than 6 months.  Further provided that fines collected under the statute would be monetary and not in-kind payments. | Slungshot; Metal knuckles; Other deadly or dangerous weapon | prohibition on concealed carry of Bowie knives.  *See* Ala. Stat. § 13A-11-50. | |
| 143 | 1881 | Arkansas | 1881 Ark. Acts 191, ch. 96, § 1-2 | Prohibited the carrying of any dirk, Bowie knife, sword, spear cane, metal knuckles, razor, or any pistol (except pistols that are used in the Army or Navy if carried openly in the hand). | Dirk; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Pistol | | |
| 144 | 1881 | Colorado | Colo. Rev. Stat 1774, § 248 (1881) | Prohibited the concealed carrying of any firearms, any pistol, revolver, Bowie knife, dagger, slingshot, brass knuckles, or other deadly weapon, unless authorized by chief of police. | Pistol; Revolver; Bowie knife; Dagger; Slingshot; Metal knuckles; Other deadly weapon | | |
| 145 | 1881 | Delaware | 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1 | Prohibited the carrying of concealed deadly weapons or selling deadly weapons other than an ordinary pocket knife to minors.  Punishable by a fine of $25-200 or imprisonment for 10-30 days. | Deadly weapon | | |

Case 3:19-cv-01537-BEN-JLB   Document 163-1   Filed 01/11/23   PageID.20916   Page 42 of 56

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 146 | 1881 | Illinois | Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code 73 (1885), ch. 38, Possession or sale forbidden, § 1 | Prohibited the possession, selling, loaning, or hiring for barter of a slungshot or metallic knuckles or other deadly weapon.  Punishable as a misdemeanor. | Slungshot; Metallic knuckles; Other deadline weapon | | |
| 147 | 1881 | Illinois | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882, at 375 (1882), Deadly Weapons: Selling or Giving to Minor, § 54b. | Prohibited selling, giving, loaning, hiring for barter any minor a pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon. Punishable by fine of $25-200. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Other deadly weapon | | |
| 148 | 1881 | Indiana | The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1, at 366 (1881), Crimes, § 1957 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol, or other missile or weapon, or throwing a stone, stick, club, or other substance at a vehicle.  Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other missile or weapon; Stone; Stick; Club; Other substance | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| 149 | 1881 | Nevada | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act to prohibit the carrying of concealed weapons by minors, § 1 | Prohibited a minor from carrying a concealed dirk, pistol, sword in case, slungshot, or other dangerous or deadly weapon. Punishable by fine of $20-200 and/or imprisonment of 30 days to 6 months. | Dirk; Pistol; Sword in case; Slungshot; Other dangerous or deadly weapon | | |
| 150 | 1881 | New York | George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects, at 321 (Vol. 1, 1881), Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9 | Prohibited using, attempting to use, or concealing a slungshot, billy, sandclub or metal knuckles, and any dirk. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk | | |
| 151 | 1881 | Tennessee – City of Nashville | William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix, at 340-41 | Prohibited the carrying of pistol, Bowie knife, dirk, slungshot, brass knuckles, or other deadly weapon. Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Metal knuckles; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | (1881), Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1 | | Other deadly weapon | | |
| 152 | 1881 | Washington [Territory] | 1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929 | Prohibited the carrying of "any concealed weapon." Punishable by fine up to $100 or imprisonment up to 30 days. | Concealed weapon | | |
| 153 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate transporting, storing, or selling gunpowder, giant powder, dynamite, nitroglycerine, or other combustibles without a license, as well as the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Gunpowder; Giant powder; Dynamite; Nitroglycerine; Other combustible; Concealed deadly weapon; Gun; Pistol; Firearm | | |
| 154 | 1881 | Washington [Territory] | William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897, at 1956 (Vol. 2, 1897) | Prohibited exhibiting a dangerous weapon in a manner likely to cause terror. Punishable by fine up to $25. | Dangerous weapon | | |
| 155 | 1882 | Georgia | 1882-83 Gal. L. 48-49, ch. 94 | Prohibited the concealed carrying of any "pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold | Pistol; Dirk; Sword cane; speak Bowie knife; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | for the purpose of offense and defense." | Other kind of knife | | |
| 156 | 1882 | Georgia | 1882-83 Ga. L. 37, ch. 18 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Raised to $100 in 1884. | |
| 157 | 1882 | Iowa – City of Sioux City | S. J. Quincy, Revised Ordinances of the City of Sioux City, Iowa, at 62 (1882), Ordinances of the City of Sioux City, Iowa, § 4. | Prohibited the carrying a concealed pistol, revolver, slungshot, cross-knuckles, knuckles of lead, brass or other metal, or any Bowie knife, razor, billy, dirk, dirk knife or Bowie knife, or other dangerous weapon. | Pistol; Revolver; Slungshot; Cross-knuckles; Metal Knuckles; Bowie knife; Razor; Billy; Dirk; Other dangerous weapon | | |
| 158 | 1882 | West Virginia | 1882 W. Va. Acts 421-22; W. Va. Code, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling any such weapon to a minor.  Punishable by fine of $25-200 and imprisonment of 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *State v. Workman*, 35 W. Va. 367 (1891) (upheld under the Second Amendment), *abrogated by New York State Rifle & Pistol Ass'n v. Bruen*, 142 |

45

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | | S. Ct. 2111, 2153 (2022) |
| 159 | 1883 | Illinois – City of Danville | Revised Ordinances of the City of Danville [Illinois], at 66 (1883), Ordinances of the City of Danville. Concealed Weapons, § 22. | Prohibited the carrying of a concealed pistol, revolver, derringer, Bowie knife, dirk, slungshot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon.  Also prohibited displaying the weapon in a threatening or boisterous manner.  Punishable by fine of $1-100 and forfeiting the weapon, if ordered by the magistrate. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Slungshot; Metallic knuckles; Razor; Other deadly weapon | | |
| 160 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading Or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, §§ 1-2 | Prohibited the selling, trading, giving, or loaning of a pistol, revolver, or toy pistol, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind.  Also prohibited the possession of such weapons by any minor.  Punishable by fine of $5-100.  Also prohibited a minor from possessing a pistol, revolver, toy pistol by which cartridges may be exploded, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapon.  Punishable by fine of $1-10. | Pistol; Revolver; Toy pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Other dangerous weapons | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| 161 | 1883 | Missouri | 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274 | Prohibited the carrying of a concealed fire arms, Bowie knife, dirk, dagger, slungshot, or other deadly weapon to a church, school, election site, or other public setting or carrying in a threatening manner or while intoxicated.  Punishable by fine of $25-200 and/or by imprisonment up to 6 months. | Fire arms; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 162 | 1883 | Washington – City of Snohomish [Territory] | 1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15 | Authorized City of Snohomish to regulate and prohibit carrying concealed deadly weapons and to prohibit using guns, pistols, firearms, firecrackers, bombs, and explosives. | Deadly weapon; Gun; Pistol; Firearm; Firecracker; Bomb | | |
| 163 | 1883 | Wisconsin – City of Oshkosh | 1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, ch. 6, § 3, pt. 56 | Prohibited the carrying of a concealed pistol or colt, or slungshot, or cross knuckles or knuckles of lead, brass or other metal or Bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon. Punishable by confiscation of the weapon. | Pistol; Colt; Slungshot; Cross knuckles; Knuckles of lead; Metal knuckles; Bowie knife; Dirk; Dagger; Any other dangerous or deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| 164 | 1884 | Georgia | 1884-85 Ga. L. 23, ch. 52 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Reduced to $25 in 1888. | |
| 165 | 1884 | Maine | The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884, at 928, (1884), Prevention of Crimes, § 10 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 166 | 1884 | Minnesota – City of Saint Paul | W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289 (1884), Concealed Weapons – License, § 1 | Prohibited the carrying of a concealed pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, Bowie knife, dirk knife or razor, or any other dangerous or deadly weapon. Punishable by seizure of the weapon. | Pistol; Dirk; Dagger; Sword; Slungshot; Cross-knuckles; Metal knuckles; Bowie knife; Dirk; Razor; Other dangerous or deadly weapon | | |
| 167 | 1884 | Tennessee | Tenn. Pub. Acts (1879), ch. 186, as codified in Tenn. Code (1884) | Prohibited the carrying, "publicly or privately," of any dirk, razor, sword cane, loaded cane, slungshot, brass knuckles, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol. | Dirk; Razor; Sword cane; Loaded cane; Slungshot; Metal knuckles; | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Spanish stiletto; Pistol; Revolver | | |
| 168 | 1884 | Vermont | 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1 | Prohibited the setting of any spring gun trap. Punishable by a fine of $50-500 and liability for twice the amount of any damage resulting from the trap. | Spring gun | | |
| 169 | 1884 | Wyoming [Territory] | 1884 Wyo. Sess. Laws, ch. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983 | Prohibited exhibiting in a threatening manner a fire-arm, Bowie knife, dirk, dagger, slungshot or other deadly weapon. Punishable by fine of $10-100 or imprisonment up to 6 months. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 170 | 1885 | Montana [Territory] | 1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63 | Prohibited possessing, carrying, or purchasing a dirk, dirk-knife, sword, sword cane, pistol, gun, or other deadly weapon, and from using the weapon in a threatening manner or in a fight. Punishable by fine of $10-100 and/or imprisonment for 1-3 months. | Dirk; Sword; Sword cane; Pistol; Gun; Other deadly weapon | | |
| 171 | 1885 | New York | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-85, at 172 (1885), Carrying, Using, Etc., Certain Weapons, § 410 | Prohibited using or attempting to use, carrying, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, or a dagger, dirk or dangerous knife. Punishable as a felony, and as a misdemeanor if a minor. | Slungshot; Billy; Sandclub; Metal knuckles; Dagger; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dangerous knife | | |
| 172 | 1885 | New York – City of Syracuse | Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations, at 215 (1885), [Offenses Against the Public Peace and Quiet,] § 7 | Prohibited the carrying or using with the intent to do bodily harm a dirk, Bowie knife, sword or spear cane, pistol, revolver, slungshot, jimmy, brass knuckles, or other deadly or unlawful weapon. Punishable by a fine of $25-100 and/or imprisonment for 30 days to 3 months. | Dirk; Bowie knife; Sword; Spear cane; Pistol; Revolver; Slungshot; Jimmy; Metal knuckles; Other deadly or unlawful weapon | | |
| 173 | 1885 | Oregon | 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2 | Prohibited the concealed carrying of any revolver, pistol, or other firearm, or any knife (other than an "ordinary pocket knife"), or any dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury. Punishable by a fine of $10-200 or imprisonment for 5-100 days. | Revolver; Pistol; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles | | |
| 174 | 1886 | Colorado – City of Denver | Isham White, The Laws and Ordinances of the City of Denver, Colorado, at 369, § 10 (1886) | Prohibited the carrying of any slungshot, colt, or metal knuckles while engaged in any breach of the peace. Punishable by a fine of $25-300. | Slungshot; Colt; Metal knuckles | | |
| 175 | 1886 | Georgia | 1886 Ga. L. 17, ch. 54 | Imposed $100 occupational tax on dealers of pistols, revolvers, | Pistol; Revolver; Dirk; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | dirks, Bowie knives, and "pistol or revolver cartridges." | Bowie knife; Pistol or revolver cartridges | | |
| 176 | 1886 | Maryland – County of Calvert | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1 | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day.  Punishable by a fine of $10-50. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 177 | 1886 | Maryland – County of Calvert | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State, at 468-69 (Vol. 1, 1888), Concealed Weapons, § 30 | Prohibited the carrying of a concealed  pistol, dirk knife, Bowie knife, slungshot, billy, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon.  Punishable by fine of up to $500 or imprisonment of up to 6 months. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 178 | 1886 | Maryland | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day within 300 yards of the polls.  Punishable by fine of $10-50. | Gun; Pistol; Dirk; Razo; Billy; Bludgeon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Election in said County, Within One Mile of the Polls § 1 | | | | |
| 179 | 1887 | Alabama | 1886 Ala. L. 36, ch. 4 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 180 | 1887 | Iowa – City of Council Bluffs | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa, at 206-07 (1887), Carrying Concealed Weapons Prohibited, § 105 | Prohibited the carrying of a concealed pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sandbag, air guns of any description, dagger, Bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 181 | 1887 | Kansas – City of Independence | O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council, at 162 (1887), Weapons, § 27 | Prohibited using a pistol or other weapon in a hostile or threatening manner.  Also prohibited carrying a concealed pistol, dirk, Bowie knife, revolver, slungshot, billy, brass, lead, or iron knuckles, or any deadly weapon.  Punishable by fine of $5-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Metal knuckles; Any deadly weapon | | |

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 182 | 1887 | Michigan | 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sandbag, skull cracker, slungshot, razor or other offensive and dangerous weapon or instrument. | Dirk; Dagger; Sword; Pistol; Air gun; Stiletto; Metallic knuckles; Billy; Sand bag; Skull cracker; Slungshot; Razor; Other offensive and dangerous weapon or instrument | | |
| 183 | 1887 | Montana [Territory] | 1887 Mont. Laws 549, Criminal Laws, § 174 | Prohibited the carrying of a any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon with the intent to assault a person.  Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 184 | 1887 | New Mexico [Territory] | An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887) | Defined "deadly weapons" as including pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, Bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can | Pistol; Dagger; Bowie Knife; Poniard; Butcher Knife; Dirk | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
|  |  |  |  | be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slungshots, bludgeons or any other deadly weapons. |  |  |  |
| 185 | 1887 | Virginia | The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia, at 897 (1887), Offences Against the Peace, § 3780 | Prohibited the carrying of a concealed pistol, dirk, Bowie knife, razor, slungshot, or any weapon of the like kind. Punishable by fine of $20-100 and forfeiture of the weapon. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Any weapon of the like kind |  |  |
| 186 | 1888 | Maryland – County of Kent | John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein, at 1457 (Vol. 2, 1888), Election Districts–Fences, § 99 | Prohibited carrying, on days of an election, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon. Punishable by a fine of $5-20. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon |  |  |
| 187 | 1888 | Florida | Fla. Act of Aug. 6, 1888, ch. 1637, subch. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) | Prohibited the concealed carrying of slungshot, metallic knuckles, billies, firearms, or other dangerous weapons if arrested for committing a criminal offense or disturbance of the peace. Punishable by | Slungshot; Metallic knuckles; Billy; Firearms; Other |  |  |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | imprisonment up to 1 year and a fine up to $50. | dangerous weapon | | |
| 188 | 1888 | Georgia | 1888 Ga. L. 22, ch. 123 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | Raised to $100 in 1890. | |
| 189 | 1888 | Maryland – City of Baltimore | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein, at 522-23 (Vol. 1, 1888), City of Baltimore, § 742 | Prohibited the carrying of a pistol, dirk knife, Bowie knife, slingshot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon if arrested for being drunk and disorderly.  Punishable by fine of $5-25, and confiscation of the weapon. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Metal knuckles; Razor; Other deadly weapon | | |
| 190 | 1888 | Minnesota | George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889, at 1006 (Vol. 2, 1888), Making, Selling, etc., Dangerous Weapons, §§ 333-34 | Prohibited manufacturing, selling, giving, or disposing of a slingshot, sandclub, or metal knuckles, or selling or giving a pistol or firearm to a minor without magistrate consent. Also prohibited carrying a concealed slingshot, sandclub, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon. | Slingshot; Sandclub; Metal knuckles; Dagger; Dirk; Knife; Pistol; Any dangerous weapon | | |
| 191 | 1888 | Utah – City of Salt Lake City | Dangerous and Concealed Weapon, Feb. 14, 1888, | Prohibited carrying a slingshot or any concealed deadly weapon | Slingshot; Deadly weapon | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
|     |                   | [Territory]  | reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14 | without permission of the mayor. Punishable by fine up to $50. |  |  |  |

56

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
Defendants' Survey of Relevant Statutes (1889 – 1930s)[1,2]

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 192 | 1889 | Arizona [Territory] | 1889 Ariz. Sess. Laws 16, § 1 | Prohibited carrying of any pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any knife manufactured to offensive or defensive purposes. Punishable by a fine of $25-100 and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass knuckles; Bowie knife; Other offensive or defensive knife | | |
| 193 | 1889 | Idaho [Territory] | The Act of the Territory of Idaho approved February 4, 1889 (Sess. Laws 1889, p. 27) | Prohibited private persons from carrying "deadly weapons" within any city, town or village. | Deadly weapons | | *In re Brickey*, 8 Idaho 597 (1902) (held unconstitutional under the Second Amendment and state constitution) |
| 194 | 1889 | Pennsylvania – City of Johnstown | Laws of the City of Johnstown, Pa., Embracing City Charter, Act of | Prohibited the concealed carrying of any pistol, razor, dirk, Bowie knife, blackjack, | Pistol; Razor; Dirk; | | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 161), Defendants created this survey of statutes, laws, and regulations that Defendants have determined are relevant to this action. Plaintiffs have indicated that, "due to the length of defendants' surveys, plaintiffs will reserve all objections to the form of the surveys, and the relevance of the purported statutes contained therein, until the filing of their responsive brief in thirty (30) days per the court's order of Dec. 12, 2022 (ECF 161)."

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment. In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause. While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians. The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

1

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions, at 86 (1897), An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12 | handy billy, or other deadly weapon. Punishable by fine of $5-50. | Bowie knife; Blackjack; Billy; Other deadly weapon | | |
| 195 | 1890 | Connecticut – City of New Haven | Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City, at 164, § 192 (1890) | Prohibited the concealed carrying of any metal knuckles, pistol, slungshot, stiletto, or similar weapons, absent written permission of the mayor or superintendent of police. Punishable by a fine of $5-50. | Metal knuckles; Slungshot; Stiletto | | |
| 196 | 1890 | Georgia | 1890 Ga. L. 38, ch. 131 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | | |
| 197 | 1890 | Louisiana | 890 La. L. 39, ch. 46 | Prohibiting the transfer of any pistol, dirk, Bowie knife, or "any other dangerous | Pistol; Dirk; Bowie knife; | | |

2

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | | | weapon, which may be carried concealed on a person to any person under the age of 21. | Other dangerous weapon | | |
| 198 | 1890 | Maryland – City of Baltimore | John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-92, and of 1892-1893, up to the Summer Recess of 1893, at 297-98 (1893), Ordinances of Baltimore, § 742A | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, sandclub, metal knuckles, razor or any other dangerous or deadly weapon, or who openly carries with the intent to injure a person. Punishable by fine of up to $500 and imprisonment up to 6 months. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 199 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles Dirk; | | |

3

**ER_269**

Case 3:19-cv-01537-BEN-JLB   Document 163-2   Filed 01/11/23   PageID.20934   Page 4 of 39

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10 | deadly weapon. Punishable by fine up to $100. | Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 200 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10. | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. Punishable by fine up to $100. | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 201 | 1890 | Oklahoma [Territory] | 1890 Okla. Laws 495, art. 47, §§ 1, 2, 10; Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory), at 495-96 (1891) | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or any other knife or instrument manufactured or sold solely for defense. Also prohibited the carrying of any pistol, revolver, Bowie knife, dirk knife, loaded cane, billy, metal knuckles, or "any other offensive or defense weapon." | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Other knife; Loaded cane; Billy; Other offensive or defensive weapon | | |

4

Case 3:19-cv-01537-BEN-JLB   Document 163-2   Filed 01/11/23   PageID.20935   Page 5 of 39

**_Miller v. Bonta_, No. 3:19-cv-01537-BEN-JLB**
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | Punishable by a fine of $50-500 and imprisonment for 3-12 months. | | | |
| 202 | 1890 | Oklahoma [Territory] | 1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19 | Prohibited the manufacture, sale, giving, or disposing of any instrument or weapon usually known as a slungshot, and prohibited the carrying any slungshot or similar weapon. | Slungshot | | |
| 203 | 1890 | Oklahoma – Town of Checotah [Territory] | General Laws Relating to Incorporated Towns of Indian Territory, at 37 (1890), Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3 | Prohibited the carrying of any pistol; dirk; butcher knife; Bowie knife; sword; spear-cane, metal knuckles, razor, slungshot, sandbag, or a switchblade. | Pistol; Dirk; Butcher knife; Sword; Spear cane; Metal knuckles; Razor; Slungshot; Sandbag; Switchblade | | |
| 204 | 1891 | Michigan | 1891 Mich. Pub. Acts 409, Police Department, pt 15 | Prohibited the carrying of a concealed pistol, revolver, Bowie knife, dirk, slungshot, billie, sandbag, false knuckles, or other dangerous weapon.  Also prohibited lurking or being concealed with the intent to injure a person or property, or threatening to beat or kill a person or property.  Punishable by fine up to $100 and the costs of | Pistol; Revolver; Bowie; Dirk; Slungshot; Billy; Sandbag; False knuckles; Other dangerous weapon | | |

5

Case 3:19-cv-01537-BEN-JLB   Document 163-2   Filed 01/11/23   PageID.20936   Page 6 of 39

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | prosecution, and in default of payment, imprisonment. | | | |
| 205 | 1891 | Missouri | "Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891 | Fined farmer for setting a trap gun that killed his wife. | Trap gun | | |
| 206 | 1891 | North Dakota | 1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1 | Prohibited the setting of any gun or gun trap to be discharged at certain animals. | Trap gun | | |
| 207 | 1891 | West Virginia | 1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling such a weapon to a minor. Punishable by fine of $25-200 and imprisonment for 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | |
| 208 | 1892 | Alabama | 1892 Ala. L. 183, ch. 95 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives, and clarified that cartridges that can be used in a pistol shall be deemed pistol cartridges. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 209 | 1892 | Georgia | 1892 Ga. L. 25, ch. 133 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and metal knuckles. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver | | |

6

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | cartridges; Metal knuckles | | |
| 210 | 1892 | Washington – City of Tacoma | Albert R. Heilig, Ordinances of the City of Tacoma, Washington, at 333-34 (1892) | Prohibited the carrying of a concealed a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, slingshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person. | Revolver; Pistol; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Instrument that causes injury | | |
| 211 | 1893 | Arizona [Territory] | 1893 Ariz. Sess. Laws 3, § 1 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use). | Pistol; Other firearm; Dirk; Dagger; Slungshot; Sword-cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | | |
| 212 | 1893 | Delaware | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the | Prohibited the concealed carrying of deadly weapons or selling deadly weapons other than an ordinary pocket knife, and prohibited discharging any firearm in any public road.  Punishable by fine of $25-100 or by | Deadly weapon | | |

7

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| | | | Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix, at 987 (1893), An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1 | imprisonment for 10-30 days. | | | |
| 213 | 1893 | North Carolina | 1893 N.C. L. 468-69, ch. 514 | Prohibiting the transfer of any pistol, pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane, or slingshot to a minor. | Pistol; Pistol cartridge; Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | | |
| 214 | 1893 | Rhode Island | 1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slingshot, pistol, or firearm of any description. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword Cane; Air gun; Billy; Metal knuckles; Slingshot; Pistol; Other firearm | | |

8

***Miller v. Bonta***, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 215 | 1893 | Tennessee – City of Nashville | Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises, at 364-65 (1893), Ordinances of the City of Nashville, § 738 | Prohibited the carrying of a pistol, Bowie knife, dirk knife, slungshot, brass knucks, or other deadly weapon.  Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Brass knuckles; Other deadly weapon | | |
| 216 | 1893 | Wyoming – City of Rawlins | A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming, at 131-32 (1893), Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1 | Prohibited a person from possessing or carrying a pistol, revolver, knife, slungshot, bludgeon or other lethal weapon.  Punishable by fine up to $100 or imprisonment up to 30 days. | Pistol; Revolver; Knife; Slungshot; Bludgeon; Other lethal weapon | | |
| 217 | 1895 | North Dakota | 1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13 | Prohibited the carrying of any slungshot or similar weapon, and the concealed carrying of any firearm or any "sharp or dangerous weapon." | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 218 | 1895 | North Dakota | The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the | Prohibited the setting of any spring or trap gun. | Trap gun | | |

9

**ER_275**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Amendments Thereto, at 1259 (1895) | | | | |
| 219 | 1895 | Vermont – City of Barre | Ordinances of the City of Barre, Vermont, ch. 16, § 18 (1895) | Prohibited discharging a gun, pistol, or other loaded firearm, firecracker, serpent, or other explosive, unless on a person's own property or with the permission of the property owner.  Also prohibited making a bonfire in the street except with city council permission and the carrying of concealed steel or brass knuckles, a pistol, slungshot, stiletto, or weapon of similar character. | Steel or brass knuckles; Pistol; Slungshot; Stiletto; Weapon of similar character; Gun; Loaded firearm; Firecracker; Serpent | | |
| 220 | 1896 | California – City of Fresno | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896, at 37, § 53 (1896) | Prohibited the transfer to any minor under the age of 18 any gun, pistol or other firearm, dirk, Bowie knife, powder, shot, bullets, or any combustible or dangerous material, absent written consent of parent or guardian. | Gun; Pistol; Dirk; Bowie knife; Powder; Shot; Bullets | | |
| 221 | 1896 | California – City of Fresno | L. W. Moultrie, Charter and Ordinances of the City of Fresno, at 30, § 8 (1896) | Prohibited the concealed carrying of any pistol or firearm, slungshot, dirk, Bowie knife, or other deadly weapon, absent written permission. | Pistol; Firearm; Slungshot; Dirk; Bowie knife; Other deadly weapon | | |

10

**Miller v. Bonta**, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 222 | 1896 | Mississippi | 1896 Miss. L. 109-10, ch. 104 | Prohibited the carrying of a concealed Bowie knife, dirk, butcher knife, pistol, brass or metallic knuckles, slingshot, sword, or other deadly weapon "of like kind or description." | Bowie knife; Dirk; Butcher knife; Pistol; Metal Knuckles; Slingshot; Sword; Other deadly weapon of like kind | | |
| 223 | 1896 | Rhode Island | General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State, at 1010-11 (1896), Offences Against Public Policy, §§ 23, 24, 26 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slingshot, pistol, or firearm of any description. Exempted officers or watchmen whose duties required them to make arrests or guard prisoners or property. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword cane; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm | | |
| 224 | 1896 | Washington – City of Spokane | Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896, at 309-10 (1896), Ordinances of Spokane, An Ordinance to Punish the Carrying of | Prohibited the carrying of a concealed revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property. punishable by fine of $25-100, cost of prosecution, and | Revolver; Pistol; Other firearms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | | |

11

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Concealed Weapons within the City of Spokane, § 1 | imprisonment until fines/costs are paid. | | | |
| 225 | 1897 | Alabama | William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, § 27 (1897) | Tax of $300 on the sale of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridge; Bowie knife; Dirk | | |
| 226 | 1897 | Missouri – City of Saint Joseph | William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged, at 508 (1897), Concealed Weapons – Carrying of, § 7 | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, Bowie knife, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. | Pistol; Revolver,; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Razor; Bowie knife; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 227 | 1897 | Texas | 1897 Tex. Gen. Laws 221, An Act to Prevent the Barter, Sale And Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal Or Hard Substance to Any Minor Without the Written Consent of the | Prohibited the selling or giving to a minor a pistol, dirk, dagger, slungshot, sword cane, spear or knuckles made of any metal or hard substance, Bowie knife or any other knife manufactured or sold for the purpose of offense or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Knuckles; Bowie knife; Any other knife | | |

**ER_278**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|------------------------|---------------|-----------------|
| | | | Parent or Guardian of Such Minor. . ., ch. 155 | defense without the consent of their parent or guardian. Punishable by fine of $25-200 and/or imprisonment for 10-30 days. | used for offense or defense | | |
| 228 | 1897 | Washington | Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897, at 1956-57 (Vol. 2, 1897), Carrying Concealed Weapons, § 7084 | Prohibited the carrying of a concealed revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.  Punishable by fine of $25-100 and/or imprisonment for 30 days. | Revolver; Pistol; Other fire-arms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | | |
| 229 | 1898 | Georgia | 1898 Ga. L. 60, ch. 103 | Prohibited the concealed carry of any pistol, dirk, sword cane, spear, Bowie knife, other kind of knife "manufactured and sold for purpose of offense and defense," and any "kind of metal knucks." | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear; Metal knuckles | | |
| 230 | 1898 | Oregon – City of Oregon City | The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order, 259 (1898), An | Prohibited the carrying of any slingshot, billy, pistol, or "any concealed deadly weapon," and the | Slingshot; Billy; Dirk; Pistol; | | |

13

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2 | discharge of any firearm, air gun, sparrow gun, flipper, or bean shooter, unless in self-defense. | Concealed deadly weapon; Firearm; Air gun; Sparrow gun; Flipper; Bean shooter | | |
| 231 | 1899 | Alaska | Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905, at App. A, p. 139 (30 Stat. L. 1253 (1899)); 1896-99 Alaska Sess. Laws 1270, ch. 6, § 117 | Prohibited concealed carrying in any manner any revolver, pistol, other firearm, knife (other than an "ordinary pocket knife"), dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury to a person or property. | Pistol; Revolver; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles; Other instrument | | |
| 232 | 1899 | Nebraska – City of Fairfield | Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899), Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1 | Prohibited the carrying of a concealed pistol, revolver, dirk, Bowie knife, billy, slingshot, metal knuckles, or other dangerous or deadly weapons. Punishable by forfeiture and "shall be so adjudged." | Pistol; Revolver; Dirk; Bowie knife; Billy; Slingshot; Metal knuckles; Other dangerous or deadly weapons | | |
| 233 | 1899 | Texas – City of San Antonio | Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General | Prohibited drawing in a threatening manner a pistol, gun, knife, sword cane, club or any other instrument or | Pistol; Gun; Knife; Sword cane; | | |

14

**ER_280**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Character in Force August 7th, at 220 (1899), Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4 | weapon that may cause death. | Club; Any other instrument or weapon that causes death | | |
| 234 | 1900 | Iowa – City of Des Moines | William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa, at 89-90,  (1900), Ordinances City of Des Moines, Weapons, Concealed, § 209 | Prohibited the carrying of a concealed pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sandbag, air guns of any description, dagger, Bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 235 | 1900 | New York | 1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1 | Prohibited manufacturing or selling a slungshot, billy, sandclub or metal knuckles, and prohibited selling a firearm to a minor in any city or incorporated village without written consent of police magistrate.  Exempted any officer of the United States or peace officer when necessary and proper to discharge official duties. | Slungshot; Billy; Sandclub; Metal knuckles; Pistol; Other firearm | | |
| 236 | 1901 | Arizona [Territory] | 1901 Ariz. 1251-53, §§ 381, 385, 390 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, | Pistol; Other firearm; Dirk; | | |

15

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use).  Exempted peace officers in discharge of official duties.  Punishable by a fine of $25-100 and forfeiture of the weapon. | Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | | |
| 237 | 1901 | Utah | 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3 | Prohibited the construction and possession of any "infernal machine," defined as a device with a loaded firearm that is capable of igniting when moved, handled, or opened. | Infernal machine | | |
| 238 | 1903 | Oklahoma [Territory] | Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25 | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or other kind of knife manufactured for defense. | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword Cane; Spear; Metal knuckles; Other knife | | |
| 239 | 1903 | South Dakota | S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471 | Prohibited the carrying of a concealed slungshot, | Slungshot; Firearm; | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | firearm, or sharp or dangerous weapon. | Sharp or dangerous weapon | | |
| 240 | 1905 | Indiana | 1905 Ind. Acts 677, Public Conveyance—Attacking, § 410 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol or other weapon, or throwing a stone, stick, club or any other substance at a vehicle. Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other weapon; Stone; stick; Club; Any other substance | | |
| 241 | 1905 | New Jersey | 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1 | Prohibited the carrying of a concealed revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor.  Punishable by fine up to $200 and/or imprisonment with hard labor up to 2 years. | Revolver; Pistol; Other deadly; offensive or dangerous weapon or firearm or any stiletto; Dagger; razor | *State v. Angelo*, 3 N.J. Misc. 1014, 1015 (1925) (upheld conceal carry ban) | |
| 242 | 1908 | Rhode Island | 1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws, § 23 | Prohibited the carrying of any dirk, dagger, razor, sword cane, Bowie knife, butcher knife, air-gun, billy, metal knuckles, slungshot, pistol, other firearm. Exempted officers or watchmen. | Dirk; Dagger; Razor; Sword cane; Bowie knife; Butcher knife; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm. | | |

17

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 243 | 1909 | Idaho | 1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1 | Prohibited the carrying a concealed dirk, Bowie knife, dagger, slungshot, pistol, revolver, gun, or any other deadly or dangerous weapon in any public setting. | Dirk; Bowie knife; Dagger; Slungshot; Pistol; Revolver; Other deadly or dangerous weapon | No longer restricts concealed carrying of a slungshot. *See* Idaho Stats. Ch. 33, § 18-3302(2)(a)(b)(i). | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 244 | 1909 | South Dakota | 1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22 | Prohibited the setting or possession of any "set gun." | Set gun | | |
| 245 | 1909 | Washington | 1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3 | Prohibited the setting of any trap, spring pistol, rifle, or other deadly weapon. Punishable by imprisonment for up to 1 year or a fine of up to $1,000. Further punishable by imprisonment for up to 20 years for non-fatal or fatal injuries resulting from the trap or | Trap gun | | |
| 246 | 1911 | New York | 1911 N.Y. Laws 442, An Act to Amend the Penal | Prohibited the manufacture, sale, giving, or disposing of | Blackjack; Slungshot; | | |

18

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1 | any weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, and the offering, sale, loaning, leasing, or giving of any gun, revolver, pistol, air gun, or spring-gun to a person under the age of 16. | Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Gun; Revolver; Pistol; Air gun; Spring gun | | |
| 247 | 1911 | New York | 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, or bludgeon, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instrument or weapon" with intent to use the weapon unlawfully against another. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | | |
| 248 | 1912 | Vermont | 1912 Vt. Acts and Resolves 261 | Prohibited the setting of any spring gun. Punishable by a fine of $50-500 and liability for twice the amount of damage resulting from the trap. | Spring gun | | |
| 249 | 1913 | Florida | 1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8 | Prohibited hunting wild game with automatic guns. | Machine guns | | |

19

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 250 | 1913 | Hawaii [Territory] | 1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons, § 3089. | Prohibited the carrying a Bowie knife, sword cane, pistol, air-gun, slungshot, or other deadly weapon. Punishable by fine of $10-250 or imprisonment for 3-12 months, unless good cause can be shown for carrying the weapon. | Bowie knife; Sword cane; Pistol; Air gun; Slungshot; Other deadly weapon | | |
| 251 | 1913 | Iowa | 1913 Iowa Acts 307, ch. 297, §§ 1, 2 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sandbag, skull cracker, slungshot, or other offensive and dangerous weapons or instruments. Also prohibited the selling, keeping for sale, offering for sale, loaning, or giving away any dirk, dagger, stiletto, metallic knuckles, sandbag, or "skull cracker." Exempted the selling or keeping for sale of "hunting and fishing knives." | Dirk; Dagger; Sword; Pistol; Revolver; Stiletto; Metallic knuckles; Picket; Billy; Sand bag; Skull cracker; Slungshot; Other offensive and dangerous weapons or instruments | | |
| 252 | 1913 | New York | 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons Carrying Weapons, Dangerous or Unusual Weapons, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb, or bombshell, and the | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; | | |

20

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instruments or weapon." | Bomb; Bombshell; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | | |
| 253 | 1915 | New Hampshire | 1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18 | Prohibited the setting of a spring gun. Punished by a fine of $50-500. | Spring gun | | |
| 254 | 1915 | North Dakota | 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5 | Prohibited the concealed carrying of any instrument or weapon usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, or any sharp or dangerous weapon, any gun, revolver, pistol, or "other dangerous fire arm," nitroglycerin, dynamite, or any other dangerous or violent explosive. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Any sharp or dangerous weapon; Any Gun; Revolver; Pistol; Dangerous firearm; Explosive | | |
| 255 | 1917 | California | 1917 Cal. Stat. 221, § 1 | Prohibited the manufacture, leasing, keeping for sale, offering, giving, or disposing of any instrument or weapon of the kind commonly known as a blackjack, | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |

21

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dirk, or dagger. | Metal knuckles; Dirk; Dagger | | |
| 256 | 1917 | California | 1917 Cal. Stat. 221, § 2 | Prohibited the possession of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, bomb, or bombshells, and the carrying of any dirk or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Bomb; Bombshells; Dirk; Dagger | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |
| 257 | 1917 | California | 1917 Cal. Stat. 221, § 5 | Prohibited the use, or carrying or possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or other "dangerous or deadly instrument or weapon." | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Loaded pistol; Revolver; Other firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; Bombshell; Other deadly or dangerous weapon | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 258 | 1917 | Missouri – City of Joplin | Joplin Code of 1917, Art. 67, § 1201. | Prohibited the carrying of a concealed firearm, Bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slungshot, or other similar deadly weapons in a church, school, election site, court, or other public setting. Also prohibits using the weapon in a threatening manner, using while intoxicated, or selling to a minor. | Firearms; Bowie knife; Spring-back knife; Razor; Knuckle; Billy; Sword cane; Dirk; Dagger; Slungshot; Other deadly weapons | | |
| 259 | 1917 | North Carolina – Harnett County | 1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1 | Prohibited killing quail with a gun that shoots over two times before reloading. | Gun that shoots over two times before reloading (machine gun) | | |
| 260 | 1917 | Oregon | 1917 Or. Sess. Laws 804-08, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 7 | Prohibited the attempted use, or the carry and possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or any other "dangerous or deadly weapon." Punishable by a fine of $50-500 or | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Pistol; Revolver; Other Firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; | | Oregon v. *Blocker*, 291 Or. 255 (1981) (struck down the ban on clubs as contrary to Oregon Constitution) |

23

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | imprisonment for 1-6 months. | Bombshell; Other dangerous or deadly weapon | | |
| 261 | 1923 | California | 1923 Cal. Stat. 695, § 1 | Prohibited the manufacture, importation, keeping for sale, offering or exposing for sale, giving, lending, or possession of any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, and the concealed carrying of any dirk or dagger. Punishable by imprisonment for 1-5 years. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Dirk; Dagger | Replaced in 1953 with enactment of Cal. Penal Code § 12020 | |
| 262 | 1923 | Missouri | 1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17 | Prohibited the carrying, while a passenger or operating a moving vehicle, of a revolver, gun or other firearm, or explosive, any Bowie knife, or other knife having a blade of more than two and one-half inches in length, any slingshot, brass knucks, billy, club or other dangerous weapon. Punishable by imprisonment of minimum 2 years. | Revolver; Gun; Explosive; Bowie knife; Other knife having a blade of more than two and one-half inches in length; Slingshot; Metal knuckles; Billy; Club; Other dangerous weapon | | |
| 263 | 1923 | South Carolina | 1923 S.C. Acts 221 | Prohibited the selling or giving to a minor a pistol or | Pistol; Pistol cartridge; | | |

24

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane or slingshot. Also prohibited a parent from giving such a weapon to their child under 12 years old.  Punishable by fine up to $50 or imprisonment up to 30 days. | Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | | |
| 264 | 1923 | Vermont | 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1 | Prohibited using, carrying, or possessing a machine gun or automatic rifle while hunting. | Machine gun; Automatic rifle | | |
| 265 | 1925 | | 1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2 | Prohibited the setting of any loaded spring gun. Punishable by a fine of $100-500 or imprisonment for 30 days to 6 months. Exception for setting of trap gun to destroy burrowing rodents. | Spring gun; Set gun | | |
| 266 | 1925 | West Virginia | 1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and | Prohibited unlicensed carrying of a pistol, dirk, Bowie knife, slungshot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon.  Punishable by imprisonment for 6-12 months for the first offense, and for 1-5 years for subsequent offenses, and in | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *City Of Princeton* v. *Buckner*, 180 W. Va. 457, 462 (1988) (held unconstitutional under state constitution); *Application of Metheney*, 182 |

25

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Possession of Weapons and Fire Arms. . . , ch. 3, § 7(a) | either case, a fine of $50-200. | | | W. Va. 722 (1990) |
| 267 | 1925 | West Virginia | 1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b | Prohibited publicly displaying for rent or sale any revolver, pistol, dirk, Bowie knife, slungshot, other dangerous weapon, machine gun, submachine gun, or high powered rifle. Requires dealers to keep a register. Prohibited selling, renting, giving, or lending any of these weapons to an unnaturalized person. | Revolver; Pistol; Dirk; Bowie knife; Slungshot; Machine gun; Other dangerous weapon; Submachine gun; High powered rifle | | |
| 268 | 1925 | West Virginia | 1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b | Prohibited carrying, transporting, or possessing a machine gun, submachine gun, or high powered rifle except on their own premises and with a permit. Also provides guidelines for such a permit. | Machine gun; Submachine gun; High powered rifle | | |
| 269 | 1927 | California | 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously | Prohibited a person, firm, or corporation possessing a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1 2 | | | | |
| 270 | 1927 | Indiana | 1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1 | Prohibited owning or possessing a machine gun or bomb in an automobile. Punishable by imprisonment for 1-5 years. | Machine gun; Bomb | | |
| 271 | 1927 | Indiana | 1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2 | Prohibited discharging a machine gun or bomb. Punishable by imprisonment for 2-10 years. | Machine gun; Bomb | | |
| 272 | 1927 | Iowa | 927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1 2 | Prohibited possession of a machine gun. | Machine gun | | |
| 273 | 1927 | Maryland | 1927 Md. Laws 156, § 388-B | Prohibited possession of liquor in an automobile that also carries a gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon. | Gun; Pistol; Revolver; Machine gun; Other dangerous or deadly weapon | | |
| 274 | 1927 | Massachusetts | 1927 Mass. Acts 416, An Act Relative to Machine | Prohibited the carrying of a pistol, revolver, machine gun, stiletto, dagger, dirk | Pistol; Revolver; Machine gun; | | |

27

**ER_293**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Guns and Other Firearms, ch. 326, § 5 | knife, slungshot, metallic knuckles, or sawed off shotgun, billy, or dangerous weapon if arrested upon a warrant for an alleged crime. Punishable by imprisonment of 6 months to 2.5 years. | Stiletto; Dagger; Dirk; Slungshot; Metallic knuckles; Sawed-off shotgun; Billy; Dangerous weapon | | |
| 275 | 1927 | Massachusetts | 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123) | Prohibited selling, renting, or leasing a pistol, revolver, or machine gun to a person without a license to possess the same. | Pistol; Revolver; Machine gun | | |
| 276 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, bludgeon. Punishable by fineup to $1,000 or imprisonment. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub; Bludgeon | | |
| 277 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. Punishable by fine of $1,000 and/or imprisonment up to 5 years. | Machine gun; Silencer | | |

28

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 278 | 1927 | New Jersey | 1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1 | Prohibited a pawnbroker from selling or possessing for sale, loan, or to give away a machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Punishable as a high misdemeanor. | Machine gun; Automatic rifle; Revolver; Pistol; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Dagger; Dirk; Dangerous knife; Stiletto; Bomb; Other high explosive | | |
| 279 | 1927 | New Jersey | 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | Prohibited selling, giving, loaning, delivering or furnishing, or possessing a machine gun or automatic rifle to another person without a license. | Machine gun; Automatic rifle | | |
| 280 | 1927 | Rhode Island | 1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6 | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun. | Pistol; Machine gun | | |
| 281 | 1927 | Rhode Island | 1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8. | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or | Pistol; Machine gun; Silencer | | |

**ER_295**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|---|---|---|---|---|---|---|
| | | | | possessing a machine gun or silencer. | | | |
| 282 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3 | Prohibited a person who has previously been convicted of a violent crime from owning, carrying, or possessing any firearm (including machine gun or pistol). | Machine gun; Pistol | | |
| 283 | 1929 | Indiana | 1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch. 55, § 1 | Prohibited being armed with a pistol, revolver, rifle shotgun, machine gun, or any other firearm or dangerous weapon while committing or attempting to commit a crime of rape, robbery, bank robbery, or larceny. Punishable by imprisonment for 10-20 years, in addition to the punishment for the original crime. | Pistol; Revolver; Rifle; Shotgun; Machine gun; Dangerous or deadly weapon | | |
| 284 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, sandbag, bludgeon, or any gas ejecting device. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub, Sandbag, Bludgeon, Gas ejecting device | | |

30

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 285 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. | Machine gun; Silencer | | |
| 286 | 1929 | Missouri | 1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2 | Prohibited selling, delivering, transporting, and possessing a machine gun. Punishable by imprisonment of 2-30 years and/or fine up to $5,000. | Machine gun | | |
| 287 | 1929 | Nebraska | 1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2 | Prohibited selling or otherwise disposing of a machine gun. Punishable by fine of $1,000-$10,000. Also Prohibited transporting or possessing a machine gun. Punishable by imprisonment for 1-10 years. | Machine gun | | |
| 288 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 4 | Prohibited selling, giving, transferring, or possessing a machine gun. Punishable by fine up to $1,000 and imprisonment by separate or solitary confinement at labor up to 5 years. Also Prohibited using a machine | Machine gun | | |

31

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | gun during an attempted crime. Punishable by separate and solitary confinement at labor for up to 10 years. | | | |
| 289 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns, § 3 | Prohibited being armed with a machine gun while committing a crime. Punishable by imprisonment with solitary confinement up to 10 years. | Machine gun | | |
| 290 | 1929 | Wisconsin | 1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1 | Prohibited owning, using, or possession a machine gun. Punishable by imprisonment of 1-15 years. | Machine gun | | |
| 291 | 1931 | Delaware | 1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1 | Prohibited a person from possessing a machine gun. Punishable by fine and/or imprisonment. | Machine gun | | |
| 292 | 1931 | Illinois | 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | Prohibited selling, loaning, or giving away, purchasing, possessing, carrying, or transporting any machine gun. | Machine gun | | |

**ER_298**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 293 | 1931 | Illinois | 1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7 | Prohibited being armed with a machine gun while committing arson, assault, burglary, kidnapping, larceny, rioting, or robbery. Punishable by imprisonment for 5 years to life. | Machine gun | | |
| 294 | 1931 | Michigan | 1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 295 | 1931 | New York | 1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1 | Prohibited using an imitation pistol and carrying or possessing a black-jack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or ay other dangerous or deadly weapon. | Imitation pistol; Blackjack; Slungshot; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Machine gun; Sawed-off shot gun; Other dangerous or deadly weapon | | |
| 296 | 1931 | North Dakota | 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2 | Prohibited selling, giving, loaning, furnishing, or delivering a machine gun, submachine gun, automatic rifle, or bomb (without a license). Punishable by imprisonment up to 10 years and/or fine up to $3,000. | Machine gun; Submachine gun; Automatic rifle; Bomb | | |

33

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 297 | 1931 | South Carolina | 1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1 | Prohibited the setting of any loaded trap gun or spring gun. Punishable by a fine of $100-500 or imprisonment of 30 days to 1 year. | Trap gun; Spring gun | | |
| 298 | 1932 | District of Columbia | District of Columbia 1932: 1932, Public-No. 275-72D Congress, ch. 465 | Prohibited being armed with or having readily available any pistol or other firearm while committing a violent crime. In addition to being punished for the crime, will also be punished with imprisonment (various terms depending on the number of previous convictions). Additionally, Prohibited people convicted of violent crimes from owning or possessing a pistol. Prohibited carrying a concealed deadly or dangerous weapon. Regulates the sale and transfer of pistols. | Pistol; Deadly or dangerous weapon | | |
| 299 | 1932 | Louisiana | 1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a | Prohibited selling, loaning, giving, purchasing, possession, carrying, or transporting a machine gun. | Machine gun | | |

34

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Penalty for a Violation Hereof . . . , §§ 1 2 | | | | |
| 300 | 1933 | California | 1933 Cal. Stat. 1169 | Prohibited a person, firm, or corporation from selling, possessing or transporting a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | | |
| 301 | 1933 | Florida | 1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1 | Prohibited throwing a bomb or shooting a machine gun across or along a street or highway, any public park or place where people assemble with the intent to do bodily harm. Punishable by death. | Bomb; Machine gun | | |
| 302 | 1933 | Hawaii | 1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2 | Prohibited a person, firm, or corporation from owning, possessing, selling, or transporting a machine gun, shell cartridge, or bomb containing or capable of emitting tear gas or other noxious gas. | Machine gun; Shell cartridge; Bomb | | |
| 303 | 1933 | Kansas | 1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Unlawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership | Prohibited possession of a machine rifle, machine gun, or submachine gun. | Machine gun | | |

35

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1 3 | | | | |
| 304 | 1933 | Minnesota | 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3 | Prohibited owning, controlling, using, possessing, selling, or transporting a machine gun. | Machine gun | | |
| 305 | 1933 | New York | 1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3 | Prohibited selling, giving, disposing of, transporting, or possessing a machine gun or submachine gun to a person guilty of a felony. | Machine gun | | |
| 306 | 1933 | Ohio | 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1 | Prohibited owning, possessing, and transporting a machine gun, light machine gun, or submachine gun without a permit. Punishable by imprisonment of 1-10 years. | Machine gun; Light machine gun; Submachine gun | | |
| 307 | 1933 | Oregon | 1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4 | Prohibited possession of a machine gun. Also Prohibited carrying a concealed machine gun, pistol, revolver, or other firearm. | Machine gun; Pistol; Revolver; Other firearm | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB

**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 308 | 1933 | Oregon | 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2 | Prohibited a unnaturalized person and person convicted of a felony against another person or the government from owning or possessing a pistol, revolver, other firearm, or machine gun. Punishable by imprisonment for 1-5 years. | Pistol; Revolver; Other firearm; Machine gun | | |
| 309 | 1933 | South Dakota | 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 | Prohibited possession of a machine gun during a violent crime. Punishable by imprisonment up to 15 years. Prohibited using a machine gun offensively or aggressively; punishable by imprisonment up to 15 years. Requires manufacturers to keep a register of machine guns and for owners to converted their machine guns to pistols to register the weapon. | Machine gun | | |
| 310 | 1933 | Texas | 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6 | Prohibited possession of a machine gun; punishable by imprisonment up to 10 years. Prohibited selling, leasing, giving, bartering, exchanging, or trading a machine gun; punishable by imprisonment for 2 months to 10 years. | Machine gun | | |

37

**ER_303**

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB
**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 311 | 1933 | Washington | 1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5 | Prohibited manufacturing, owning, buying, selling, loaning, furnishing, transporting, or possessing a machine gun. | Machine gun | | |
| 312 | 1934 | New Jersey | 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5 | Declares a person who possesses a machine gun or submachine gun a "gangster" and therefore, enemy of the state.  Also declares a person who carries a deadly weapon without a permit a "gangster." If convicted a "gangster," punishable by fine up to $10,000 and/or imprisonment up to 20 years. | Machine gun; Submachine gun; Deadly weapon | | |
| 313 | 1934 | South Carolina | 1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6 | Prohibited transporting, possessing, selling, renting, or giving a firearm or machine gun. Punishable by fine up to $1,000 and imprisonment with solitary confinement up to 20 years. | Firearm; Machine gun | | |
| 314 | 1934 | Virginia | 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain | Prohibited possession or use of a machine gun during a violent crime; punishable by death or imprisonment for a minimum of 20 years. | Machine gun | | |

*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB

**Defendants' Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 | Prohibited unlawful possession or use of a machine gun for offensive or aggressive purposes; punishable by imprisonment for a minimum of 10 years. Requires manufacturers to keep a register of machine guns. | | | |
| 315 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01-164.06 | Prohibited using or possessing a machine gun during an attempted violent crime; punishable by imprisonment of minimum 20 years. Prohibited use of a machine gun for offensive or aggressive purposes; punishable by imprisonment of minimum 10 years. | Machine gun | | |
| 316 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1 | Prohibited selling, possessing, using, or transporting a machine gun, automatic firearm, bomb, hand grenade, projectile, shell, or other container that can contain tear or other gas. Punishable by imprisonment for 1-3 years. | Machine gun; Automatic firearm; Bomb; Hand grenade; Projectile; Shell; Other container that can contain gas | | |

**ER_305**

```
 1          UNITED STATES DISTRICT COURT          ┌──────────┐
                                                  │ ORIGINAL │
 2      FOR THE SOUTHERN DISTRICT OF CALIFORNIA   └──────────┘

 3              BEFORE THE HONORABLE
         ROGER T. BENITEZ, DISTRICT JUDGE PRESIDING
 4  ─────────────────────────────────────────────────────────

 5  VIRGINIA DUNCAN, et al.,     ) Case No: 3:17-cv-01017-BEN-JLB
                                 )
 6  Plaintiffs,                  ) Motion Hearings
                                 ) Department 5A
 7          v.                   )
                                 ) Date: 12/12/2022
 8  ROB BONTA, in his official   )
    capacity as attorney general )
 9  of the State of California   )
                                 )
10  Defendants.                  )
                                 )
11  ─────────────────────────────────────────────────────────

12  KIM RHODE, et al.,           ) Case No: 3:18-cv-00802-BEN-JLB
                                 )
13  Plaintiffs,                  )
                                 )
14  v.                           )
                                 )
15  ROB BONTA, in his official   )
    capacity as attorney general )
16  of the State of California,  )
                                 )
17  Defendants.                  )
18  ─────────────────────────────────────────────────────────

    JAMES MILLER, et al.,        ) Case No: 3:19-cv-01537-BEN-JLB
19                               )
    Plaintiffs,                  )
20                               )
    v.                           )
21                               )
    CALIFORNIA ATTORNEY GENERAL  )
22  ROB BONTA, et al.,           )
                                 )
23  Defendants.                  )
24  ─────────────────────────────────────────────────────────

25      --- caption continued on the following page ---
```

ER_306

```
 1  _____

 2  RUSSELL FOUTS, et al.,          ) Case No: 3:19-cv-01662-BEN-JBL
                                    )
 3  Plaintiffs,                     )
                                    )
 4  v.                              )
                                    )
 5  ROB BONTA, in his official      )
    capacity as attorney general    )
 6  of the State of California.     )
                                    )
 7  Defendants.                     )
    _____

 8
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
 9
                          Pages 1 through 51
10

11

12

13

14

15

16

17

18

19

20

21       --- appearances continued on the following page ---
    _____
22
    REPORTED BY:              Abigail R. Torres, CSR, RPR/RMR, FCRR
23                            CSR No. 13700
                              United States District Court
24                            Southern District of California
                              333 West Broadway, Suite 420
25                            San Diego, California 92101
```

**ER_307**

```
 1   APPEARANCES:

 2

     For the Plaintiffs:      MICHEL & ASSOCIATES, PC
 3   Duncan, et al.          180 East Ocean Boulevard, Suite 200
                             Long Beach, California 90802
 4                           By:  ANNA M. BARVIR, ESQ.
                             By:  SEAN A. BRADY, ESQ.
 5                           By:  KONSTADINOS T. MOROS, ESQ.

 6   For the Defendants:      DEPARTMENT OF JUSTICE
     Becerra, et al.         OFFICE OF ATTORNEY GENERAL
 7                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 9012
 8                           Los Angeles, California 90013
                             By:  KEVIN J. KELLY, ESQ.
 9                                  -oOo-
                             DEPARTMENT OF JUSTICE
10                           OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
11                           300 South Spring Street, Suite 1702
                             Los Angeles, California 90013
12                           By:  MARK R. BECKINGTON, ESQ.

13   APPEARANCES:

14   For the Plaintiffs:      MICHEL & ASSOCIATES, PC
     Rhode, et al.           180 East Ocean Boulevard, Suite 200
15                           Long Beach, California 90802
                             By:  ANNA M. BARVIR, ESQ.
16                           By:  SEAN A. BRADY, ESQ.
                             By:  KONSTADINOS T. MOROS, ESQ.
17
     For the Defendants:      DEPARTMENT OF JUSTICE
18   Becerra, et al.         OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
19                           1300 I Street, Suite 125
                             Sacramento, California 95814
20                           By:  ANTHONY P. O'BRIEN, ESQ.
                                    -oOo-
21                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
22                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
23                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.

24

25        --- appearances continued on the following page ---
```

**ER_308**

```
 1  APPEARANCES:

 2  For the Plaintiffs:      DILLON LAW GROUP, APC
    Miller, et al.,          2647 Gateway Road, Suite 105, No. 255
 3                           Carlsbad, California 92009
                             By:  JOHN W. DILLON, ESQ.
 4
    For the Defendants:      DEPARTMENT OF JUSTICE
 5  Becerra, et al.,         OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
 6                           300 South Spring Street, Suite 9012
                             Los Angeles, California 90013
 7                           By:  KEVIN J. KELLY, ESQ.
                                       -oOo-
 8                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
 9                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
10                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.
11
    APPEARANCES:
12
    For the Plaintiffs:      LAW OFFICE OF ALAN BECK
13  Fouts, et al.,           2692 Harcourt Drive
                             San Diego, California 92123
14                           By:  ALAN A. BECK, ESQ.
                                       -oOo-
15                           STAMBOULIEH LAW, PLLC
                             PO Box 428
16                           Olive Branch, Mississippi 38654
                             By:  STEPHEN D. STAMBOULIEH, ESQ.
17
    For the Defendants:      DEPARTMENT OF JUSTICE
18  Becerra, et al.          OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
19                           1300 I Street, Suite 125
                             Sacramento, California 95814
20                           By:  ANTHONY P. O'BRIEN, ESQ.
                                       -oOo-
21                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
22                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
23                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.
24

25
```

```
 1    SAN DIEGO, CALIFORNIA; MONDAY, DECEMBER 12, 2022; 10:38 A.M.

 2                              -oOo-

 3            THE COURT:  Good morning.

 4            THE CLERK:  Calling 1, 2, 3, and 4 on calendar.

 5            One, 17-cv-1017, Duncan, et al., v. Becerra, et al.

 6            Two, 18-cv-0802, Rhode, et al., v. Becerra, et al.

 7            Three, 19-cv-1537, Miller, et al., v. Becerra, et al.

 8            Four, 19-cv-1662, Fouts, et al., v. Becerra, et al.

 9            All set for status conference.

10            THE COURT:  All right, Counsel.  Thank you for being

11    here this morning.  Let's start with the Plaintiff.

12            If you would please identify yourself.  Please speak

13    slowly, clearly, so that my court reporter can take down your

14    names and so that I can, hopefully, do justice to them.  Okay?

15            MS. BARVIR:  Thank you, Your Honor.

16            Anna Barvir, B-a-r-v-i-r, for Plaintiff Virginia

17    Duncan, et al.

18            THE COURT:  All right.

19            MR. BRADY:  Good morning, Your Honor.

20            Sean Brady, S-e-a-n, B-r-a-d-y, on behalf of the

21    Plaintiffs.

22            MR. MOROS:  Good morning, Your Honor.

23            Konstadinos Moros on behalf of the Plaintiffs.  That's

24    K-o-n-s-t-a-d-i-n-o-s.  And last name is Moros, M-o-r-o-s.

25            THE COURT:  Okay.  And for the State?
```

```
 1              MR. O'BRIEN:  Good morning, Your Honor.

 2              Deputy Attorney General Anthony O'Brien,

 3    A-n-t-h-o-n-y; O, apostrophe, B-r-i-e-n, on behalf of the

 4    Attorney General and the Fouts and Rhode matter.

 5              THE COURT:  Okay.

 6              MR. KELLY:  Your Honor, excuse me.  I'm also

 7    appearing -- I'm appearing on behalf of the State and the

 8    Attorney General in the Duncan and Miller matters.

 9              My name is Kevin Kelly.  K-e-v-i-n.  Kelly, K-e-l-l-y.

10    Deputy Attorney General.  Thank you.

11              THE COURT:  I'm sorry.  You're on Duncan and Miller?

12              MR. KELLY:  Correct, Your Honor.

13              THE COURT:  Okay.  Boy, I hope I can keep all this

14    straight.  Okay.

15              MR. BECKINGTON:  Good morning, Your Honor.

16              Mark Beckington, B-e-c-k-i-n-g-t-o-n.  I'm joining

17    Mr. O'Brien and Mr. Kelly on all four cases.

18              THE COURT:  I'm sorry?

19              MR. BECKINGTON:  I'm joining Mr. Kelly and Mr. O'Brien

20    on all four of the cases.

21              THE COURT:  On all four.  I remember you from the

22    Miller case.

23              MR. BECKINGTON:  Yes, Your Honor.

24              THE COURT:  Yeah.  Okay.  Great.

25              All right.  All right.  Let's see Plaintiff in the
```

7

```
 1    Rhode case.
 2            MR. BRADY:  Your Honor, Sean Brady on behalf of the
 3    Plaintiffs on Rhode.
 4            MS. BARVIR:  Anna Barvir on behalf of the Plaintiffs
 5    and Rhode as well.
 6            THE COURT:  All right.  And on the Fouts matter?
 7            MR. STAMBOULIEH:  Steven Stamboulieh,
 8    S-t-a-m-b-o-u-l-i-e-h, for Plaintiff Fouts.
 9            THE COURT:  I'm sorry.  Just a second.
10            Can you repeat your last name again for me, please?
11            MR. STAMBOULIEH:  Stamboulieh, S-t-a-m-b-o-u-l-i-e-h.
12            MR. BECK:  Alan Beck on behalf of the Plaintiffs.
13    A-l-a-n.  Last name B-e-c-k, sir.
14            THE COURT:  Okay.  Have I missed anyone?
15            MR. DILLON:  Your Honor, this is John Dillon appearing
16    on behalf of the Plaintiffs for the Millers and --
17            THE COURT:  I'm sorry.  For Miller?
18            MR. DILLON:  Yes.
19            THE COURT:  And?
20            MR. DILLON:  John Dillon.
21            THE COURT:  Just on the Miller case?
22            MR. DILLON:  Yeah, just for Miller.
23            THE COURT:  All right.  Have I missed anyone?
24            Okay.  Well, thank you so much for being here this
25    morning.  The reason why I called the status conference -- and
```

**ER_312**

1   I called all these cases at the same time -- is because, you

2   know, a great deal of my life over the last few years has been

3   devoted to dealing with these Second Amendment cases.

4          As you probably know, I have four of these cases and

5   recently inherited the fee-shifting case from two other judges.

6   And I've spent an awful lot of time, an awful lot of time, and

7   read an awful lot of material and heard testimony on some of

8   these -- at least one of these cases, anyway.

9          And so I thought that, given the fact that these cases

10  have been returned to me following the Bruen opinion, that I

11  didn't want to duplicate effort.  First of all, my time, as I'm

12  sure your time, my law clerk's time is valuable.

13         And so I thought that perhaps there was some way that

14  we could approach a joint methodology for dealing with all of

15  these cases, essentially, at one time and in one -- in one way.

16  So my understanding of -- of Heller, is that Heller has not

17  changed.  It has not been overruled.  It is still good law.

18         Bruen, the Bruen opinion, I believe, discarded the

19  intermediate scrutiny test that I also thought was not very

20  useful; and has, instead, replaced it with a text history and

21  tradition test.  Now, the text history and tradition issue is

22  pretty much common, I think, to all of these cases.

23         There may be some nuance as to whether, for example,

24  in some case the -- the history and tradition may effect

25  ammunition.  In another case, it may effect the type of weapon,

1    for example, whether it's a rifle or a dirk or a dagger.  But

2    in the end, it's the same.  We're basically looking at the same

3    body of history and tradition that we're going to be looking at

4    in all of the cases.

5            So I have an idea of how this case ought to go

6    forward, and I'll tell you what I would like to have -- by the

7    way, I might add, I'm not sure, Mr. O'Brien, whether you filed

8    the supplemental brief in the Fouts case.  I'm not sure who

9    filed that.

10           MR. O'BRIEN:  Yes, Your Honor, I did.

11           THE COURT:  All right.  Well, let me compliment you on

12   that, because one of the things that I thought you did that I

13   really appreciated was you filed several declarations.  One of

14   those declarations did a historical analysis of several rules,

15   laws, regulations, and so on and so forth, all of which I have

16   read, I might add.  So --

17           You can sit down.

18           -- I found that to be very, very helpful.

19           But I would like to ask you folks to do something a

20   little bit different; very similar.  But I don't have the

21   staff.  I don't have, really, the resources to do this, at

22   least not to do it in a timely fashion.

23           So I thought that I would ask you to do something for

24   me, which is to, essentially, do a similar survey as,

25   Mr. O'Brien, you did in the -- in the Fouts case.

1          And I would like that survey, if you would.  I mean,

2    I'm sure you all have access to Excel spreadsheets and so on.

3    But I'd like to see a survey that does the following for me:

4    First of all, on a chronological bases, starting with date, the

5    date of any law, regulation, ordinance, restriction.  And I'm

6    going to refer to those from now on as "restrictions."  Okay.

7    Generically, okay, restriction or regulation.  Okay.

8          So if you could start out chronologically, if you

9    would give me the date, and then if you would tell me what was

10   it that was restricted.  So, for example, in many of those

11   regulations, they regulate dirks, daggers, metal knuckles.  In

12   some cases, it might be storage of gunpowder or cartridges.

13   Some of them, some of these, are "use" regulations.  In other

14   words, you cannot use these while committing a crime.  You

15   cannot use them while breaking and entering into somebody's

16   property.  You cannot display them in anger.

17          So what is it exactly that the law or the regulation

18   restricted?  What type of weapon?  What was the weapon that was

19   being restricted?  Was it a knife? a Bowie knife? a stiletto?

20   metal knuckles? pistols? rifles?  Then I would like to know

21   whether or not that statute was repealed and, if it was

22   repealed, what was repealed by, and was it replaced by

23   something else?  And if so, if you would do the same analysis?

24   Again, continuing a chronological order.  Right?

25          And then, finally, whether or not that regulation or

1   restriction was reviewed by court or courts?  And if so, what

2   was the -- what was the outcome?  For example, was it found to

3   be unconstitutional, or was it found to be constitutional?  And

4   if you'll give me a citation so that I can then go and look at

5   the cases and see what the cases say.

6           I think -- so to pose an example, I think there are

7   one or two regulations that I have found that restricted --

8   specifically restricted billys.  Okay.  So in the Fouts case, I

9   think that would be particularly relevant.  I think I found one

10  or two that restricted rifles and shotguns.  I think I found

11  one or two that restrict certain ammunition, cartridges.

12  Right.  I think I found one that restricts a weapon that can

13  fire more than 16 or 18 rounds.  And I found one that dealt

14  with machine guns and automatic rifles.

15          You see, that's the sort of thing that I've read

16  through that I've captured, but I can't really capture it in a

17  way that I think that the Supreme Court would like us to do it,

18  which is a chronological order, so that we can determine what

19  regulations, what tradition exists with regards to restrictions

20  at the adoption of the Second Amendment; and then I think,

21  secondarily, at the time that the Fourteenth Amendment was

22  adopted.

23          I think with that body of information, I think this

24  Court would be in a much better position to make a decision as

25  to what to do in each one of these cases.

1            So the cases have been sent back to me, given the

2    Bruen opinion, and I'm now going to attempt to deal with them,

3    but I don't want to have to deal and read the same stuff over

4    and over and over again, because I've already read some of it

5    twice.  And, frankly, there's a lot of material there.  I don't

6    know how many boxes of five-inch binders I have, but it's a

7    lot, and I have only so much time.

8            So I would suggest both sides, if you can, please do

9    that for me.  Okay.  And I think that would be very helpful.

10           Now, as far as actually setting a hearing to -- to

11   hear your arguments on these, I don't think there's any use in

12   taking any evidence, meaning testimony, from anyone in any of

13   these cases.

14           I mean, the history and tradition is what it is.  I

15   don't need, you know, Mr. Spitzer or Mr. Cornell to tell me

16   what his view of the history and tradition is.  I see no point

17   in that; nor do I think any additional discovery is necessary

18   or additional expert work is necessary.  So, anyway, that's

19   my -- that's my initial thought on this case.

20           If anyone has any suggestions on how we can go about

21   proceeding with these cases, I would love to hear your views.

22   I may not adopt your suggestion, but I'll certainly consider

23   it.  So if -- if anybody wants to address what I have said, or

24   anything else on how we proceed with these cases, please feel

25   free to speak up.

1          Maybe we'll start with Duncan, since it was the first

2    case that I dealt with.

3          So do you have anything you want to add?

4          MS. BARVIR:  Should I move here?

5          THE COURT:  Yeah.  Whatever.  If you feel comfortable

6    there at the table, that's fine.

7          MS. BARVIR:  Again, Anna Barvir for Plaintiff Virginia

8    Duncan.

9          Thank you, Your Honor, for your thoughtful

10   consideration of all four matters.  I'm sorry.  I'm -- we've

11   heard what -- that Your Honor is asking for from each party.  I

12   think that makes a lot of sense, though I do want to, I think,

13   perhaps, focus the Court a little bit on what Plaintiffs' view

14   as the kind of proper way of reviewing this case.  And in our

15   position, it doesn't really rely on -- it actually shouldn't

16   rely, and it might be improper to rely on the sorts of -- even

17   the laws that Your Honor is referencing in this survey and/or

18   spreadsheet that we were talking about just now.

19         It is our position that Heller already tells -- Your

20   Honor, tells all of us how to analyze this.  The -- this is an

21   arms banned possession case.  So the Heller court then, backed

22   up by the decision in Bruen, already handled that entire

23   analysis.  The analysis starts with --

24         THE COURT:  But if that were so, why would the Ninth

25   Circuit have kicked it back to me?  I mean, I agree with you in

14

```
 1   concept, but, you know, the Ninth Circuit kicked it back to me,
 2   so...
 3           MS. BARVIR:  Excuse me.  I think that's a good
 4   question, and perhaps that's why Your Honor is, I think,
 5   intelligent, smart to ask the parties to do what we're doing.
 6   But I think that -- excuse me -- the Ninth Circuit also has a
 7   lot of these -- had a lot of these cases before it.  And,
 8   obviously, all of the pro Second Amendment cases had gone up to
 9   en banc, and perhaps the Court wasn't willing to handle those
10   at that point.
11           I'm not trying to cast aspersions, but I think we can
12   all kind of agree that we've seen a lot of decisions that are
13   not upholding lower-court decisions that strike California
14   state laws, gun control laws, just overturned.
15           So perhaps they'd like to see that Your Honor do some
16   more work on this case, but I don't think it requires --
17           THE COURT:  Would you like some water?
18           MS. BARVIR:  Yes.
19           I don't think that that requires us to do a new
20   analysis of all the history that's out there.  The Heller court
21   was very -- had done a very detailed deep dive into all of the
22   historical laws that are banning possession of arms and other
23   types of gun control laws since the Founding and before.
24           And it found that the test is if it's -- excuse me --
25   that the only time the State can lawfully ban a firearm or
```

1    other type of arm that is protected by the Second Amendment is

2    if it's dangerous and unusual.  The flip side being, typically

3    possessed by law-abiding citizens for lawful purposes or

4    other -- we've also heard it called the "common use" test.  And

5    so that test came out of the Court's analysis of the history

6    and tradition.

7         So if the Court -- so the question that really is

8    posed -- that Duncan poses this Court today, is whether or not

9    magazines, and maybe more specifically magazines capable of

10   holding more than ten rounds, are protected arms, bearable

11   arms, under the Second Amendment's text.

12        And then, secondly, if there -- excuse me --

13   otherwise, if there's a longstanding tradition, meaning are

14   they dangerous and unusual.  And this Court has already found

15   that -- I mean, we have a really large record showing that

16   they're not dangerous and unusual.  And several courts have

17   agreed with that finding both in the Ninth Circuit and other

18   circuits have found it or they have been willing to accept it.

19   And I don't think that Heller or -- I mean, I'm sorry -- I do

20   not think Bruen changed that outcome.

21        So that's what we would like Your Honor to consider

22   and to look at and perhaps think about when we are doing this

23   search for more historical restrictions.

24        THE COURT:  Let me ask you a question that I think has

25   troubled me somewhat.  So I think facts matter.  And in

1    certain -- and in cases -- every case, there are parties that

2    have greater access to evidence than others.  Right.  And at

3    least in California, we have a presumption, for example, that

4    when a party has the largest body of evidence but fails to

5    present it, there's a presumption that if the evidence were to

6    be considered by the Court, that the presumption would be that

7    the party who has a greater body of evidence, that it would be

8    held against him.

9           Now, one of the things that I'm concerned about, for

10   example, is I just read someone said, "There's no evidence that

11   a homeowner has ever fired more than ten rounds in defense."

12   And I kind of think that that's -- I mean, I think probably the

13   best evidence of that would be the State.  The State would have

14   the investigative reports, police reports, and so on, to

15   explain that.

16          But I wonder if you agree with that statement, that

17   there are no cases where a homeowner or a business owner has

18   ever fired more than ten rounds in defense.  And if so, and if

19   that's the case, have you provided the Court with any

20   information to support that?

21          MS. BARVIR:  I don't -- I don't, standing here, know

22   that that's true.  I think that part of that is -- it's a kind

23   of a false thing to do when you're limited to that number,

24   anyway, but also --

25          THE COURT:  I understand you.  I understand -- I hear

```
 1   you.  I hear you.  But I -- particularly in the Miller case, I
 2   took issue with Ms. Alan's -- Ms. Alan's analysis.  And then I
 3   think I read something recently -- I can't recall which court
 4   it was -- but somebody said, "Oh, there's no evidence that a
 5   homeowner has fired more than ten rounds."
 6          And defense -- and of course all that anyone has to do
 7   is go on the Internet and do a cursory search and find out that
 8   that's not true.
 9          MS. BARVIR:  Right.
10          THE COURT:  And I wonder if you've done that.
11          MS. BARVIR:  I think when we were here on MSJ -- and
12   that's why we had this conversation several years ago.
13          THE COURT:  You know, I'm sorry.  But as I said, I
14   have four of these, and if I get you all confused with one
15   another, please forgive me.  You know, I'm not as young as I
16   used to be, so...
17          MS. BARVIR:  None of us are.
18          When we were here on MSJ, I think we had this
19   conversation as well.  And a lot of times that was coming
20   from -- you know, from Plaintiffs' side was coming from, I
21   guess you could say, anecdotal news stories.  Because we don't
22   -- we aren't the State.  We don't have access to those same
23   sorts of records.
24          I don't think that it's true that that's never
25   happened.  That there's no evidence that it's ever happened.
```

 1  But, again, even if it never happened, which I find

 2  extraordinarily hard to believe -- the police do it all the

 3  time -- it's not a relevant matter because the test --

 4          THE COURT:  Yeah, I know.

 5          MS. BARVIR:  -- for common use is typically

 6  possession.

 7          THE COURT:  I heard you.  I know that.  But I was just

 8  wondering if you agreed with that statement that there's no

 9  evidence that the homeowner has ever fired more than ten

10  rounds, and just wanted to pick your brain on that.

11          Okay.  I distracted you.

12          MS. BARVIR:  That's okay.  I have nothing more to add.

13          THE COURT:  Okay.  Great.

14          MS. BARVIR:  So thank you for your time.

15          THE COURT:  Sometimes -- sometimes less is more.

16  Okay.

17          Anyone else?  No one else?  Gee, I'm so glad.

18          MR. KELLY:  Your Honor, could I be heard?

19          THE COURT:  No.  Sorry.  I've heard all I need to

20  hear.

21          No.  Go ahead.

22          MR. KELLY:  So the State would like to renew its

23  request for an addition discovery period, not a lengthy

24  discovery period in this action.  Just a three-month is all we

25  would ask for.

```
1              THE COURT:  Tell me why.

2              MR. KELLY:  Sorry, Your Honor?

3              THE COURT:  Tell me why.

4              MR. KELLY:  There's two reasons:  First of all, this

5    is a brand-new area of law, and it's a brand new area of

6    historical analysis.  And a three-month period would give our

7    experts more time to actually look into this.  I think we

8    submitted a declaration from Professor Schrag, who details the

9    types of work that is required of historians when they approach

10   an issue like this.

11             And, also, Professor Cornell in his declaration also

12   said that, "This work is still ongoing, and we did our level

13   best" --

14             THE COURT:  What happens in three months when the work

15   stops?  What's the -- what's the miracle?  Was the miracle

16   pertinent?  Drops down in three months and work stops?

17             MR. KELLY:  Well, Your Honor, obviously, I can't

18   represent that new evidence will be found, but that's also

19   because I don't know what I don't know, at this point, and

20   neither do our experts.

21             So we would, again, renew our request for an

22   additional discovery period followed by supplemental briefing.

23             And -- excuse me -- I had another point to make on

24   that.

25             THE COURT:  Okay.  Go ahead.
```

```
 1          MR. KELLY:  So we would also want an opportunity for
 2   our experts to examine the evidence, the new evidence that the
 3   plaintiffs included in their response to our supplemental
 4   briefing.  And that would also give our experts a chance to do
 5   so, and then --
 6          THE COURT:  So give me an example.
 7          MR. KELLY:  So I will give -- one moment, Your Honor.
 8          So the Plaintiffs brought or included a declaration
 9   from Ashley Hlebinsky, who claimed that "repeating rifles were
10   not commonly owned in the nineteenth century," presumably in
11   response to our declaration from Professor Vorenberg.
12          THE COURT:  I'm sorry.  They said "they were not"?
13          MR. KELLY:  They were not commonly owned in the
14   nineteenth century.
15          THE COURT:  She says they were not.
16          MR. DILLON:  No.
17          THE COURT:  No.  I think you're wrong.  I think you're
18   opposite.  I think she says --
19          MR. KELLY:  Opposing counsel will correct me if I'm
20   wrong.
21          THE COURT:  Yeah, I think you're wrong.  I think she
22   said the opposite.
23          MR. DILLON:  I don't believe that's the case that she
24   said they were not.
25          (Court reporter interruption.)
```

1            MR. DILLON:  John Dillon on behalf of the Miller

2    defendants.

3            THE COURT:  Yeah.  So she said they were commonly

4    owned.

5            MR. DILLON:  Yeah.

6            THE COURT:  So the Model 94 Winchester --

7            MR. DILLON:  She was rebutting Dr. Saul Cornell's

8    statement that these guns were, in fact, not common.  That's

9    what his testimony was, Your Honor.

10           THE COURT:  All you got to do, if you look at

11   Professor Cornell's declarations and you look at the website

12   that he refers to -- to Winchester -- to the Winchester

13   company, if you look at that website, you see that, in fact,

14   they were commonly owned.

15           So, I mean, what are you going to do?  You going to --

16           MR. KELLY:  Your Honor, if --

17           THE COURT:  How are you going to -- I mean, if you

18   look at Mr. Vorenberg's declaration, and you look at -- for

19   example, as I sit here right now, I can recall one instance

20   that he talks about where two miners were mining for borax.

21           Do you recall the incidents?

22           MR. KELLY:  Sorry.  Do I recall the incidents, Your

23   Honor?

24           THE COURT:  Yeah.

25           MR. KELLY:  I do not, no.

```
1              THE COURT:  Okay.  So two miners were mining for

2    borax.  And I can't recall whether it was Montana or Wyoming or

3    Nebraska, or whatever.  These are just two miners, two common

4    folks that were miners for miners -- I mean, mining for borax,

5    and they're attacked by a band of 40 Indians.  And these two

6    miners happen to have Henry rifles, and they were able to

7    defeat the 40 Indians that were attacking them.

8              So the point -- the point was, if you look at Mr. --

9    Professor Cornell's -- if you look at Professor Vorenberg's

10   materials, which I have looked at, you see that the statement

11   that they were not commonly owned is just not true.

12             For example, there's a statement in there about how

13   after the Civil War many of the -- of the soldiers, when they

14   were released from duty, were, in fact, allowed to buy the

15   repeating rifles and took the repeating rifles home.

16             And you can do the statistical analysis, by the way,

17   which I sat down and did because maybe I have too much time on

18   my hands.  But there was an awful lot of those weapons that

19   wound up in civilian hands.

20             So, I mean, the evidence is there.  You can call, I

21   suppose, this person for a deposition and take her deposition.

22   But I don't think, no matter what she says, it's not going to

23   contradict her own experts' declarations and the materials that

24   they themselves refer to.

25             You follow what I'm saying?  Okay.
```

1          MR. KELLY:  Your Honor, I do have another example of

2     something we would want to explore and --

3          THE COURT:  Okay.  Give me one more.

4          MR. KELLY:  So the Plaintiffs also include a

5     declaration from Clayton Cramer --

6          THE COURT:  Okay.

7          MR. KELLY:  -- presumably in response to Professor

8     Roth's position that mass murder was not a new phenomenon or --

9     excuse me -- mass murder, yes, correct, is a new phenomenon at

10    this point.  And we would want -- to my knowledge, Mr. Cramer

11    was not disclosed as an expert, was not deposed in any prior

12    proceeding in Duncan.

13         And we would first want an opportunity for Professor

14    Roth to examine the new evidence that the Plaintiffs have

15    brought, as well as potentially depose Mr. Cramer on that

16    issue.

17         THE COURT:  Well, before I get to that issue, let me

18    point out something, Mr. Kelly.  I don't know how long you've

19    been in this case.  But you said something about -- going back

20    to the reason why you needed three months; that you needed --

21    that this was a new area and so on and so forth.

22         Did I get you right?

23         MR. KELLY:  That's correct, Your Honor.

24         THE COURT:  Yeah.  How long you have been in this

25    case, Mr. Kelly?

```
1            MR. KELLY:  Several weeks, Your Honor.

2            THE COURT:  It's not fair to dump you into a case like

3   this.  Mr. -- Professor Cornell has gone on record and stated

4   -- in 2017, Professor Cornell stated that he had been

5   researching and writing on the history and tradition of Second

6   Amendment regulations for two decades.  That's 20 years,

7   20 years before 2017.  We're now in 2023.  Add five years to

8   that; that's 25 years.  That's a quarter of a century that

9   Professor Cornell has been writing, researching on the history

10  of and tradition of the Second Amendment.

11            And I've read an awful lot of that material.

12  Professor Cornell cites to Spitzer.  Spitzer cites to

13  Vorenberg.  Vorenberg cites to Bazilli.  Bazilli, I think it

14  is, who cites to -- these folks have been working on this for a

15  really, really long time.

16            In 2000- -- well, as you probably know in the Rhode --

17  Rhode case, I issued an opinion where I said that the State's

18  regulation had no historical pedigree, and I was right.  The

19  Ninth Circuit asked the State to file a supplemental brief on

20  the issue of the historical pedigree.

21            In response to that request from the Ninth Circuit,

22  the State at Footnote 3, page 11 of its response, cites to Saul

23  Cornell and Nathan DeNino, "A Well Regulated Right.  The Early

24  American Origins of Gun Control," 2004, surveying firearms

25  regulations from Founding era through the nineteenth century.
```

```
1            Mr. Kelly, with all due respect, Mr. Cornell and all
2     these other folks have been researching and writing on this
3     issue for 25 years.  We're not here, looking -- this is not a
4     question for the missing link.  We're not looking for truffles.
5     If it's a history and tradition, 25 years of research and
6     writing should have disclosed it by now.
7            And as you know, probably in Bruen -- I think it was
8     in Bruen.  It might have been in Heller, as well, where the
9     Court said, "Look, 'a lot of' doesn't show a history and
10    tradition."  Right.  So I don't think -- I mean, with all due
11    respect, I understand what you're doing, and I appreciate that.
12    And I'm sorry that you got dumped into this just a few -- just
13    a few weeks ago.
14           But, realistically, you don't need more time.  I might
15    give you a little more time to depose the one expert, and that
16    might be it, but that's about it.  Okay.
17           MR. KELLY:  Thank you, Your Honor.
18           THE COURT:  All right.  Is there anything else you
19    wanted to add?
20           MR. KELLY:  Actually, a point of clarification, Your
21    Honor.
22           THE COURT:  Sure.  Go ahead.
23           MR. KELLY:  Would Your Honor like us to submit one set
24    of briefing for all four matters, or one for each matter?
25           THE COURT:  I'm open to suggestions.  I don't want to
```

1   have to be rereading the same stuff over and over and over

2   again.  So what do you think?

3          MR. KELLY:  Your Honor, I think they should be heard

4   separately.  I think as Your Honor said, you know, there is

5   some overlap here in terms of the historical analysis,

6   et cetera.  But there's also enough nuance among the cases

7   that, I think, both, as a matter of fairness, and to make your

8   burden easier, they should be heard separately.

9          For example, I think the textual analyses is different

10  in these case; the first prong under Bruen as to whether the

11  regulated items constitute arms under the Second Amendment.

12  And our position is a different analysis in each case.

13         THE COURT:  Okay.  Well, what you say makes sense.

14  All right.  So how about if what we do is we have a joint

15  historical analysis?  In other words, what I suggested at the

16  very beginning of this hearing?  How about if we have that as

17  one?

18         And, yes, I can understand how you might want to

19  argue, for example, that in the Fouts case, looking at the

20  historical analysis, there's, you know, history and tradition.

21  And that you might want to brief that separately.

22         Yeah, I can understand what you're saying.  I'll hear

23  from the Plaintiffs in just a second, see if they have a

24  different idea.  But that makes sense.  I can go along with it.

25         MR. KELLY:  Thank you, Your Honor.

```
 1              THE COURT:  All right.  Thank you.

 2              Anyone else?

 3              All right.  Let's go back to the Plaintiffs.  Anyone

 4     have anything you want to comment in response?

 5              MR. BRADY:  Sure, Your Honor.  Sean Brady on behalf of

 6     the Plaintiffs.

 7              I agree.  I think that makes sense.  But to address

 8     the nuance, there are some things that are going to sort of be

 9     boilerplate with respect to this compendium of Excel

10     spreadsheet of the laws.  If the State prepares that, they're

11     going to have to prepare that for all the cases.  Right.  So it

12     wouldn't be an additional burden on them.

13              THE COURT:  I want you to look at it, and see if you

14     agree or disagree because I want to know, you know, if there's

15     disagreement.  Right.

16              MR. BRADY:  If Your Honor would like us to meet and

17     confer, you know -- I guess our position is that it's the

18     State's burden to research and present these laws, and they've

19     had adequate time for that.  We don't need to get into --

20              THE COURT:  I think I agree.  But I think it's always

21     really a good idea to meet and confer.  So if you could do

22     that, that would be wonderful.

23              MR. BRADY:  Absolutely.  And if Your Honor wants us to

24     do that prior to -- instead of dressing it in our opposition

25     and meeting and conferring beforehand, we're more than happy to
```

 1  do that.

 2          THE COURT:  Why don't you do that.  And then if

 3  there's any disagreement, if there's any disagreement, then we

 4  can deal with that later.  Right.

 5          So here's something that I do with jury instructions.

 6  I ask the parties to meet and confer and come up with an

 7  agreed-upon body of jury instructions.  Okay.  And then if

 8  there are any jury instructions that they disagree with, then

 9  they can file a brief to tell me what instructions they

10  disagree with and what other instructions they want me to give.

11          Perhaps this is a good policy for us to apply here.

12  If you meet and confer and agree on the historical analysis,

13  then that's great.  You can submit that.  And if there are any

14  disagreements, then you can submit that separately.

15          How's that?  That work?

16          MR. BRADY:  I think that works, Your Honor.

17          THE COURT:  Mr. Kelly?

18          MR. KELLY:  Yeah, that works for us, Your Honor.

19          THE COURT:  Great.

20          MR. BRADY:  This meet-and-confer process, though, is

21  there going to be another status conference or -- that's my

22  only concern.  Or are we just going to address it in our

23  briefing?

24          THE COURT:  No.  I don't think we need another

25  meet-and-confer conference after this.  I think -- look, I

1    don't want to slow-walk these cases.  These are important cases

2    both to the State and to the Plaintiffs and the people that

3    insist that they have these rights, and I think we need to move

4    these cases along.

5          So a meet-and-confer.  Give me an agreed-upon

6    historical analysis, and then what I will do is I will give you

7    a time period for that to be filed.  I'll give you a time

8    period for additional briefs to be filed, and then we're going

9    to have hearings, and we're going to put these cases to bed.

10         MR. MOROS:  Your Honor, one question.

11         Is the State to be limited in the presentation of its

12    laws to laws before the year 1900?  Because I know in their

13    supplemental briefing, they went into twentieth century laws,

14    and our position is those aren't relevant.  But if you want a

15    comprehensive view, just to get everything.

16         THE COURT:  You know, frankly, I don't see much point

17    in those because I think that there would be so many laws.  I

18    mean, let's face it, after -- there came a point when -- when

19    they began to grow exponentially.

20         I think in the Bruen opinion it talks about -- the way

21    I see it, it places greater emphasis on those laws that were,

22    essentially, in effect at the time the Second Amendment was

23    adopted, and then with a secondary emphasis at the time that

24    the Fourteenth Amendment incorporated the Second Amendment by

25    reference.  I think that's the time period.

```
 1              In fact, I think the one -- if I'm not mistaken, the
 2    one statute that regulates -- that was submitted in the Fouts
 3    case, it talks about machine guns and automatic rifles, is a
 4    1927 statute, if I'm not mistaken; which, frankly, I thought
 5    was irrelevant, anyway.
 6              So why don't we limit it to -- how about this?  How
 7    about, let's say, 20 years -- how about an arbitrary and
 8    capricious number that I'm going to give you?  Twenty years
 9    after the Second Amendment was incorporated by the Fourteenth
10    Amendment -- or the Fourteenth Amendment was adopted.  How's
11    that?
12              MR. MOROS:  So, 1888.  Okay.
13              THE COURT:  All right.  Twenty years after the
14    Fourteenth Amendment was adopted.
15              MR. KELLY:  Your Honor, we would object to that.
16              THE COURT:  Why?
17              MR. KELLY:  In Bruen, it specifically says that
18    statutes after the Fourteenth Amendment's ratification can be
19    used as evidence so long as they do not conflict with the
20    restrictions that were in place prior to then around the
21    Founding and the Reconstruction period.
22              So we would want to reserve our right to introduce
23    those laws if -- if we do, in fact, do that.
24              THE COURT:  Can you cite me to the page in Bruen?
25              MR. KELLY:  Yes, Your Honor.
```

```
1              THE COURT:  And if that were the case, why would --
2    why would the Supreme Court have overturned the New York
3    statute on concealed carry?  Since there were -- I would
4    imagine there's probably 100, if not 200, statutes that have
5    prohibited the methodology for obtaining concealed carry
6    permits.
7              MR. KELLY:  So, Your Honor, the page we're referring
8    to is at 142, Supreme Court page 2153, Note 28.
9              THE COURT:  Can you read it for me?  Because I -- I
10   don't have a photographic memory.
11             MR. KELLY:  Sure, Your Honor.  Just give us one
12   moment.
13             Your Honor, the footnote says:  "We will not address
14   any of the twentieth century historical evidence brought to
15   bear by respondent or their amici.  As with their
16   late-nineteenth-century evidence, the twentieth century
17   evidence presented by Respondent's in the amici --"
18             (Court reporter interruption.)
19             MR. KELLY:  "-- the twentieth century evidence
20   presented by Respondents and their amici does not provide
21   insight into the meaning of the Second Amendment when it
22   contradicts earlier evidence."
23             And we would argue that that footnote would allow us
24   to introduce statutes and regulations post-Reconstruction so
25   long as they do not contradict earlier restrictions.
```

```
1              THE COURT:  The problem with that, though, as I
2    said -- how many -- how many laws have been enacted?  I mean,
3    just look at California.  Let's just take, for example, the
4    Miller case, right, the AR-15-type regulations.
5              How many of those laws have been enacted since 1927?
6    Lots and lots and lots and lots.  But how does that help me
7    decide the history and tradition of regulation of rifles --
8              MR. KELLY:  I think, Your Honor --
9              THE COURT:  -- at the time the Second Amendment was
10   adopted, or at the time the Fourteenth Amendment was adopted?
11   All that tells me is -- has happened after the Civil War when
12   states found out that, yes, they could restrict certain
13   firearms.  Right.  That all of a sudden there was an explosion
14   of restrictions because the states found out, "Hey, guess what?
15   We can do this."  So then they did it.
16             But how does that help me determine the history and
17   tradition of these laws at the time the Second Amendment was
18   adopted or at the time that the Nineteenth -- I mean the
19   Fourteenth Amendment was adopted?
20             MR. KELLY:  Your Honor, I'm only speculating that
21   these laws are out there.  I personally do not know.  I think
22   we would just want to reserve our right and not be barred from
23   doing so should it come to that.
24             THE COURT:  I'll tell you what I'll do.  I'll let you
25   file a separate one.  You can file -- you can file a separate
```

1    survey, and we'll call it "Post 20 years after" -- "20 Years

2    After the Ratification of the Fourteenth Amendment."

3            How's that?

4            MR. KELLY:  That sounds good, Your Honor.

5            THE COURT:  And include as many as you want.  In fact,

6    the more the merrier.

7            MR. DILLON:  Your Honor, if I may?

8            THE COURT:  Yes, go ahead.

9            MR. DILLON:  I just wanted to clarify on the parameter

10   of exactly what you're requesting.  As I heard you, you're

11   looking for a single spreadsheet-style chronological order of

12   all the statutes, ordinances, restrictions that the State can

13   come up with that identify what was restricted, what act was

14   restricted, whether it was a law that was repealed or not

15   repealed, and whether or not it was ever brought before a

16   court.

17           And then they'll present -- they'll draft that

18   document with no argument, no expert witness testimony.

19           THE COURT:  Correct.

20           MR. DILLON:  It will just be a straight list of the

21   laws.  We will have a chance to review it as Plaintiffs.  And

22   like a summary judgment, if we have a contested issue of the

23   summary of the law that they present, we can note that contest

24   in the -- you know, a joint document?  Is that what you're --

25           THE COURT:  Sounds reasonable.  Sounds reasonable to

```
 1   me.
 2            MR. DILLON:  No problem.  Thank you, Your Honor.
 3            MR. KELLY:  Your Honor, I think we would object to
 4   that as well.  I think we would want, if we need to, to
 5   introduce experts to interpret some of the laws and the
 6   standards --
 7            THE COURT:  No.
 8            MR. KELLY:  -- in the language --
 9            THE COURT:  No.
10            MR. KELLY:  -- and the statute --
11            THE COURT:  No.  Look -- no, no.
12            Mr. Kelly, with all due respect, I don't need -- every
13   one of these experts that you've put forth, I have read, just
14   like experts that they have put forth, like Mr. Copill, for
15   example.  Your experts -- these are people that have, you know,
16   biased points of view.  I mean, Mr. Bosey, for example -- I
17   hope I'm pronouncing his name.  The fellow who worked for --
18            MR. MOROS:  Kimber, Your Honor.
19            THE COURT:  Kimber.  Yeah.  Who at some point in time
20   had an epiphany and realized that all the work that he'd been
21   doing for all these years, selling these weapons to the public
22   was not good.  And now he works -- he's a consultant for
23   Everytown -- I'm trying to remember.
24            Anyway, look.  These people's opinions of what these
25   statutes say, right, means nothing.  It means nothing.  It's
```

1   like, I remember -- I think it was Justice Brier in -- I think

2   it was Bruen, who talked about, "Well, we need to have this

3   factual record," and this and that, what have you.

4        No.  702 says that the admission of expert testimony

5   is help -- is possible if, because of the expert's knowledge,

6   skill, or experience, it will assist the trier of fact.  Okay.

7        But there's nothing.  I mean, I've read these

8   declarations.  Every one of these folks come in here with a

9   biased -- it's not like they're really neutral experts, okay,

10  or they're not experts who've come up on these opinions as a

11  result of these cases, okay, doing research for these cases.

12       These are all people that already come with

13  preconceived ideas and opinions, but their opinion is not worth

14  any more than your opinion or her opinion.  They're going to

15  tell me, "Well, in my opinion, if you look at this statute,

16  this statute means that -- you know, that the State of Wyoming

17  regulated concealed carry of brass knuckles," and so I can read

18  that.  I can figure that out by myself.

19       MR. KELLY:  Well, Your Honor, I think the issue that

20  we might have with simply creating a spreadsheet and submitting

21  it to the Court doesn't take into account that restrictions

22  were found in places other than statutes.  In our supplemental

23  briefing, we -- Professor Vorenberg testified as to how, for

24  example, in the Reconstruction period, the U.S. Army acted to

25  restrict firearms with magazines or carrying more than ten

1    rounds.

2              THE COURT:  When was the Reconstruction period?  It

3    was after the Civil War.

4              MR. KELLY:  Correct, Your Honor.

5              THE COURT:  Yeah.  It was after the Fourteenth

6    Amendment?

7              MR. KELLY:  It was during the same period, Your Honor;

8    during the same time period.

9              THE COURT:  And why would I want to give -- in fact, I

10   think there was some discussion about this.  I thought maybe it

11   was in Bruen.

12             Why would I want to give any credit to -- to what the

13   U.S. Army was doing in their territories?  In fact, I think,

14   wasn't it Bruen that somewhat criticizes applying laws that

15   were regulations that were used in territories that --

16             MR. KELLY:  Your Honor, it goes to the history and

17   tradition of firearm regulations.  That may not be a statute.

18             THE COURT:  But, look.  If it's the State's position

19   that there's a long history and tradition to regulating

20   firearms, if that's your position, you don't need to present

21   any evidence.  I'll buy that.  I understand that.

22             Any time the State can get their -- the ability to

23   regulate something, they'll do it, and they've been regulating

24   firearms for a long time.  Right.  But that doesn't mean that

25   it's an analog to the particular statute that's at issue in the

1   cases that I have before me.

2          So the fact that, for example, in the territories in

3   the Reconstruction period, the Army may not have wanted to have

4   people to have this, that or whatever, that doesn't help me.

5   It's not an analog.

6          Yes, we know.  We know.  We know.  We don't have -- I

7   don't need to take testimony of the fact that there's a history

8   and tradition in the United States in regulating firearms.

9   Right.  But if that were the test, if that were the test,

10  Heller would not have been decided the way it was, and neither

11  would McDonald, and neither would Bruen, and neither would

12  Caetano.

13         That's not the test.  But the test is, is there a

14  reasonable analog?  It doesn't have a twin.  It doesn't have to

15  be a twin.  But is there a reasonable analog in the history and

16  tradition of firearm regulation or arms regulation?  Because in

17  the Fouts case, we're dealing with billy clubs.

18         Is there an analog in the history and tradition of

19  regulating this type of weapon, this type of conduct, this type

20  of behavior?  That's what we're looking at.

21         So, anyway, all right.  Anyone else?

22         Yes.

23         MR. O'BRIEN:  Your Honor, just wanted to check.

24         With respect to Fouts and Rhode, what the Court's

25  requesting here, what effect does it have on kind of the

1    existing posture of those cases?

2          With respect to Fouts, the Plaintiffs have an

3    opposition brief due on the 22nd, currently.  And Rhode, there

4    hasn't been any order with respect to briefing.  So I'm just

5    trying to check and see what's the -- what is kind of the

6    process going forward.

7          THE COURT:  Thank you.  I appreciate your mentioning

8    that.

9          So here's what I'd like for you to do.  As I said,

10   Professor Cornell, Spitzer, and some of these other folks, they

11   have been working on this for a really long time.  So it really

12   shouldn't take them really long to be able to come up with

13   this -- with a survey that I've requested.  So I'm going to ask

14   that that be done within 30 days.  Okay.

15         I will then -- given that, I will then give each side

16   an opportunity to file a brief, and the reason why I use the

17   word "brief," it's because I want it to be brief.  Okay.  I'm

18   not going to -- I'm not going to require a 25-page maximum, but

19   I don't think it needs to be 25 pages for you to tell me what

20   the analogs are that I should apply in your case.  And I'll

21   give you 30 days to do that.  Then I'll give you 10 days to

22   each side to file a response.

23         Now, Mr. Kelly, you said you wanted to take somebody's

24   deposition, and I'm more than happy to give you a chance to

25   depose someone.  See what happens.

```
 1              So who did you want to depose?

 2              MR. KELLY:  Mr. Cramer, Your Honor.

 3              THE COURT:  Mr. Cramer.  Whose witness is Mr. Cramer?

 4              MS. BARVIR:  Clayton Cramer is the Duncan Plaintiffs'

 5    declarant.  He was responding, I think, to Professor Roth.

 6              I would think that if Your Honor is going to give the

 7    State some time to depose our witness, we should also get the

 8    chance to depose Mr. Roth.  He was also not disclosed at any

 9    point prior to filing that.

10              THE COURT:  You each have 20 days to work out an

11    agreement to -- one, to depose Mr. Cramer, to depose Mr. Roth.

12    Okay.

13              MR. STAMBOULIEH:  Yes, Your Honor.  I'm with --

14    Stephen Stamboulieh for the Fouts Plaintiffs.

15              Plaintiff Cramer is also going to be our expert even

16    though we're outside the discovery deadline.  He has,

17    obviously, not been disclosed to them as an expert, just like

18    their witnesses were not disclosed to us as an expert.

19              I'm not really sure that he needs to be deposed since

20    he's just going to be responding to Mr. Spitzer's declaration

21    of what the -- what he's found the historical analogs to be.

22    So I'm not really sure, other than wasting money and time, what

23    a deposition would bring to them.

24              I did have one question, and I -- the page length for

25    the supplemental briefs, my understanding of the local rules is
```

1   that we were limited to 25 pages.  We have not filed motions to

2   strike.  We have not tried to burden the docket with anything.

3   I figured I would just ask the Court.

4        Do we have the same page limit that the Defendants do,

5   which I believe was 36 pages?  We're not going to burden --

6        THE COURT:  I don't think we need 36 pages, especially

7   if we're breaking it up.  Okay.  So we've got -- so we have

8   the -- so we have the historical survey.  Right.  I don't know

9   why you would need 36 pages.  So why would you need 36 pages to

10  tell me that the history and tradition of arm regulations --

11  I'm going to use the Fouts case -- for billys is consistent

12  with the history and tradition of that which has been provided

13  to me by way of that survey?  You don't need 36 pages;

14  25 pages, max, for any opening brief, and 10 pages for any

15  reply.

16        MR. STAMBOULIEH:  Let me go back one step, Your Honor.

17        They filed the supplemental brief that this Court

18  ordered.  I'm not sure the actual date; October 17th, I

19  believe.  And they took 36 pages.  Ours is coming up.  The

20  response is due on the 22nd.

21        So my question to the Court, and perhaps the Court

22  just answered me when you limited it to 25 pages.  The reason

23  that we might need to go a little bit beyond that page limit,

24  Your Honor, is they've raised this issue and said that there's

25  really been no historical analysis of the "dangerous" -- and

 1   they corrected it to be "or unusual" instead of "dangerous and

 2   unusual" language.

 3          THE COURT:  Yeah.  I noted that.  I noted that.  I

 4   found that to be rather distressing, even though in the -- in

 5   the past, they have referred to some instances as "dangerous or

 6   unusual."  But as Justice Alito pointed out in his concurring

 7   opinion in Caetano, anyone with a ninth-grade education can

 8   read the Heller opinion and determine that, in fact, it is

 9   "dangerous and unusual," i.e., the conjunctive, not a

10   disjunctive.

11          So I don't know why that keeps popping up.  I mean, I

12   heard some supposedly distinguished legal scholar make that

13   same error, and I don't know whether that's intentional or not.

14   I hope that's not intentional.

15          MR. STAMBOULIEH:  Well, the Supreme Court said

16   "dangerous and unusual," Your Honor, so we're going to go with

17   what the Supreme Court --

18          THE COURT:  That's a good thing to do.

19          MR. STAMBOULIEH:  Right.

20          THE COURT:  That's a really good thing to do.

21          MR. STAMBOULIEH:  So my question, Your Honor -- and

22   I'm sorry for taking so long on this.

23          THE COURT:  It's okay.

24          MR. STAMBOULIEH:  We have briefed "dangerous and

25   unusual."  It takes us beyond 35 pages.  It's about 35 pages.

1    We've briefed it.  So to the extent the Court wants to see

2    it -- if the Court limits us to 25, we'll cut the "dangerous

3    and unusual" and just cite back "see Supreme Court.  See

4    Justice Alito" who references Caetano --

5            THE COURT:  Are you saying -- are you talking about

6    whether or not the weapon is dangerous and unusual, or are you

7    talking about the fact that the test that some folks referred

8    to it as "dangerous or unusual"?  You follow what I'm saying?

9    Are you talking about the weapon?  Because, certainly, I can

10   understand, particularly in your case, talking about whether or

11   not the weapon is or is not dangerous and unusual.

12           But I don't want to talk about whether or not the test

13   is "dangerous and unusual" or "dangerous or unusual."  That has

14   been decided by somebody who's way above my pay grade.  Okay.

15           MR. BECK:  Alan Beck for the Plaintiffs Fouts, Your

16   Honor.

17           Our briefing also indicates that the phrase "dangerous

18   and unusual" doesn't actually refer to any sort of intrinsic

19   property of an arm.  Historically, in Heller, the Court

20   references the tradition of prohibiting carrying "dangerous and

21   unusual" weapons.

22           And after we took a look at what that actually was,

23   that -- that typically refers to prohibitions on carrying in

24   certain manners, that were actually what terrified people.

25           So our position is that the possession of any weapon

1    cannot be justified simply through this historical tradition of

2    carrying dangerous and unusual weapons, because it doesn't

3    refer to types of weapons; it refers to certain types of

4    conduct with weapons.

5         And in light of the fact that the State's brief was

6    36 pages, we're just hoping to have an equal-length brief as

7    the brief they filed so we can demonstrate that to the Court,

8    Your Honor.

9         THE COURT:  And you've already prepared this, you're

10   telling me?

11        MR. BECK:  Yes, Your Honor.

12        THE COURT:  Okay.  File it.

13        MR. BECK:  Thank you.

14        THE COURT:  File it.  Thank you for making my life

15   that much more difficult, but whatever.  Okay.  File it.  I'm

16   done.

17        Okay.  So -- so --

18        MR. O'BRIEN:  Your Honor --

19        THE COURT:  You have 30 days to file the survey.  You

20   have 30 days after that to file any brief that you wish to

21   file.  And this goes for both sides.  Having looked at the

22   survey, having made your decisions, et cetera, you've got

23   30 days after that to file your brief.  You've got 10 days

24   after that to file any opposition that you want to in that

25   brief.  You have 20 days to depose Mr. Cramer and Mr. Roth.

```
1              Anything else?

2              MR. O'BRIEN:  Your Honor, if I may.  With respect to

3    the survey due in 30 days --

4              THE COURT:  Yes.

5              MR. O'BRIEN:  -- we would request, if possible, to

6    extend that to 60 days.

7              THE COURT:  I could probably do it -- if I had the

8    time and the resources, I think I could probably do that in

9    probably less than two weeks.  The State has unlimited

10   resources.  You can do this.  Trust me, you can do it.  I've

11   looked at it.  And if I had the resources and the time to do

12   it, I could do it in probably -- I could probably do it in a

13   week.

14             MR. O'BRIEN:  Well, you know, I understand where the

15   Court is coming from.

16             I think that there's a couple of issues.  One, we do

17   have a holiday period, and I think that our resources will be

18   limited at least, you know --

19             THE COURT:  Yeah.  I hear you.  I feel your pain.

20             MR. O'BRIEN:  -- to the last week, so I think to

21   expand beyond that, that takes away one week.

22             Also, as we note, even in Fouts, even, you know, in a

23   case where, you know, we provided a lot of that historical, you

24   know, information, it's still, I think with respect to what the

25   Court's asking for, is going to, you know, require, you know,
```

```
 1   some additional time, especially in researching each of those

 2   laws and determining whether or not they were challenged, and

 3   what the -- what the disposition was in those cases.

 4          THE COURT:  I would imagine, Mr. O'Brien, with all due

 5   respect, that whoever came up with that -- I don't know,

 6   whatever it is, 40 pages, 30 pages of statutes or whatever,

 7   already has, pretty much, that information.  And if they

 8   submitted it to the Court for purposes of persuading the Court,

 9   they should also have the information to determine, for

10   example, whether or not that statute has been previously held

11   unconstitutional or constitutional, and should be able to

12   provide me with a citation.

13          I don't think 30 days is unreasonable.  I understand,

14   but my order remains.  All right.

15          Is there anything else?  I'm sorry.  I don't --

16          Yeah, go ahead.

17          MR. O'BRIEN:  One more, Your Honor.

18          You know, we would just also request with respect

19   to -- as you're allowing for -- I believe, in the Miller or the

20   Duncan cases, for deposing Professor Cramer.  I don't know what

21   Professor Cramer or Mr. Cramer will testify to with respect to

22   Fouts.  I would -- if we need to depose him, and I don't know

23   if they're -- you know, we want to have that opportunity to do

24   so if we need.

25          THE COURT:  Well, if you don't know what you want from
```

1    them in Fouts, what's the point of deposing him?

2            MR. O'BRIEN:  Well, we need to have an opportunity to

3    review his -- his declaration and --

4            THE COURT:  Was the declaration already filed or not?

5            MR. STAMBOULIEH:  The declaration is not filed yet,

6    Your Honor.  The declaration, I would think, is probably

7    substantially complete.  It's a rebuttal of Mr. Spitzer's

8    expert report.

9            THE COURT:  Tell you what we'll do.  Let's leave that

10   up in the air.  You take a look at it.  When you get the

11   opposition -- opposition, you get the declaration.

12           I've read Mr. Spitzer's declaration.  I'd say it's

13   probably one of the better ones I think that I've read.  If

14   after you read -- and, hopefully, you'll read it pretty

15   quickly.  But it isn't Mr. Cramer -- or is it Professor or

16   Mr. Cramer?  I hate to insult people.  But whatever it is he

17   says, if you think you need to depose him, let me know and let

18   me know quickly.

19           And if I decide that, in fact, that deposition is

20   necessary, I'll probably order that deposition to be taken on

21   very short notice, in which case I will allow you to take the

22   deposition of Mr. Spitzer.  And we'll take it from there.

23           We're going to get all this done, folks, in the time

24   period that I have set.

25           As I said, these are important cases to the State and

47

```
1   to the Plaintiffs and to the -- to the People of the State of
2   California.  So I want to move it along.  And that's that.
3   Okay.  I really appreciate you all being here.
4            MR. BRADY:  Regretfully, Your Honor, I have to raise
5   one issue --
6            THE COURT:  What's that?
7            MR. BRADY:  -- about the Rhode case that may,
8   unfortunately, complicate things.
9            And that is, the Rhode case, the analysis is a little
10  bit different than these other cases which have to do with
11  whether these specific items, right, are protected.  Here we're
12  talking about -- I don't think that there's any dispute that
13  ammunition is protected, and sale of it.  But what I suspect
14  the State, and what we've seen in the Ninth Circuit briefing,
15  their position is going to be that background checks on any
16  arm, regardless, are going to be covered historically, because
17  Bruen suggested that background checks on carry license are
18  going to be protected.
19           Our position is, obviously, going to be ammunition is
20  different, right, because the State admits that this is the
21  very first time that ammunition background check has ever been
22  put in place.  So our position is going be that's treated
23  differently.
24           But I think that we need, potentially, a backup
25  argument to make in case the State's argument carries the day
```

1   that background checks are generally okay or outside the scope

2   of the Second Amendment, and that is to point out that even if

3   background checks on ammunition are outside of the scope of the

4   Second Amendment, at some point the burden on them becomes so

5   great that --

6           THE COURT:  Well, I already decided that.  Didn't I

7   already decide in the ammunition case --

8           MR. BRADY:  Yes.

9           THE COURT:  -- that I thought that requiring people to

10  pay $19 every time they buy ammunition is unreasonable?

11          MR. BRADY:  Correct.

12          THE COURT:  I thought I decided that.

13          MR. BRADY:  You did, Your Honor.

14          THE COURT:  So we don't need to rehash stuff that

15  we've already gone through.

16          I think the question -- I think the question is:  Is

17  there any history or tradition that supports these background

18  checks?

19          Now, with that, Counsel, let me just say this.  The

20  Bruen case did say that background checks were okay, right,

21  with regard to the concealed carry.  Now, they also said,

22  however, that you can't impose unreasonable restrictions

23  because, you know, you can regulate the Second Amendment out of

24  existence by imposing regulations on something.  Right.

25          MR. BRADY:  Correct.  And that's what I was getting

49

1   at, Your Honor.  If you're saying that your previous findings

2   are the law of the case and the findings up to this point --

3           THE COURT:  I'm not changing my mind.

4           MR. BRADY:  Okay.  Then I -- so no --

5           THE COURT:  You know, but I do want to raise

6   something, by the way.  You know, I'm glad you mentioned that.

7   I'm going to take a wild guess that your position is that any

8   background check for buying ammunition is not reasonable.  I'm

9   putting words in your mouth.  Okay.

10          Now, I said that this regulation -- which is not what

11  the legislature had originally enacted; right?

12          MR. BRADY:  Correct.

13          THE COURT:  This -- the way the bureaucracy has now

14  regulated purchases of ammunition is unreasonable.  But I guess

15  what I'm offering to you folks to talk about is whether or

16  not -- and I don't expect that this will be fruitful, but I

17  have to offer it because I think it's possible that if there

18  was a consent decree that said that the regulation of

19  purchasing ammunition as set forth by the legislature in the

20  legislative enactment would be what would be required, my

21  analysis might be very different.

22          And so I'm thinking that that perhaps might be a way

23  to compromise a resolution of that case.  I just offer that as

24  an idea, folks, but you can do with it whatever you wish.

25          I've spent about as much time on this case as I'm

1   going to.  So I need to go, unless there's something really,

2   really, really important you need to address.

3         MR. BECKINGTON:  Your Honor, I apologize for testing

4   your patience.  I'll be very brief.

5         THE COURT:  Okay.

6         MR. BECKINGTON:  Just for the clarification of the

7   record, we did have a motion for reconsideration.  We did have

8   requests, I think, both in the Miller and in Fouts and Rhode

9   for the additional time to do discovery, to submit evidence,

10  et cetera.

11         Is the Court making a formal rule on those matters --

12         THE COURT:  Nothing -- nothing is -- the only thing

13  that has changed -- the only thing that has changed since I

14  issued my rulings on the cases that I've issued rulings is what

15  Bruen -- the Bruen opinion says, which is that we consider the

16  history and tradition of the firearm regulation or the arm

17  regulation.  Okay.  That's the only thing that has changed.

18         All right.  Thank you.  Thank you very much.

19         MR. O'BRIEN:  Just one other thing, Your Honor.

20  Apologize.  Is the Court going to be issuing a written order?

21  We did the best we can to kind of keep track of what you were

22  looking for with respect to the survey, but I just wanted to

23  clarify that as well.

24         THE COURT:  Well, you couldn't write that fast?

25         MR. O'BRIEN:  I tried, Your Honor.

1          MR. DILLON:  We have to summarize, Your Honor.

2          MR. O'BRIEN:  Yeah.

3          THE COURT:  We'll do our best.  I'll issue a written

4    order.  Thank you very much.  And I appreciate you all being

5    here.

6          (The proceedings were adjourned at 11:50 a.m.)

7                            -oOo-

8                   **C E R T I F I C A T E**

9          I, Abigail R. Torres, certify that I am a duly
     qualified and acting Official Court Reporter for the United
10   States District Court; that the foregoing is a true and
     accurate transcript of the proceedings as taken by me in the
11   above-entitled matter on December 12, 2022, and that the format
     used complies with the rules and requirements of the United
12   States Judicial Conference.

13   DATED:  December 20, 2022, San Diego.
     S/ABIGAIL R. TORRES
14   _____
     Abigail R. Torres, CSR No. 13700
15   U.S. Official Court Reporter

16

17

18

19

20

21

22

23

24

25

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General
ANNA FERRARI
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendants Rob Bonta and
Blake Graham, in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **JAMES MILLER et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA et al.,**<br><br>Defendants. | 3:19-cv-01537-BEN-JLB<br><br>**SUPPLEMENTAL DECLARATION OF LUCY P. ALLEN**<br><br>Dept:         5A<br>Judge:        Hon. Roger T. Benitez<br><br>Action Filed:  8/15/2019 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUPPLEMENTAL DECLARATION OF LUCY P. ALLEN**

I, Lucy Allen, declare under penalty of perjury that the following is true and correct:

1.     I previously submitted a Declaration in Support of Defendant's Opposition to Motion for Preliminary Injunction, which was filed with this Court on January 23, 2020 ("2020 Allen Declaration").[1]  I make this supplemental declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 8, 2022, filed on August 29, 2022.

2.     This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.     I am an economist and a Managing Director of NERA Economic Consulting ("NERA").  I have been retained by the California Department of Justice to provide certain statistical analyses in this matter.  NERA is being compensated for my work on this matter at a rate of $1,050 per hour and at lower rates for work performed by other NERA professionals and staff.

**BACKGROUND AND QUALIFICATIONS**

4.     My background and qualifications were summarized in the 2020 Allen Declaration.

5.     My current resume is attached as Exhibit A.

**OPINIONS**

6.     I have been asked by the California Department of Justice to provide supplemental testimony based on an analysis of The Heritage Foundation's "Defensive Gun Uses in the U.S." database ("Heritage DGU Database"), which was

---

[1] My 2020 Declaration was marked as Defendants' Trial Exhibit A and was filed publicly at Docket Number 33-1.

1

**ER_358**

first published after the 2020 Allen Declaration.[2] In particular, I have been asked to analyze the percent of incidents in which rifles were used in self-defense according to this database.

7.     This testimony supplements the opinions I previously provided in the 2020 Allen Declaration.  I stand by the opinions expressed in that declaration, which were based on the data that were available and considered at that time.[3]

8.     The Heritage Foundation is a think tank focused on "formulat[ing] and promot[ing] public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."[4] According to The Heritage Foundation, "[t]he right of the people to keep and bear arms is a fundamental part of American liberty, serving as an important individual defense against crime and a collective defense against tyranny."[5]

9.     In April 2020, The Heritage Foundation began publishing and periodically updating a database of news stories describing incidents in the U.S. in which individuals purportedly defended themselves using firearms.[6] The Heritage

---

[2] "Defensive Gun Uses in the U.S.," *The Heritage Foundation,* as of October 7, 2022, https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us.

[3] Note that contrary to suggestions in the June 4, 2021 Court Decision (see, *Decision,* June 4, 2021, pp. 48, 50 and 53), the data used in the 2020 Allen Declaration were turned over to Plaintiffs and in fact even discussed on the record by Plaintiffs' counsel during my deposition (see, Allen Deposition at 17:23-18:20). Neither Plaintiffs nor their experts ever indicated that the data were not available or that the analysis was not replicable.

[4] "About Heritage," *The Heritage Foundation*, https://www.heritage.org/about-heritage/mission.

[5] "Firearms," *The Heritage Foundation*, https://www.heritage.org/firearms.

[6] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

Supplemental Declaration of Lucy P. Allen (3:19-cv-01537-BEN-JLB)

1  Foundation notes that its database is not comprehensive but meant to "highlight"

2  stories of successful self-defense.[7,8]

3      10.   As of October 7, 2022, the Heritage DGU Database included 2,714

4  incidents from January 1, 2019 through October 6, 2022.[9] The Heritage DGU

5  Database codes the following information for each incident:[10]

6      • Date of the incident;

7      • Website link to the news story;

8      • Location (city and state);

9      • Context (e.g., domestic violence, home invasion, robbery, etc.);

10     • Whether the defender had a concealed-carry permit;

11     • Whether there where multiple assailants;

12     • Whether shots were fired; and

13     • Firearm type (handgun, shotgun, rifle, pellet rifle, long gun, or unknown).[11]

14

15     11.   I performed an analysis of all 2,714 incidents in the Heritage DGU

16  Database as of October 7, 2022 to determine what number and percent of the

17  incidents involved a rifle. I found there were 51 incidents indicating a rifle was

18

19     [7] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

20     [8] Note that a review of the news stories cited in the database indicates that a

21  number of the incidents may not involve individuals defending themselves. For

22  example, in one incident ("Two Burglary Suspects Caught By Victim's Brother

     And Friend, Held At Gunpoint For Police," *5NewsOnline*, February 11, 2019), a

23  homeowner's brother and friend appear to have found and apprehended burglars on

24  the roadside.

25     [9] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

     [10] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

26     [11] A review of the data and linked news stories from the Heritage DGU

27  Database indicates that the firearm type corresponds to the firearm associated with

28  the defender.

3

1    involved. These 51 incidents represent 2% of all incidents in the database and 4%

2    of incidents with a known gun type.[12] The table below shows the breakdown of

3    incidents by coded firearm type for the 2,714 incidents.

**The Heritage Foundation**
**Defensive Gun Use Database**

| Firearm Type | Incidents[1] | % of Total | % of Known |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

Source:
"Defensive Gun Uses in the U.S.," *The Heritage Foundation*.
Data as of October 7, 2022.
[1] Note that three incidents are coded as having more than one
firearm type and thus the sum by firearm type is larger than
the total number of incidents.

12.    I conducted the same analysis of the Heritage DGU Database

excluding incidents that occurred in states that have restrictions on assault weapons.

In particular, I excluded incidents in California, Connecticut, Hawaii, Maryland,

Massachusetts, New Jersey, and New York, as well as Washington D.C.[13] In states

---

[12] This analysis is based on The Heritage Foundation's coding of these

incidents. We have not independently verified the coding of these incidents.

[13] See, "Assault Weapons," *Giffords Law Center*,

https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-

(continued…)

4

1  without assault weapons restrictions, the Heritage DGU Database has 48 incidents

2  indicating a rifle was involved. These 48 incidents represent 2% of incidents in

3  these states and 4% of incidents with a known gun type in these states. The table

4  below shows the breakdown of incidents by coded firearm type for states that do

5  not restrict assault weapons.

**The Heritage Foundation**
**Defensive Gun Use Database**
**States Without Assault Weapon Restrictions**

| Firearm Type | Incidents[1] | % of Total | % of Known |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| Handgun | 1,033 | 41% | 90% |
| Shotgun | 63 | 3% | 6% |
| Rifle | 48 | 2% | 4% |
| Long Gun | 0 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,357 | 54% | |
| **Total known:** | **1,142** | | |
| **Total:** | **2,499** | | |

**Source:**
"Defensive Gun Uses in the U.S.," *The Heritage Foundation.*
Data as of October 7, 2022. Excludes the following states with
assault weapon restrictions: California, Connecticut, Hawaii,
Maryland, Massachusetts, New Jersey, and New York
as well as Washington D.C. Classification from Giffords Law
Center. Incidents in Delaware not excluded as restrictions
were enacted in June 2022.
[1] Note that three incidents are coded as having more than one
firearm type and thus the sum by firearm type is larger than
the total number of incidents.

weapons/. Delaware is not excluded since restrictions in Delaware were enacted in
June 2022.  See, "Governor Carney Signs Package of Gun Safety Legislation,"
*Delaware.gov,* June 30, 2022, https://news.delaware.gov/2022/06/30/governor-
carney-signs-package-of-gun-safety-legislation/.

5

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

2    the United States of America that the foregoing is true and correct.

3         Executed on October 13, 2022, at New York, New York.

4

5

6    _____

7                Lucy P. Allen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

Supplemental Declaration of Lucy P. Allen (3:19-cv-01537-BEN-JLB)

# EXHIBIT A



**NERA**
ECONOMIC CONSULTING

**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# LUCY P. ALLEN
# MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present          **National Economic Research Associates, Inc.**
Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993          **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988          **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984          Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

1

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

Summer 1985   **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983   **Arthur Andersen & Company**
<u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching
1989- 1992   **<u>Teaching Fellow</u>, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

 "Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

4

Lucy P. Allen

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC,* 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc.*, 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

5

Lucy P. Allen

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

Testimony and Deposition Testimony before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

6