No. 23-2979

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
————————————

JAMES MILLER, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE
OF CALIFORNIA, ET AL.,

*Defendants-Appellants*.

————————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:19-cv-1537-BEN-JLB
Hon. Roger T. Benitez

————————————

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS-APPELLANTS

————————————

Jennifer Loeb
  *Counsel of Record*
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

Aaron R. Marcu
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
(212) 277-4000
aaron.marcu@freshfields.com
*(Additional Counsel on Next Page)*

*Attorneys for Amici Curiae*
Giffords Law Center to Prevent Gun Violence,
Brady Center to Prevent Gun Violence, and March for Our Lives

Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
Aedan Collins
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
(212) 277-4000
brandt.henslee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com
aedan.collins@freshfields.com

## CORPORATE DISCLOSURE STATEMENT AND NOTIFICATION OF PUBLICLY HELD AFFILIATES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives state that they are non-profit corporations organized under 26 U.S.C. § 501(c)(3), have no parent corporation, do not issue stock, and have no publicly-held affiliates.

Date: December 8, 2023

Freshfields Bruckhaus Deringer US LLP

*/s/  Jennifer Loeb*
Jennifer Loeb

*Attorney for Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives

i

## **TABLE OF CONTENTS**

I.   INTEREST OF *AMICI CURIAE* .........................................................................1

II.  INTRODUCTION ........................................................................................2

III. ARGUMENT ............................................................................................3

   A.  *Bruen*'s Second Amendment Test Requires the Consideration of Empirical Research.........................................................................................................3

   B.  Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires a Nuanced Approach.........................5

     1.  The Frequency, Lethality, and Geographic Concentration of Premeditated Public Mass Shootings Are Novel Societal Concerns. ......................................5

     2.  The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined...........................7

     3.  Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings. ..................................................10

     4.  *Bruen* Requires Nuance in Analyzing Historical Analogues....................13

   C.  The District Court's Formulation of "Common Use" Is Inherently Flawed Because the Challenged Laws Are Not a Categorical Ban, and Therefore the Common Use Standard Does Not Apply. ............................................................14

   D.  Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.................................17

     1.  Pistol Grips.........................................................................................22

     2.  Forward Grips .....................................................................................23

     3.  Detachable Magazines..........................................................................24

IV. CONCLUSION ..........................................................................................25

ii

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) .................................................................2

*Bevis v. City of Naperville*,
No. 23-1353, 2023 WL 7273709 (7th Cir. Nov. 3, 2023).........................*passim*

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................................................................*passim*

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ...............................................................22

*Libertarian Party of Erie Cnty. v. Cuomo*,
970 F.3d 106 (2d Cir. 2020) .................................................................2

*McDonald v. City of Chicago*,
561 U.S. 742 (2010).................................................................2

*Md. Shall Issue v. Hogan*,
353 F. Supp. 3d 400 (D. Md. 2018).................................................2

*Miller v. Bonta*,
542 F. Supp. 3d 1009 (S.D. Cal. 2021)....................................15, 16

*Miller v. Bonta*,
No. 19-CV-01537, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023).............*passim*

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. 22-CV-1118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)........................2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022).................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
990 F. Supp. 2d 349 (W.D.N.Y. 2013)............................................23

*Peruta v. Cnty. of San Diego*,
824 F.3d 919 (9th Cir. 2016) ...............................................................2

*Richmond Boro Gun Club, Inc. v. City of New York*,
   97 F.3d 681 (2d Cir. 1996) .................................................................23

*Rupp v. Becerra*,
   401 F. Supp. 3d 978 (C.D. Cal. 2019) ..................................................2

*Staples v. United States,*
   511 U.S. 600 (1994).............................................................................21

*Stimmel v. Sessions*,
   879 F.3d 198 (6th Cir. 2018) ................................................................2

**Statutes**                                                              **Page(s)**

Cal. Penal Code § 30505.................................................................5, 13

Cal. Penal Code § 30515.............................................................*passim*

Cal. Penal Code § 30600....................................................................2

Cal. Penal Code § 30605....................................................................2

Cal. Penal Code § 30800....................................................................2

Cal. Penal Code § 30915....................................................................2

Cal. Penal Code § 30945....................................................................2

Cal. Penal Code § 32900..................................................................22

**Other Authorities**                                                    **Page(s)**

*1866 Yellowboy Rifle History*, Uberti USA,
   https://tinyurl.com/3x2wjth3..........................................................12

Adam Lankford, *Confirmation That the United States Has Six Times
   Its Global Share of Public Mass Shooters, Courtesy of Lott and
   Moody's Data*, 16 Econ. J. Watch 1 (2019),
   https://tinyurl.com/5c8xpuv9...........................................................6

*Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone
   Armory, https://tinyurl.com/hppuzpb2 .............................................10

*Assault Weapons and Large Capacity Magazines*, Educ. Fund to Stop Gun Violence, https://tinyurl.com/yjmaba4k .......................................24

Bonnie Berkowitz, *Double mass shootings over weekend set grim U.S. record*, Wash. Post (Dec. 4, 2023), https://tinyurl.com/2p82e2mb.....................6

Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4 ........................................................6

Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15* 4 (2023) ............................................................25

Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu ...................................13

Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64...............................................10

Dan Alex, *Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye........................11

Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC News (May 29, 2022), https://tinyurl.com/27hr2p2w ...........................................21

Decl. of Brian DeLay, *Sullivan v. Ferguson*, No. 3:22-cv-05403, ECF No. 128 (W.D. Wash. Sept. 1, 2023)...........................................12

Decl. of Robert Spitzer, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023)...................................12

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed ...........................................21

Erin Grinshteyn & David Hemenway, *Violent death rates in the US compared to those of the other high-income countries, 2015*, 130 Nursing & Health Pros. Fac. Rsch. & Publ'ns 1 (2019), https://tinyurl.com/zb7phedb ...........................................7

v

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t..................................................................12

*Gun Violence Archive 2023*, Gun Violence Archive, https://tinyurl.com/5t4rrt56..................................................................6

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe ..........................................................20

Homes Lybrand, *Two arrested on gun charges after crashing into barricade near the US Capitol, authorities say*, CNN (Nov. 6, 2023) https://tinyurl.com/mssjae43 ..................................................22

*Interim Report 2022*, Tex. H.R. Investigative Comm. on the Robb Elementary Shooting (July 17, 2022), https://tinyurl.com/ssahf6uh.................13

*Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022)...................................................................8

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.......................9

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye..........................................................11

Joshua Horwitz, *Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (Sept. 2003)...........................23, 24

Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.......................................5

Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs ................................................12

*Meet a Musketeer*, Newcastle Univ. Nat'l Civil War Centre, https://tinyurl.com/heehyjnk..................................................................10

vi

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l
Consortium for the Study of Terrorism and Responses to Terrorism
(2019), https://tinyurl.com/3s9nmbbc .................................................................8

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic
(June 30, 2016), https://tinyurl.com/vjac8a3b ...................................................19

Pablo Barberá, *Social Media, Echo Chambers, and Political
Polarization*, Cambridge Univ. Press (Aug. 24, 2020),
https://tinyurl.com/bdds6wf9 .................................................................................8

*Past Summary Ledgers*, Gun Violence Archive,
https://tinyurl.com/y5s7ax23 ..................................................................................6

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets,
weapons, and myths,* 80 J. of Trauma & Acute Care Surgery 6
(2016) ...................................................................................................................11

*Pop Culture: 1800*, U.S. Census Bureau (Dec. 9, 2022),
https://tinyurl.com/78cxvafx ...................................................................................9

*Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*,
U.S. Dep't of the Army (2003), https://tinyurl.com/3reu38px ...........................19

Ryan Hodges, *The 1866 Rifle*, Taylor's & Co. (Aug. 26, 2020),
https://tinyurl.com/bp8xebtn .................................................................................11

Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J.
(July 12, 2017), https://tinyurl.com/2jwemryz ....................................................18

Sara Swann, *The history of the AR-15 and how it became a symbol of
American gun culture,* Poynter (June 29, 2022),
https://tinyurl.com/5bffkafr ...................................................................................18

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED
(June 17, 2016), https://tinyurl.com/5d5prxmt ...................................................20

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which
Version of the Past Will the Supreme Court Choose in NYSRPA v.
Bruen?,* 49 Hastings Const. L.Q. 145 (2022),
https://tinyurl.com/zx2dvsmc .................................................................................13

Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33 ................................................................ 11

*TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army (May 2016), https://tinyurl.com/2p963dxd ............................................... 12

Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023) https://tinyurl.com/3ak32wvp ........................... 19

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa......................................................... 19, 20

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack,* Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us .................................................................. 9

Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk ................... 10

*What is your par time for an AR-15 emergency reload?*, AR15.com (Nov. 22, 2010), https://tinyurl.com/3csjs7kd ..................................... 11

*What we know so far about the mass shooting in Maine*, AP (Oct. 28, 2023), https://tinyurl.com/5mcr4n6c ................................................ 6

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://tinyurl.com/2zedk6c6................................................... 11

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough Sch. Bus. Rsch. Paper No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46 ............................................................ 15

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.......................... 11

viii

# I.   INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), and March for Our Lives ("MFOL") (together, "*Amici*") respectfully submit this Brief in Support of Defendants-Appellants' Opening Brief, ECF No. 25 ("Defs. Br.").

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.

Brady is the Nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives.

Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to this filing. No party's counsel authored any part of this brief, and no one other than amici contributed to its preparation or submission.

Giffords Law Center, Brady, and MFOL have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations,[2] and judges have regularly cited the organizations' research and expertise.[3]

## II.   INTRODUCTION

The California laws regulating possession of assault firearms, Cal. Penal Code §§ 30515, 30800, 30915, and 30945, and the penalty provisions, Cal. Penal Code §§ 30600 and 30605 (together, the "Challenged Laws"), are constitutional under the test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* instructs that when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. When considering the unprecedented social and technological conditions addressed by the Challenged Laws, *Bruen*

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont,* No. 22-CV-1118, 2023 WL 4975979, at *12 (D. Conn. Aug. 3, 2023); *Rupp v. Becerra,* 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,* 910 F.3d 106, 121–22 (3d Cir. 2018); *Md. Shall Issue v. Hogan,* 353 F. Supp. 3d 400, 403–05 (D. Md. 2018); *Stimmel v. Sessions,* 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego,* 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring). Giffords Law Center filed the latter two briefs under its former name Law Center to Prevent Gun Violence.

requires a "nuanced approach" to the analogical inquiry to avoid creating a "regulatory straightjacket." 142 S. Ct. at 2132–33. The Challenged Laws are constitutional under this test because they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of the time.

This Court, however, need not even reach the historical regulation question because the weapons and weapon features governed by the Challenged Laws are also uniquely dangerous and are not quintessential self-defense weapons, and, therefore, are not covered by the plain text of the Second Amendment. The weapons at issue here are weapons of war, designed to kill large numbers of people quickly or to grievously wound them; these weapons are significantly more lethal than any firearms in the 1700s or 1800s.

Finally, Plaintiffs' version of the common use test is inherently flawed and should be rejected.

### III.   ARGUMENT

**A.   *Bruen*'s Second Amendment Test Requires the Consideration of Empirical Research.**

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation is constitutional under the Second Amendment. The party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the relevant governmental body to demonstrate that the regulation is "consistent with

this Nation's historical tradition" of firearms regulation. *Bruen*, 142 S. Ct. at 2135 (2022).

Significantly though, the Court explained that a modern regulation need not be the "twin" of a historical regulation. *Id.* at 2132. The Court recognized that while it is "relatively simple" to analogize modern regulations to "historical" ones in some cases, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* The Court also identified two important—but non-exclusive—considerations for lower courts to use in determining if historical and modern regulations are similar: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in modern and historical American society. Such empirical research helps courts contextualize modern and historical laws and the prevailing societal backdrop against which those laws were passed, as *Bruen* requires.

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of relevant prevailing societal conditions, and empirical research provides indispensable evidence of these conditions.

**B.  Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires a Nuanced Approach.**

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Challenged Laws, which, like many regulations spanning our Nation's history, were designed to protect the public.[4]

**1.  The Frequency, Lethality, and Geographic Concentration of Premeditated Public Mass Shootings Are Novel Societal Concerns.**

The United States has experienced a recent, exponential increase in the frequency of public mass shootings. *Amici* could find evidence of only two instances of private mass shootings in America throughout all of the 18th and 19th centuries,[5] both of which occurred in 1891 and neither of which involved fatalities (likely given the limitations of gun technology at the time).[6] One scholar estimates that 25 mass

---

[4] *See* Defs. Br. at 10–11; *see also* Cal. Penal Code § 30505(a) ("the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state.").

[5] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance. Yet, no matter what definition one uses, one thing is certain: mass shootings have skyrocketed in this country.

[6] *See* Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.

shootings occurred between 1900 and 1965.[7] By contrast, more than 600 mass shootings *per year* have been reported in each of the last three years (610 in 2020, 690 in 2021, and 646 in 2022).[8] As of the drafting of this brief,[9] 633 mass shootings have occurred in the United States in 2023,[10] an average of nearly two per day.

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in the United States relative to the rest of the world. At least one comprehensive study has found that between 1998 and 2012, the United States experienced 29.7% of all mass shootings globally, but accounted for just 4.5% of the world's population.[11] This disparity is even starker when measured by gun-related fatalities: in 2015, "[t]he overall firearm death rate was 11.4 times higher in the US than in other high-income countries," and "83.7% of all firearm deaths, 91.6% of

---

[7] *See* Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.

[8] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

[9] And this number is likely to grow. Just weeks ago, a man killed 18 people in Maine. *See What we know so far about the mass shooting in Maine*, AP (Oct. 28, 2023), https://tinyurl.com/5mcr4n6c.

[10] *See Gun Violence Archive 2023,* Gun Violence Archive, https://tinyurl.com/5t4rrt56 (last accessed Dec. 8, 2023); *see also* Bonnie Berkowitz, *Double mass shootings over weekend set grim U.S. record*, Wash. Post (Dec. 4, 2023), https://tinyurl.com/2p82e2mb (explaining that, following two mass shootings only days before the filing of this brief, the United States set a new record for mass killings (shootings in which four or more people are killed) in a year).

[11] *See* Adam Lankford, *Confirmation That the United States Has Six Times Its Global Share of Public Mass Shooters*, *Courtesy of Lott and Moody's Data*, 16 Econ J. Watch 1, 73–77 (Mar. 2019), https://tinyurl.com/5c8xpuv9.

women killed by guns, and 96.7% of all children aged 0–4 years killed by guns were from the US."[12]

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any other time in history or in any other comparable place in the world.

> ### 2. The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.

Several modern social phenomena coincided with a surge in mass shootings over the 21st century, making gun violence prevention especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

> #### a. *Social Media*

Social media platforms create a means of communication that is exponentially faster, farther-reaching, and more difficult to appropriately regulate than anything the Founders could possibly have imagined. Numerous studies correlate social media with increases in anti-social behavior; mental health disorders; political, religious, and social extremism; and ultimately, mass shootings. Social media plays

---

[12] *See* Erin Grinshteyn & David Hemenway, *Violent death rates in the US compared to those of the other high-income countries, 2015*, 130 Nursing & Health Pros. Fac. Rsch. & Publ'ns 1, 2 (2019), https://tinyurl.com/zb7phedb.

an important role in the radicalization of American extremists,[13] as a mounting body of evidence demonstrates that content-ranking algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[14]

Amid such violent and frenetic discourse, many perpetrators of mass shootings have been inspired by what they read online. One example (of far too many) is the May 2022 Tops Buffalo shooting, in which the 18-year-old gunman published a racist manifesto online before broadcasting the shooting live on social media.[15] The New York Attorney General reported that the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [previous] mass shooting."[16] The Buffalo shooter also posted material on a different social media platform, Discord, "with the explicit goal of provoking future mass shootings."[17] A *Reuters* article observed that the shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out

---

[13] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[14] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[15] *See Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022).

[16] *Id.* at 3.

[17] *Id.* at 15.

deadlier mass shootings inspired by previous attackers."[18] Even more recently, on May 7, 2023, another mass shooter killed 8 people in Allen, Texas, after seemingly being influenced by content he saw on social media.[19]

### b. *Urbanization*

Urbanization has also radically transformed society since the Founders' era. In 1800, the United States averaged 6.1 people per square mile.[20] By 2020, the population had increased by a staggering 1,500% to an average of 93 people per square mile.[21]

This explosion in population density has profoundly changed how people associate. People gather in large groups more frequently than could have been possible before urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, crowded night clubs, sports arenas and stadiums, concerts, movie theaters, malls, and parades. These gatherings create "sitting duck" situations in

---

[18] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[19] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

[20] *Pop Culture: 1800*, U.S. Census Bureau (Dec. 9, 2022), https://tinyurl.com/78cxvafx.

[21] Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of population density in *urban and suburban* areas, where most mass shootings occur.

which mass shooters can efficiently injure or kill large numbers of people in a single event. The Route 91 Music Festival shooting in Las Vegas lasted only 11 minutes but killed 58 concertgoers and injured nearly 1,000 others.[22]

### 3. Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill vastly more people more quickly than ever before.

Modern firearms far surpass their Founding-era counterparts in lethality. The typical Revolutionary-era musket (i) held just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[23] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[24] (30 times more); (ii) can

---

[22] Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk.

[23] Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64. "Muzzle velocity" is the speed of a projectile when leaving the muzzle of a gun, and is a general measure of the power and lethality of a firearm. *Meet a Musketeer*, Newcastle Univ. Nat'l Civil War Centre, https://tinyurl.com/heehyjnk.

[24] AR-15 rifles use the same magazines as M16 rifles, which come in a standard size of 30 rounds. *See Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone Armory, https://tinyurl.com/hppuzpb2. *See also*, Ingraham, *supra* note 23.

shoot accurately from around 400 yards[25] (7 times as far); (iii) attains a muzzle velocity of around 3,251 feet per second[26] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[27] Thus, a shooter wielding an AR-15 is massively more lethal than one with a Revolutionary-era musket.[28]

Even "amazing"[29] firearms of the Civil War era were a far cry from modern weapons such as an AR-15 rifle. For example, the 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[30] a maximum effective range of approximately 100 yards (one-fourth of an AR-15 rifle), a muzzle velocity of 1,100 feet per second (one-third of an AR-15 rifle),[31] required the shooter to manually

---

[25] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

[26] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 6, 856 (2016).

[27] *What is your par time for an AR-15 emergency reload?*, AR15.com, (Nov. 22, 2010), https://tinyurl.com/3csjs7kd.

[28] Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33.

[29] *See Miller v. Bonta*, No. 19-CV-01537, 2023 WL 6929336, at *20 (S.D. Cal. Oct. 19, 2023). The rifles were, in fact, far from amazing: their exposed magazine was open to dirt and debris, which made it susceptible to jamming, their barrel would become dangerously hot after firing, and they were very heavy when loaded. *See* Ryan Hodges, *The 1866 Rifle*, Taylor's & Co. (Aug. 26, 2020), https://tinyurl.com/bp8xebtn; *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://tinyurl.com/2zedk6c6.

[30] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.

[31] Dan Alex*, Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

manipulate a lever in between each shot,[32] and could fire only ten shots per minute.[33] Using a semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds.[34] This meets the U.S. Army definition for "rapid semiautomatic fire."[35]

Increased firepower, coupled with advanced ballistics,[36] have made modern firearms far more deadly and fundamentally different from their historical predecessors. Current events too frequently illustrate how, with modern technology, a lone individual can commit mass murder in mere seconds before he can be located and stopped. On May 24, 2022, a lone gunman armed with an AR-15-style weapon fired at least 100 rounds in two and a half minutes inside an elementary school in Uvalde, Texas, "likely murder[ing] most of his innocent victims before any

---

[32] *See* Decl. of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023).

[33] *1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer."). Additionally, the 1866 rifle was far from as widespread in the civilian world as the District Court might believe: experts have estimated that by 1872 (four years after ratification of the Fourteenth Amendment) fewer than 800 Winchester rifles had been sold to civilians in the United States. *See* Decl. of Brian DeLay ¶ 57, *Sullivan v. Ferguson*, No. 3:22-cv-05403, ECF No. 128 (W.D. Wash. Sept. 1, 2023).

[34] *See* Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

[35] *TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.

[36] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t.

responder set foot in the building."[37] The ratifiers of the Second Amendment could not have imagined such rapid, indiscriminate carnage.

### 4. *Bruen* Requires Nuance in Analyzing Historical Analogues.

In passing the Challenged Laws, the California legislature contended with realities that legislatures of the past did not: Mass shootings that even in 1989[38] were occurring more frequently than ever before, structural shifts in society, and rapid advances in gun technology. These drastic societal and technological changes require this Court, under *Bruen,* to employ a nuanced analysis when comparing the "hows" and "whys" of the Challenged Laws with those of historical laws.

The motivation behind the Challenged Laws—their ("why")—is, fundamentally, to promote public safety.[39] Many (if not all) gun regulations at the Founding and throughout our history had the same motivation: to protect the public from deadly harm.[40] Thus, there is a strong and easily discernible link between the past and present "whys."

---

[37] Carla Astudillo et al, *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu (quoting *Interim Report 2022*, Tex. H.R. Investigative Comm. on the Robb Elementary Shooting (July 17, 2022), https://tinyurl.com/ssahf6uh).

[38] *See* Defs. Br. at 10–11 (explaining motivation of Challenged Laws).

[39] *See id.*; *see also* Cal. Penal Code § 30505(a) ("the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state.").

[40] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version*

13

To analogize present and past "hows," this Court must determine whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 142 S. Ct. at 2133. The California legislature chose to restrict the use and sale of specific especially dangerous firearms and accessories to protect public safety, and it has done so without preventing citizens from possessing what *Bruen* categorized as the modern-day quintessential self-defense weapon: handguns. Employing *Bruen*'s nuanced approach, *id*. at 2132, this Court should conclude that the Challenged Laws are relevantly similar to many historical weapons regulations, and thus are consistent with our Nation's tradition of firearm regulation.[41]

### C. The District Court's Formulation of "Common Use" Is Inherently Flawed Because the Challenged Laws Are Not a Categorical Ban, and Therefore the Common Use Standard Does Not Apply.

The District Court held that the Challenged Laws ban assault weapons, and that "[u]nder *Heller, McDonald, Caetano,* and *Bruen,* [assault weapons] may not be banned" because such weapons are "commonly-owned by law-abiding citizens for lawful purposes." *Miller*, 2023 WL 6929336, at *5.

---

*of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc; *see also* Defs. Br. at 37–51 (analyzing historic tradition of regulating weapons that threaten public safety).

[41] *See* Defs. Br. at 37–51.

Preliminarily, the District Court is incorrect that the arms and magazines covered by the Challenged Laws are in common use such that they are presumptively entitled to Second Amendment protection. The District Court asserts they are in common use because they "number in the millions across the nation and are rarely used to commit crimes." *Id.* at n.31 (citing *Miller v. Bonta,* 542 F. Supp. 3d 1009, 1020–21 (S.D. Cal. 2021)). For support, however, the District Court primarily relies on an unpublished, non-peer-reviewed summary of an online survey. *Id.* at 34–35 ("English also estimates about 24,600,000 individuals have owned AR-15 styled rifles. The evidence, once again, suggests that modern rifles are commonly owned and useful for self-defense.") (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough Sch. Bus. Rsch. Paper No. 4109494, at 2 (May 13, 2022) ("English Survey"), https://tinyurl.com/yc3fer46). The summary itself acknowledges that actual ownership numbers are likely lower than stated because the survey asked whether respondents had "ever owned" such a rifle or magazine, *English Survey* at 22, 33, and its estimate thus does not account for obsolescence, destruction, or transfer of ownership, such as resale, of these weapons. *Id.* at 33. This highlights just one fallacy in the District Court's use of historical ownership statistics to define

"common use:"[42] the argument necessarily assumes that every individual who has ever owned one of these weapons still owns it, actively uses it, and uses it only for lawful purposes.[43] Using ownership statistics spanning many decades to define "common use" also ignores the additional, immensely important requirement that such weapons must be in common use for *lawful self-defense*. *See Bruen*, 142 S. Ct. at 2132 (Second Amendment protects only "instruments that facilitate armed self-defense"); *Bevis v. City of Naperville*, No. 23-1353, 2023 WL 7273709, at *11 (7th Cir. Nov. 3, 2023) ("the definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose . . . is at its core the right to individual self-defense").

Nor does the District Court compare the Challenged Laws with the regulation at issue in *Heller*[44] or provide any other support to justify its claim that the Challenged Laws constitute an absolute, categorical ban. It could not do so. Cal.

---

[42] *See Miller*, 2023 WL 6929336, at n.31 (citing *Miller*, 542 F. Supp. 3d at 1020–21).

[43] In a similar vein, the District Court admits to the tenuous nature of the statistics it is relying on, stating that out of an alleged 24.4 million assault weapons in circulation in the United States, "a smaller number of people (7.9 million) might own most of them." *See Miller*, 2023 WL 6929336, at *35.

[44] The District Court relies on *Heller* to posit that "it is no constitutional answer for government to say that it is permissible to ban some guns so long as other guns are allowed." *Miller*, 2023 WL 6929336, at *5 (citing *Heller*, 554 U.S. at 629). But *Heller* was specifically addressing a ban on all handguns, not a sub-category of assault weapons. *See Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of *handguns* so long as the possession of other firearms (*i.e.,* long guns) is allowed.") (emphasis added).

16

Penal Code § 30515 (a) does not ban possession of all "rifles" or "semi-automatic rifles." The statute regulates an enumerated list of semiautomatic rifles and semiautomatic pistols that pose a specific threat to society. The District Court itself confirms the point, describing the Challenged Laws as prohibiting only "three principal types" of semi-automatic rifles. *Miller*, 2023 WL 6929336, at *6.[45]

By restricting only a limited selection of firearms, the Challenged Laws accord with *Heller*'s recognition that the Second Amendment right "is not unlimited" and had never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. The Challenged Laws thus stand in contrast to the one the Court invalidated in *Heller*—a total ban on handgun possession in the home that "amount[ed] to a prohibition of an entire class of 'arms.'" *Id.* at 628.

The Challenged Laws regulate specific, enumerated especially dangerous firearms, features, and accessories posing a threat to society. They do not constitute a complete ban on an entire class of constitutionally-protected weapons.

### D. Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has held that the Second Amendment right to bear "arms"

---

[45] *See also id.* ("Antique firearms and certain pistols designed expressly for Olympic events are exempted" from Cal. Penal Code § 30515 (a)).

protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—inside and outside the home for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2119. The Court expressly cautioned, however, that the Second Amendment should not be understood to bestow a right to keep and carry any weapon, in any manner, for any purpose. Instead, it endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27.[46]

The Challenged Laws fit neatly in this historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a limited subset of assault rifles with features that turn them into dangerous military-style firearms designed and suited for use in war. The AR-15, for example, traces its origins to a military-grade rifle designed in the late 1950s.[47] Aside from lacking full automatic-fire capability, the AR-15 is functionally the same as the M16, an automatic weapon designed for military combat that the Supreme Court has recognized can be banned. *See Heller*, 554 U.S. at 627. Just because the AR-15 does not fire automatically does not make it appropriate for civilian use. *Bevis*, 2023 WL 7273709, at *12 (finding

---

[46] *Bruen* makes clear that many regulations implicating Second Amendment rights will survive judicial review. *See Bruen*, 142 S. Ct. at 2133–34.

[47] *See* Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J. (July 12, 2017), https://tinyurl.com/2jwemryz; Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

weapons such as the AR-15 do not "enjoy Second Amendment protection" because "the AR-15 is almost the same gun as the M16 machinegun. . . . Both weapons share the same core design, and both rely on the same patented operating system").[48] The AR-15's and M16's gas-impingement system specifically appealed to the military—an innovation that redirects some of the energy from a fired bullet to reload the next bullet in order to reduce recoil and make it easier for a gunman to maintain aim, increasing accuracy.[49]

It is the AR-15's "phenomenal lethality" that has made versions of it the U.S. military's standard-issue assault rifle since the Vietnam War.[50] The U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be."[51] Indeed, virtually all of the world's armies now use assault rifles that are variants of the AR-15.[52] *See Bevis,* 2023 WL 7273709, at *12 (concluding that the Second Amendment does not protect the weapons and feeding devices covered by the challenged legislation

---

[48] *See also* Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023), https://tinyurl.com/3ak32wvp.

[49] *Id.*

[50] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[51] *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

[52] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b

"because these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense").

Assault weapons are exponentially more lethal than any firearms available during the ratification of the Second or Fourteenth Amendments or throughout most of our Nation's history. When traveling through the body, bullets fired from semiautomatic rifles cause "cavitation," whereby a swath of tissue several inches from the bullet's path ripples away from the bullet and then settles back, creating a large cavity.[53] These bullets need not hit an artery to cause catastrophic bleeding.[54] Exit wounds can be the size of oranges.[55] Underscoring the carnage that assault-rifle fire wreaks, Peter Rhee, a trauma surgeon at the University of Arizona, has explained that wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there," whereas wounds inflicted by a 9mm handgun "look[] like a bad knife cut."[56]

The effects of assault weapons are particularly devastating in mass shootings

___

[53] *See* Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe (explaining the difference between injuries inflicted by semiautomatic rifles versus handguns).

[54] *Id.*

[55] *Id.*

[56] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt; *see also* Dickinson, *supra* note 50 (quoting the Navy trauma surgeon who operated on Congresswoman Gabrielle Giffords saying that while handgun wounds are comparable to "stabbing with a bullet," shooting someone with an AR-15 is "as if you shot somebody with a Coke can").

involving child victims. Roy Guerrero, a pediatrician in Uvalde, Texas, recalled victims with "[o]pen chest wounds," "war wounds," and wounds akin to "decapitation," "as if things exploded once the bullets hit the bodies."[57] In his Congressional testimony, Dr. Guerrero recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-spattered cartoon clothes still clinging to them. "[58]

The lower court cites *Staples v. United States* in an attempt to distinguish the assault weapons regulated by the Challenged Laws from those not protected by the Second Amendment, while admitting that machine guns are one of a number of weapons that "lay beyond the fence of absolute constitutional protection." *Miller*, 2023 WL 6929336, at *6, n.38 (citing *Staples*, 511 U.S. 600, 611–612 (1994).[59] Yet the District Court questions why "[a]n AR-15 with normal parts is banned, but the same AR-15 with an awkward shark fin grip, an unmovable stock, and a barrel compensator in place of a flash hider, shooting the same ammunition, is fine." *Id.* at

---

[57] Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC News (May 29, 2022), https://tinyurl.com/27hr2p2w.
[58] *Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed.
[59] Confusingly, the District Court later chastises Defendants for raising that machine guns can be banned under federal law. *See Miller*, 2023 WL 6929336, at *37.

*5. The answer is simple. Assault weapons are weapons of war,[60] and the features regulated by the Challenged Laws—such as pistol grips, forward grips, and detachable magazines—increase their lethality, placing them far outside the category of "quintessential self-defense weapons" at issue in *Heller* and more like machine guns,[61] which the District Court recognized as beyond the Second Amendment's reach.

"The very features that qualify [these] firearm[s] as . . . banned assault weapon[s] . . . 'serve specific, combat-functional ends'" that citizens would not require for ordinary self-defense. *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017).

### 1. Pistol Grips[62]

Pistol grips alter the way a weapon functions in practice and increases its

---

[60] As the Seventh Circuit explained, while the plain text of the Amendment covers "Arms that ordinary people would keep at home for purposes of self-defense," it does not protect "weapons that are exclusively or predominantly useful in military service." *Bevis*, 2023 WL 7273709, at *11.

[61] While not challenged here, Cal. Penal Code § 32900 bans multiburst trigger activators, also known as "bump stocks," a further attachment meant to increase a weapons lethality. As explained by the Seventh Circuit, "[t]he similarity between the AR-15 and the M16 only increases when we take into account how easy it is to modify the AR-15 by adding a 'bump stock' (as the shooter in the 2017 Las Vegas event had done) . . . thereby making it, in essence, a fully automatic weapon." *Bevis*, 2023 WL 7273709, at *13. *See, e.g.,* Homes Lybrand, *Two arrested on gun charges after crashing into barricade near the US Capitol, authorities say*, CNN (Nov. 6, 2023) https://tinyurl.com/mssjae43 ("[O]fficers . . . found two pistols, one of which had a device attached known as a 'Giggle Switch' . . . The device converts a semi-automatic Glock pistol into an illegal machine-gun pistol capable of firing multiple rounds with one pull of the trigger.").

[62] Cal. Penal Code § 30515 (a)(1)(A).

lethality, especially during prolonged episodes of rapid fire. By allowing the shooter to place the shooting hand beneath the gun, the shooter can exert leverage on the gun with both hands and maintain greater control and aim during rapid, prolonged firing.[63] Pistol grips enable a shooter to shoot from the hip instead of the shoulder, something that is useless for hunting or lawful self-defense because there is hardly any accuracy when shooting from the hip, but does make it easier for a shooter to indiscriminately spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("[P]istol grips are designed to make [] spray firing from the hip particularly easy."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 370 (W.D.N.Y. 2013), ("New York points to evidence that [pistol grips] aid shooters when 'spray firing' from the hip."), *aff'd in part, rev'd in part*, 804 F.3d 242 (2d Cir. 2015).

### 2. Forward Grips[64]

Forward pistol grips (such as those found on AR-15 rifles) are located in front of the trigger and are meant to be used by the shooter's non-shooting hand. Forward grips give shooters "enhanced control" by allowing a shooter to place the non-shooting hand underneath the barrel of the gun, which grants more leverage and

---

[63] *See* Joshua Horwitz, *Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence, 9 (2003).
[64] Cal. Penal Code § 30515 (a)(1)(F).

control during episodes of rapid firing.[65] The enhanced control and aim increase the weapon's lethality, especially during prolonged episodes of offensive rapid fire.[66]

### 3. Detachable Magazines[67]

Detachable magazines equip firearms with a drastically higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[68] Detachable magazines can hold as many as one hundred rounds without having to reload.[69] They also allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds, with little practice.[70] When combined with other features regulated by the Challenged Laws,[71] detachable magazines thus render weapons uniquely dangerous. They are especially lethal when used in combination with firearms that have "features that allow [for] enhanced control while firing multiple rounds."[72]

\* \* \*

The regulated assault rifles and weapons with the regulated features are

---

[65] *See* Horwitz, *supra* note 63.

[66] *Id.*

[67] Cal. Penal Code § 30515 (a)(1) (banning "semiautomatic, centerfire rifle[s] *that do[] not have a fixed magazine*." (emphasis added)).

[68] *See Assault Weapons and Large Capacity Magazines*, Educ. Fund to Stop Gun Violence, https://tinyurl.com/yjmaba4k.

[69] *Id.*

[70] *See id.*

[71] *See* Cal. Penal Code § 30515 (a).

[72] Educ. Fund to Stop Gun Violence, *supra* note 68.

uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Second Amendment protects. Instead, these "rifles were designed to achieve a simple goal: fire a lot of bullets fast to kill or maim as many enemy soldiers as possible."[73] And until the public availability of these destructive weapons is curtailed, as is the constitutionally-permissible purpose of the Challenged Laws, they will continue to be used as horrific offensive weapons to commit mass killings of innocent civilians, just as they were in Parkland, Orlando, Uvalde, Highland Park, Buffalo, Las Vegas, and many other domestic massacres.

## IV.   CONCLUSION

For the reasons set forth above and those set forth in the Defendants' Brief, the Challenged Laws are constitutional, and this Court should overturn the decision below.

Dated: December 8, 2023          Respectfully submitted,

/s/ *Jennifer Loeb*
Jennifer Loeb
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson

---

[73] Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15* 4 (2023).

25

Taylor Jachman
Aedan Collins
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henselee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com
aedan.collins@freshfields.com

*Attorneys for Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>No. 3:19-cv-1537-BEN-JLB</u>

I am the attorney or self-represented party.

**This brief contains** <u>      6,246      </u> **words,** including <u>  0  </u> words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.

    [  ] a party or parties are filing a single brief in response to multiple briefs.

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**_____ */s/ Jennifer Loeb*_____**Date** <u>December 8, 2023</u>