No. 23-2979

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES MILLER, et al.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as the
Attorney General of the State of California, et al.,
*Defendants-Appellants*,

Appeal from United States District Court
for the Southern District of California
Civil Case No. 3:19-cv-01537-BEN-JLB
The Honorable Roger T. Benitez, Judge

## RESPONSE BRIEF FOR APPELLEES

John William Dillon
DILLON LAW GROUP, APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, CA 92009
jdillon@dillonlawgp.com

David H. Thompson
Peter A. Patterson
Clark L. Hildabrand
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

George M. Lee
SEILER EPSTEIN LLP
4 Embarcadero Center
14th Floor
San Francisco, CA 94111
(415) 979-0500
gml@sezalaw.com

*Counsel for Plaintiffs-Appellees*

December 22, 2023

## PLAINTIFFS-APPELLEES RULE 26.1
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, James Miller, San Diego County Gun Owners Political Action Committee, Wendy Hauffen, Gunfighter Tactical, LLC, Firearms Policy Coalition, Inc., Second Amendment Foundation, John Phillips, Neil Rutherford, California Gun Rights Foundation, Adrian Sevilla, PWGG, LP, and Ryan Peterson submit this corporate disclosure and financial interest statement. They are all nongovernmental entities and/or persons. They have no parent corporations. No publicly traded corporations own 10 percent or more of stock in any of them.

Dated: December 22, 2023

/s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION .................................................................................... 1

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF THE CASE .................................................................. 2

SUMMARY OF THE ARGUMENT .......................................................... 4

ARGUMENT .......................................................................................... 6

I. The Firearm Ban Regulates Conduct Falling Within the Plain Text of the Second Amendment. ........................................................... 7

A. The Banned Firearms Are "Arms." ................................................. 7

B. The State Inappropriately Imports Other Issues Into *Bruen's* Threshold Inquiry. .................................................................... 11

1. "Common Use" Is An *Historical* Rule of Decision. ............ 12

2. The State's Proposed "Most Useful In Military Service" Test Is Invalid. ........................................................................ 14

II. The Firearm Ban Is Inconsistent with This Nation's Historical Tradition of Firearm Regulation. ......................................................... 19

A. Arms In Common Use Cannot Be Banned Consistent With Historical Tradition. .................................................................. 19

B. The State Has Presented No Historical Tradition That Can Justify The Firearm Ban. ..................................................................... 32

1. This Case Offers No Reason to Lessen the State's Burden to Find a Valid Founding-Era Analogue. ............................. 33

i

2. There Is No Tradition of Banning "Especially Dangerous" Weapons. ..........................................................................40

III.   This Case Should Be Decided Now and This Court's Judgment Should Not Be Stayed...........................................................52

CONCLUSION ......................................................................................52

# TABLE OF AUTHORITIES

**Cases**     **Page**

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. of N.J.*,
910 F.3d 106 (3rd Cir. 2018) ........................................................22

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) .......................................................15

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ........................................................12, 13, 30

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..................1, 4, 7, 10, 12, 13, 15, 16, 17, 18,
19, 23, 24, 27, 29, 32, 33, 41, 42, 46, 51

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .......................................................15

*Friedman v. City of Highland Park*,
136 S. Ct. 447 (2015) .............................................................21, 22

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .......................................20, 21, 22

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ..................................................15, 29

*Lynch v. Donnelly*,
465 U.S. 668 (1984)......................................................................38

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .....................................................................37

*Malloy v. Hogan*,
378 U.S. 1 (1964).....................................................................37, 38

*Maryland Shall Issue v. Moore*,
86 F.4th 1038 (4th Cir. 2023).................................................10, 11

*Myers v. United States*,
272 U.S. 52 (1926).......................................................................38

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015).........................................................22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022).....................................1, 4, 6, 7, 11, 13, 19, 20, 32, 33, 34,

35, 36, 37, 38, 39, 40, 42, 43, 44, 46, 47, 49, 50, 51

*Staples v. United States*,
511 U.S. 600 (1994) ................................................18, 20, 49, 50

*Stenberg v. Carhart*,
530 U.S. 914 (2000) ..........................................................20

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) ...................5, 6, 12, 20, 21, 24, 48, 49

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) .............................................13, 14

*United States v. McAdory*,
935 F.3d 838 (9th Cir. 2019) ..................................................14

**<u>Constitutional and Statutory Provisions</u>**

Cal. Penal Code
§ 30515(a) .....................................................................2, 3
§ 30515(a)(1)(A) ..................................................................8
§ 30515(a)(4)(C) ..................................................................9
§ 30600(a) ..........................................................................2
§ 30605(a) ..........................................................................2

18 U.S.C. § 922(o)(2)(b) .............................................................30

1750 Mass. Acts 544, ch. 17, § 1 ..............................................44

1772 N.Y. Laws 682, ch. 1549 ...............................................45, 46

1786 Mass Acts 87, ch. 38 .......................................................44

1788–1801 Ohio Laws 321 .......................................................44

1835 Fla. Laws 423 ...............................................................47

1837-1838 Tenn. Pub. Acts 200, ch. 137, § 2 ...........................47

1839 Ala. Acts 67 § 1 .............................................................47

AN ACT TO DESCRIBE, APPREHEND, AND PUNISH DISORDERLY PERSONS § 2 (1799),
reprinted in *Laws of the State of New Jersey* 474
(Nettleton ed., 1821) ............................................................44

JUSTICES OF THE PEACE, § 16, *in* THE REVISED STATUTES OF THE STATE OF MAINE
(1840) ...............................................................................47

OF PROCEEDINGS TO PREVENT THE COMMISSION OF CRIMES, ch. 134, § 16, *in* THE
REVISED STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS 748
(Boston, Dutton & Wentworth1836) ............................................................47

## **Other Authorities**

*2021 Firearms Retailer Survey Report*, NSSF (2021),
https://bit.ly/3gWhI8E ...................................................................................23

Benjamin M. Blau et al., *Guns, laws and public shootings in the United States*, 48
APPLIED ECON. 1 (2016) .................................................................................36

Br. for Violence Pol'y Ctr. & the Police Chiefs of L.A., Minneapolis, and Seattle
as Amici Curiae Supporting Pet'rs, *District of Columbia v. Heller*, No. 07-
290, 2008 WL 136348 ...............................................................................27, 36

*Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF
(July 20, 2022), https://bit.ly/3QBXiyv .................................................22, 23

*Poll of current gun owners*, WASH. POST-IPSOS (Mar. 27, 2023),
https://bit.ly/46CqzRa .............................................................................22, 23

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design,
Sale, and Carrying on Fatal Mass Shootings in the United States*,
19 CRIM'Y & PUB. POL'Y 1 (2020) ...........................................................35, 36

Dave Campbell, *A Look Back at the Thompson Submachine Gun*, AMERICAN
RIFLEMAN (Apr. 17, 2019), https://bit.ly/3ZlZL5y ......................................28

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
20 J. CONTEMP. L. 381 (1994) ...............................................................20, 21

David Kopel, *Bowie knife statutes 1837-1899*, REASON (Nov. 20, 2022),
https://bit.ly/3Rst1nM ...................................................................................48

DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES AND THE
SECOND AMENDMENT (2d ed. 2022) .........................................................9, 19

E. Gregory Wallace, *"Assault Weapon" Lethality*,
88 TENN. L. REV. 1 (2020) .............................................................................25

E. Gregory Wallace, *"Assault Weapon" Myths*,
43 S. ILL. U. L. J. 193 (2018) ...............................................................8, 9, 19

*Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*,
RAND CORP., https://bit.ly/3mR58uT (last updated on Jan. 10, 2023) ........36

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, Crime in the United States, FBI, U.S. DEP'T OF JUST. (2018), https://bit.ly/2p0bw4D .................................................................35

Granville Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* (1782).................................................42

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 HOMICIDE STUDIES 125 (2013) ..................................................35

John Adams, *Argument for the Defense: 3-4 December 1770*, NAT'L ARCHIVES, https://bit.ly/435ah2j (last accessed Dec. 21, 2023)...............................44, 45

Letter from Stephanie M. Boucher to Jeffrey E. Folloder (Feb. 24, 2016), https://bit.ly/3tksUCT ...............................................................................30

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD ............................................................................37

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, HAV. J. L. & PUB. POL'Y PER CURIAM (Sep. 27, 2023), https://bit.ly/478KTtI.........................32

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285 (2009)......................................................22

NSSF, *Firearm Production in the United States With Firearm Import and Export Data*, 17 (2020), https://bit.ly/3v5XFvz........................................................21

Pedersoli, *Pedersoli Brown Bess Musket .75 Cal*, MUZZLE-LOADERS, *available at* https://bit.ly/3S2i2TL..................................................................................46

*Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY (Aug. 2008), https://bit.ly/3pvS3SW ..............................................................................18

Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND CORP. (Apr. 15, 2021), https://bit.ly/3RT1SvO..............................................35

Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7..........................................35

Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS, https://bit.ly/3v2N0So (last updated Apr. 28, 2023)....................................21

STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 398 (2022), https://bit.ly/3GTUJF9 ..........................................................................25, 26

U.S. DEP'T OF DEF.: ADVANCED RSCH. PROJECTS AGENCY, *Rep. of Task No. 13A: Test of Armalite Rifle, AR-15 (U)* (Aug. 20, 1962) .......................................... 9

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw .................................................................................... 23

**INTRODUCTION**

Under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), Plaintiffs must prevail in their challenge to California's bans on commonly possessed semiautomatic firearms. *Bruen* unequivocally reaffirms what *District of Columbia v. Heller*, 554 U.S. 570 (2008) teaches: that arms that are in common use for lawful purposes are protected and their possession and use cannot be banned—full stop.

The district court correctly held that the arms banned under the challenged provisions are "in common use" today for lawful purposes. That alone is dispositive of this case, but even considering the varied analogues proposed by the State to support its ban, the historical record demonstrates that California's ban on common rifles, handguns, and shotguns is an extreme historical outlier compared to any historical law restricting, in some way, the possession or carriage of weapons. Indeed, it is utterly unlike any historical law in the way it establishes a blanket ban on a category of firearms (of the State's creation) despite the fact that those firearms are among the most popular in the country. Not only is there no similar law from the Founding, the most important time period for assessing the scope of the Second Amendment's protections, there is no similar law from any time before the 20th century. The district court's decision permanently enjoining enforcement of the law should be affirmed.

1

## STATEMENT OF THE ISSUES

Whether California's restrictions on certain common semiautomatic rifles, pistols, and shotguns, defined based on their features as "assault weapons" under California Penal Code § 30515(a)(1)–(8) violate the Second Amendment to the United States Constitution, as incorporated against California by the Fourteenth Amendment.

## STATEMENT OF THE CASE

California generally bans the manufacture, distribution, transportation, importation, sale, lending, and possession of certain firearms it designates "assault weapon[s]." Cal. Penal Code § 30600(a), 30605(a). As relevant here, an "assault weapon" includes:

(1) A semiautomatic, centerfire rifle that does not have a fixed magazine but has any one of the following:
    (A) A pistol grip that protrudes conspicuously beneath the action of the weapon.
    (B) A thumbhole stock.
    (C) A folding or telescoping stock.
    (D) A grenade launcher or flare launcher.
    (E) A flash suppressor.
    (F) A forward pistol grip.
(2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.
(3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.
(4) A semiautomatic pistol that does not have a fixed magazine but has any one of the following:
    (A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.
    (B) A second handgrip.

2

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning the bearer's hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5) A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

(6) A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

(7) A semiautomatic shotgun that does not have a fixed magazine.

(8) Any shotgun with a revolving cylinder.

Cal. Penal Code § 30515(a). In the judgment of the State, the tendentiously labeled "assault weapons" that share these features are "substantially similar to weapons" that are proscribed by name in Section 30510 and differ in some cases only in name from firearms specifically mentioned in that section. 6-ER-1396.

Plaintiffs are several individuals who want to possess firearms classified as "assault weapons" under Section 30515(a)(1)–(8) as well as several organizations that count them as members. *See* 1-ER-19; *see also* First Am. Compl., Doc. 9 at 3–10 (Sept. 27, 2019).[1] They originally filed this lawsuit in 2019 and filed the operative complaint, seeking an injunction against Defendants' enforcement of Section 30515(a)(1)–(8) as well as any related laws and regulations, on September 27, 2019. *See id.* at 41–42. Plaintiffs moved for a preliminary injunction that same year. Doc.

---

[1] All citations to "Doc." refer to an entry on the district court docket in No. 19-cv-01537-BEN-JLB.

3

22. The district court consolidated the preliminary injunction hearing with the trial on the merits and held a two-day bench trial in 2021. Docs. 96, 97. Following trial, the district court permanently enjoined the challenged provisions. Docs. 115, 116. The State appealed, Doc. 117, and while the case was on appeal, the Supreme Court decided *Bruen*, altering the standard this Court applies in Second Amendment cases. Following *Bruen*, this Court remanded the case for further proceedings applying that standard. *See* Order, *Miller v. Bonta*, No. 21-55608 (9th Cir. Aug. 1, 2022), Doc. 27. After receiving supplemental briefing, the district court again permanently enjoined the challenged provisions in their entirety. 1-ER-80–81. This appeal followed, and a motions panel of this Court entered an administrative stay of the district court's judgment and expedited briefing and argument. Order, *Miller v. Bonta*, 23-2979 (Oct. 28, 2023), Doc. 13.1.

## SUMMARY OF THE ARGUMENT

As a matter of plain text, the Second Amendment extends to "all instruments that constitute bearable arms," *Bruen*, 597 U.S. at 28, in other words, "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581 (quoting 1 A NEW AND COMPLETE LAW DICTIONARY). As a matter of history, *Heller* and *Bruen* establish that the only exception to this broadly protective amendment is that arms that are "dangerous and unusual" are not protected. However, if an arm is "in common use" then it is, by

4

definition, not dangerous and *unusual*. In this case, that is dispositive and the State's arguments to the contrary, including the argument that these arms, which are chosen by millions of Americans for the purpose of self-defense, are by their nature ill-suited to that purpose, are irrelevant and should be disregarded.

The State rejects this conception of the Second Amendment and argues first, that an "arm" is only an "arm" within the plain text of the Second Amendment if it is "in common use" and is not a weapon that is "most useful in military service." Neither of these are "textual" limitations—"common use" is the rule of decision derived from *history* to be applied in arms-ban cases and "most useful in military service" is a red herring with no place in Second Amendment analysis—but in either event, the banned arms *are* in common use and *are not* "most useful in military service."

The State in particular disputes the idea that these arms are "in common use," arguing that deciding that issue requires more than just asking whether they are owned in large numbers. The State would place the burden on Plaintiffs to prove that the features it has banned are, in fact, helpful to someone defending themselves. This gets the analysis backward—this is, again, the *historical* test, and the burden is on the State to prove the banned firearms are not in common use, as this Court has recently explained in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023). Further, what the State needs to disprove is not that the banned firearms are commonly used for self-

5

defense specifically but rather that they are commonly possessed for lawful purposes generally. And on that front, there can be no question regarding the banned firearms. *See id.* at 950.

It is therefore unnecessary for this Court to even examine the historical laws collected by the State and proffered as analogues for its ban. In doing so, all that becomes clear is that *Heller* accurately grasped the historical landscape as the State has failed to demonstrate any historical tradition of firearm regulation that would permit it to ban the possession of arms in common use for lawful purposes. Indeed, it is not until much too late—the 20th century—that the State finds *any* historical laws that are close to as restrictive as its ban, and those laws focus on machine guns, which have, since their invention, never been adopted as commonly possessed arms by the American people.

## ARGUMENT

California's ban on common firearms is unconstitutional, as the district court correctly found. This follows directly and simply from the standard which *Bruen* clarified must be applied in all Second Amendment cases:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

597 U.S. at 17. Applying that standard here is straightforward. There can be no question whatsoever that the firearms banned by California are "arms" and so possessing them is conduct covered by the plain text of the Second Amendment. And the Supreme Court has already done the necessary historical analysis to determine when a ban on "arms" is consistent with the Second Amendment. California's ban is invalid under that standard because the banned firearms are in common use for lawful purposes.

## I. The Firearm Ban Regulates Conduct Falling Within the Plain Text of the Second Amendment.

### A. The Banned Firearms Are "Arms."

Determining whether the Second Amendment extends, prima facie, to the semiautomatic firearms banned by California requires no new analysis at all. As the State concedes, "[t]he meaning of the term 'Arms' is broad." State's Opening Br., Doc. No. 25 at 21 (Dec. 2, 2023) ("State Br."). *Heller* explains, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The banned firearms are unquestionably "bearable arms" since they are "[w]eapons of offence" and "thing[s] that a man . . . takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (quotations omitted). Indeed, the State concedes that "semiautomatic rifles, pistols, and shotguns generally constitute '[w]eapons of offence.' " State Br. at 22 (quoting *Heller*, 554 U.S. at 581). Since the

7

banned firearms are a subset of those categories of "arms," they too must be "arms" within the meaning of the Second Amendment.

The State does not dispute that *some* of the challenged categories of firearms are "arms," *see* State Br. at 22 ("Some of the categories challenged by plaintiffs address features that are inherent to the defined assault weapon."), but it argues that other categories are not because they "define prohibited weapons based on tactical accessories that can easily be added to or removed from the weapon," *id.* To repeat this argument is to refute it. The State itself notes that it is not the accessories themselves, but "prohibited weapons" to which the accessories are attached that it has banned. That should be enough to demonstrate that the "plain text" of the Second Amendment is implicated. That the State posits some accessories are "inherent" to the firearm with which they are paired while others are not is irrelevant. *See* State Br. at 22. As an initial matter, the State is wrong to assert with such certainty that it can divine between an optional accessory and an inherent feature. For instance, it suggests that the prohibition on a semiautomatic rifle with "a pistol grip that protrudes conspicuously beneath the action of the weapon" is a prohibition on a mere accessory that could be removed. *See* Cal. Penal Code § 30515(a)(1)(A). But a pistol grip is not optional on many rifles, including some AR-types. On "many hunting rifles and shotguns, the centerline of the barrel is higher than the shooter's shoulder because the buttstock of the rifle is angled lower than the barrel. Recoil thus causes

8

the barrel of the rifle to move back and up." E. Gregory Wallace, *"Assault Weapon"*
*Myths*, 43 S. Ill. U. L. J. 193, 229 (2018). But in order to reduce inaccuracy due to
recoil, the AR-15 has a different alignment, with "the buttstock in line with the barrel
so that the rifle's recoil will push straight back against the shooter's shoulder." *Id.*
This straight-line configuration "*requires* a pistol grip separate from the buttstock
because it is too awkward to pull the trigger while gripping the raised buttstock when
firing the rifle from the shoulder." *Id.* (emphasis added). The Department of Defense,
has explained the purpose of the pistol grip is to "minimize rotation about the
shoulder during firing." U.S. Dep't of Def.: Advanced Rsch. Projects Agency,
*Rep. of Task No. 13A: Test of Armalite Rifle, AR-15 (U)* at 2 (Aug. 20, 1962).

To take a few more examples, the law *itself* explains the important function
performed by a barrel "shroud" which "allows the bearer to fire the weapon without
burning the bearer's hand." Cal. Penal Code. § 30515(a)(4)(C); *see also* Dennis P.
Chapman, The AR-15 Controversy: Semiautomatic Rifles and the Second
Amendment 66–67 (2d ed. 2022) (noting that burned hands are "a critically
important safety concern" and that these shrouds "exist to protect shooters from
injury by contact with hot rifle barrels during ordinary, routine shooting activities").
And telescoping stocks are simply "ergonomic improvements over earlier fixed-
stock rifle configurations" that "makes a rifle easier to shoulder properly for different
users." Wallace, *Myths supra* at 232.

More importantly, even if the State could accurately decide which features are really optional, there is no warrant in the text of the Second Amendment for the distinction the State proposes, and it is hard to explain why such a rule should exist except to carve out an exception for a features-based prohibition like the one at issue here. Rather, the Second Amendment protects *firearms*, and thus also protects the parts of those same arms. Any other rule invites this Court and the State to set about determining what is *really* necessary for an individual to exercise their Second Amendment rights, and that is a road that the Supreme Court has refused to go down. *See Heller*, 554 U.S. at 629. The State attempts to manufacture a textual hook, by claiming that unlike "arms" which are protected, mere "accessories" like a pistol grip would have been considered "accoutrements" at the Founding and are not within the "plain text" of the Second Amendment. But the State's list of accoutrements— "scabbards, holsters, cartridge boxes, or cartridge cases," State Br. at 23—notably does not include *anything* that was a feature of a firearm that altered how it functions. They are, in fact, exclusively secondary items used to hold either the arms themselves or ammunition for the arms. And the State cannot credibly dispute that the features it has banned alter the functionality of the firearms in questions—else its regulation of them is wholly irrational. At any rate, to the extent such accoutrements affected at all the use of a firearm, restricting them would implicate the plain text as well, because a restriction that affects a person's ability to use a

firearm *infringes*—i.e., hinders—a person's ability to use that firearm. *See Maryland Shall Issue v. Moore*, 86 F.4th 1038, 1044 n.8. (4th Cir. 2023).

### B. The State Inappropriately Imports Other Issues Into *Bruen*'s Threshold Inquiry.

Since the banned firearms are "arms," they are presumptively protected by the Second Amendment and the State's ban can only be justified if the State can demonstrate it is consistent with this Nation's history of firearm regulation. *Bruen* could hardly have been clearer that, at this point, the burden is on the State to prove that its presumptively unconstitutional law is, in fact, valid. *See, e.g.*, *Bruen*, 597 at 32. But the State resists the straightforward application of *Bruen* (and the imposition of the burden), by arguing that two other factors must be considered before reaching history. First, it argues that this Court must "assess whether a weapon is 'in common use' today for self-defense' in determining whether it is presumptively protected," State Br. at 24 (quoting *Bruen*, 597 U.S. at 31 (Kavanaugh, J., concurring)), and second, that firearms "most useful in military service" are excluded from the Second Amendment's plain text, which only "covers 'weapons that were not specifically designed for military use and were not employed in a military capacity,'" State Br. at 31–32 (quoting *Heller*, 554 U.S. at 581). Neither of these considerations are relevant to the textual analysis of the Second Amendment and indeed, the "most useful in military service" issue raised by the State is not relevant *at all*.

11

### 1. "Common Use" Is An *Historical* Rule of Decision.

The State's claim that whether an arm is "in common use" impacts the *textual* analysis is foreclosed not just by the plain language of *Bruen*, but also by this Court's decision in *Teter*, which held that a Hawaii ban on butterfly knives violated the Second Amendment. In *Teter* this Court

> reject[ed] Hawaii's argument that the purported 'dangerous and unusual' nature of butterfly knives means they are not 'arms' as that term is used in the Second Amendment. *Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.' It did not say that dangerous and unusual weapons are not arms.

76 F.4th at 949–50 (quoting *Heller*, 554 U.S. at 627) (emphasis in *Teter*). And *Teter* also held that if a "weapon is commonly possessed by law-abiding citizens for lawful purposes" it cannot be "dangerous and unusual." 76 F.4th at 950. This was a faithful application of *Heller* which also tied these two issues together. After all, the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," was the Court's *justification* for interpreting the Second Amendment to protect arms "in common use." *Heller*, 554 U.S. at 627. And the Supreme Court could not have been clearer that the categories are mutually exclusive. After all, "[a] weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) (emphasis in original). A firearm that is "in common use"—and hence not "unusual"—cannot be banned consistent

12

with the *history* of banning dangerous and unusual arms. *Id* at 418. And again in *Bruen*, the Supreme Court reiterated that the two were linked: "For example, we found it 'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). *Bruen*'s statement that arms "in common use" are "protect[ed]" forecloses the State's argument that they are merely "presumptively protected." State Br. at 24.

The State attempts to justify its interpretation by claiming first that Justice Kavanaugh, in his concurrence in *Bruen*, stated that "common use" was part of the textual inquiry, but Justice Kavanaugh said no such thing—rather, like the majority, he merely reiterated what *Heller* had said about this "limitation [that] is fairly supported by [an] historical tradition." 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27). Second, it points to this Court's decision in *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). *Alaniz* involved a Second Amendment challenge to a sentencing enhancement for cases in which a crime was committed and " 'a dangerous weapon (including a firearm) was possessed' and present during the crime." *Id*. at 1126 (quoting U.S.S.G. § 2D1.1(b)(1)). In summarizing the *Bruen* framework at the outset of that case, the *Alaniz* panel stated that part of the "textual analysis" required by *Bruen* included the

question of "whether the weapon at issue is in common use today for self-defense." 69 F.4th at 1128 (cleaned up). But unlike in *Teter*, the statement in *Alaniz* was dicta. *Alaniz* was not reviewing a ban on any sort of arm and the issue of "common use" was irrelevant to the substance of the case. *Id.* More importantly, *Alaniz* did not actually engage in the textual analysis on which it was commenting—it merely assumed, without deciding, that the Second Amendment was implicated. *Id.* Such a prefatory "comment[] 'made casually and without analysis, uttered in passing without due consideration of the alternatives, or done as a prelude to another legal issue that commands the panel's full attention," is not binding. *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (cleaned up). In *Teter*, on the other hand, the panel's discussion of "common use" was the result of the panel "confront[ing] an issue germane to the eventual resolution of the case." *Id.* (quoting *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004)). For that reason, *Teter* is binding on this Court and the State was wrong to confine its discussion of the decision to a pair of footnotes. *See* State Br. at 39 nn.18–19. Because "common use" is the *historical* test in this case, Plaintiffs will discuss it in detail below.

### 2. The State's Proposed "Most Useful In Military Service" Test Is Invalid.

The State also argues that "weapons that are most useful in military service . . . may be banned," State Br. at 31 (quoting *Heller*, 554 U.S. at 627), and, it posits, the so-called "assault weapons" targeted by the challenged law fit that

description, so this case does not implicate the text of the Second Amendment. This is not a textual argument—in fact, it is directly contrary to the text of the Second Amendment which states that its purpose is to preserve the militia— and it lacks any support in history. Indeed, the reasons why the Founders valued the militia make nonsensical any argument that an amendment meant to, in part, preserve that institution would fail to protect arms because they could be useful for military purposes. As *Heller* explains, the militia was "useful in repelling invasions and suppressing insurrections," "render[ed] large standing armies unnecessary," and enabled the people to be "better able to resist tyranny." 554 U.S. at 597–98. It would be counterintuitive, to say the least, that an amendment designed to preserve the militia would categorically exclude the types of arms most suited to the militia's purposes.

The argument that the Second Amendment does just that was developed pre-*Bruen* as a justification for upholding similar bans to the one at issue here, *see Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015), and it has recently been embraced again by one of those courts post-*Bruen*, *see Bevis v. City of Naperville*, Nos. 23-1353, 23-1793 & 23-1825, 2023 WL 7273709 (7th Cir. Nov. 3, 2023). But this argument is based on a misreading of *Heller* and has no place in post-*Bruen* caselaw.

15

In the passage from *Heller* quoted by the State, the Court was attempting to explain an unusual implication of its analysis, namely that, based on history, firearms that were "highly unusual in society at large" could be banned, even if that meant that those firearms "most useful in military service" such as "M-16 rifles" could be kept out of civilian hands. 554 U.S. at 627. This was an odd result, and required additional explanation from the Court, because it appeared to create a conflict between the scope of the Second Amendment right and its "prefatory clause" which stated that the right was included in the Constitution to preserve the militia. *Id. Heller* was, therefore, making the defensive point that there was no contradiction between the fact that there were some weapons that were *in fact* being used by the military that could be banned, and the Amendment's stated purpose. The reason there was no contradiction in its interpretation, the Court explained, was that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty"; in other words, they would be armed with those weapons that were "in common use" as opposed to those "that are highly unusual in society at large." *Id.* at 627. But that did not, of course, mean that merely because a firearm is used by the military, it could not *also* be in common use for lawful purposes by civilians. Indeed, as the district court noted "[e]ven today, the [Civilian Marskmanship Program run by the Army] sells surplus *actual* weapons of

16

war to citizens," including the M1 Carbine which "could easily be deemed an 'assault weapon' under California's definition." 1-ER-26. California gets things precisely backwards: *Heller* was suggesting that machine guns might be regulated *despite* their usefulness in the military, not because of it; a firearm that is both in common use *and* useful in military service is at the heartland of constitutional protection and aligns perfectly the operative clause of the Second Amendment and the prefatory clause announcing its purpose.

The State also takes essentially the opposite of the correct lesson from *Heller*'s statement that "[t]he term 'Arms' covers 'weapons that were not specifically designed for military use and were not employed in a military capacity.'" State Br. at 32 (quoting *Heller*, 554 U.S. at 581). It suggests from this language that those weapons not specifically designed for military use are the *only ones* that are protected, and that weapons used by the military are necessarily *not* arms. *Id.* But nothing could be further from the truth—*Heller* was making the point that *not only* military weapons are protected, as that was one of the arguments advanced in favor of the petitioners. In Justice Stevens's dissent in *Heller*, he argued that the phrase "bear arms" meant *only* to serve in the military, so that private possession of weapons (including the types of weapons not used in military service) would not be protected. *See Heller*, 554 U.S. at 646–47 (Stevens, J., dissenting). As such, this language from the majority's opinion was intended to emphasize how *broad* the meaning of "arms"

17

really is, not to narrow it to exclude military arms, which must also be protected under its textual analysis. *See Heller*, 554 U.S. at 581.

Furthermore, even if the line the State tries to draw were legitimate (and it is not), it would not impact this case, since the firearms that California classes as "assault weapons" and bans are *not* "most useful in military service." To support its wrongheaded claim, the Government emphasizes that " 'the AR-15 is almost the same gun as the M16 machinegun'—they 'share the same core design, and both rely on the same patented operating system.' " State Br. at 32 (quoting *Bevis*, 2023 WL 7273709, at *12). Furthermore, the State emphasizes that the AR-15 and M-16 can use the same ammunition, which they shoot with the same velocity at the same range. State Br. at 31. But these similarities pale in comparison to the major, constitutionally relevant distinction between them: unlike an M16 machinegun, which can fire in fully automatic mode, semiautomatic firearms such as the banned AR-15s "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994); *see also id.* at 602 n.1 (noting that the only distinction between a semiautomatic firearm and a machine gun is the ability of the latter to fire multiple rounds with a single pull of the trigger). The M16 has a much higher rate of fire than a semiautomatic AR-15. *See Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY, at tbl. 2-1 (Aug. 2008), https://bit.ly/3pvS3SW. Indeed, having thoroughly reviewed industry and military

18

manuals, former Army officer and infantryman Dennis Chapman concludes: "Semiautomatic rifles such as the AR-15 cannot even approximate—much less replicate—the effective rates of fire of machineguns or selective-fire weapons, and they cannot even remotely approach the extreme capabilities that some poorly informed commentators attribute to them." CHAPMAN, *supra* at 34. In fact, automatic fire is *the* defining feature of a military rifle. No military in the world uses a service rifle that is only capable of semiautomatic fire. Wallace, *Myths supra* at 205–06. Semiautomatic AR-15s simply are not M16s and the State's attempts to equate the two must be rejected.

## II. The Firearm Ban Is Inconsistent with This Nation's Historical Tradition of Firearm Regulation.

### A. Arms In Common Use Cannot Be Banned Consistent With Historical Tradition.

If the Ban is to survive, the State must prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 21 (quoting *Heller*, 554 U.S. at 627). And a law by definition *will not* fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.' " *Id.*; *see also Heller*, 554 U.S. at 625. As noted above,

19

whether an arm is "in common use" is the rule of decision in this case, and part of *Bruen's* historical analysis. Therefore, the government bears the burden of showing the banned arms are not "commonly possessed by law-abiding citizens for lawful purposes." *Teter*, 76 F.4th at 950 (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015)); *Bruen*, 597 U.S. at 24. The State cannot possibly make that showing and the judgment of the district court must be affirmed.

While California calls the arms it bans "assault weapons," that is a pejorative term that does not refer to any identifiable class of firearms. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted). But while "assault weapons" are not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic rifles, handguns, and shotguns that California labels as "assault weapons" and that Plaintiffs wish to acquire.[2] Semiautomatic firearms are clearly "in common use." In contrast to automatic firearms, semiautomatic firearms "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Indeed, such firearms have been commercially available for over a century. *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1287 (D.C. Cir. 2011)

---

[2] Section 30515(8) also labels as "assault weapons" shotguns that operate with a revolving cylinder. The State has not shown that these shotguns specifically are dangerous and unusual.

(Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). According to industry estimates, there were 89 million semiautomatic handguns sold in the United States between 1990 and 2018, and over the same period, 12 million semiautomatic shotguns and 43.4 million semiautomatic rifles were sold. *See* NSSF, *Firearm Production in the United States With Firearm Import and Export Data*, 17 (2020), https://bit.ly/3v5XFvz. Apart from the now-expired ten-year federal assault weapons ban, the federal government has not banned them and, currently, the vast majority of states do not ban semiautomatic "assault weapons" either. *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS, https://bit.ly/3v2N0So (last updated Apr. 28, 2023). Because the State's ban makes it illegal to possess certain semiautomatic weapons and semiautomatic weapons are indisputably in common use, it follows that the ban is invalid under the Second Amendment.

Even if the Court accepts the State's artificial "assault weapon" framing, then the banned firearms *still* easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in this category. *See Teter*, 76 F.4th at 950; *see also Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "[r]oughly five million Americans

21

own" them and "[t]he overwhelming majority . . . do so for lawful purposes[.]");
*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3rd
Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that
millions . . . are owned"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d
242, 255 (2d Cir. 2015), *abrogated by Bruen* ("Even accepting the most conservative
estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in
common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We
think it clear enough in the record that semi-automatic rifles . . . are indeed in
'common use.' ").

The popularity of these firearms can be demonstrated by looking at the AR-
15 and similar modern semiautomatic rifles that epitomize the firearms the State
lumps together in this category. The AR-15 is America's "most popular semi-
automatic rifle," *id.* at 1287 (Kavanaugh, J., dissenting), and in recent years it has
been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply
Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg
Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285,
1296 (2009). Today, the number of AR-rifles and other modern rifles in circulation
in the United States exceeds *twenty-four million*. *Commonly Owned: NSSF
Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022),
https://bit.ly/3QBXiyv; *see also Poll of current gun owners* at 1, WASH. POST-IPSOS

(Mar. 27, 2023), https://bit.ly/46CqzRa; William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1–2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles). In recent years they have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See 2021 Firearms Retailer Survey Report* at 9, NSSF (2021), https://bit.ly/3gWhI8E. Considering the overwhelming evidence, the district court did not belabor the obvious point: the "firearms like the AR-15 rifle" that the State has banned "are commonly owned for lawful purposes." 1-ER-20.

The State, of course, *does* contest this point—but given that the numbers are overwhelming, it does so primarily by distorting the legal standard. It argues that the prevalence of a firearm is not itself sufficient, suggesting that although *Heller* explicitly noted the popularity of handguns, it was *Heller*'s examination of "the objective features of handguns to explain why they qualify as a 'self-defense weapon[,]' " that led to them being protected. State Br. at 24 (quoting *Heller*, 554 U.S. at 629). This is doubly wrong. First, *Heller* did not say that the only firearms that were protected were those that were useful for *self-defense*. Rather, it said that the types of arms used by those in the militia were those "in common use at the time for lawful purposes *like* self-defense." 554 U.S. at 624 (quotation marks omitted)

(emphasis added). The State would take this illustrative example of one lawful purpose and make it the sole object of the Second Amendment's protections. In addition to contradicting *Heller*, this contradicts *Teter* which correctly stated, without limitation, that arms are not dangerous and unusual if they are "commonly possessed by law-abiding citizens for lawful purposes." 76 F.4th at 950 (quoting *Fyock*, 779 F.3d at 997). Second, it is a bizarre misreading of *Heller* to suggest that the Court required a showing that handguns were in fact well-suited to self-defense, when the passage on which the State relies shows the Court did precisely the opposite. In responding to the argument that as long as *some* guns remained lawful to possess, it was fine for the District of Columbia to ban handguns, the Court listed reasons why "a citizen *may* prefer a handgun for home defense." 554 U.S. at 629 (emphasis added). But, it said, those reasons ultimately were irrelevant to the question of whether handguns were protected, because: "*Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id.* (emphasis added).

The State's related argument, that the banned firearms are in fact poorly suited for self-defense based on the State's assessment of their features is, therefore, irrelevant (as are the State's many inaccurate factual assertions about how these firearms function). The judgment that matters on this issue is that of the American people, not the state of California. *Id.* But even so, the State's argument is not well-

24

founded. It argues that the problems with the so-called "assault weapons" it bans are that they: (1) fire rounds that have the ability to overpenetrate and pass through doors and drywall, *see* State Br. at 25, (2) "are nearly identical to the M16 in every material respect except the M16's fully automatic capability," *id.* at 25–26, and (3) have "specific functional design features" that enhance their effectiveness, by "enhancing control and countering muzzle rise," "make a weapon more concealable and help hide the location of a shooter," and enable a shooter to fire more rounds before reloading. *Id.* at 26.

Taking these in turn, overpenetration is not an issue unique to "assault weapons"; in fact, "nearly all handgun, rifle, and shotgun rounds will pass through walls," and due to the small size of the round often fired by AR-15 rifles and similar so-called "assault weapons," they generally "penetrate *less* through building materials than common handgun and shotgun rounds." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 TENN. L. REV. 1, 37–38 (2020). Though the State stresses throughout its brief that the issue in this case is whether its *features-based* restrictions are valid, not one of the features the State restricts impacts the energy or penetration abilities of a round fired from a banned firearm—which is largely dependent upon the caliber and type of round fired and not at all on whether the firearm that shot it had a pistol grip or other banned feature. *Id.*; *see also* STEPHEN

P. Halbrook, America's Rifle: The Case for the AR-15 398 (2022), https://bit.ly/3GTUJF9.

As for the fact that AR-15s are "nearly identical" to M16s except for the fact that the M16 can fire in fully automatic mode, as explained above, the ability to fire in fully automatic mode *is the critical feature* of an M16 that makes it a uniquely military firearm that the Court reasoned may nevertheless be regulated consistent with the Second Amendment.

Turning to the actual effects of the features the State lists—improved control, the ability to fire more rounds, and even the ability to hide a flash from the barrel of a rifle are all *good things* when a firearm is in the hands of a law-abiding citizen. *See, e.g.*, Halbrook, *supra* at 399 (explaining that flash suppressors reduce noise and potentially aid accuracy). Would the State really prefer that its citizens defend themselves with firearms devoid of features that "enhanc[e] control?" State Br. at 26. Of course not, but the State—and this is a core problem with the State's theory of the case—focuses almost exclusively on the way that criminals could misuse the firearms it bans and entirely disregards their overwhelmingly more common lawful use by peaceable people. Not only should the constitutional analysis be focused on the lawful possess and use the Constitution protects, but the State's preferred focus is also particularly inappropriate because these firearms are rarely used in crime. As discussed below, the vast majority of crimes are committed with ordinary handguns,

not an "assault weapon" as defined by the State. As the district court pointed out, if *every* rifle homicide in the United States in 2021 was committed with a different AR-15 rifle, that would still mean that less than .00002% of the AR-15s in the country were used to commit a homicide that year. 1-ER-9.

More importantly, this way of thinking about the case is contrary to *Heller*, which conspicuously *ignored* unlawful use. It held that handguns were protected because they were used by law-abiding citizens for lawful purposes, notwithstanding the fact that, as Justice Breyer stressed in his dissent, "handguns . . . are specifically linked to urban gun deaths and injuries, and . . . are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). Indeed, it is edifying to compare the State's arguments against the arguments that were leveled against the handgun ban in *Heller* to see how perfectly they mirror, for example, the Violence Policy Center's claims that "the handgun is the *least* effective firearm for self-defense . . . [whereas] shotguns and rifles are much more effective." Br. for Violence Pol'y Ctr. & the Police Chiefs of L.A., Minneapolis, and Seattle as Amici Curiae Supporting Pet'rs, *District of Columbia v. Heller*, No. 07-290, 2008 WL 136348, at **29–30 ("VPC Br."). The State's argument is nothing more than the arguments in favor of the ban in *Heller* made in reverse (since in *Heller*, it was handguns that were banned and rifles that were permitted) and this Court must reject them just as the Supreme Court did in *Heller*.

27

It is no answer for the State to suggest that Americans are *wrong* to trust arms it defines as "assault weapons" with their self-defense, or to suggest that "the same could be said of a short-barreled shotgun or an M16 rifle." State Br. at 31. Again, *Heller* held that handguns were protected "whatever the reason" that they were chosen by Americans, and history refutes the claim that Americans would rush to adopt any firearm that is commercially available. After all, when perhaps the most famous automatic firearm, the Thompson submachine gun, first appeared on the market in 1921 though "virtually anyone with the cash could buy one across the counter," "[s]ales trickled in." Dave Campbell, *A Look Back at the Thompson Submachine Gun*, AMERICAN RIFLEMAN (Apr. 17, 2019), https://bit.ly/3ZlZL5y. At the same time, automatic firearms became "[t]he guns of choice for most [Prohibition-era] gangs." *Id.* Given the choice, Americans at the time did not choose automatic weapons for their self-defense.

The State next argues that the common use test that the district court applied— which it derided as a "numbers-only approach"—"cannot be squared" with Supreme Court precedent and "would lead to 'circular' and 'absurd' results." State Br. at 28 (quoting *Friedman*, 784 F.3d at 409). This is because, the State argues, "[i]t would allow the government to ban any new weapon before it became widespread" while "if an unprotected weapon (like the M16) became lawful in some parts of the country . . . an aggressive marketing (or giveaway) campaign" could result in it

28

having constitutional protection. *Id.* But these objections are based on a misunderstanding of the common use test and lack merit. As to the claim that the test is circular, the very same argument was raised by Justice Breyer in dissent in *Heller* but "the *Heller* majority was obviously unmoved by it." *See Kolbe*, 849 F.3d at 153 (Traxler, J., dissenting). In fact, there is no circularity problem since *Heller* made clear that a firearm must be "dangerous *and* unusual" to be banned. 554 U.S. at 627 (emphasis added) (quotations omitted). A firearm may be infrequently owned (and therefore unusual numerically) but not any more "dangerous" than other firearms in common use. For example, to take the State's hypothetical example of a new firearm, if a manufacturer created an entirely new type of firearm that operated on a new principle, but it resulted in a comparable rate of fire, level of accuracy, and degree of reliability as semiautomatic firearms already in common use, that new firearm, though not yet owned by anyone at all, could not be banned at its inception since it is not, in any relevant sense, "dangerous." Common use is a sufficient (and in this case, dispositive) condition for constitutional protection, but not a necessary one. And although the State cynically views Americans choosing firearms for their own lawful purposes as little more than the marks for an industry intent on "aggressive[ly] marketing" to them, State Br. at 29, as products such as the Google Glass or the Ford Edsel demonstrate, producers cannot dictate to consumers what to

purchase. Arms that are in common use today are in common use because the American people have found them useful and elected to obtain them.

The State next argues that common use proves too much, since Justice Alito noted in his concurrence in *Caetano*, "that approximately 200,000 civilians owned stun guns," 577 U.S. at 420 (Alito, J., concurring), and if common ownership alone sufficed to show a firearm was not "dangerous and unusual" then the *Caetano* line of 200,000 would necessarily mean that machineguns are also protected since there are over 700,000 federally registered in the United States. State Br. at 30. But there are in fact fewer than 200,000 machine guns lawfully owned by typical American citizens. That is because there were only approximately 176,000 registered before new machine guns became generally unlawful for typical Americans to possess. *See* Letter from Stephanie M. Boucher to Jeffrey E. Folloder (Feb. 24, 2016), http://bit.ly/3tksUCT. The State may still argue that 176,000 is close to 200,000, but even going by just the numbers, it is far from clear that an arm that is over 10 percent less common than stun guns in circulation—which may well represent the lower bar of constitutional protection—qualifies as "in common use." The constitutional status of the 176,000 automatic machine guns grandfathered in under the 1986 ban has little bearing on the protection of semiautomatic firearms owned by tens of millions of Americans.

Finally, the State argues that Plaintiffs at least cannot show common use for the pistols and shotguns that it defines as "assault weapons," noting that just 8.8% of assault weapons are pistols and 1.9% are shotguns. State Br. at 27–28. According to those numbers, approximately 89% of assault weapons are rifles. If there are 24.4 million "assault weapons" that are rifles nationally, that would mean there are approximately 27.4 million "assault weapons" total, of which approximately 2.5 million are pistols and 548,000 are shotguns. In all cases, there are far more of these banned firearms than there were stun guns when *Caetano* was decided. The State has also not demonstrated that those semiautomatic arms are any more "dangerous" than other constitutionally protected arms. More fundamentally, if the Court does not look at this issue as a ban on semiautomatic firearms, then the State should not be heard to complain that some of the configurations it bans as "assault weapons" are rarer than others. It has created its own category of firearms for purpose of banning them and labeled them "assault weapons." If, in doing so, it has created a category that is "in common use for lawful purposes," that is dispositive of this case. What is more, under *Bruen* it is the State's burden to show that any banned firearm is both dangerous and unusual, and it has not carried that burden for any of the categories of firearms at issue.

### B. The State Has Presented No Historical Tradition That Can Justify The Firearm Ban.

As outlined above, the firearms banned by the State are in common use for lawful purposes and the State therefore cannot show that the challenged law fits into "the historical tradition" of restricting "dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (quotations omitted). This Court's analysis can and should therefore end here, for *Heller* and *Bruen* speak with one voice and they speak clearly: where the government enacts a prohibition on arms, the *only* way it can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are in common use at the time." *Bruen*, 597 U.S. at 21, 24 (cleaned up). If the government cannot make that showing because the firearms at issue are in common use, then there is no need for this Court to go any further.

This is not because the "common use" test renders the second step of *Bruen*'s text-and-history standard irrelevant. Rather, it merely recognizes that in the context of an absolute ban on certain firearms, the application of that standard has already been decided by the Supreme Court. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sep. 27, 2023), https://bit.ly/478KttI. So, while there is no *need* for additional historical work, should this Court decide to

analyze the historical analogues offered by the State, all it will demonstrate is that the Supreme Court was correct to determine that there is no historical tradition of banning firearms that are not "dangerous and unusual."

### 1. This Case Offers No Reason to Lessen the State's Burden to Find a Valid Founding-Era Analogue.

The State begins its historical argument by arguing this case requires a "more nuanced approach" to historical comparisons because it involves "dramatic technological changes" and implicates "unprecedented societal concerns." State Br. at 33 (quoting *Bruen*, 597 U.S. at 27). Neither is true, but even if the State were right, it wouldn't matter. A "more nuanced approach" makes no difference when the analogy has *already been drawn* by the Supreme Court.

In any case, this case does not involve a technological or social change that softens the analysis in any way—if anything, those factors work in Plaintiffs' favor. The State argues this case involves a dramatic technological change by pointing out that the firearms it bans are different from those that were available at the Founding. State Br. at 34. This is both obvious and irrelevant. *Heller* rejected as "bordering on the frivolous" the argument that the Second Amendment only protected "those arms in existence in the 18th century," 554 U.S. at 582, and in *Bruen*, the Court clarified that *Heller*'s statement was a demonstration of properly interpreting the Second Amendment to account for modern developments, but doing so in a way that was protective of Second Amendment rights by recognizing that it generally "covers

modern instruments that facilitate armed self-defense," 597 U.S. at 28. In other words, technological changes in the types of firearms that are available does not offer the State a justification for banning certain arms, but rather expands the universe of arms "in common use" that cannot be banned.

It is revealing that the ways that the State identifies modern firearms as differing from the arms available at the Founding is that those earlier firearms were generally time consuming to load and reload, severely limiting the frequency with which shots could be fired, and they were, the State claims, "liable to misfire . . . [a]nd when fired (or misfired) once, they were not better than a club in hand-to-hand combat." State Br. at 34. It is, of course, not the adjustable stocks, pistol grips, hand guards, or any other of the features of so-called "assault weapons" that permit the banned arms to fire more than "two to three shots per minute in combat," *id.*, and in this the State tips its hand that it is *all* semiautomatic firearms against which its ire is directed, *id.* at 35. As Plaintiffs have repeatedly noted, semiautomatic firearms generally are overwhelmingly in common use, and besides, if a firearm could be banned because it was capable of shooting more reliably and more frequently than Founding-era musket, then *Heller* would have come out the other way.

Nor does this case implicate any unprecedented societal concerns. The State argues that the banned firearms contribute to a modern problem of mass violence

and mass shootings, *id.* at 35–36, but again, that was even more true of the firearms at issue in *Heller*, since ordinary semiautomatic handguns, and not "assault weapons," are the most common firearm used in mass shootings, *see* Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND CORP. (Apr. 15, 2021), https://bit.ly/3RT1SvO; James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 HOMICIDE STUDIES 125, 136 (2013); *accord* Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 CRIM'Y & PUB. POL'Y 1, 17 (2020), and the same are overwhelmingly the weapons of choice for criminals generally, *see Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, *Crime in the United States*, FBI, U.S. DEP'T OF JUST. (2018), https://bit.ly/2p0bw4D (approximately 90% of murders with known type of firearm committed with handgun); *see also, e.g.,* Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 (showing that, of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns).

More fundamentally, though it attempts to disguise it, the State effectively is arguing in favor of the sort of analysis that *Bruen* explicitly warned this Court against when it explained that its opinion should not be read to permit courts to "engage in independent means-end scrutiny under the guise of an analogical inquiry." 597 U.S.

at 29 n.7. Indeed, the State's proposed analysis is *worse* than the old (and overruled) means-end test because there, at least, the question of whether there really is a connection between the banned arms and "a recent rise in mass shooting incidents" would be tested (and it would be found there is no such connection), *see Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP., https://bit.ly/3mR58uT (last updated on Jan. 10, 2023); *see also* Webster, *supra* at 18 ("[B]ans on assault weapons had no clear effects on either the incidence of mass shootings or on the incidence of victim fatalities from mass shootings."); Benjamin M. Blau et al., *Guns, laws and public shootings in the United States*, 48 APPLIED ECON. 1, 2 (2016). Here, rather than meeting some means-end analysis, the State argues that the mere existence of mass shootings should permit it to declare any number of very different historical regulations as "similar" to the firearm ban because both involve threats to "public safety" writ large. *See, e.g.*, State Br. at 37. Such broad generalizations would presumably excuse *any* firearm ban the State could wish to enact. They would have excused the firearm ban in *Heller*, and they were offered to the Court and ignored in *Heller*, *see* VPC Br. at 23–25, and they must likewise be rejected by this Court. The State bears the burden of pointing this Court to a robust tradition of historical laws that similarly burden the right to keep and bear arms, and that burden is not lessened in this case in any way. *See Bruen*, 597 U.S. at 17.

One final note on the historical analysis: the State relies on laws from the fourteenth to the twentieth century to attempt to justify its ban, and is critical of the district court for discounting laws that long predated the Founding or that post-dated the ratification of the Fourteenth Amendment in 1868. *See* State Br. at 53. But the district court was right to do so. *See* 1-ER-21. The critical period for interpreting the scope of the Second Amendment is at or around the time of its ratification—1791—so even laws from the mid-1800s come too late to be very informative about the scope of the right, to say nothing of the period when the State finds its closest (though not *close*) analogues, the early 1900s. *See* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.

Two principles—both established by binding and unequivocal Supreme Court precedent—necessitate the conclusion that 1791 is the critical year, not 1868—and *certainly* not the 1920s. First, incorporated Bill of Rights provisions have the same meaning applied to the States as to the federal government. *See McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010). It has been a bedrock principle of Bill of Rights jurisprudence *for over five decades* that while it is the Fourteenth Amendment that *incorporates* the Bill of Rights' guarantees against the States, once incorporated, those rights have *exactly the same meaning against the States* as they do against the federal government. As the Court put the point in *Malloy v. Hogan* in 1964, the

37

protections in the Bill of Rights are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 378 U.S. 1, 10 (1964). The Court has repeatedly reiterated that fundamental rule in the ensuing years, most recently *in Bruen itself*: "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 597 U.S. at 37.

Second, as *Bruen* also makes clear, the Supreme Court has always treated the ratification of the Bill of Rights as the key period for understanding the scope of the rights enumerated therein. *Id*. (collecting cases). Almost a century ago, the Court explained that the First Congress of 1789, is "a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174–75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].").

To be sure, *Bruen* "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining

its scope (as well as the scope of the right against the Federal Government)," and it stated that it did not "need [to] address this issue." 597 U.S. at 37–38. But the Court's decision not to wade into a "scholarly debate" cannot be read as changing or casting doubt on the longstanding precedent described above. And that precedent dictates that 1791 is the critical date.

Justice Barrett's concurring opinion in *Bruen* provides further confirmation of the point. Justice Barrett strongly suggested that "Reconstruction-era history" is "simply too late," and she cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id*. at 82–83 (Barrett, J., concurring). It would be difficult to come up with a more apt description of Defendants' discussion of history in this case.

The *Bruen* majority opinion is fully consistent with Justice Barrett's analysis. The majority, too, treated evidence surrounding 1791 as generally dispositive of the contours of the Second Amendment. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id*. at 34. That is why courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its

39

original meaning as earlier sources.' " *Id.* at 36 (quoting *Heller*, 554 U.S. at 614). In fact, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (quoting *Heller II*, 670 F.3d at 1274 n.6 (Kavanaugh, J., dissenting)). Similarly, the majority clarified that while continuous English practices that remained in effect at the Founding may shed some light on the Amendment's scope, evidence of an ancient practice that "never was acted upon or accepted in the colonies" is irrelevant. *Id.* at 35 (quotation omitted). This is especially true of English common-law practices which changed over time and "cannot be indiscriminately attributed to the Framers of our own Constitution." *Id.*

## 2. There Is No Tradition of Banning "Especially Dangerous" Weapons.

The State posits that there is a tradition of restricting "especially dangerous" weapons. State Br. at 38. This is, of course, *half* of the correct answer, as the Supreme Court has repeatedly made clear that there is no history of banning arms unless they are "dangerous *and unusual* weapons." *Bruen*, 597 U.S. at 47 (emphasis added). The State writes "unusual" out of the formulation because it is necessary to sell its inaccurate historical narrative that, "from the founding era to the present, firearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality." State Br. 46. At the risk of

40

sounding like a broken record, if that historical narrative were true, then *Heller* would necessarily have been decided in favor of the District of Columbia, since handguns, more than any other weapon, have proliferated in society and have become the overwhelming weapon of choice for violent criminals. *See, e.g.*, *Heller*, 554 U.S. at 698 (Breyer, J., dissenting). Indeed, the State's alternative formulation only serves to demonstrate the centrality of the "unusual" element of this historical tradition, as the only way to understand *Heller* is that firearms in common use for lawful purposes—no matter how useful they are found to be for criminals—cannot be banned.

The historical laws to which the State points do not support the proposition that an arm in common use for lawful purposes may nevertheless be banned because it is "dangerous." The State begins by characterizing the "right" to bear arms as "a public allowance" and emphasizes that the English Bill of Rights guaranteed only a right to keep arms "as allowed by Law." State Br. at 38 (quotations omitted) (emphasis omitted). But as *Heller* explained, this provision of the English Bill of Rights, while "the predecessor to our Second Amendment," was limited in ways that the Second Amendment is not, since it did not apply to anyone but Protestants and (as the language quoted by the State shows), "was held only against the Crown, not Parliament." *Heller*, 554 U.S. at 593. The same is not true and never has been true of the Second Amendment. Nevertheless, even accepting for the sake of argument

41

the claim that "as allowed by law" meant that governments could "restrain the use of *some particular sort of arms*," as the State claims, State Br. at 48 (quoting Granville Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17–18 (1782) (emphasis in original)), it does not answer *which* particular sort of arms could be so restricted. The answer, found in the same sources on which the State relies, reaffirms the line that *Heller* drew. Sharp explains that while Parliament could "restrain the use of . . . only such arms as were liable to be concealed, or otherwise favour the design of murderers," those that were "*proper arms for defence* . . . [were] so far from being forbidden by [historical] statute, that they are clearly authorized, and *the exercise thereof* expressly recommended by it." Sharp, *Tracts* at 18. And Sharp furthermore was clear that "proper arms for defence" meant "*then* fashionable weapons" so that while in Henry VIII's England, the long bow was protected, "the reason of the law holds equally good, to *require the exercise of* ALL MEN in the use of the present fashionable weapons, the *musquet and bayonet*." *Id.* at 14–15 (emphases in original). In other words, accepting the limitation the State argues for only gets it back to where *Heller* left things: with arms in common use protected.

The centrality of arms in common use to the English right explains the two laws from 1383 and 1541 to which the State points that restricted the public carry of launcegays and crossbows. *See* State Br. at 39. Indeed, in *Bruen* the Court noted that

the anti-crossbow law was borne primarily out of Henry VIII's concern that preferences for other weapons would "threaten[] Englishmen's proficiency with the longbow," 597 U.S. at 42 (discussing 25 Hen. 8, ch. 6 (1541)), and the anti-launcegay law the Court distinguished on the ground that a launcegay, unlike any modern carried weapon, was "a 10- to 12-foot-long lightweight launce" which was generally "carried only when one intended to engage in lawful combat or . . . to breach the peace," *id.* at 41 (discussing 7 Rich. 2, ch. 13 (1383)). In any event, both of these ancient laws are far too remote to tell us much about the scope of the right adopted at the Founding.

Moving on to the colonial period, the State's proposed analogues fare no better. "At most, [they] can show that colonial legislatures sometimes prohibited the carrying of dangerous and unusual weapons." *Bruen*, 597 U.S. at 47 (quotations omitted). Indeed, the State's primary colonial support, an East New Jersey law, supports Plaintiffs' interpretation of history. *See* State Br. at 40 (quoting An Act Against Wearing Swords (1686), reprinted in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289–90 (1881)). The law was discussed (and distinguished) at length in *Bruen*, and it burdened the right significantly less than the challenged "assault weapon" ban does since it did not even outright ban carriage (much less possession) of the arms it targeted, but "restricted only concealed carry, not all public carry" of certain "unusual" weapons while not touching the carry

43

of "presumably more common pistols" except as to a discrete category of individuals. 597 U.S. at 48. Furthermore, the *Bruen* Court declined to "put meaningful weight on this solitary statute" since, in addition to the above issues, "it does not appear that [it] survived for very long," noting that "[a]t most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment." *Id.* at 49.

The State also notes that some colonies enacted laws against the carrying of clubs, but each of the laws the State cites, *see* State Br. at 41 n.20, was directed at rioting, *see* 1750 Mass. Acts 544, ch. 17, § 1; 1786 Mass Acts 87, ch. 38, or targeted carrying clubs while committing or intending to commit a crime, 1788–1801 Ohio Laws 321, 323; AN ACT TO DESCRIBE, APPREHEND, AND PUNISH DISORDERLY PERSONS § 2 (1799), reprinted in *Laws of the State of New Jersey* 474 (Nettleton ed., 1821), and therefore did not outlaw the peaceful carrying of clubs. And in fact, there is strong evidence that the right to possess clubs for defensive uses *was* protected. At the trial of the soldiers involved in the Boston Massacre, John Adams, defending the soldiers, said of the crowd of Americans who had assembled armed with, among other things, clubs, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, *Argument for the Defense: 3-4*

44

*December 1770*, NAT'L ARCHIVES, https://bit.ly/435ah2j (last accessed Dec. 21, 2023).

The State next points to anti-trap gun laws. State Br. at 41–42. This is a poor analogy. In addition to the fact that there were few such laws, *see* 1-ER-46, trap guns, or guns fired automatically when a trap (*i.e.*, a trip wire) is triggered, are not a type of firearm, but an illegal and dangerous way of rigging a firearm to go off without a human pulling the trigger. Laws against setting traps do not impact the right to possess or lawfully use any firearms; they criminalize a specific sort of misuse. 1-ER-46–47. The State attempts to justify its reliance on them by claiming that the features of "assault weapons" that it outlaws "are *also* particularly lethal configurations of guns." State Br. at 52–53. But there is no "configuration[] of guns" that was made illegal to possess by these trap gun laws, they only prevented individuals from setting up traps that would permit the gun to fire without a human being choosing to pull the trigger.

The State's firearm ban is also utterly unlike the colonial and early American regulation of gunpowder. *See id.* at 42. As the State notes, these laws were fire-prevention measures, intended to prevent accidental explosions and fires in densely populated areas. They were not directed at minimizing danger from misuse of firearms at all. *See* 1-ER-47–49. And they did not prevent anyone from possessing any firearm or from possessing significant amounts of gunpowder. The State's

45

example from New York permitted individuals in the city to possess up to 6 pounds of gunpowder. 1772 N.Y. Laws 682, 683, ch. 1549; *see* State Br. at 42. Powder is measured in grains and there are 7,000 grains in a pound. Modern replicas of the Revolutionary-era "Brown Bess" musket recommend 70 grains of powder per round, *see* Pedersoli, *Pedersoli Brown Bess Musket .75 Cal*, MUZZLE-LOADERS, *available at* https://bit.ly/3S2i2TL, meaning that a New Yorker with six pounds of gunpowder in his home would have enough gunpowder for hours of sustained fire in a self-defense situation. In any event, *Heller* has already explained that such laws are irrelevant to modern bans on types of arms: "Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right to self-defense as much as an absolute ban on handguns." 554 U.S. at 632. The same is true in the context of a ban on so-called "assault weapons."

Moving into the middle of the nineteenth century, the State focuses next on laws regulating Bowie knives, claiming that "[b]y 1840 at least 5 states or territories had enacted laws restricting the carrying of Bowie knives or other fighting knives" and "[n]early every state enacted a law restricting Bowie knives by the end of the nineteenth century." State Br. at 43. In addition to the fact that these laws come too late in time to help the State, merely noting that laws "restricted" Bowie knives is not enough to carry the State's burden under *Bruen*, which requires an analysis of *how* the historical laws burdened the right. 597 U.S. at 29. In support of this broad

statement, the State points to a chart compiling alleged historical laws, put together by one of its historical experts, Robert Spitzer. *See* 4-ER-731–34. As the district court noted regarding Spitzer's report: "When a historian overgeneralizes about past laws, it is not helpful." 1-ER-57. In any event, the laws do not help the State. For example, of the five states that the State claims restricted the carriage of Bowie knives before 1840, it fails to mention three were limited to restrictions on *concealed* carriage. *See* 1839 Ala. Acts 67, § 1, 4-ER-773; 1835 Fla. Laws 423, 4-ER-787; 1837–1838 Tenn. Pub. Acts 200, ch. 137, § 2, 4-ER-837. And the other two, from Maine and Massachusetts, were not restrictions on carriage itself but rather were surety laws, permitting "any person having cause to fear an injury or breach of the peace" to seek to require the individual "to find sureties for keeping the peace for a term." JUSTICES OF THE PEACE, § 16, *in* THE REVISED STATUTES OF THE STATE OF MAINE (1840), 4-ER-800; *see also* OF PROCEEDINGS TO PREVENT THE COMMISSION OF CRIMES, ch. 134, § 16, *in* THE REVISED STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS 748 (Boston, Dutton & Wentworth 1836). In other words, none of these early laws formed an outright ban on carriage, and in fact the existence of the surety laws shows that carrying knives was in fact normal. *See* 1-ER-56.

As for the broader claim that "[n]early every State enacted a law restricting Bowie knives by the end of the nineteenth century, whether by outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership,"

State Br. at 43, again, the assertion fails on its own terms because of its generality. Of the listed ways that a law could "restrict" Bowie knives, only laws that outright ban their possession, carry, or sale could be said to comparably burden the Second Amendment right to the way the State's firearm ban does. Spitzer claims in his report that, in fact, "[s]everal states banned the possession of Bowie knives outright," but he cites no law in support and rather points only to his collection of hundreds of laws regarding all manner of what he labels "dangerous weapons." 4-ER-668. In fact, very few such extreme laws ever existed and "[a]t the end of the 19th century, no state prohibited possession of Bowie knives" while only two states "Tennessee and Arkansas, prohibited sales." David Kopel, *Bowie knife statutes 1837-1899*, REASON (Nov. 20, 2022), https://bit.ly/3Rst1nM. Rather, just "[a]s with handguns, the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives" and in the "few jurisdictions [that] forbade the open carry of Bowie knives . . . open carry of handguns was also outlawed." *Id.* Indeed, this Court exhaustively reviewed these laws in *Teter* and noted that laws banning the sale and carry of Bowie knives were "outliers" and "[t]he vast majority of the statutes" dealing with them were less restrictive. 76 F.4th at 951–53. Such outliers did not compel the conclusion that the handgun ban at issue in *Heller* was valid, and they do not support the so-called "assault weapons" ban here either.

48

The story is much the same with anti-slungshot laws and anti-pistol laws that the State points to next. *See* State Br. at 44–45. Although the State notes that "forty-two states and the District of Columbia enacted anti-slungshot laws by the end of the nineteenth century," again, what matters is *how* these laws regulated slungshots. While some anti-slungshot laws were fairly stringent, not all were, *see Teter*, 76 F.4th at 951 n.11 (collecting laws), and such laws were not considered valid analogues in *Teter*. The State has failed to show that these laws targeted a type of weapon that was in common use for lawful purposes, and in any event, most come from far too late a date to inform our understanding of the Second Amendment right. The pistol laws are no better. As *Heller* clearly establishes, no historical laws support the banning of pistols today, and indeed *Bruen* specifically rejected the claim that restrictions on *concealed* carry of pistols could justify a ban on all forms of carriage today. *Bruen*, 597 U.S. at 47. If they cannot even support a ban on carriage, it is hard to understand how the State could think that they support a ban on *possession* of common firearms.

It is not until the 20th century, when discussing laws restricting the purchase and possession of fully automatic machine guns that the State finally hits on a set of laws that are as restrictive as its ban. *See* State Br. at 46. Such laws really did ban possession of certain firearms, but as discussed above, bans on possession of machine guns are irrelevant because these firearms are *not* the same as semiautomatic firearms. Indeed, the Supreme Court has identified the line between

49

semiautomatic and automatic as key in determining whether a firearm is of a type traditionally "accepted as lawful." *See Staples*, 511 U.S. at 612. And in any event, these laws all come much too late to contradict the earlier evidence which weighs strongly in Plaintiffs' favor. *See Bruen*, 597 U.S. at 66 n.28 (declining to address 20th-century historical evidence, noting that it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence"); *see also* 1-ER-56.

In summarizing all of these laws, the State candidly admits that the various state laws "were not identical" in the ways that they addressed concerns about these different weapons, but it shrugs off the fact that the "restrictions" it identifies range from taxes or limitations on concealed carriage to (in a few rare instances) outright bans on carriage or on sale, as consistency and uniformity is "neither realistic nor desirable in a federal system." State Br. at 44. Unfortunately for the State, it is required by *Bruen* to show not just that these laws were directed at the same problem as its "assault weapons" ban, it must also show that they chose the same method to deal with the problem. *Bruen*, 597 U.S. at 26–27. While, as discussed above, the State at once treats the advent of the banned "assault weapons" as an unprecedented technological or societal shift, the core of its argument is directly contrary to that claim. It characterizes its law as merely the most recent instance in which a State has responded to a new weapon "proliferat[ing], and result[ing] in violence, harm, or

50

contribut[ing] to criminality." State Br. at 54. The problem is, almost *none* of the historical laws that the State has pointed to (and none from the Founding era) dealt with the problem of proliferating weapons contributing to criminality by outright banning their possession. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," as the State claims is the case here, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. So even granting the State its faulty premises, its arguments fail under *Bruen* on their own terms.

The State attempts to minimize the burden imposed by its law, noting that it leaves open the possibility of possessing *other* semiautomatic rifles, pistols, and shotguns, but that is no distinction at all. It was true in *Heller* as well, and as the Court explained in that case, "[i]t is no answer . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms . . . is allowed." 554 U.S. at 629.

Finally, the State argues that rejecting its arguments amounts to a statement that *nothing* may be banned, not even "cannons and howitzers." State Br. at 55. It should be, at this point, clear enough that that is a strawman distortion of Plaintiffs' position. As an initial matter, since cannons and howitzers are not "bearable" arms—i.e., they are not capable of being carried by individuals—they likely fall outside of

51

the Second Amendment's plain text. And as a historical matter, the State can ban arms it can prove are "dangerous and unusual," it just may not ban arms, like the firearms it has misleadingly dubbed "assault weapons" that are in common use for lawful purposes.

## III.    This Case Should Be Decided Now and This Court's Judgment Should Not Be Stayed.

The State dedicates the final pages of its brief to arguing that the district court's judgment should remain stayed pending this appeal and further that the "panel may wish to consider holding this matter in abeyance pending the Court's resolution of *Duncan*." *Id.* at 56. This Court accelerated hearing this case as a direct result of the decision to grant a stay of the district court's judgment. It should not now, having expedited briefing and argument, hold the case, with the stay in place, pending *Duncan*. And were it to reverse the decision to expedite and rather hold the case, it should also reverse the decision to stay the district court's judgment so that Plaintiffs' can at least enjoy the judgment they won while awaiting this Court's review.

**CONCLUSION**

The judgment of the district court should be affirmed.

Dated: December 22, 2023   Respectfully submitted,

John William Dillon     /s/ David H. Thompson
DILLON LAW GROUP, APC   David H. Thompson
2647 Gateway Road     Peter A. Patterson
Suite 105, No. 255      Clark L. Hildabrand
Carlsbad, CA 92009     COOPER & KIRK, PLLC
jdillon@dillonlawgp.com    1523 New Hampshire Ave., NW
             Washington, D.C. 20036
George M. Lee      (202) 220-9600
SEILER EPSTEIN LLP    dthompson@cooperkirk.com
4 Embarcadero Center
14th Floor
San Francisco, CA 94111
(415) 979-0500
gml@sezalaw.com

*Counsel for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6 Counsel for Plaintiffs-Appellees are aware of the related, consolidated cases that Counsel for Defendants-Appellants listed in their Opening Brief dated December 1, 2023.

Dated: December 22, 2023 /s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2979

I am the attorney or self-represented party.

**This brief contains** | 13,377 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/David H. Thompson | **Date** | 12/22/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit on December 22, 2023, by using the appellate CM/ECF system. I hereby certify that service will be accomplished on December 22, 2023, by the appellate CM/ECF system on all parties or their counsel.

Dated: December 22, 2023

/s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellees*