**No. 23-2979**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES MILLER, et al.,

*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as the
Attorney General of the State of California, et al.,

*Defendants-Appellees*,

On Appeal from the United States District Court for the
Southern District of California,
No. 3:19-cv-01537

## BRIEF FOR NATIONAL SHOOTING SPORTS FOUNDATION
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES

LAWRENCE G. KEANE
NATIONAL SHOOTING SPORTS
 FOUNDATION, INC.
400 N. Capitol Street, NW
Washington, DC 20001
(202) 220-1340

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are
members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation*

December 29, 2023

## RULE 26.1 DISCLOSURE STATEMENT

*Amicus curiae* National Shooting Sports Foundation has no parent corporation

and no publicly held company owns ten percent or more of its stock.

CLEMENT & MURPHY, PLLC

s/Erin E. Murphy
Erin E. Murphy

*Counsel for* Amicus Curiae

December 29, 2023

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ............................................................... i

TABLE OF AUTHORITIEs ..................................................................................... iii

STATEMENT OF INTEREST ................................................................................ 1

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 5

ARGUMENT ........................................................................................................... 8

I.      The Firearms That California Bans Are "Arms" ........................................... 8

II.     The Arms That California Has Banned Are Typically Possessed By
        Law-Abiding Citizens For Lawful Purposes, Including Self-Defense ........ 12

III.    There Is No Historical Tradition In This Country Of Banning Arms That
        Millions Of Law-Abiding Citizens Own For Lawful Purposes ................... 20

IV.     California Cannot Save Its Sweeping Ban On Common Arms By
        Pointing To Some Dramatic Technological Change Or Novel Societal
        Problem ........................................................................................................ 23

CONCLUSION ...................................................................................................... 29

CERTIFICATE    OF    COMPLIANCE    WITH    TYPE-VOLUME
        LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Barnett v. Raoul*,
2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) .......................................................15

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023).................................................. 16, 17, 18

*Caetano v. Massachusetts*,
577 U.S. 411 (2016)........................................................ 9, 13, 22, 26

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..................................................................... *passim*

*Duncan v. Becerra*,
970 F.3d 1133 (9th Cir. 2020)................................................................24

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015)................................................................16

*Jackson v. City & Cnty. of S.F.*,
746 F.3d 953 (9th Cir. 2014)................................................................25

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017)................................................................15

*Miller v. Bonta*,
542 F.Supp.3d 1009 (S.D. Cal. 2021)........................................... 14, 27

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)..................................................................... *passim*

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023)................................................................27

*Staples v. United States*,
511 U.S. 600 (1994)........................................................ 2, 13, 18

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017)................................................................8

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023)........................................................ *passim*

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013).............................................................25

*United States v. Stevens*,
   559 U.S. 460 (2010)............................................................................11

**Statutes**

Cal. Code Regs. tit. 11, §5471(hh)..............................................................6

Cal. Code Regs. tit. 11, §5471(ii) ...............................................................7

Cal. Penal Code §30515 ..............................................................................5

Cal. Penal Code §30515(8) ........................................................................25

Cal. Penal Code §30515(a) .................................................................. 6, 7, 9

Pub. L. No. 103-322, 108 Stat. 1796 (1994)..............................................26

1989 Cal. Stat. 60 ........................................................................................5

S.B. 263, 1991-1992 Reg. Sess. (Cal. 1991) ..............................................5

S.B. 880, 2015-2016 Reg. Sess. (Cal. 2016) ..............................................5

Assembly B. 1135, 2015-2016 Reg. Sess. (Cal. 2016)................................5

**Regulations**

11 Cal. Civ. Reg. §5495 ..............................................................................5

11 Cal. Civ. Reg. §5499 ..............................................................................5

**Other Authorities**

William English, PhD, *2021 National Firearms Survey: Updated
   Analysis Including Types of Firearms Owned* (May 13, 2022),
   https://bit.ly/3HaqmKv ..................................................................... 13, 16

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups
   on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB..................14

Ford, *Fourth-Quarter 2020 Sales* (Dec. 2020),
    https://ford.to/3H87Y5T .......................................................................14

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of
    the Right to Bear Arms* (2008).......................................................... 27

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment*
    (2d ed. 2018) ......................................................................................28

Christopher S. Koper et al., *An Updated Assessment of the Federal
    Assault Weapons Ban: Impacts on Gun Markets & Gun Violence,
    1994-2003, Rep. to the Nat'l Inst. of Justice*, U.S. Dep't of Justice
    (2004), *available at* https://bit.ly/3wUdGRE ................................... 26

Lot 1249, Rock Island Auctions Co. (Sept. 8, 2018),
    http://tinyurl.com/yurawrwx ............................................................. 25

Nat'l Shooting Sports Found., *2021 Firearms Retailer Survey Report*,
    https://bit.ly/3CXJwC1 ........................................................................6

Nat'l Shooting Sports Found., *Commonly Owned: NSSF Announces
    Over 24 Million MSRs in Circulation* (July 20, 2022),
    https://bit.ly/3zKDFh4 .......................................................................13

*Newspapers Fact Sheet*, Pew Rsch. Ctr. (June 29, 2021),
    https://pewrsr.ch/3CNXFS0 .............................................................. 14

Kate Robertson, *New York Times Reports a Gain of 180,000 Digital
    Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T ..................14

Mark W. Smith, *What Part of 'In Common Use' Don't You
    Understand?: How Courts Have Defied Heller in Arms-ban
    Cases—Again* (June 18, 2023), bit.ly/42OrITT.................................20

Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll
    of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023)............................13

## STATEMENT OF INTEREST[1]

The National Shooting Sports Foundation is the national trade association for the firearm, ammunition, hunting, and shooting sports industry. NSSF's membership includes manufacturers, distributors, and retailers of firearms and shooting- and hunting-related goods and services; sportsmen's organizations; gun clubs; and more. NSSF's interest in this case is manifest. California flatly bans the manufacture, sale, and even possession of firearms widely owned by law-abiding citizens for lawful purposes. Among NSSF's members are the leading manufacturers of these and other constitutionally protected products, which is why NSSF has filed suit to challenge the constitutionality of various materially similar laws in other states.

## INTRODUCTION

There are many difficult constitutional questions surrounding the regulation of firearms. Whether California may continue after *Bruen* to ban firearms lawfully owned by millions of law-abiding Americans for lawful purposes is not one of them. The Supreme Court made crystal clear in *Bruen* that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The firearms that California

---

[1] No party's counsel authored any part of this brief, and no one other than amicus contributed to its preparation or submission. All parties have consented to this filing.

continues to ban are more common than the most popular truck in the United States. These are not newfangled innovations that demand novel government intervention. Semiautomatic rifles, pistols, and shotguns have been around for generations, and as recently as just a few decades ago, it was common ground that these common arms are "lawful." *Staples v. United States*, 511 U.S. 600, 612 (1994). Slapping the term "assault weapon" on firearms lawfully owned by millions of Americans does not take them outside of the Second Amendment's embrace. The arms that California has banned are not just in common use; they are ubiquitous. That puts California's ban far out of step with our Nation's history of regulating firearms.

*Bruen* starts the analysis with the plain text, and it makes clear beyond cavil what the term "arms" in the Second Amendment "covers": all bearable "instruments that facilitate armed self-defense." 597 U.S. at 28. Indeed, as this Court recognized in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), "the general definition of 'arms'" in the Second Amendment context includes not just defensive instruments, but all "'[w]eapons of offence' that may be 'use[d] in wrath to cast at or strike another.'" *Id.* at 949 (quoting *Heller*, 554 U.S. at 582). Rifles, pistols, and shotguns obviously satisfy that "general definition," and they do not somehow cease being bearable arms simply because they are equipped with a pistol grip, a detachable magazine, or any of the other common features that California singles out for opprobrium.

2

To be sure, the rule that all things that "constitute bearable arms" are *presumptively* protected, *see Bruen*, 597 U.S. at 17, 28, does not mean that the Second Amendment guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626. Some things that are presumptively protected under the broad *textual* definition of "arms" nevertheless may be prohibited consistent with the Nation's historical tradition. But *Bruen* also left no doubt about what that historical tradition is: While the keeping and bearing of arms that "'are highly unusual in society at large'" is not protected, the keeping and bearing "of weapons that are … 'in common use'" decidedly is. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). And whatever else may be said of the various firearms that California has banned, there can be no serious dispute that they are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Indeed, millions of law-abiding citizens possess the semiautomatic firearms California has banned in the tens of millions.

California contends that the firearms it has declared "assault weapons" are more dangerous than other common arms, and thus that the need to prohibit their possession is more acute. But it is not open to states (or this Court) to withhold constitutional protection based on the relative "dangerousness" of arms when used for *un*lawful purposes. *Bruen* forecloses any such inquiry for arms that—like those California continues to ban—are in lawful common use. The only question under

3

*Bruen* and *Heller* is whether law-abiding citizens typically possess and use the arms at issue for law-abiding purposes. And when it comes to the exceedingly broad range of arms that California bans, the answer is plainly yes.

Under a proper application of *Bruen*, that is the end of the analysis. There is no need to conduct any further historical inquiry, because the Supreme Court has already determined what the "historical tradition" of our nation is when it comes to efforts to ban arms: States may not ban arms that are "in common use today." *Bruen*, 597 U.S. at 47. In all events, the historical laws to which California points do not help its cause, as they predominantly involve either restrictions on carrying (not possessing) things like "melee weapons" or bans on *fully automatic* machine guns— i.e., arms that were *not* commonly possessed for lawful purposes. As *Bruen* made clear, pointing to historical restrictions on arms that *were* "considered 'dangerous and unusual'" at the time "provide[s] no justification for laws restricting … weapons that are unquestionably in common use *today*." *Id.* at 47-48 (emphasis added). Nor could it. When it comes to classes of arms that (like those California continues to ban) law-abiding citizens *have* overwhelmingly chosen for lawful purposes, "American governments simply have not broadly prohibited the[ir] public carry," let alone their private possession. *Id.* at 70.

In short, while there is a long historical tradition of law-abiding citizens possessing for lawful purposes the classes of arms that California now prohibits,

there is no similar tradition of government regulation of these commonly owned arms—let alone of outright bans. California's ban is therefore unconstitutional, and the district court's thoughtful opinion so holding should be affirmed.

## BACKGROUND

Since first enacting the Assault Weapons Control Act ("AWCA") in 1989, California has adopted various definitions of "assault weapon," continually adding to what qualifies—and thus what is criminal for ordinary citizens to keep and bear. The original version of the AWCA banned certain semiautomatic firearms by make and model. 1989 Cal. Stat. 60, 64. California expanded the make-and-model list of prohibited "assault weapons" over the following decade. *See, e.g.*, S.B. 263, 1991-1992 Reg. Sess. (Cal. 1991) (expanding make/model list); 11 Cal. Civ. Reg. §§5495, 5499 (further expanding it). It widened the scope of prohibition even further in 1999, amending the AWCA to add eight features-based definitions of "assault weapon" on top of the already-long make-and-model list. Those features-based definitions—which themselves were later broadened, *see* Cal. Penal Code §30515 (added by Assembly Bill 1135, 2015-2016 Reg. Sess. (Cal. 2016); S.B. 880, 2015-2016 Reg. Sess. (Cal. 2016))—are today codified in Penal Code Section 30515(a).

Under Section 30515(a)(1), a semiautomatic,[2] centerfire[3] rifle qualifies as an "assault weapon" if it lacks a fixed ammunition magazine (and thus is capable of accepting a detachable magazine) and "has any one of the following" components: a pistol grip; a thumbhole stock; a folding or telescoping stock; or a flash suppressor. That definition alone captures nearly all modern semiautomatic rifles and sweeps in all rifles on the AR platform. For that reason, Section 30515(a)(1) alone bans roughly 20% of *all firearms*—and a majority of the rifles (semiautomatic or otherwise)—that were sold in the United States in 2020. *See* Nat'l Shooting Sports Found., *2021 Firearms Retailer Survey Report* 9, https://bit.ly/3CXJwC1. And California did not stop there. A semiautomatic, centerfire rifle is also banned if it is equipped with a fixed magazine capable of accepting more than ten rounds or if it has an overall length of less than 30 inches. Cal. Penal Code §30515(a)(2)-(a)(3).

Not content with banning most modern rifles, California also bans an array of common semiautomatic pistols. A semiautomatic pistol that lacks a fixed magazine (and thus is capable of accepting a detachable magazine) is an "assault weapon" under Section 30515(a)(4) if it "has any one of the following" components: a threaded barrel; a barrel shroud; a second handgrip; or "[t]he capacity to accept a

---

[2] A firearm is "semiautomatic" if it fires a single cartridge with each separate trigger pull. *See* Cal. Code Regs. tit. 11, §5471(hh).

[3] "Centerfire" refers to the method by which ammunition is expelled from a rifle's barrel and the most common type of ammunition. *See* 1-ER-15 n.40.

detachable magazine at some location outside the pistol grip." A semiautomatic pistol equipped with a fixed magazine is also banned if it is capable of accepting more than ten rounds of ammunition. Cal. Penal Code §30515(a)(5).

The AWCA also bans shotguns. All semiautomatic shotguns are banned if they have a detachable magazine. *Id.* §30515(a)(7). So too are all shotguns equipped with either a revolving cylinder, *id.* §30515(a)(8), or "both of" (A) an adjustable stock and (B) a pistol grip, thumbhole stock, or vertical handgrip, *id.* §30515(a)(6). *See also* Cal. Code Regs. tit. 11, §5471(ii).

Finally, the AWCA bans all "semiautomatic centerfire firearm[s] that [are] not a rifle, pistol, or shotgun" but that have "a fixed magazine with the capacity to accept more than 10 rounds" or "an overall length of less than 30 inches," Cal. Penal Code §30515(a)(10)-(a)(11), plus any such firearm that lacks a fixed magazine but "has any one of" a pistol grip, second handgrip, thumbhole stock, folding or telescoping stock, threaded barrel, barrel shroud, or flash suppressor, *id.* §30515(a)(9).

"Under California's law one commits a crime by simply possessing one of these firearms called 'assault weapons.'" 1-ER-16. "Likewise, one commits a felony by lending, giving, exposing for sale, offering for sale, keeping for sale, importing into the state, transporting, distributing, manufacturing, or causing to be manufactured one of these firearms." 1-ER-16. Yet, as this Court has recognized, "the core Second Amendment right 'wouldn't mean much' without ability to acquire

7

arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc).

## ARGUMENT

### I.    The Firearms That California Bans Are "Arms."

*Bruen* left no doubt about how to resolve Second Amendment claims.  The first question in a case challenging a law under the Second Amendment is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts.  597 U.S. at 17.  If it does, then the conduct is "presumptively protect[ed]" by the Constitution, and the state bears the burden of identifying a historical tradition justifying its regulation.  *Id.*  *Bruen* later "reiterate[d] that" point:  "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id.* at 24.  Indeed, the Court went on to use the phrase "plain text" twice more to describe the threshold textual inquiry, i.e., the inquiry into whether conduct is presumptively protected.  *Id.* at 32, 33.  And it dispensed with the application of that threshold inquiry in just a few short paragraphs, which principally looked to "the Second Amendment's text" and the definitions that *Heller* supplied for its key words ("keep," "bear," "arms").  *Id.* at 32-33.  Ultimately, the *Bruen* Court's conclusion on the threshold inquiry boiled down to one sentence:  "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms."  *Id.* at 32.

The plain text inquiry is equally clear here. California prohibits the general public (i.e., "the people" whose rights the Second Amendment protects) from obtaining or possessing (i.e., "keep[ing] and bear[ing]") hundreds of models of rifles, pistols, and shotguns. Cal. Penal Code §30515(a). Rifles, pistols, and shotguns are obviously "arms." As this Court explained in *Teter*, the Supreme Court has already supplied the definition of "arms": "[w]eapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 582; *see Teter*, 76 F.4th at 948-49; *see also Bruen*, 597 U.S. at 28 (reiterating that "the Second Amendment's definition of 'arms'" extends to all "modern instruments that facilitate armed self-defense," "'even those that were not in existence at the time of the founding'" (quoting *Heller*, 554 U.S. at 582)). Rifles, pistols, and shotguns plainly fit that "definition" no matter what kind of grip, stock, feeding device, or other features they may have. A straightforward textual inquiry thus confirms that keeping and bearing the firearms California bans is "presumptively protect[ed]" by the Constitution. *Id.* at 17, 24. Any other conclusion would defy the holding that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id.* at 28 (quoting *Heller*, 554 U.S. at 582); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam).

California contends that rifles, pistols, and shotguns are not presumptively protected unless a plaintiff can prove that they are "in common use." That is incorrect. *Bruen* was emphatic: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. And just as nothing in the Second Amendment's text draws a home/public distinction, *see id.* at 32, nothing in the text says anything about common use.

To be clear, that does not mean that the Second Amendment guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Nor does it mean that the question of whether arms are in common use for lawful purposes like self-defense is irrelevant. But considerations that find no purchase in the plain text are not part of the plain text inquiry. It should therefore come as no surprise that the Supreme Court has *twice* instructed that the question of whether a class of arms is "'in common use'" (or instead is "'highly unusual in society at large'") is part of the "historical tradition" inquiry. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). That is precisely why this Court held in *Teter* that common use is relevant "in the second prong of the *Bruen* analysis" on which the state bears the burden, not part of a plaintiff's threshold textual burden. 76 F.4th at 949-50; *see* AG.Br.39 n.18.

10

None of that is particularly novel. Just as the plain text of the Second Amendment does not distinguish among different types of "arms," the plain text of the First Amendment does not distinguish among different types of "speech." *See Bruen*, 597 U.S. at 24-25 (drawing this analogy). That is why, in the speech context, "the government must generally point to historical evidence about the reach of the First Amendment's protections" "to carry [its] burden" to show that "expressive conduct falls outside of the category of *protected* speech." *Id.* at 24 (emphasis added); *see id.* at 25 (noting that *United States v. Stevens*, 559 U.S. 460 (2010), "plac[ed] the burden on the government to show that a type of speech belongs to a 'historic and traditional categor[y]' of constitutionally unprotected speech"). The government bears that burden precisely because speech that falls outside "the category of protected speech" is still speech within the plain meaning of that term. By the same token, arms that fall outside the category of *protected* arms are still arms. Thus, if a state wants to prohibit a class of arms, it must meet its burden of proving that they belong to a historic and traditional category of *unprotected* arms.

In short, whether a particular type of firearm is unusual and unprotected does not make it any less an "arm" under "the Second Amendment's definition," which covers *all* bearable "instruments that facilitate armed self-defense," even if a state does not believe that they are objectively or best suited to that purpose. *Id.* at 28; *see Heller*, 554 U.S. at 581 (defining "arms" to include "'[w]eapons of offence'").

The threshold textual inquiry here thus begins and ends with the indisputable fact that the various firearms California has outlawed "constitute bearable arms," which means they are "presumptively protect[ed]" by the Second Amendment and the state bears the burden of justifying its prohibition. *Bruen*, 597 U.S. at 17, 24, 28.

## II. The Arms That California Has Banned Are Typically Possessed By Law-Abiding Citizens For Lawful Purposes, Including Self-Defense.

Because the firearms that California has banned easily fit within "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that it nonetheless can ban them "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 28, 33-34. The state cannot meet that burden. The Supreme Court has already decided which "arms" may be banned consistent with "historical tradition": those that are not "in common use today," but rather are "highly unusual in society at large." *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). That is the irreducible minimum of the Second Amendment: The government may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628. In the context of a flat ban on arms like California's, then, the only question after *Bruen* is whether the arms that have been banned are "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. If they are, then the state may not ban them, full stop. Once again, the answer is easy. The arms that California bans are the furthest thing from "highly unusual" in modern America. *See Bruen*, 597 U.S. at 47.

12

1. For starters, California bans all AR-platform rifles by name and/or by feature. *See* p.6, *supra*. The Supreme Court itself has described "AR-15 rifle[s]" as "widely accepted as lawful possessions." *Staples*, 511 U.S. at 603, 612. That remains the case in most states. And these rifles have only become more popular since *Staples*. Roughly one million Americans lawfully owned an AR-style rifle in 1994; today, the number has at *least* sextupled, with somewhere between 6 and 8 million Americans collectively owning more than 24 million of these rifles. 1-ER-72; *see* William English, PhD, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2 (May 13, 2022), https://bit.ly/3HaqmKv (finding same); Nat'l Shooting Sports Found., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3zKDFh4 (ditto).

It should go without saying that a product lawfully owned by millions of Americans—and 20% of all U.S. gun owners, *see* Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023)—is not "highly unusual in society at large," *Bruen*, 597 U.S. at 47. *See Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) (stun guns, which "approximately 200,000 civilians" own, sufficiently "widely owned and accepted" for protection). But a few examples help prove the point.

The number of lawfully owned AR-platform rifles in America today exceeds the number of Ford F-150s, America's most popular automobile, on the road. *See*

13

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB; 1-ER-16-17. And the numbers of AR-platform rifles in civilian hands have been steadily increasing. Nearly 2 million such rifles were manufactured or imported into the United States in 2018 alone. *Miller v. Bonta*, 542 F.Supp.3d 1009, 1022 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). That figure exceeded the number of Ford F-series trucks (not just F-150s) sold that year. *See* Ford, *Fourth-Quarter 2020 Sales* at 2 (Dec. 2020), https://ford.to/3H87Y5T (787,442 F-series trucks sold in 2020).

The number of AR-platform rifles sold per year (over 2 million) is also significantly more than the number of *New York Times* print subscribers (761,000). *See* Kate Robertson, *New York Times Reports a Gain of 180,000 Digital Subscribers*, N.Y. Times (Aug. 3, 2022), https://nyti.ms/3H8bz3T. And the total number of these rifles in circulation is slightly more than the "total U.S. daily newspaper circulation (print and digital combined) in 2020 … 24.3 million for weekday[s]," and only slightly less than the "25.8 million for Sunday[s]." *Newspapers Fact Sheet*, Pew Rsch. Ctr. (June 29, 2021), https://pewrsr.ch/3CNXFS0. Indeed, rifles built on the AR-15 platform are so common that courts, commentators, and industry members alike often refer to them simply as "modern rifles" (or "modern sporting rifles").

It is therefore not too surprising that California does not meaningfully dispute the commonality of the firearms it bans, which of course sweeps well beyond just

AR-platform rifles.[4]  *See* pp.6-7, *supra*.  Instead, California asserts that "[t]he objective characteristics of the assault weapon categories at issue" make them "ill-suited to 'ordinary self-defense.'"  AG.Br.25.  That is both wrong and irrelevant and it invites the very government interest-balancing that *Bruen* forbids.

First, it is "uncontroverted that many of the banned modifiers, including but not limited to pistol grips, protruding grips, flash suppressors, and shrouds, have legitimate purposes that assist law-abiding citizens in their ability to defend themselves."  *Barnett v. Raoul*, 2023 WL 3160285, at *12 (S.D. Ill. Apr. 28, 2023), *vacated sub nom. Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023).  And it is incontrovertible that the features that render an otherwise-lawful firearm an unlawful "assault weapon" in California have meaningful self-defense benefits.  Even the state admits that the features it singles out "can help a shooter … fire more accurately and rapidly."  AG.Br.8.  And while the state seems to think that is a bad thing, "[t]he defensive application" of being able to fire accurately and rapidly "is obvious, as is the public safety advantage in preventing stray shots."  *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting).  Little

---

[4] California faults the plaintiffs for not putting on sufficient evidence of commonality about arms "other than AR- and AK-platform rifles." AG.Br.28. But, as explained, it is the state's burden to show that the arms it seeks to ban are *not* in common use for lawful purposes. *See Teter*, 76 F.4th at 947-48; pp.10-11, *supra*. Yet even now, the state does not even try to identify any banned arm that it does not think is commonly owned.

wonder, then, that even jurists who take a dim view of the Second Amendment have acknowledged that the types of firearms California bans "can be beneficial for self-defense." *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015).

In all events, whether *California* thinks particular firearms are well suited to self-defense is beside the point, as what matters after *Bruen* is why the *typical owners* of such arms typically possess them. *See Teter*, 76 F.4th at 950. And on that score, the record could hardly be clearer. Purchasers consistently report that self-defense, hunting, and sport shooting are the most important reasons why they buy rifles on the AR-15 platform. *See* English, *supra*, at 33-34. The case-specific evidence introduced below confirms the point, showing that "people want to buy AR-15s for home and self-defense." 1-ER-16; *see* 1-ER-16 n.42.

2. Unable to dispute the common ownership of the firearms it bans or the fact that they are typically possessed by law-abiding citizens for lawful purposes, California changes the subject. Relying on a recent, *Bruen*-defying decision from the Seventh Circuit, California argues that what matters is not what the people whose rights the Second Amendment protects choose for their own defense, but the California legislature's view that "the categories of assault weapons prohibited by California 'are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual defense.'" AG.Br.32 (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1195 (7th Cir. 2023)).

According to California, a firearm that falls on the former side of the line "may be regulated or banned."  AG.Br.32 (quoting *Bevis*, 85 F.4th at 1197).

There is a reason that the state cites nothing in *Bruen* or *Heller* that supports that view:  Neither says anything of the sort.  To be sure, *Heller* acknowledged that application of that test may compel the conclusion that some of the "weapons that are most useful in military service—M-16 rifles and the like—may be banned," since they "are highly unusual in society at large."[5]  554 U.S. at 627.  But *Heller* nowhere embraced the nonsensical proposition that weapons may be banned because they are useful in military service.  Nor could it have given the historical tradition it recognized in the very next breath of ensuring that people could "bring the sorts of lawful weapons that they possessed at home to militia duty."  *Id.*  Ultimately, then, whether a particular arm may be popular with the military, or may descend from wartime innovation, makes no difference to the constitutional inquiry.  What matters is whether the American people have chosen an arm en masse.  *Bruen* was emphatic about this:  "[T]he traditions of the American people … demand[] our unqualified deference."  597 U.S. at 26.  And both *Bruen* and *Heller* could not be clearer the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for lawful purposes.

---

[5] Although the state tries to conflate them, *Heller* there referred to fully automatic rifles, not commonly owned semiautomatic rifles like the ones California bans.

The state insists that all of the semiautomatic rifles, shotguns, and pistols it has banned fall on the unprotected side of the line because a *semi*automatic AR-15 rifle—the most popular rifle in the country—is purportedly "almost the same gun as" a *fully* automatic M16 rifle. AG.Br.32 (quoting *Bevis*, 85 F.4th at 1195). That conclusion defies both common sense and reality, and it disregards yet another Supreme Court decision—namely, *Staples*. The core question in *Staples* was whether an AR-15 is similar enough to an M16 to put people on notice that they should ensure that it has not been modified in some way that renders its possession illegal. In answering that question "no," the Court accepted the proposition that "certain categories of guns"—including "machineguns"—are so dangerous and unusual that people should know that even their mere possession may be illegal. 511 U.S. at 611. But it refused to extend that logic to "conventional semi-automatic" firearms such as AR-15 rifles, "precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions." *Id.* at 612, 615. The Court's holding thus necessarily turned on the conclusions *both* that AR-15s are not even in the same "category" as (let alone "indistinguishable" from) M16s *and* that AR-15s have traditionally been legal, whereas M16s have not. The only way to adopt California's view is to disregard Supreme Court precedent. But it should go without saying that it is not up to states (or this Court) to pick and choose which Supreme Court decisions are worthy of respect.

18

In the end, the state circles back to the unfortunate reality that some people misuse these common firearms for unlawful—indeed, awful—purposes.[6]  But that was equally true in *Heller*, if not more so.  The *Heller* dissenters protested that handguns (which the District of Columbia banned) "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals."  554 U.S. at 682 (Breyer, J., dissenting).  The majority did not dispute that.  It just found it irrelevant to whether they are constitutionally protected, as that question does not turn on whether arms are misused by criminals; it turns on whether law-abiding citizens own and use them for lawful purposes.  So it was enough that handguns—the overwhelming majority of which today are semiautomatic—are typically possessed for lawful purposes.  *See id.* at 624-25 (majority op.).  What was true in *Heller* is no less true here given the millions of Americans who own the arms California bans.  Just as in *Heller*, then, the flat ban here is flatly unconstitutional.

---

[6] California focuses on mass shootings, which are unquestionably horrific.  But no more than a few dozen people have ever used one of these arms for such a heinous end.  That is less than one one-hundredth of one percent of the millions who own an AR-platform rifle—to say nothing of the millions more who lawfully own one of the myriad other arms that California bans across the board.  And even if one assumed that some additional number of Americans misused such an arm for some other unlawful purpose, the unassailable reality remains that AR-platform rifles (and the other firearms California has banned outright) are "*typically* possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 624-25 (emphasis added).

### III. There Is No Historical Tradition In This Country Of Banning Arms That Millions Of Law-Abiding Citizens Own For Lawful Purposes.

The Court can and should end its analysis there. "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 597 U.S. at 26, and the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for lawful purposes like self-defense. In the context of a flat ban on the acquisition or even possession of classes of arms, that *is* the historical test. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied Heller in Arms-ban Cases—Again* (June 18, 2023), bit.ly/42OrITT. And it forecloses the state's effort to ban these common arms. After all, a state may not prohibit what the Constitution protects.

Nevertheless, even if further historical inquiry were necessary, California has not come close to meeting its burden of demonstrating any historical tradition of prohibiting semiautomatic firearms with the features it singles out. Indeed, the very fact that millions of Americans have chosen these arms in the tens of hundreds of millions confirms that there is not, and never has been, any tradition of banning them. To the contrary, the historical record reveals a long tradition of welcoming technological advancements aimed at improving the speed, firing capacity, accuracy, and functionality of firearms kept and born by civilians.

To be sure, historical laws *regulated* common arms, such as by prohibiting the concealed carry of certain arms. But a concealed carry law deprives citizens of

20

(at most) one-half of one-half of the Second Amendment "right to armed self-defense" with respect to whatever arms it covers; people retain the right to openly carry those arms, and they of course remain free to keep them as well. A law that bans the possession of a class of arms outright, by contrast, deprives citizens of the entire "right to armed self-defense" with respect to those arms; keeping and bearing (both concealed and open) are now off the table, as obviously is possession. Concealed carry laws thus do not begin to justify possession bans. Indeed, *Bruen* deemed concealed carry laws insufficiently analogous to support *carry* bans; *a fortiori* they are insufficient to justify possession bans. *See Bruen*, 597 U.S. at 57. California's insistence otherwise therefore defies not just *Bruen*, but *Heller*. After all, if the mere existence of historical laws regulating concealed carry, or gunpowder storage, or other facets of keeping and bearing arms sufficed to justify a modern law banning a class of arms, then *Heller* should have come out the other way.

California next asserts that history and tradition demonstrate that particularly "dangerous" weapons are unprotected without regard to whether they are "unusual." *See* AG.Br.38-47. But the Supreme Court has rejected this crabbed view of the history, instead recognizing only a "historical tradition of prohibiting the carrying of 'dangerous *and* unusual weapons.'" *Bruen*, 597 U.S. at 21 (emphasis added) (quoting *Heller*, 554 U.S. at 627). As Justice Alito has explained, "this is a conjunctive test: A weapon may not be banned unless it is both dangerous and

21

unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). Dangerousness *vel non* is not enough; states may ban only those arms that are "highly unusual in society at large" *in addition* to being unusually dangerous. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *accord Teter*, 76 F.4th at 949-50.

Given that California's account of the history flies in the face of *Bruen* and *Heller*, it should come as no surprise that California misses the forest for the trees. For instance, laws regulating "melee weapons," AG.Br.44, certainly existed, but what they show is not that commonly owned but "uncommonly" dangerous arms were commonly banned. They instead show exactly what *Heller* and *Bruen* held: The only types of arms states and municipalities have historically restricted in this country (let alone banned outright) are those that were sparingly chosen by law-abiding citizens for lawful purposes, but overwhelmingly chosen by criminals for illicit ends—in other words, weapons that were *both* dangerous *and* unusual.

As for the rest of California's historical narrative, the Supreme Court has already determined the import of the fact "that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'": "[E]ven if these colonial laws prohibited the carrying of [certain class of arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627).

And in all events, "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 70. Instead, both states and the federal government long confined themselves to prohibiting only those arms that are "*not* typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added).

Indeed, bans on the kinds of common arms covered by California's law remained rare even in the twentieth century. To be sure, several states began restricting the possession and use of *automatic* firearms almost as soon as they came on the civilian market in the mid-1920s. But in stark contrast to the treatment of automatic weapons, only a handful of states enacted restrictions on *semi*automatic firearms, even though they had already been on the civilian market for several decades before the advent of civilian machine guns—and each of these laws was ultimately either repealed outright or replaced with a law that restricted only fully automatic weapons. The state's proposed analogues thus fall far short of justifying the AWCA, for the simple reason that our Nation's history contains no tradition of banning arms commonly owned by law-abiding citizens for lawful ends.

## IV. California Cannot Save Its Sweeping Ban On Common Arms By Pointing To Some Dramatic Technological Change Or Novel Societal Problem.

The state leans heavily on *Bruen*'s dictum that a "more nuanced approach" to drawing "historical analogies" may be warranted when a case "implicat[es]

unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27. But no amount of nuance can change the fact that American states and municipalities in the eighteenth and nineteenth centuries did not prohibit law-abiding citizens from possessing arms that were commonly kept and borne for lawful purposes just because they were especially dangerous in the hands of criminals. In all events, this case does not implicate the types of novel issues *Bruen* had in mind.

1. The lack of any tradition supporting the state's ban is certainly not owing to any "dramatic technological changes." *Contra* AG.Br.19, 33-37. Most of the firearms California bans have been around for decades, and the critical technology at the heart of them has been around since at least the end of the nineteenth century.

Nearly all of the firearms the AWCA bans are semiautomatics, *see* pp.6-7, *supra*, and semiautomatic firearms have been a mainstay in this country for more than a century. The semiautomatic action was invented in 1885; the first semiautomatic pistols date back to 1896; and many of the early-twentieth-century semiautomatics had features the AWCA singles out. *See Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and rev'd on reh'g en banc sub nom.*, *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S.Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). Furthermore, features like pistol grips on repeating firearms predate the Civil War. *See id.* It is indisputable

24

(and undisputed) that semiautomatic firearms equipped with detachable magazines and features like a pistol grip have been in civilian hands in this country for over a hundred years.[7]

Nevertheless, the earliest state laws treating features like pistol grips, collapsible stocks, or barrel shrouds as sufficient to convert an otherwise-lawful semiautomatic firearm into a so-called "assault weapon" date back to only 1989—which is far too late to serve as an indicator of a historical tradition. *See Bruen*, 597 U.S. at 36-37; *see also United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) (deeming supposedly analogous "firearm restrictions" that did not come around "until 1938" insufficiently "longstanding" to provide a basis to find a historical tradition of similar regulation); *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 962-63 (9th Cir. 2014) (looking only to supposed analogues in founding-era and Reconstruction-era fire safety laws in the context of a challenge to regulations on handgun storage and sales of certain ammunition). As for the federal government, it did not restrict semiautomatic firearms *at all* until 1994, when Congress adopted

---

[7] In addition to common semiautomatics, the AWCA also bans shotguns that operate with a revolving cylinder. *See* Cal. Penal Code §30515(8). These arms are even *less* novel than semiautomatics; Samuel Colt himself manufactured shotguns with revolving cylinders before the Civil War. *See, e.g.*, Lot 1249, Rock Island Auctions Co. (Sept. 8, 2018), http://tinyurl.com/yurawrwx (selling an "original example of a Colt Model 1839 Revolving Shotgun that was manufactured at Samuel Colt's Paterson, New Jersey, factory c. 1839-1841").

a nationwide ban on certain semiautomatic firearms and ammunition feeding devices with a capacity of more than ten rounds. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). And Congress allowed that law to expire in 2004 after a Justice Department study revealed that it had produced "no discernable reduction" in violence committed with firearms. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice*, U.S. Dep't of Justice 96 (2004), *available at* https://bit.ly/3wUdGRE.

To be sure, modern firearms are more accurate and capable of quickly firing more rounds than their founding-era (or even early-twentieth-century) predecessors. But that does not make them any less linear descendants of the "small-arms weapons used by militiamen … in defense of person and home" when the Second Amendment was ratified. *Heller*, 554 U.S. at 624-25; *see also Caetano*, 577 U.S. at 416-17 (Alito, J., concurring in the judgment) (noting that "revolvers and semiautomatic pistols" are protected as descendants of arms in common use at the founding). After all, it would be perverse to confine the people whose rights the Second Amendment protects to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists. *See Bruen*, 597 U.S. at 70.

Moreover, much of what California says about why the firearms it bans are supposedly different from other arms long in common use could be said equally of

the handguns *Heller* held protected. That is precisely why the Supreme Court eschewed a test focused on which arms are capable of doing the most damage in the hands of the small number of people bent on misusing them, in favor of a test focused on which arms law-abiding citizens commonly conclude best serve their needs (even if legislators think they know better). And far from treating technological advancements aimed at improving the accuracy, firing capacity, and functionality of firearms as nefarious developments that made firearms "too dangerous," history establishes time after time that those are precisely the kinds of things people have consistently looked for when determining how best to protect self, others, and home.

2. To the extent California seeks to excuse the relative novelty of "assault weapons" bans as owing to some "unprecedented societal concern[]," *Bruen*, 597 U.S. at 27; *see* AG.Br.19, 35-36, 50-51, that argument fails too. Even accepting the dubious proposition that there is some causal link between the arms California has banned and the horrific acts on which the district court focused, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). Nevertheless, before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds," *Miller*, 542 F.Supp.3d at 1024,

and there were almost no efforts to restrict the firing capacity of semiautomatic arms. This was not, as the state suggest, because such firearms were adopted only by militaries. On the contrary, the types of semiautomatic firearms that California bans were popular with civilians long before they gained traction militarily. *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 463, 519 (2d ed. 2018).

Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 597 U.S. at 47; *Heller*, 554 U.S. at 627. Because California's ban flies in the face of that historical tradition, it violates the Second Amendment.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

s/Erin E. Murphy

|  |  |
|---|---|
| LAWRENCE G. KEANE | PAUL D. CLEMENT |
| NATIONAL SHOOTING SPORTS | ERIN E. MURPHY |
| FOUNDATION, INC. | *Counsel of Record* |
| 400 N. Capitol Street, NW | MATTHEW D. ROWEN[*] |
| Washington, DC 20001 | CLEMENT & MURPHY, PLLC |
| (202) 220-1340 | 706 Duke Steet |
|  | Alexandria, VA 22314 |
|  | (202) 742-8900 |
|  | erin.murphy@clementmurphy.com |

[*] Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation*

December 29, 2023

29

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, according to the "word count" function of Microsoft Word 2016, it contains 6,990 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.


December 29, 2023

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy