No. 23-2979

In the
United States Court of Appeals for the Ninth Circuit

JAMES MILLER, *ET AL.*,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellant*.

On Appeal from the
United States District Court for
the Southern District of California

Brief *Amicus Curiae* of Gun Owners of America, Inc.,
Gun Owners Foundation, Gun Owners of California, Inc.,
Heller Foundation, Tennessee Firearms Association,
America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and
Conservative Legal Defense and Education Fund
in Support of Plaintiffs-Appellees and Affirmance

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  *Attorneys for Amici Curiae*

December 29, 2023
*Attorney of Record

## DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., Heller Foundation, Tennessee Firearms Association, America's Future, Inc., U.S. Constituitonal Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A). These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.  CALIFORNIA'S HOSTILITY TO FIREARMS NOW EXTENDS TO THE SUPREME COURT, THE *HELLER* AND *BRUEN* DECISIONS, AND ANY CIRCUIT COURT WHICH FAITHFULLY APPLIES THOSE DECISIONS . . . . . .  4

    A.  California Has Demonstrated Hostility to the Supreme Court and to *Bruen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    B.  *Bruen* Reset the Compass . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    C.  California Invites this Court to Take a Narrow View of Self-Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

II.  ASSAULT WEAPONS ARE PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT, AND CALIFORNIA FAILED TO PROVIDE RELEVANT HISTORICAL ANALOGUES . . . . . . . . . . . . . . . . . . . . . . .  13

    A.  California Seeks to Twist the *Bruen* "Plain Text" Test, as It Previously Did with the *Heller* Test . . . . . . . . . . . . . . . . . . . .  15

    B.  Under *Heller* and *Bruen*, Assault Weapons Are Bearable Arms .  16

    C.  California Failed to Provide Relevant Historical Analogues for Its Assault Weapon Ban . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

III. THE FEATURES BY WHICH CALIFORNIA DEFINES AN ASSAULT
WEAPON DO NOT TRANSFORM CONVENTIONAL SEMIAUTOMATIC
WEAPONS INTO SOME FRIGHTENING BREED OF ARMS . . . . . . . . . . . 22

    A.    Conspicuous or Forward Pistol Grips (Sections (A) and (F)) . . . 24

    B.    Thumbhole Stocks (Section (B)) . . . . . . . . . . . . . . . . . . . 25

    C.    Folding or Telescoping Stocks (Section (C)). . . . . . . . . . . . 26

    D.    Grenade or Flare Launcher (Section (D)). . . . . . . . . . . . . . 27

    E.    Flash Suppressor (Section (E)) . . . . . . . . . . . . . . . . . . . 28

    F.    A Semiautomatic, Centerfire Rifle that Has a Fixed Magazine
        with the Capacity to Accept More than 10 Rounds (Cal. Penal
        Code § 30515(a)(2)) . . . . . . . . . . . . . . . . . . . . . . . . 30

    G.    An "Overall Length of less than 30 Inches" (Cal. Penal Code
        § 30515(a)(3)) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    H.    California Uses Arbitrary, Sometimes Counterproductive,
        Always Irrelevant Criteria . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

Page

**UNITED STATES CONSTITUTION**
Article V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

**STATUTES**
26 U.S.C. § 5845 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30
Cal. Penal Code § 30510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Cal. Penal Code § 30515 . . . . . . . . . . . . . . . . . . . . 2, 4, 23, 24
Federal Assault Weapons Ban, 108 *Stat*. 1796. . . . . . . . . . . . . . . . . . . . 23

**CASES**
*Beers v. AG United States*, 927 F.3d 150 (3d Cir. 2019) . . . . . . . . . . . . . . 7
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . 1, *passim*
*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*en banc*). . . . . . . . . . . . . 25
*McDonald v. Chicago*, 561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . 1, 7
*NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
      2012 U.S. App. LEXIS 26949 (5th Cir. 2012) . . . . . . . . . . . . . . 7
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) . . . . 3, *passim*
*Rupp v. Bonta*, 2022 U.S. App. LEXIS 18769 (9th Cir. 2022) . . . . . . . . . . 3
*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) . . . . . . . . . . . . . . . . 10
*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) . . . . . . . . . . . . . . . . . 14
*United States v. Chapman,* 666 F.3d 220 (4th Cir. 2012) . . . . . . . . . . . . . 14
*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . . 7
*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) . . . . . . . . . . . . . . . . . 7

**MISCELLANEOUS**
J. Campbell, "California governor signs gun control measures into law,
      including nation's first state tax on firearms and ammunition," *CNN*
      (Sept. 27, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
"Classic M203 Receiver," *LMT Defense* . . . . . . . . . . . . . . . . . . . . . 27
"Colt / AAI M203," *Military Factory* (Aug. 10, 2023) . . . . . . . . . . . . . . 28
"How Does a Flash Hider Work?" *Silencer Shop* (Dec. 14, 2022). . . . . . . . . 29

W.J. Krouse, "Gun Control: ATF Final 'Stabilizing Brace' Rule," *Congressional Research Service* (Mar. 24, 2023). . . . . . . . . . . . . . . 30

John R. Lott, Jr., "What type of gun control will actually make us safer?" Testimony before the Joint Economic Committee of the U.S. House of Representatives and the Senate (Sept. 18, 2019). . . . . . . . . . . . . . 31

"National Firearms Act Handbook," *ATF* (Apr. 2009) . . . . . . . . . . . . . . 28

T. Nerozzi, "ATF director refuses to define 'assault weapon,' says it's up to Congress," Fox News (Apr. 26, 2023) . . . . . . . . . . . . . . . . . . 22

"The Pros and Cons of Using Compensators on Firearms," *Precision Outdoors* (Nov. 10, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Jeffrey A. Roth & Christopher S. Koper, "Impacts of the 1994 Assault Weapons Ban: 1994-96," *National Institute of Justice* (Mar. 1999) . . . 31

Sources of Our Liberties (R. Perry and J. Cooper, eds., Am. Bar Fdn., Rev. ed. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

"The Truth About So-Called 'Assault Weapons,'" *NRA-ILA* . . . . . . . . . . . 23

D. Walters, "Gavin Newsom channels Jerry Brown with constitutional amendment proposal," *Cal Matters* (Aug. 21, 2023) . . . . . . . . . . . . . 5

"What Does a Muzzle Brake Do?" *American Gun Association* . . . . . . . . . . 29

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., Heller Foundation, Tennessee Firearms Association, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE CASE

Thirty-four years ago, California enacted a ban on certain conventional semiautomatic firearms, in the state's "Roberti-Roos Assault Weapons Control Act of 1989" ("AWCA").[2] That law criminalized possession of certain semiautomatic firearms listed by make and model. *See* Cal. Penal Code

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] AWCA's enactment occurred 19 years before *District of Columbia v. Heller*, 554 U.S. 570 (2008) when the Second Amendment was conclusively deemed an individual right, and 21 years before *McDonald v. City of Chicago*, 561 U.S. 742 (2010), when the Second Amendment was confirmed as applying to the states.

§ 30510(a)-(c). The current action does not challenge these provisions of the 1989 statute. However, in 1999, California amended its law to expand its list of "assault weapons" to include semiautomatic firearms which had certain features. Cal. Penal Code § 30515(a)(1)-(a)(8). Both laws contained a limited "grandfather" provision, allowing continued possession of banned weapons. *See* Appellant's Opening Brief ("Appellant's Br.") at 11, n.7.[3]

Five individual gun owners and six Second Amendment rights groups filed a complaint against then-Attorney General Xavier Becerra and others challenging the constitutionality of the 1999 AWCA under the Second Amendment. On September 23, 2020, the district court denied California's motion to dismiss. *Miller v. Becerra*, 488 F. Supp. 3d 949, 957 (S.D. Cal. 2020). On June 4, 2021, the district court invalidated certain provisions of the AWCA. After a trial on the merits, the court ruled that the AWCA amounted to a ban on the possession of such weapons, and that "[a] law that imposes such a severe restriction on the

---

[3] The 1999 statute also banned standard-capacity magazines capable of containing more than 10 rounds of ammunition, terming them "large-capacity" magazines" — a provision challenged in other litigation before this Court. Some of these *amici* have previously filed four *amicus* briefs in support of that challenge. *See Duncan v. Bonta*, Ninth Circuit No. 19-55376; *Duncan v. Bonta*, U.S. Supreme Court No. 21-1194. Yesterday, these *amici* filed a fifth *amicus* brief supporting the Plaintiffs-Appellees in *Duncan v. Bonta,* Ninth Circuit No. 23-55805.

2

fundamental right of self-defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1026 (S.D. Cal. 2021) (quoting *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017)). Accordingly, the court enjoined enforcement of the challenged provisions. *Id*. at 1069. The Ninth Circuit stayed the injunction pending its determination of a similar challenge in *Rupp v. Bonta*, 2022 U.S. App. LEXIS 18769 (9th Cir. 2022), after the district court for the Central District of California upheld the AWCA.

After the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), this Court vacated both the *Rupp* and *Miller* decisions, remanding both cases to district court for further proceedings in light of *Bruen*. *See Rupp*; *Miller v. Bonta*, 2022 U.S. App. LEXIS 21172 (9th Cir. 2022).

On October 19, 2023, the district court below found the California ban unconstitutional under *Bruen*, ruling that "the State's ban on modern semi-automatics has no historical pedigree." *Miller v. Bonta*, 2023 U.S. Dist. LEXIS 188421, at *20 (S.D. Cal. 2023). The court permanently enjoined the

3

law, but granted a 10-day stay of its injunction. On October 30, 2023, this Court stayed the district court's injunction pending resolution of this appeal.

## ARGUMENT

### I. CALIFORNIA'S HOSTILITY TO FIREARMS NOW EXTENDS TO THE SUPREME COURT, THE *HELLER* AND *BRUEN* DECISIONS, AND ANY CIRCUIT COURT WHICH FAITHFULLY APPLIES THOSE DECISIONS.

The district court's opinion was issued in response to this Court's direction to address how the *Bruen* decision should be applied to evaluate Plaintiffs-Appellees' challenge to the California ban on assault weapons in Cal. Penal Code §§ 30515, *et seq. See Miller v. Bonta*, 2022 U.S. App. LEXIS 21172 (9th Cir. 2022). The analysis employed by the district court and the result obtained were fully consistent with *Bruen*'s directives. Nevertheless, California challenges the district court opinion at every turn. On closer examination, it becomes apparent that California's objections are not based on any alleged misapplication of *Bruen*, but rather exist because the district court faithfully followed *Bruen*.

### A. California Has Demonstrated Hostility to the Supreme Court and to *Bruen*.

The California government is led by officials who have demonstrated hostility not just to the "right to keep and bear arms," but also to the *Bruen*

4

decision. When *Bruen* was before the Supreme Court on the merits, California

joined other states in filing an *amicus* brief urging virtually unlimited latitude for

states to restrict gun rights, in stark opposition to the approach eventually taken

by the *Bruen* Court.[4] Since the *Bruen* decision was issued, California Governor

Gavin Newsom has roundly criticized it, the Supreme Court generally, and those

circuit courts that have followed it:

> Newsom slammed last year's landmark US Supreme Court decision
> expanding gun rights and criticized lower circuit courts that have
> since overturned gun control measures.[5]

> "This Supreme Court is that bad…. The Bruen decision was that
> bad. When I say code red, this is code red. California's led the
> nation on common sense gun safety laws."[6]

In fact, Governor Newsom has become so agitated by *Bruen* that he has

called upon legislatures of three-quarters of the states to undo that decision by

---

[4] *See* Brief for the States of California … as *Amici Curiae*, in Support of
Respondents in *New York State Rifle & Pistol Assn. v. Bruen*, No. 20-843 (Sept.
21, 2021) ("[T]here is 'no general right to carry arms into the public square for
self-defense….'" *Id*. at 3. "Intermediate Scrutiny Is the Proper Form of Means-
Ends Analysis for Public Carry Regulations." *Id*. at 23.).

[5] J. Campbell, "California governor signs gun control measures into law,
including nation's first state tax on firearms and ammunition," *CNN* (Sept. 27,
2023).

[6] D. Walters, "Gavin Newsom channels Jerry Brown with constitutional
amendment proposal," *Cal Matters* (Aug. 21, 2023).

5

calling for an Article V Constitutional Convention to adopt his Proposed 28th Amendment, *inter alia*, which would limit gun rights. The full contours of the proposed amendment have not yet been identified, but they include an authorization for government to prohibit the sale, loan, or transfer of so-called "assault weapons" and other pejoratively labeled "weapons of war" to private citizens.[7] By leading an effort to enact a constitutional amendment to enable California to ban assault weapons, Governor Newsom can be seen to have implicitly recognized that California's current ban violates the Second Amendment. Of course, not wanting to wait for the Article V constitutional amendment process to play out, it is no surprise that California's Opening Brief now asks this Court to find a way to evade *Bruen* according to a playbook it has used in the past — by twisting the Supreme Court's guidance in a manner that undermines its decisions — an invitation that this Court should reject.

**B.    *Bruen* Reset the Compass.**

The *Heller* decision restored life to a pre-existing, constitutionally enumerated individual right that the State of California does not trust its citizens to exercise. In the aftermath of *Heller*, it appeared that most federal judges

---

[7]  *See* California Senate Joint Resolution 7 (passed Sept. 21, 2023).

6

across the country also believed it too dangerous to entrust Americans with a right to "keep and bear arms" without a bevy of government restrictions. Should this Circuit again find novel ways to narrow the *Bruen* holding, it would repeat the mistake in evading the 2008 *Heller* decision (as applied to the federal government) and the 2010 *McDonald* decision (as applied to the states) until the corrective *Bruen* decision in 2022. During this period, courts of appeals invented the "two-step test," which was little more than a cleaned-up version of the balancing test urged in dissent by Justice Breyer, but soundly rejected in the majority opinion in *Heller*. *See Heller* at 634-35.

This Circuit adopted the now-abrogated two-step framework to review Second Amendment challenges in *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013). On step one, this and other circuit courts frequently found that a law restricting firearms did not actually "burden conduct protected by the Second Amendment."[8] And, often, circuit courts merely "assumed" there was a burden, only to deny rights based on some invented level of scrutiny (employing interest balancing as Justice Breyer urged in his dissent in *Heller*) in step two.

---

[8] *See, e.g.*, *Beers v. AG United States*, 927 F.3d 150, 152 (3d Cir. 2019); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021); *NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2012 U.S. App. LEXIS 26949 (5th Cir. 2012).

7

Although the "two-step" test gave the appearance of a legitimate judicial test, in reality it undermined the protection that the Second Amendment was designed to provide.

*Bruen* rejected two-step test's subjective and vague "**burden conduct protected by**" test does not appear in *Bruen*, which instead requires only that the challenged restriction is envisioned by the "**plain text**" of the Amendment. How *Bruen* applied its "plain text" threshold issue with respect to bearing firearms outside the home illustrates how it should be applied here to so-called "assault weapons."

> We therefore turn to whether the **plain text** of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.... The Second Amendment's **plain text** thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense. [*Bruen* at 2134-35 (emphasis added).]

Seeing how *Bruen* handled the issue of "bearing" firearms demonstrates what an examination of the "plain text" means. In the post-*Bruen* period, we again are at risk that courts of appeals, often composed of judges with no sympathy for that decision, are tempted by litigants like California to find new ways to evade another Second Amendment Supreme Court decision. There is no doubt that many judges love interest-balancing tests, as such tests empower them

8

to issue decisions based on their personal preferences under the guise of objective analysis. Nonetheless, these *amici* urge this Court to accept Justice Scalia's admonition that the Second Amendment is "the very *product* of an interest balancing by the people — which Justice Breyer would now conduct for them anew," and thus is not "subject to future judges' assessments of its usefulness." *Heller* at 634-35.

The *Heller* Court forbade allowing federal judges to balance (i) governmental claims of power to protect public safety against (ii) the individual right to "keep and bear" arms, since the result would be that there would be "no constitutional guarantee at all." *Id.* at 634. Previously, California asked this Court to twist the *Heller* test to justify many infringements on gun rights, requiring it to be corrected by the Supreme Court in *Bruen*. Now, as detailed below, California is asking this Court to twist the *Bruen* test to justify ongoing infringements on gun rights. This Court should not have followed California's lead before and certainly should not do so now.

## C. California Invites this Court to Take a Narrow View of Self-Defense.

California takes a very narrow view of the type of self-defense which the Second Amendment protects. Before *Heller*, California did not believe the

9

Second Amendment even protected the right of an individual to possess a handgun in the home.[9]  The self-defense right protected by the Second Amendment is much more robust than resisting a lone intruder, but even there, a commonly owned semiautomatic rifle, handgun, or shotgun — with design features the legislature finds troublesome (*see* Section III, *infra*) — can be required.  *See Miller* at *8.  It also includes the right of Americans to serve in a militia to defend our government against terrorism or other external threats, and also to resist our government, should it someday become tyrannical, to preserve a "free state."  *See Heller* at 597-98.

In the Declaration of Independence, America's founders viewed armed resistance to tyranny as not only a "right," but also a "duty."  Having experienced the loss of their rights as Englishmen, the American people were not so sanguine to think that the new governments they were creating could not, themselves, devolve into despotism.  Thus, the people of Virginia reaffirmed in their 1776 state constitution "that … a majority of the community hath an indubitable, inalienable, and indefeasible right to reform, alter, or abolish" the

---

[9]  Before *Heller*, California apparently took the "collective rights" position that the Second Amendment only authorized arming a state militia and did not establish any individual right whatsoever.  *See Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) (cert. denied).

very government created by such constitution "in such manner as shall be judged most conducive to the public weal." Sources of Our Liberties (R. Perry and J. Cooper, eds., Am. Bar Fdn., Rev. ed. 1978) at 311. *See also* 1776 Pennsylvania Constitution, Sources, p. 329. To that end, the Virginia Constitution guaranteed "a well-regulated militia, composed of the body of the people, trained to arms, [as] the proper, natural, and safe defence of a free State…." 1776 Virginia Constitution, Section 13, Sources at 312. To the same end, the Pennsylvania Constitution guaranteed to "the people [the] right to bear arms for the defence of themselves and the state…." 1776 Pennsylvania Constitution, Section XIII, Sources at 330. Self-defense against external threats or governments requires robust weapons, sometimes more than those needed for self-defense against a single criminal.

In fact, read in light of *Heller* and *Bruen*, and in stark contrast to California's position, if a bearable arm is useful in militia service, this only **strengthens** the Second Amendment's protection of the firearm under a proper historical analysis. Defense of one's fellow citizens against tyrannical governments and hostile foreign forces was a quintessentially lawful purpose. As

11

*Heller* noted, King George III had attempted to disarm the Americans in order to ensure superiority of firepower to the British:

> [W]hat the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists.  In the tumultuous decades of the 1760's and 1770's, the Crown began to disarm the inhabitants of the most rebellious areas.  That provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms. [*Heller* at 594.]

Effectuating the lawful purpose of defense against tyrannical government and foreign attackers requires parity of firepower with opposing forces.  *Heller* makes this clear.  The military nature of a bearable arm not only fails to take the weapon outside the ambit of the Second Amendment, but was also in fact one of the intended purposes for which the Amendment was enshrined.  There are many reasons why the militia was thought to be "necessary to the security of a free State," including that, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny."  *Heller* at 598. California's idea that government may prohibit weapons with any military capability — because of that capability — is at direct odds with the purpose and intent of the Second Amendment.  As Justice Story noted in his Commentaries:

> The right of the citizens to keep and bear arms has justly been considered as **the palladium of the liberties** of a republic, since it offers a strong moral check against the usurpation and **arbitrary**

12

**power of rulers**, and will generally, even if these are successful in the first instance, enable the people to **resist and triumph** over them. [Cited in *Heller* at 667-68 (emphasis added).]

California automatically assigns an "offensive" character to military weapons. *See*, *e.g.*, Appellant's Br. at 7, 18, 25. But in stark contrast with California's position, to the Framers as they drafted the Second Amendment, such military applications were defensive, not "offensive." "'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.'" *Heller* at 624-25.

## II. ASSAULT WEAPONS ARE PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT, AND CALIFORNIA FAILED TO PROVIDE RELEVANT HISTORICAL ANALOGUES.

In *Bruen*, the U.S. Supreme Court set out the test to be used by reviewing courts:

In keeping with *Heller*, we hold that when the Second Amendment's **plain text covers an individual's conduct**, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, **the government must demonstrate** that the regulation is **consistent with this Nation's historical tradition** of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*Bruen* at 2126 (emphasis added).]

13

Step one of the discredited two-step test allowed courts to deem that many firearm restrictions fell "outside the scope of the right as originally understood" and thereby circumvented the constitutional text. Courts skeptical of firearms often would make a threshold finding that an obvious restriction on gun rights did not even "implicate" the Second Amendment. Or, sometimes a court would casually "assume without determining" that the restriction implicated the text only to uphold the restriction using permissive interest balancing under step two.[10]

*Bruen* banished the two-step test once and for all. It confirmed the preeminence of the Constitution's unadorned, "plain text." As this Court recently explained in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), in determining "'whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct,'" the *Bruen* Court "analyzed only the 'Second Amendment's text,' applying ordinary interpretive principles." *Id.* at 948. Then, it put the burden on the government to show relevant historical analogues of similar restrictions. Here, California's efforts to evade the "plain

---

[10] *See, e.g., United States v. Chapman,* 666 F.3d 220, 226 (4th Cir. 2012).

14

text" threshold issue should be rejected, and its attempt to demonstrate a pattern of similar restrictions by use of a "nuanced" approach fares no better.

**A.  California Seeks to Twist the *Bruen* "Plain Text" Test, as It Previously Did with the *Heller* Test.**

Insofar as the California statute criminalizes possession of semiautomatic rifles, handguns, and shotguns characterized as "assault weapons" which are "commonly used" in most states, one would have thought that California would have conceded that "the Second Amendment's **plain text** covers an individual's conduct" in possessing such a weapon.  *Bruen* at 2126 (emphasis added).  That approach still would have allowed California to attempt to show "this Nation's historical tradition of firearm regulation."  *Id*.  Rather, California's opening brief denies that the "plain text" of the Second Amendment covers the issue by erroneously adding a "historical" component to what should have been a simple application of "ordinary interpretive principles."  California misstates the *Bruen* rule, as follows:

> The threshold question under the *Bruen* framework is whether plaintiffs have carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct.  *Bruen*, 142 S. Ct. at 2130....  To answer that question, the Court addresses whether "the Second Amendment's **plain text** covers [the] conduct."  [*Id*.] at 2129-2130.  **That inquiry considers "the normal and ordinary meaning of the Second Amendment" as well as its**

15

**"historical background."** *Id*. at 2127 (internal quotation marks omitted).  [Appellant's Br. at 21 (emphasis added).]

Although the words "historical background" which California quotes do appear in the *Bruen* decision, California misrepresents them as describing the initial inquiry of the *Bruen* test.  Actually, Justice Thomas was describing how *Heller* reached its conclusion that "'the Second Amendment conferred an **individual right** to keep and bear arms.'"  *Bruen* at 2127 (emphasis added). Justice Thomas was not discussing the test that courts should apply under *Bruen*'s textual threshold inquiry.  Clearly, the "plain text" of the Second Amendment covers the California law, and thus presumptively all bearable firearms.  If California wants to defend its law and rebut the presumption that the Second Amendment protects so-called "assault weapons," it has the burden to demonstrate relevant historical analogues.  California cannot evade that burden by shoehorning "historical background" into the "plain text" analysis, as it previously convinced this Court to do at step one of the two-step test.

### B.    Under *Heller* and *Bruen*, Assault Weapons Are Bearable Arms.

California argues that so-called "assault weapons" are not bearable arms, and then argues that based on a "nuanced" view of the historical analogue

16

requirement, no real historical analogue is required.  But the Supreme Court has made clear that modern firearms are bearable weapons.

> The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." … Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." …  Although one founding-era thesaurus limited "arms" (as opposed to "weapons") to "instruments of offence *generally* made use of in war," even that source stated that **all firearms constituted "arms."**  [*Heller* at 581-82 (bold added, italics original).]

Lest the definition of arms be viewed too narrowly, the Court added, "[s]ome have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.  We do not interpret constitutional rights that way…." *Id*. at 582.  Indeed, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen* at 2132 (quoting *Heller* at 582).

California attempts to create an arbitrary classification for weapons used for "military" purposes, in an effort to somehow read those weapons out of the

Second Amendment's plain text and avoid its historical burden. But *Heller* anticipates these arguments. *Heller* made clear that weapons used for military purposes were not only permitted but also explicitly contemplated under the Second Amendment's protections: "'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.'" *Heller* at 624-625. Indeed, the members of the militia "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 624.

Nothing in the Second Amendment's plain text can aid California's arbitrary and atextual conclusion that adding useful features to a semiautomatic rifle takes it outside of the definition of a bearable arm.

## C. California Failed to Provide Relevant Historical Analogues for Its Assault Weapon Ban.

Since "assault weapons" are presumptively protected by the Second Amendment, the only remaining issue is whether California has "demonstrate[d] that the regulation is **consistent with this Nation's historical tradition** of firearm regulation." *Bruen* at 2126 (emphasis added). There is no means-end scrutiny to be employed and no need or utility for recitations of the dangers and risks of firearms. There is no deference to the legislative branch whatsoever, because

18

"while that judicial deference to legislative interest balancing is understandable —
and, elsewhere, appropriate — it is not deference that the Constitution demands
here. The Second Amendment 'is the very *product* of an interest balancing by
the people....'" *Id*. at 2131 (citing *Heller* at 635).

The Attorney General tries to make much out of *Bruen*'s dicta: "when the
challenged regulation 'implicat[es] unprecedented societal concerns or dramatic
technological changes,' that 'may require a more nuanced approach.'"
Appellant's Br. at 33 (citing *Bruen* at 2132). California insists that semiautomatic
rifles with certain features involve "'dramatic technological changes'" since the
days of muskets, and that shootings are an "'unprecedented societal concern,'"
thereby justifying a ban on some semiautomatic rifles as a "'nuanced'" response.
*Id*.

The basic rule of *Bruen*, of course, is anything but "nuanced." *Bruen*
describes the Second Amendment as an "'unqualified command'" (*Bruen* at
2126), demanding "unqualified deference" from the courts. *Id*. at 2131. The
fact that modern firearms are more modern than revolutionary weapons is not
dispositive, or every new type of gun would be subject to ban. The court below
considered the issue and noted that by the time the Fourteenth Amendment was

ratified in 1868, firearms had undergone "dramatic technological changes" since 1791. Yet the technological advancements did not change the meaning of the Second Amendment right, as the district court explained:

> [T]he lever-action repeating Henry and Winchester rifles that were popular at the time of the Fourteenth Amendment were also dramatic technological advancements in firearms. These popular lever-action rifles had large tubular magazines and could be fired multiple times in succession very accurately and quickly. Yet, [California proffers] no state prohibitions on the possession or manufacture of these lever-action rifles [contemporaneous to the Fourteenth Amendment]. [*Miller* at *47-48.]

Thus, the district court quite properly rejected California's attempt to convert *Bruen*'s careful historical analysis into a covert means-end scrutiny balancing test. It examined California's complete ban on rifles, handguns, and shotguns with certain features and concluded correctly that it was anything but a "nuanced" analogue to historical gun regulations. The court struck down California's unprecedented complete ban "prohibit[ing] simple possession" of semiautomatic rifles, noting that "[t]he history and tradition of concealed carry prohibitions are not nuanced analogues for California's 'assault weapon' ban. At best, it is a historical twin for California's present laws restricting the concealed carrying of firearms." *Miller* at *63-64. The court rightly rejected California's effort to convert *Bruen* into a "closet means-end scrutiny" holding. "Nuance"

20

aside, this Court still must "identify a well-established and representative historical *analogue*" to California's unprecedented ban, in order to uphold it. *Bruen* at 2133. This, as the district court has noted, California has utterly failed to do. "But **reliance on history to inform the meaning of constitutional text — especially text meant to codify a** *pre-existing* **right — is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits** of firearms restrictions....'" *Id.* at 2130 (bold added, italics original).

California seeks to convince judges not merely to adopt their own "judge-empowering interest-balancing tests," but to defer to the legislature and abandon the historical analysis required by *Bruen* as too extreme. "When **legislatures charged with protecting** the safety of their communities enact laws addressing novel firearms technologies or new societal concerns, it stands to reason that **there will be no historical precursors** addressing the same technologies and concerns.... Without 'a nuanced approach,' ***Bruen*'s** 'analogical inquiry' would **unduly constrain** legitimate regulatory efforts...." Appellant's Br. at 37 (emphasis added). The Constitution cannot be overridden by the legislature or the judiciary. The district court gave the Appellant plenty of opportunity to

provide historical analogues to support the assault weapon ban. *See Miller* at

*44. The district court correctly concluded that "the 'assault weapon' prohibition

has no historical pedigree and it is extreme." *Id*. at *5.

## III. THE FEATURES BY WHICH CALIFORNIA DEFINES AN ASSAULT WEAPON DO NOT TRANSFORM CONVENTIONAL SEMIAUTOMATIC WEAPONS INTO SOME FRIGHTENING BREED OF ARMS.

The term "assault weapon" has no independent, fixed meaning in the

firearms industry or anywhere else. When asked if he knew what an assault

weapon is, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

Steven Dettelbach demurred, stating it was not something he was qualified to rule

upon.[11] Indeed, the term "assault weapon" is a pejorative, political term affixed

to many commonly owned weapons lawfully used for self-defense. The term was

designed to persuade the public, politicians, and judges that such arbitrarily

classified weapons are somehow inherently more dangerous than other firearms

and only useful to facilitate mass shootings. Research into the derivation of the

term showed the following:

---

[11] T. Nerozzi, "ATF director refuses to define 'assault weapon,' says it's up to Congress," *Fox News* (Apr. 26, 2023).

22

In 1984, a group called Handgun Control, Inc. first used the term "assault weapon" in reference to a rifle in a newspaper advertisement.

A few years later, in 1988, the term rose in prominence after Josh Sugarmann, a gun control advocacy group's communications director, stated in a Violence Policy Center paper:

> "The weapons' **menacing looks**, coupled with the **public's confusion** over fully automatic machine guns versus semi-automatic assault weapons — anything that looks like a machine gun is assumed to be a machine gun — can only **increase the chance of public support** for restrictions on these weapons."

["The Truth About So-Called 'Assault Weapons,'" *NRA-ILA* (emphasis added).]

The California "assault weapons" ban criminalizes possession of widely owned semiautomatic rifles, handguns, and shotguns, establishing somewhat different criteria necessary to convert each type of lawfully owned weapon into an assault weapon. For rifles, assault weapons are those centerfire rifles which have detachable magazines and **any one**[12] of the following features:

(A) A pistol grip that protrudes conspicuously beneath the action of the weapon;
(B) A thumbhole stock;
(C) A folding or telescoping stock;
(D) A grenade launcher or flare launcher;

---

[12] In 1994, Congress imposed a Federal Assault Weapons Ban, 108 *Stat.* 1796, which defined assault weapons in a manner similar to California's ban, but which required "**two or more**" of the features viewed as offensive — not just "one" as California provides. The law contained a sunset provision and after 10 years was allowed to expire.

(E) A flash suppressor; [or]

(F) A forward pistol grip. [Cal. Penal Code § 30515(a)(1).]

Also included are all semiautomatic centerfire rifles with a fixed magazine capable of accepting more than 10 rounds or an overall length of less than 30 inches. *See* Cal. Penal Code § 30515(a)(2)-(3).

California makes scant attempt to explain how any of these features convert a lawful semiautomatic rifle to one that should send someone to jail. On the contrary, some of these features have no effect on the amorphous, asserted "dangerousness" of the weapon at all, while others are ergonomic, safety-increasing items that reduce or eliminate unintended harm. None of these features increase a bullet's muzzle velocity, its terminal effectiveness (lethality), the mechanical rate of fire of a weapon itself, or one's ability to move the muscles in their trigger finger more quickly. All of California's purported "justifications" in its Opening Brief for prohibiting these features in so-called "assault rifles" are set out, and commented on, below.

## A. Conspicuous or Forward Pistol Grips (Sections (A) and (F)).

California offers three justifications for its criminalization of pistol grips. (i) "A second handgrip or barrel shroud can help a shooter hold a pistol with two hands during rapid fire to counter muzzle rise." Appellant's Br. at 8. (ii) "[A]

24

pistol grip beneath the action, an adjustable stock … can help a shooter conceal the shotgun or fire more accurately and rapidly." *Id*. at 8. (iii) "[P]istol grips … enable more lethal rapid fire by enhancing control and countering muzzle rise." *Id*. at 26.

In other words, California law prefers rifles that are less accurate, as if that feature somehow contributes to "public safety." The opposite is true. The increased ability to control a firearm assists in all contexts, including self-defense. Contrary to California's fearmongering, pistol grips and other ergonomic handheld surfaces are ubiquitous safety-improving features that promote comfort, stability, and accuracy, and "'[t]he defensive application is obvious, as is the public safety advantage in preventing stray shots.'" *Kolbe v. Hogan*, 849 F.3d 114, 159 (4th Cir. 2017) (*en banc*) (Traxler, J., dissenting).

## B. Thumbhole Stocks (Section (B)).

California's brief never even tries to explain how a "thumbhole stock" increases the dangerousness of a firearm. It makes two statements only: (i) "a thumbhole stock … enables the shooter to place the thumb of the trigger hand within the stock…." (*id*. at 11-12) and (ii) a weapon becomes "an assault weapon if it is equipped with … a thumbhole stock…." (*id*. at 12). Similar to pistol

25

grips, thumbhole stocks enable a more ergonomic grip on a firearm, reducing inaccuracy.

### C.   Folding or Telescoping Stocks (Section (C)).

California offers three justifications for criminalizing the possession of folding or telescoping stocks.  First, it states that "a folding or telescoping stock attached to the receiver ... allows for shoulder firing."  *Id*. at 12.  This is no reason at all, as it functions the same as a fixed stock.  Second, California then states:  "The prohibited features 'serve specific, combat-functional ends' [like] telescoping stocks....  They are 'designed to achieve their principal purpose — "killing or disabling the enemy" on the battlefield.'"  *Id*. at 13.  Again, California makes an assertion not only without proof, but also without any reasoned analysis.  Third, California states "adjustable stocks ... can make a weapon more concealable and help hide the location of a shooter."  *Id*. at 26.  Of course, a handgun is also more concealable than rifles, but that is no reason to ban a semiautomatic rifle.

Contrary to California's frivolous assertions, adjustable stocks simply are ergonomic features in widespread use throughout the country that enable people of all statures, strengths, abilities, and disabilities to tailor their self-defense

26

implements to their own unique needs. For example, a woman standing just over five feet tall needs a different stock length from a man standing well over six feet tall with longer arms, and an adjustable stock permits both to use the same family rifle for self-defense purposes. If California wishes to wave the talisman of "public safety," it cannot be allowed to prohibit the features that have the most direct effect on a firearm user's comfort, accuracy, and attendant safety.

### D.    Grenade or Flare Launcher (Section (D)).

In its Opening Brief, California never defends why the ability of a firearm to accommodate a "launcher" increases the weapon's dangerousness. It simply asserts: "a semiautomatic centerfire rifle qualifies as an assault weapon if it … is equipped with … a grenade or flare launcher…." *Id*. at 11-12. To be clear, here California is not banning grenades or flares — just weapons equipped with launchers.

Such a prohibition makes little sense when one realizes that grenade launchers already are regulated separately under federal law as "destructive devices," requiring taxation and registration with the ATF due to the size of their bore diameters.[13] *See* 26 U.S.C. § 5845(f). These launchers are heavy and

---

[13] *See, e.g.*, "Classic M203 Receiver," *LMT Defense* ("Must have ATF approval as [destructive device] to mount a barrel.").

27

unwieldy, increasing the weight of weapons to which they are attached by over 30 percent[14] and undermining the very "concealability" and maneuverability that California claims to be dangerous. *See* Appellant's Br. at 26.

Flare launchers and other similar pyrotechnic devices "are not weapons" at all,[15] but rather "signaling" and "safety" devices. 26 U.S.C. § 5845(f)(3). Consequently, federal law only proscribes their use with "'anti-personnel' ammunition,"[16] otherwise requiring the same destructive-device registration as grenade launchers in those cases. Without such ammunition, flare launchers are the functional equivalent of flashlights.

### E.    Flash Suppressor (Section (E)).

California justifies criminalization of possessing flash suppressors by stating that: "[P]istol grips, flash suppressors, and barrel shrouds enable more lethal rapid fire by enhancing control and countering muzzle rise…. Flash suppressors … can make a weapon more concealable and help hide the location of a shooter." Appellant's Br. at 26. Interestingly, the California law does not ban "barrel shrouds" which here are described as enabling "more lethal rapid fire."

---

[14]    *See, e.g.*, "Colt / AAI M203," *Military Factory* (Aug. 10, 2023).

[15]    "National Firearms Act Handbook," *ATF* at 150 (Apr. 2009).

[16]    "National Firearms Act Handbook," *supra*, at 150.

California's assault weapon definition includes one "equipped with ... a threaded barrel to which a shooter can attach a flash suppressor...." *Id*. at 12.

But flash suppressors, colloquially called "flash hiders," have no effect on how quickly an individual can pull a trigger with their finger. Instead, they prevent firearm users from being momentarily blinded in low lighting conditions, such as a home owner defending against a late-night home invasion in a dark room. By redirecting the gases that exit the barrel behind a fired bullet, flash hiders also can mitigate muzzle rise and recoil, improving accuracy.[17]

California law already allows accuracy-improving and recoil-mitigating compensators and muzzle brakes, but they, unlike flash hiders, significantly increase the noise level generated by firearms, leading to increased noise pollution, wildlife disturbances, and, with prolonged exposure, hearing damage.[18] In other words, California's prohibition on flash hiders facilitates unnecessary noise and nuisance.

---

[17] *See, e.g.*, "How Does a Flash Hider Work?" *Silencer Shop* (Dec. 14, 2022).

[18] *See, e.g.*, "The Pros and Cons of Using Compensators on Firearms," *Precision Outdoors* (Nov. 10, 2022); "What Does a Muzzle Brake Do?" *American Gun Association*.

29

**F.      A Semiautomatic, Centerfire Rifle that Has a Fixed Magazine with the Capacity to Accept More than 10 Rounds (Cal. Penal Code § 30515(a)(2)).**

California's Opening Brief states that capacities over 10 rounds enable "a shooter to maintain sustained fire for a longer time without pausing to reload." *Id*. at 26.  As the district court observed, sometimes more than 10 rounds are important for normal self-defense purposes. *Miller* at *8 ("Outnumbered seven to one, it took the resident 30 rounds from his AR-15 to stop the attackers.").  If there are any fixed magazines that take over 10 rounds, California has not identified any misuse of such a rifle.

**G.      An "Overall Length of less than 30 Inches" (Cal. Penal Code § 30515(a)(3)).**

California's Opening Brief never explains or even discusses why an overall length of 30 inches is *ipso facto* "safer" than an overall length of 28 inches.  Not even the National Firearms Act takes such an extreme position, setting the threshold of "concealability" at 26 inches.[19]  *See* 26 U.S.C. § 5845(a).  But any arguments as to "concealability" somehow being dangerous fall flat when the

---

[19]  W.J. Krouse, "Gun Control:  ATF Final 'Stabilizing Brace' Rule," *Congressional Research Service*, at 2 (Mar. 24, 2023) ("Since at least 1976, ATF adopted 26 inches in overall length as the determining dimension that separates NFA-regulated 'concealable' smoothbore handguns, or AOWs, from solely GCA-regulated short-stocked, smoothbore firearms.").

30

*most* concealable firearms — handguns — proliferate and enjoy unequivocal constitutional protection. *See Heller* at 629.

## H. California Uses Arbitrary, Sometimes Counterproductive, Always Irrelevant Criteria.

Viewed separately or together, the inherent arbitrariness of these attributes of a semiautomatic rifle which California has decreed make it so dangerous that no Californian may acquire one, make little sense, except as the next stop to incrementally disarm the American people. The truly arbitrary nature of this law can be seen in the fact that assault weapon bans do not affect crime. Dr. John R. Lott, Jr., President, Crime Prevention Research Center, has testified before Congress about the ineffectiveness of various types of gun control:

> Assault weapon bans have been studied extensively, but even researchers funded by the Clinton administration, which enacted the 1994 federal ban, were unable to find evidence that such a ban reduced any type of violence.[20] It doesn't make any sense to ban so-called "military-*style*" weapons, when there are other functionally identical semi-automatic hunting rifles available. [John R. Lott, Jr., "What type of gun control will actually make us safer?" Testimony Before the Joint Economic Committee of the U.S. House of Representatives and the Senate (Sept. 18, 2019).]

---

[20] *See* Jeffrey A. Roth & Christopher S. Koper, "Impacts of the 1994 Assault Weapons Ban: 1994-96," *National Institute of Justice* (Mar. 1999).

## CONCLUSION

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

   */s/Jeremiah L. Morgan*

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  wjo@mindspring.com
  *Attorneys for Amici Curiae*

*Attorney of Record
December 29, 2023

32

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-2979

I am the attorney or self-represented party.

**This brief contains** 6,667 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jeremiah L. Morgan **Date** 12/29/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 29th day of December 2023, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

 */s/Jeremiah L. Morgan*
Jeremiah L. Morgan
Attorney for *Amici Curiae*