No. 23-2979

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

JAMES MILLER, et al.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California, et al.,

*Defendants-Appellants*.

————————

**On Appeal from the United States District Court**
**for the Southern District of California**
No. 3:19-cv-01537-BEN-JLB
The Honorable Roger T. Benitez, Judge

————————

## BRIEF OF AMICUS CURIAE JOHN CUTONILLI
## IN SUPPORT OF PLAINTIFFS-APPELLEES FOR AFFIRMANCE

————————

John Cutonilli
P. O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

29 December 2023

v

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus John Cutonilli certifies that the amicus is not a publicly held corporation, that the amicus does not have a parent corporation, and that no publicly held corporation owns 10 percent or more of amicus's stock.

/s/John Cutonilli
John Cutonilli
P. O. Box 372
Garrett Park, MD 20896
jcutonilli@gmail.com

vi

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE.................................................................1

SUMMARY OF ARGUMENTS ...................................................................1

ARGUMENTS ...........................................................................................2

   1.  California misunderstands what "arms" mean.................................2

   2.  California misunderstands why our Nation's historical traditions were created and that "Dangerous and Unusual" and "in Common Use" relate to societal uses ................................................4

   3.  "Weapons that are most useful in military service" is not a Second Amendment disqualifier.......................................................9

   4.  "Assault weapons" are in common use...........................................11

   5.  History and precedent demonstrate that the people provide for public safety ......................................................................................12

   6.  There has been a grave defect in the scrutiny process for nearly 80 years and lower courts continue to exploit it ....................................15

   7.  Text of the Second Amendment .......................................................19

CONCLUSION.............................................................................................21

vii

## TABLE OF AUTHORITIES

**Cases**

*Association of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey*,
910 F.3d 106 (2018)............................................................................18

*Aymette v. State*, 21 Tenn. 154 (1840) ................................................6, 7

*Castle Rock v. Gonzales*, 545 U.S. 748 (2005).......................................14

*DeShaney v. Winnebago County*, 489 U.S. 189 (1989)...........................15

*English v. State*, 35 Tex. 473 (1871)........................................................6

*FCC v. Beach Communications, Inc*., 508 U.S. 307 ...............................19

*Fried v. Archer*, 775 A. 2d 430 (Md. Ct. Spec. App.).............................14

*Haynes v. State*, 24 Tenn. 120, 5 Hum. 120 (1844)..................................7

*Heller v. D.C.*, 556 U.S. 570 (2008) ............................................... passim

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...................................1, 18

*Korematsu v. United States,* 584 F Supp. 1406 (N. D. Cal. 1984) .................. 16, 17

*N.Y. State Rifle & Pistol Ass'n v. City of N.Y.* - 883 F.3d 45 (2d Cir. 2018)...........18

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022)  1, 4, 5, 9

*State v. Buzzard*, 4 Ark. 18 (1842)........................................................7, 8

*State v. Chandler*, 5 La. Ann. 489 (1850)..............................................6, 8

*State v. Reid*, 1 Ala. 612 (1840) ..............................................................6

*State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891) ......................................6

*Trump v Hawaii*, 138 S.Ct. 2392 (2018)................................................17

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622........................18

*Warren v. DC*, 444 A. 2d 1 (DCCA 1981) .............................................14

viii

**Statutes**

Statute of Winchester (1285) ...................................................................12

**Other Authorities**

33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.) ...................................................5

Beattie, J. M., Policing and Punishment in London, 1660-1750: Urban Crime and

the Limits of Terror. p. 226 (2001) .....................................................13

J. Malcolm, To Keep and Bear Arms 2 (1994)........................................13

Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1198 (1999).....................13

The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket

Dagges and Pistols, reprinted in 1 Stuart Royal Proclamations 359–60 (James F.

Larkin & Paul L. Hughes eds., 1973) .................................................6

**Treatises**

W. Blackstone, 4 Commentaries on the Laws of England 148-149 (1769) ...........20

W. Hawkins, Treatise on the Pleas of the Crown ch 63 § 4 (1716) .......................21

1

## INTEREST OF AMICUS CURIAE[1]

Cutonilli is a resident of Maryland and is subject to similar firearm laws in question in this case. He is unable to successfully bring a lawsuit against Maryland due to the precedent set in *Kolbe v. Hogan,* 849 F.3d 114 (4th Cir. 2017). He seeks to provide additional insight into other aspects of the law that were neither addressed by the plaintiffs-appellees nor in the Lower Court's decision in this case. His intent is to help this Court avoid previous errors so that other fellow Americans are not subject to such laws.

## SUMMARY OF ARGUMENTS

Upending the basis on which the *Kolbe* argument and many other Second Amendment cases largely rests, *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022) unequivocally states that the Second Amendment protects the possession and use of weapons that are "in common use at the time." Importantly, *Bruen* makes no mention of arms that are "most useful in military service" (See *Heller v. D.C.*, 556 U.S. 570, 627 (2008)) – a phrase that California and *Kolbe* rely upon but grossly misinterpret.

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than amicus contributed money that was intended to fund preparation or submission of this brief.

2

This brief expands upon the Plaintiffs-appellants' discussion of California's magazine ban violates the Second Amendment. It demonstrates flaws under California's theory of "arms". It provides historical insight into how the key phrases, "dangerous and unusual" and "in common use," relate to societal biases that carry forward into this case. It provides examples of the commonly accepted uses of so called "assault weapons". It demonstrates that "weapons that are most useful in military service" is not a Second Amendment disqualifier. It demonstrates through references to history and precedent, that the people themselves provide public safety. It provides insight into errors that invalidate the scrutiny process used in the previous Second Amendment opinions.  It provides clarification of some data about shots fired in self-defense. It also offers additional textual and history-based interpretation of the text of the Second Amendment.

ARGUMENTS

## 1.    California misunderstands what "arms" mean

California and numerous Courts misunderstand what "arms" mean. While they correctly cite the Heller definition ("'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another'", *Heller* at 581.) They fail to understand how this definition relates to firearms.

This definition of "arms" involves more than just the firearm itself. This is because firearms themselves do not typically "cast at or strike another". The

3

California definition of a firearm demonstrates this fact; "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion" (CA Pen Code 16520). It is the projectile or bullet that is actually "cast at or strike another". To fulfill the definition of "arms", firearms need to include bullets and projectiles.

California is arguing that it is simply regulating accessories rather than arms. They later claim that these "accessories" "threaten public safety" (see Argument II.B). They are taking two contradictory positions. Either California is regulating accessories that do not "cast at or strike another" or they do. The references they make that these "accessories" "threaten public safety" suggest that these "accessories" do enhance the ability to "cast at or strike another". The historical accessories they list (scabbards, holsters, cartridge boxes, or cartridge cases) do not appear to be able to or enhance the ability to "cast at or strike another", which is why those accessories are not considered an "arm".

California's misunderstanding of "arms" also impacts the definition of "assault weapon" among other definitions. The law in question, along with a number of California laws, depend on a firearm operating semiautomatically e.g this law or automatically e.g. "machinegun". If certain parts of the firearm are considered accessories rather than part of the firearm then these definitions become meaningless along with the laws that depend on these definitions. California has

4

made a similar argument about the magazine (they consider it an accessory rather than part of the firearm in *Duncan v Bonta*, 23-55805, Ninth Circuit). Without the magazine, "assault weapons" and "machineguns" do not operate semiautomatically or automatically as required under the definitions. This misunderstanding would render many more laws meaningless words.

**2.    California misunderstands why our Nation's historical traditions were created and that "Dangerous and Unusual" and "in Common Use" relate to societal uses**

The test that Bruen adopts "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen.* at 17 (slip). While Bruen does not provide an "exhaustive survey" of how to do this, they acknowledge that "Heller and McDonald point toward at least two metrics: **how** and **why** the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 20.

Bruen's brief examination of the historical context relates to public and concealed carry provides a case in point for the type of historical and textual analysis privileged by the Court for Second Amendment cases. A fuller examination of the historical prohibitions on some types of public and concealed carry further illuminates analogous misunderstandings and unfounded biases found in California's arguments. California fails to provide any historical evidence as to why the regulation burdened a citizen's right as instructed in *Bruen*.

5

*Heller* and *Bruen* acknowledged that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 12 quoting *Heller* at 626. They find, for example, that limitations are "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" while, on the other hand, that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" *Id.* at 12 quoting *Heller* at 627. However, neither *Heller* nor *Bruen* fully examine the historical meaning of the key phrases "dangerous and unusual" and "in common use."

For this reason, historical context is essential to understand why concealed carry, and other arms like Bowie knives, were prohibited and to determine if prohibitions such as the California's "assault weapon" ban use analogously faulty reasoning. Historically, concealed carry, and other arms like Bowie knives, were equated with criminality, with moral deviancy, when there is no necessary or logical link between the two. A number of statues in force before the Constitution was written provide instructive illustrations of these societal biases embedded in the law of the day. For example, in 1541, a statue against concealed carry was enacted to stop "shamefull muthers roberies felonyes ryotts and routs." by "evil disposed persons." 33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.). Similarly, a 1613 proclamation banned the carrying of "Steelets, pocket Daggers, pocket Dags and Pistols" because they were considered "weapons utterly unserviceable for defence,

6

Militarie practise, or other lawfull use, but odious, and noted Instruments of

murther, and mischief," By The King James I: A Proclamation Against Steelets,

Pocket Daggers, Pocket Dagges and Pistols, reprinted in 1 Stuart Royal

Proclamations 359–60 (James F. Larkin & Paul L. Hughes eds., 1973).

Similar reasoning may be found in many of the early U.S. state court cases.

In *State v. Reid*, 1 Ala. 612 (1840), the court upheld the prohibition on concealed

carry because it was believed that concealed weapons would "exert an unhappy

influence upon the moral feelings of the wearer, by making him less regardful of

the personal security of others." In *State v. Chandler*, 5 La. Ann. 489 (1850), the

court upheld the prohibition because it was believed to promote "secret advantages

and unmanly assassinations." In *English v. State*, 35 Tex. 473 (1871), the court

upheld the prohibition because it was thought to "protect that pernicious vice, from

which so many murders, assassinations, and deadly assaults have sprung, and

which it was doubtless the intention of the legislature to punish and prohibit." In

*State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891), the court upheld the prohibition

because concealed arms "are only habitually carried by bullies, blackguards, and

desperadoes, to the terror of the community and the injury of the state." In *Aymette*

*v. State*, 21 Tenn. 154 (1840), (a concealed carry of a Bowie knife case), the court

upheld the prohibition because the legislature has "a right to prohibit the wearing

or keeping [of] weapons dangerous to the peace and safety of the citizens, and

7

which are not usual in civilized warfare, or would not contribute to the common defence." In *Haynes v. State*, 24 Tenn. 120, 5 Hum. 120 (1844), (another concealed carry of a Bowie knife case), the court articulated that the carrying of Bowie-style knives, "by truculent and evil disposed persons but to often ended in assassition[sic]".

Importantly, in *State v. Buzzard*, 4 Ark. 18, 19 (1842), the court upheld the prohibition on concealed carry because it allowed public carry and, therefore, did not "detract anything from the power of the people to defend their free state and the established institutions of the country." This case is particularly instructive for the current case, as in a contemporary context, the prohibitions it has unjustly enforced in the state of California have detracted from the power of the people to contribute to public safety, as will be shown in Argument 6.

Understanding the historical context through close textual reading enables recognition of the bias inherent in the laws of the day that prohibited concealed carry, and other arms like Bowie knives. It becomes clear, as one court echoes the next down through time, that concealed carry, and other arms like Bowie knives, were prohibited because it was **ONLY** associated with criminal behavior, "murther" and "mischiefe," and the unsavory moral characteristics of "bullies, blackguards, and desperadoes." Open carry, on the other hand, was believed to

8

"incite men to a manly and noble defence of themselves, if necessary, and of their country" See *Chandler*.

Just as there is no necessary connection between concealed carry and criminality, there is no necessary connection between the arms California deems prohibited and criminality – and yet that is the unfounded bias that permeates the state's position. Indeed, in Arguments 4 and 6, it will be demonstrated that such weapons are "in common use" by law enforcement and private security companies because of their effectiveness in *deterring and combatting* criminality.

Following *Bruen's* mandate to root Second Amendment cases firmly in historical and textual analysis, the court should evaluate the meaning of the phrases "dangerous and unusual" and "in common use" in light of these historical cases and the important example set by *State v. Buzzard*, which deftly tailors the right of citizens to bear arms in a way that upholds the intent of the Founders while acknowledging the realities of the contemporary social setting. In being guided by any or all of these cases, the court would be guided rightly by precedent that is intended to limit the consequences of criminally malicious behavior in society while protecting the rights of law-abiding citizens to use them lawfully.

9

### 3.     "Weapons that are most useful in military service" is not a Second Amendment disqualifier

The *Bruen* decision confirms the types of arms that the Second Amendment protects. In doing so, the decision cites the applicable sections of Heller to reiterate the types of arms protected. *Bruen* acknowledges that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Bruen* slip opinion 12 citing Heller at 626). *Bruen* finds that the Second Amendment protects the possession and use of weapons that are "in common use at the time," i*d.* at 12 and 38-39 citing Heller at 627, and asserts that examples of Second Amendment limitations are "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 12 citing *Heller* at 627. It adds that acceptable limitations are specific to arms that "are highly unusual in society at large." *Id.* at 38-39 citing *Heller* at 627. At no time does *Bruen* refer to any limitation dealing with arms that are "most useful in military service." (See *Heller* at 627).

The *Heller* Court never specified that "weapons that are most useful in military service—M-16 rifles and the like—may be banned" without infringement upon the Second Amendment right. See *Heller* at 627. In the conditional tense, Heller stated, "**It may be objected that if** weapons that are most useful in military service—M-16 rifles and the like—may be banned**, then the Second Amendment right is completely detached from the prefatory clause**" (emphasis added). It

10

was not singling out that militarily useful weapons are beyond the Second Amendment's reach. Instead, the *Heller* Court was acknowledging that the militarily usefulness of weapons, as implied by the prefatory clause, was **NOT** the criterion for Second Amendment protection.

This clarification makes the meaning clear: "We think that Miller's 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind **in common use at the time.**' 307 U. S., at 179." (emphasis added) *Heller* at 624. The third sentence of the paragraph then talks about "sophisticated arms that **are highly unusual in society at large**." (emphasis added).

The concept of military usefulness is introduced by Heller to address -- and flatly reject -- the argument that the prefatory clause protects all military arms. In refutation, Heller states plainly:

> "Indeed, it may be true that no amount of small arms could be useful against modern-day tanks and bombers. But the fact that modern developments have limited the fit between the prefatory clause and the protected right **cannot change our interpretation of the right**" (emphasis added).

As the Bruen decision makes clear, "Weapons that are most useful in military service" is not a Second Amendment disqualifier. The Second

11

Amendment also does not restrict arms to those that have "some reasonable relationship to the preservation or efficiency of a well regulated militia"

## 4. "Assault weapons" are in common use

"Assault weapons" are in common use in society today, including in California. In the context of this case, the California legislature has accepted that they play an important, everyday role in protecting public safety and property. For example, they are in common use in California among federal, state, and local law enforcement and are used in the course and scope their regular duties. In addition, retired law enforcement officers and private security companies are permitted to use them for their personal self-defense and the protection of property. In allowing the use of "assault weapons" not only by the police but also by retired officers and private security companies, the state acknowledges the public safety benefit that "assault weapons" provide.

Given this fact, it must be asked why – if "assault weapons" provide a demonstrable and valued public safety benefit in the hands of the police and certain private personnel – the same benefit would be denied to law-abiding citizens?

The hyperbolic nature of California's arguments militates against recognition of their beneficial use in society. For example, the California's claims that these arms "inflict nearly five-times more deaths and injuries." CA brief pg 51. They cite statistics that supposedly show a capability for enhanced lethality—more

12

wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns. Yet, clearly, in the hands of the police, retired officers, and, by extension, law-abiding gun owners, it would be very wrong to assume that these weapons are valued for their capability for more wounds, more serious, in more victims. Here, California conflates the features and capabilities of the weapon itself with the purported intent of its users. Such malicious intent should not be attributed to the government any more than to its law-abiding citizens. Per *Bruen*, this case must be reconsidered in light of the fact that the very arms that are defined by California as "assault weapons" are not only commonly used in society but are demonstrably beneficial for the public good.

## 5. History and precedent demonstrate that the people provide for public safety

Many U.S. laws are rooted in the English legal system and can be illuminated by an appreciation of their lineage. The *Bruen* decision emphasizes this fundamental point. In the English tradition, the average citizen played a central role in providing law enforcement and protection for society at large. Emerging around the time of King Alfred (c 871), this tradition persisted by custom for hundreds of years and was more formally codified with the Statute of Winchester (1285), which included provisions for arming the people, making arrests, and raising the "hue and cry" to apprehend criminal offenders. The Statute of

Winchester further delineated and established the roles of unpaid constables and watchmen—private citizens who functioned as security personnel for their communities.

This system lasted through our founding and was the primary method of law enforcement at the time. Law enforcement was one of the key roles envisioned for the militia in colonial America and following the Revolution. (See Article 1 Section 8 Clause 15.) Professional law enforcement agencies did not arise until the mid-19[th] century, and it was not until 1878, with the passage of the Posse Comitatus Act, that military and law enforcement functions were formally separated (*Heller* at 716, Breyer dissent). The Maryland State Police pays homage to this long-standing tradition on its website:

> "Under English common law, every person had an active responsibility for keeping the peace…The responsibility included crime prevention through vigilance and the apprehension of suspected lawbreakers by groups of persons raising the 'hue and cry' or the more official 'posse comitatus.'"

This was the most practical system, given the rural conditions in England and America at the time (J. Malcolm, To Keep and Bear Arms 2 (1994)). It was not without its limitations, however, as there was no institutional means to prosecute felons; that was the job of the victim (Beattie, J. M., Policing and Punishment in London, 1660-1750: Urban Crime and the Limits of Terror. p. 226 (2001); Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1198 (1999)).  Additionally,

14

with the rise of industrialization in the U.S., many companies found it necessary to hire private police to protect their interests, which led to the emergence of private security companies. Today, in fact, in the U.S., the number of security personnel employed by private security companies outnumbers public police by a factor of three to two.

However effective police departments may be, the role of the police is inherently limited. Because the government has limited resources, there are limits to the degree of safety the government can provide. This is not merely a practical issue; it is a legal issue as well. As explained in *Warren v. DC*, 444 A. 2d 1 (DCCA 1981), "…courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, *it assumes a duty only to the public at large and not to individual members of the community.*" *Id.* at 4 (emphasis added). In that case, the District of Columbia was found to have based its case on the "uniformly accepted rule…that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." *Id.* at 4.

Consistently, courts have ruled that public safety, through the government's police power interests, is owed to the public at large and not to any specific individual. (*Warren v. DC*, 444 A. 2d 1 (DCCA 1981), *Fried v. Archer*, 775 A. 2d 430 (Md. Ct. Spec. App.), 2001, *Castle Rock v. Gonzales*, 545 U.S. 748 (2005),

15

*DeShaney v. Winnebago County*, 489 U.S. 189 (1989)). Therefore, the government has no interest in the protection of any specific individual because it cannot deliver protection at the individual level.

Overturning California law on the basis of this historical legacy, with acknowledgement of the role that lawful citizens play in public safety and the arms that are "in common use" for public safety purposes, will restore Constitutional rights while strengthening law-abiding citizens' ability to contribute to their own safety, that of their families, and the community's safety as well.

**6.     There has been a grave defect in the scrutiny process for nearly 80 years and lower courts continue to exploit it**

*Korematsu v. United States,* 323 US 214 (1944) provides an object lesson in the types of mistakes the courts have made in Second Amendment cases. During World War II the United Stated forced the relocation and incarceration of more than 100,000 Japanese Americans, citing concerns for public safety. The Supreme Court found that "exclusion of those of Japanese origin was deemed necessary because of the presence of an un-ascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country." *Id.* at 218. The Court's decision resulted in placing restrictions on the Japanese-American population at large—most of whom were law-abiding citizens—because of the purported or potentially illicit acts of a few.

16

While the court acknowledged that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect," it still asserted that "pressing public necessity may sometimes justify the existence of such restrictions…" *Id.* at 216. While claiming that it applied "the most rigid scrutiny," it appears, particularly in retrospect, that the Court instead simply deferred to the government's findings, stating an unwillingness to "reject as unfounded the judgment of the military authorities." *Id.* at 219.

Importantly, the dissent in Korematsu claimed that in deferring to the government, the Court had failed to rule on a key judicial question. In doing so, it had permitted the overstepping of "… the allowable limits of military discretion" and failed to define the "definite limits to [the government's] discretion." *Id.* at 234. In a statement that anticipates the future view of the courts and the American public on the Korematsu decision, the dissent further argued that:

> "[I]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." *Id.* at 234 (Murphy, J., dissenting).

A subsequent trial held long after the war, *Korematsu v. United States,* 584 F Supp. 1406 (N. D. Cal. 1984), brought forward substantial evidence that the government omitted relevant information from the Court and also provided misleading information. While the Court decided not to determine any errors of law, it did grant a writ of *coram nobi* and cautioned subsequent courts that:

17

"It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability. It stands as a caution that in times of international hostility and antagonisms our institutions, legislative, executive and judicial, must be prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused." Id. at 1420

While the Court has only recently said "Korematsu was gravely wrong the day it was decided" *Trump v Hawaii*, 138 S.Ct. 2392, 2423 (2018), it has yet to explain why it was "gravely wrong". One thing is certain.

"Korematsu was not excluded from the Military Area because of hostility to him or his race. He was excluded because we are at war with the Japanese Empire, because the properly constituted military authorities feared an invasion of our West Coast…" *Korematsu* at 223.

At a time of marked "distress … hostility and antagonism" in the country, the previous *en banc* opinion in this case employs the same unjust logic that was at work in the case of Korematsu, arguing that the government's public safety interest supersedes constitutional guarantees and abridging the rights of law-abiding citizens because of the wrongdoing of others. As in the Korematsu case, the previous *en banc* opinion in this case deferred to the rule maker (the legislature in this instance) without putting the evidence before it to the proper test.

The failure to apply intermediate scrutiny is not unique to the Seventh Circuit but is part of a broader pattern that has become typical of how Second Amendment cases are handled. In *N.Y. State Rifle & Pistol Ass'n v. City of N.Y. -*

18

883 F.3d 45 (2d Cir. 2018), the City presented no empirical evidence, yet the

Second Circuit found the challenged rule met intermediate scrutiny because there

was a "substantial fit between the Rule and the City's interest in promoting public

safety." *Id*. at 64. An assertion of "substantial fit" stands in for the demonstration

of "substantial evidence." Similarly, in *Kolbe*, the Fourth Circuit found that "The

judgment made by the General Assembly of Maryland in enacting the FSA is

precisely the type of judgment that legislatures are allowed to make without

second-guessing by a court." *Id.* at 140. Again in *Association of New Jersey Rifle*

*and Pistol Clubs v. Attorney General New Jersey*, 910 F.3d 106 (2018), the dissent

chastises the majority for substituting "anecdotes and armchair reasoning for the

concrete proof that we demand for heightened scrutiny anywhere else." *Id.* at 126.

Nonetheless, the majority found that "the Act survives intermediate scrutiny." *Id.*

at 122.

While *Bruen* rejected the intermediate scrutiny approach used in the

previous *en banc* opinion in this case, this Court should understand the problems

that led *Bruen* to its decision. At the core of intermediate scrutiny is the

requirement for the government to draw "reasonable inferences based on

substantial evidence" because the government "must demonstrate . . . that the

regulation will in fact alleviate these harms in a direct and material way." *Turner*

*Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994). When courts fail to

19

uphold this essential requirement, they fail to maintain the standard of intermediate scrutiny. Without substantial evidence, the intermediate scrutiny standard devolves to the lower order of the rational basis standard, which does not require substantial evidence. Instead, rational basis cases may be decided using "rational speculation *unsupported by evidence or empirical data*." *FCC v. Beach Communications, Inc.* 508 U.S. 307, 315 (1993) (Emphasis added.) Rational basis is inappropriate for fundamental rights, such as those comprised by the Second Amendment, *Heller* at 628. Infamously, in the Korematsu decision, the Court failed to properly evaluate the evidence and, instead, accepted at face value the government's assessment of the evidence. This abnegation of the court's proper role compromised the constitutional rights of American citizens rather than protecting them – and serves as both an analogy for past Second Amendment cases and an object lesson for future ones.

**7.    Text of the Second Amendment**

As underscored in Heller, the Second Amendment is structurally and grammatically divided into two parts: an operative clause and a prefatory clause. The operative clause guarantees a pre-existing right of the individual to possess and carry weapons in case of confrontation, *Heller* at 592. The prefatory clause, which refers to this right as it relates to the formation of militias, is best understood within the context of the Tenth Amendment, which clarifies the respective powers

delegated to the federal government or reserved to the states. At the time of the founding, the Second Amendment was codified to ensure that the federal government did not have the power to disarm the militia. *Id.*, at 599. It ensures that the federal government does not abridge the right of citizens to keep and bear arms. Additional examples of the right to keep and bear arms appear in state declarations of the period, such as the right to possess arms for self-defense or to hunt. *Id.* at 642 (Stevens dissenting). These examples are enumerated in state declarations because they apply at the state and not the federal level. Together, the Second Amendment plus the various state-level declarations constitute the full expression of citizens' rights to keep and bear arms.

While the right to keep and bear arms is broader than – or extends beyond – the Second Amendment in this way, it is not unlimited. Heller at 627, for example, notes the historical prohibition on carrying "dangerous and unusual weapons," a phrase that originates in the Statute of Northampton. See 4 Blackstone 148–149 (1769). Neither *Heller* nor *Bruen* elaborate on what is meant by "dangerous and unusual weapons," and the legal history since Northampton provides little in the way of a clear definition of the phrase. Nonetheless many assumptions and unfounded assertions have been made. Fortunately, a number of 17th- and 18th-century treaties provide useful interpretive context (W. Blackstone, 4 Commentaries on the Laws of England 148-149 (1769), W. Hawkins, Treatise on

the Pleas of the Crown ch 63 § 4 (1716). These texts consistently demonstrate that there was no general prohibition on carrying common arms, as has been reiterated in Bruen.

## CONCLUSION

*Bruen* unequivocally states that it protects the possession and use of weapons that are "in common use at the time." Weapons defined by California as "assault weapons" are "in common use" and allow the law-abiding people of California to provide for their own safety and that of their families and communities.

This conclusion is based on a number of factors. The most important of these is based on historical insight into how the key phrases, "dangerous and unusual" and "in common use," relate to societal biases that carry forward into this case. It is based on fact that "weapons that are most useful in military service" is not a Second Amendment disqualifier. It is based on references to history and precedent, that the people themselves provide public safety and on the data about shots fired in self-defense. It is based on insight into errors that invalidate the scrutiny process used in previous Second Amendment cases and additional textual and history-based interpretation of the text of the Second Amendment.

22

For the foregoing reasons, this Court should affirm the case for the

plaintiffs-appellees.

Respectfully submitted,

/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

29 December 2023

23

## CERTIFICATE OF COMPLIANCE

1. This motion complies with type-volume limitation of Fed. R. App. P. 29(a)(5) because the amicus brief contains 5001 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Dated: 29 December 2023

/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

24

CERTIFICATE OF SERVICE

I hereby certify that on 29 December 2023, I electronically filed the foregoing United States Court of Appeals for the Ninth Circuit by using the Electronic Document Submission System. I emailed a copy of the document to the following addresses

John.Echeverria@doj.ca.gov Attorney for Defendants-Appellants

dthompson@cooperkirk.com,

jdillon@dillonlawgp.com,

gml@sezalaw.com Counsel for Plaintiffs-Appellees

/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com