No. 23-2979

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————

JAMES MILLER, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL
OF THE STATE OF CALIFORNIA, ET AL.,

*Defendants-Appellants*.

———————

## On Appeal from the United States District Court
## for the Southern District of California
No. 3:19-cv-01537-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————

## APPELLANTS' REPLY BRIEF

———————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ANNA FERRARI
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3479
John.Echeverria@doj.ca.gov
*Attorneys for Defendants and Appellants*

January 8, 2024

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Argument....................................................................................................2

I.     Plaintiffs Have Not Established That the Challenged Categories of
Assault Weapons Are Presumptively Protected ...............................2

     A.     "Arms"..............................................................................3

     B.     "Common Use for Self Defense" ........................................5

     C.     "Most Useful in Military Service" ....................................14

II.     California's Restrictions on the Challenged Categories of Assault
Weapons Are Consistent with this Nation's Historical Tradition.................15

     A.     Even If the Second Amendment Presumptively Protects These
Assault Weapons, *Bruen*'s Historical Inquiry and "More
Nuanced" Approach Would Apply ....................................16

     B.     California's Restrictions Are Consistent with the Historical
Tradition of Regulating Especially Dangerous Weapons .................19

III.    The District Court's Permanent Injunction and Judgment Should
Remain Stayed .........................................................................29

Conclusion ...............................................................................................30

Certificate of Compliance ........................................................................31

Certificate of Service ...............................................................................32

i

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Antonyuk v. Nigrelli*
__ F.4th __, 2023 WL 8518003 (2d Cir. Dec. 8, 2023) ....................................23

*Bevis v. City of Naperville*
85 F.4th 1175 (7th Cir. 2023) ...................................................................14

*Caetano v. Massachusetts*
577 U.S. 411 (2016)...................................................................................9

*Capen v. Campbell*
__ F. Supp. 3d __, 2023 WL 8851005 (D. Mass. Dec. 21, 2023)...............18, 21

*District of Columbia v. Heller*
554 U.S. 570 (2008)...........................................................................*passim*

*Friedman v. City of Highland Park*
784 F.3d 406 (7th Cir. 2015) .......................................................................9

*McCullen v. Coakley*
573 U.S. 464 (2014).................................................................................18

*Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*)
__ F. Supp. 3d __, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) .................22, 28

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022)...............................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*
646 F. Supp. 3d 368 (D.R.I. 2022) .............................................................4

*Staples v. United States*
511 U.S. 600 (1994)..................................................................................15

*Teter v. Lopez*
76 F.4th 938 (9th Cir. 2023) .................................................................6, 7, 22

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) ...................................................5, 6, 7, 11

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018) .............................................................4

*United States v. Dorsey*
    677 F.3d 944 (9th Cir. 2012) ...............................................................14

*United States v. McAdory*
    935 F.3d 838 (9th Cir. 2019) .................................................................7

**STATUTES**

United States Code, Title 18
    § 922(*o*)(2) ........................................................................................10
    § 923 ...................................................................................................10

United States Code, Title 26
    § 5801(a) ............................................................................................10

California Penal Code
    § 30515.........................................................................................25, 27
    § 30515(a)(1) ...................................................................................3, 11
    § 30515(a)(2) ......................................................................................11
    § 30515(a)(3) ......................................................................................11
    § 30515(a)(4) ...................................................................................3, 11
    § 30515(a)(5) ......................................................................................11
    § 30515(a)(6) ...................................................................................3, 11
    § 30515(a)(7) ......................................................................................11
    § 30515(a)(8) ......................................................................................11

1763-1775 N.J. Laws 346, ch. 539, § 10 ...............................................24

1837 Ala. Acts 7, § 2............................................................................25

1837 Ga. Acts 90, § 1 ...........................................................................25

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

1837-1838 Tenn. Pub. Act 200, ch. 137, § 1 ...........................................25

1849 N.Y. Laws 403 ...................................................................................25

1849 Vt. Acts & Resolves 26.....................................................................25

1850 Mass. Acts 401, § 2............................................................................25

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment...............................................................................*passim*

**OTHER AUTHORITIES**

Blackstone, *Commentaries on the Laws of England* (1769) ....................20

Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) .................................22

Schwoerer, *Gun Culture in Early Modern England* (2016) .....................21

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* (1782) ...................................20, 21

Smith, *What Part of 'In Common Use' Don't You Understand?* (Sept. 27, 2023), http://tinyurl.com/5h6ydhyk...............................................16

Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev. 1 (2020)........................13

iv

## INTRODUCTION

Plaintiffs advance an unduly broad understanding of the Second Amendment that cannot be reconciled with Supreme Court precedent. In their view, a plaintiff's *only* burden is to establish that a weapon is bearable and can be used to strike another person. AB 7.[1] If so, the "dispositive" question is how many of those weapons are lawfully possessed in the United States: if the number is 200,000 (or thereabouts), the weapon "cannot be banned—full stop." AB 1; *see* AB 30. The Supreme Court has never endorsed that numbers-only approach to Second Amendment analysis. And plaintiffs' challenge cannot survive a proper application of Supreme Court precedent. Plaintiffs failed to establish that each (or any) of the eight categories of assault weapons at issue is presumptively protected based on its objective characteristics. Even if this Court were to assume that those weapons are presumptively protected, moreover, the record shows that the challenged restrictions are "consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

---

[1] "AB" refers to the answering brief; "OB" refers to the opening brief.

1

# ARGUMENT

## I. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE CHALLENGED CATEGORIES OF ASSAULT WEAPONS ARE PRESUMPTIVELY PROTECTED

The threshold issue under *Bruen* is whether plaintiffs have established that "the Constitution presumptively protects" their proposed course of conduct. 597 U.S. at 17. As plaintiffs see things, however, the only question a court may ask in resolving that issue is whether the challenged law regulates bearable weapons that may be "use[d] in wrath to cast at or strike another." AB 7. That approach misunderstands *Bruen* and *Heller*. It would needlessly create inter- and intra-circuit conflicts. And it would extend presumptive constitutional protection to weapons—like M16 rifles and short-barreled shotguns—that the Supreme Court has already recognized are not "eligible for Second Amendment protection" and "may be banned." *District of Columbia v. Heller*, 554 U.S. 570, 622, 625, 627 (2008).

The proper inquiry considers the plain text of the Second Amendment in light of its "normal and ordinary meaning" and its "historical background." *Bruen*, 597 U.S. at 20; *see* OB 21-32. In determining whether a weapon is presumptively protected, the Supreme Court considers not only whether it fits the historical definition of an "Arm," but also whether it is "'in common use' today for self-defense," *Bruen*, 597 U.S. at 32, and whether it is "most useful in military service,"

2

*Heller*, 554 U.S. at 627.[2]  Plaintiffs failed to carry their burden to establish that the assault weapons at issue here are presumptively protected.

## A.   "Arms"

At each step of their analysis, plaintiffs advance broad arguments about "assault weapons" generally instead of addressing the particular characteristics of each separate category of weapon challenged in their complaint.  They begin by asserting that "[t]here can be no question whatsoever that the firearms banned by California are 'arms.'"  AB 7.  No doubt, semiautomatic rifles, pistols, and shotguns generally constitute bearable offensive weapons.  OB 22.  But plaintiffs' broad assertion fails to account for differences between the specific categories of assault weapons prohibited by California—and particularly the fact that some categories effectively prohibit only the use of accessories (such as flash suppressors or barrel shrouds) that can easily be added to or removed from a weapon.  *See* OB 22-23; Cal. Penal Code § 30515(a)(1), (4), (6).  As a matter of text and history, there is "a clear distinction between 'Arms' and 'accoutrements.'"

---

[2] The Court has also considered the "tradition of prohibiting the carrying of 'dangerous and unusual weapons'" to determine what "sorts of weapons [are] protected."  *Heller*, 554 U.S. at 627.  Other courts have recognized that the "dangerous and unusual" nature of a weapon is properly considered as part of the threshold inquiry into whether a weapon is presumptively protected.  OB 39 n.18 (collecting cases).  But because a three-judge panel of this Court recently held that it is only relevant "'in the second prong of the *Bruen* analysis,'" *id.*, this brief addresses it in that context, *see infra* pp. 22-23.

*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387 (D.R.I. 2022). Accessories that are not themselves "'thing[s] . . . use[d] in wrath to *cast at or strike* another'" qualify as accoutrements, not arms. *Id.* at 386; *see* 2-ER-141.

Plaintiffs appear to agree that "accoutrements" are not "arms." AB 10. But they contend that "accoutrements" covers only "secondary items" that do not "alter[] how" a firearm "functions," and they appear to take the position that any accessory that may be affixed to a weapon qualifies as an "arm." *Id.* Plaintiffs cite no support for that theory, and it is inconsistent with the record below. *See, e.g.*, 2-ER-152 (describing "Gun Slings" as accoutrements); *cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself.").

Plaintiffs also dispute the premise that the removable accessories that turn certain semiautomatic firearms into prohibited assault weapons are "optional." AB 8. In their view, the accessories are "important," or represent "ergonomic improvements," or make it less "awkward" to fire. AB 9. But they offer no record support for those views—relying instead on quotations from sympathetic extra-record sources. *See id.* The evidence that *is* in the record disproves plaintiffs' argument that the prohibited accessories are not optional: "featureless rifle[s]"—devoid of any of the prohibited accessories—are commercially available and maintain "the overall function of the rifle." 3-ER-407; *see* 3-ER-377–381.

4

### B. "Common Use for Self Defense"

Even if each category of assault weapons does regulate "Arms," plaintiffs must show that those weapons are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32. The Supreme Court has applied that concept in a manner that focuses on the objective characteristics of a particular weapon. *See, e.g.*, *Heller*, 554 U.S. at 622, 629. But plaintiffs have not even attempted to show that the characteristics of each category of assault weapon make them suitable for "ordinary self-defense." *Bruen*, 597 U.S. at 71; *see* OB 10-14, 25-27. Plaintiffs instead advance a "common use" argument that reflects a profound misunderstanding of precedent.

1. Plaintiffs first disavow any burden to establish that the regulated assault weapons are in common use for self-defense as part of the threshold inquiry into whether they are presumptively protected. AB 5, 12. In plaintiffs' view, "the burden is on the State to prove the banned firearms are not in common use" at the historical stage of the inquiry. AB 5. This Court's precedent says the opposite: The "threshold inquiry," referred to as "*Bruen* step one," considers (among other things) "whether the weapon at issue is '"in common use" today for self-defense.'" *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). Only if that "first step is satisfied" does the Court "proceed to *Bruen* step two, at which the

'government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.*

That understanding is also compelled by *Bruen*. *Before* the Supreme Court concluded that the "Second Amendment's plain text . . . presumptively guarantees" a right to bear handguns "in public for self-defense," *Bruen*, 597 U.S. at 33, it first considered whether "handguns are weapons 'in common use' today for self-defense," *id.* at 31. Only after satisfying that requirement did the Court treat the plaintiffs' conduct as presumptively protected and place "the burden . . . on [the State] to show" consistency with historical tradition. *Id.* at 33-34. Plaintiffs do not discuss or even cite that part of *Bruen*. AB 12-14.

Plaintiffs instead assert that this Court "recently explained in *Teter v. Lopez*" that "the burden is on the State to prove the banned firearms are not in common use" at the second stage of the *Bruen* framework. AB 5. That is not what *Teter* held. It held that "whether butterfly knives are *'dangerous and unusual'* is a contention as to which [the State] bears the burden of proof in the second prong of the *Bruen* analysis." 76 F.4th 938, 950 (9th Cir. 2023) (emphasis added). *Teter* is the subject of a pending en banc petition, and that particular holding is already at issue in an active en banc proceeding. *Duncan v. Bonta*, No. 23-55805; *see* OB 39 n.18, 56–57. But even if the *Teter* panel were correct on that disputed point, it would not require the State to bear the burden on the distinct inquiry into

6

"common use for self-defense."  Indeed, *Teter* could not have held that because the earlier decisions in *Bruen* and *Alaniz* said the opposite.[3]

2.  Next, plaintiffs embrace the district court's flawed, numbers-only approach to determining whether a type of weapon is in common use for self-defense.  AB 28.  In their view, the "dispositive" question for the common-use inquiry (and also for the entire Second Amendment analysis) is the aggregate number of such weapons lawfully owned in the United States.  AB 21.  If a weapon is sufficiently "popular" (*id.*) then it "cannot be banned—full stop."  AB 1. Plaintiffs never say precisely what the magic number is, but they appear to believe that as few as "200,000" is sufficient.  AB 30.  That would mean that if 1 in every 1,655 Americans chooses to purchase a bearable weapon, then no government in the United States could ever again prohibit its use or possession—no matter the weapon's objective characteristics, dangerousness, or suitability for self-defense.

The Supreme Court has never embraced that startling understanding of the Second Amendment.  To the contrary, *Heller* emphasized the importance of

---

[3] Plaintiffs' effort to dismiss *Alaniz* as "dicta" (AB 14) is unpersuasive.  The proper framework for analyzing Second Amendment claims was squarely before this Court in *Alaniz*, which was the Court's first published post-*Bruen* merits opinion. The Court's "well-reasoned" articulation of that framework was hardly a "stray remark."  *United States v. McAdory*, 935 F.3d 838, 843-844 (9th Cir. 2019).  And even if that articulation were viewed as non-binding dicta, *Bruen* would still control this issue.

examining the "character of the weapon" at issue. 554 U.S. at 622. It then examined the specific features of handguns (such as size, weight, and shape) that render them objectively suitable for use as a "self-defense weapon." *Id.* at 629. The Court later reiterated that "'individual self-defense is 'the *central component*' of the Second Amendment right.'" *Bruen*, 597 U.S. at 29. And when the Court recognized that certain types of weapons "may be banned"—and called out short-barreled shotguns and M16 rifles as examples—it did so without considering the numerical prevalence of those weapons. *Heller*, 554 U.S. at 625, 627.

Plaintiffs contend that the objective features of a weapon are "irrelevant" to the constitutional analysis, asserting that "it is a bizarre misreading of *Heller* to suggest that the Court required a showing that handguns were in fact well-suited to self-defense." AB 24. But what is truly bizarre is plaintiffs' attempt to ignore the Supreme Court's clear instruction that the objective "character of the weapon" matters to the constitutional analysis. *Heller*, 554 U.S. at 622. The Supreme Court never suggested that the objective qualities that make handguns the "quintessential self-defense weapon" are irrelevant; it instead detailed the objective characteristics of that type of weapon to explain why it was suitable "for self-defense in the home." *Id.* at 629.

Plaintiffs also offer no response to the concern that a numbers-only approach would not be administrable. OB 28-29. And their brief only raises more questions

8

about how their approach would function in practice.  They do not offer any neutral constitutional principle or historical evidence supporting their apparent position that 200,000 is sufficient.  AB 30.  Although they characterize it as "the *Caetano* line," *id.*, that 200,000 figure was referenced only by a concurrence in *Caetano v. Massachusetts*—and that concurrence did not rely exclusively on numbers.  577 U.S. 411, 420 (2016) (Alito, J., concurring); *see* OB 30.  And plaintiffs never take a position on whether the same "line" would apply to all types of weapons; whether the number would increase over time with population growth; whether the number should be assessed relative to the general population or the number of gun owners; or whether the analysis differs if the weapons are concentrated in the hands of relatively few gun owners.

Plaintiffs' only response to the concern that their approach would lead to "circular" and "absurd" results (*Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)) is to reiterate their view that a firearm must be both "unusual numerically" and "more 'dangerous' than other firearms in common use" to be banned.  AB 29.  But that response acknowledges that even if a new weapon is exceedingly dangerous, the constitutional authority of States to prohibit it could exist at one moment and then vanish forever if just one State legalized it and 200,000 models were sold.  That exclusive reliance on modern sales data is

9

irreconcilable with "a test rooted in the Second Amendment's text, as informed by history." 597 U.S. at 19.

Plaintiffs all but concede the dramatic practical consequences their approach would have. For example, the Supreme Court has observed that it would be "startling" to conclude that "restrictions on machineguns [are] unconstitutional." *Heller*, 554 U.S. at 624. But plaintiffs are not so sure: by their count, there are already 176,000 registered machineguns in civilian hands in the United States; on that basis, plaintiffs appear to believe that machineguns are on the cusp of being protected (or perhaps already are protected). *See* AB 30 ("it is far from clear" that "176,000 is close [enough] to 200,000" to render machineguns protected). In fact, the number of lawfully possessed machineguns might be greater.[4] Any approach to the Second Amendment that would guarantee machineguns constitutional protection, either based on their current numbers or if just a few thousand additional models were sold, cannot be squared with precedent, text, or history.

---

[4] There are approximately 700,000 registered machineguns currently in the United States, including those registered by state and local law enforcement agencies. *See* OB 30 & n.15. Of that total, 176,000 were reportedly manufactured before 1986, when it became illegal under federal law for most civilians to acquire new machineguns. *See* AB 30; 18 U.S.C. § 922(*o*)(2) (exempting pre-1986 machineguns). The actual number in civilian hands may be larger because some civilians may acquire new machineguns if they obtain a federal firearms license and pay a special occupancy tax. *See* 18 U.S.C. § 923; 26 U.S.C. § 5801(a).

3.  Finally, plaintiffs ignore that their burden applies to each particular "*type of weapon at issue*." *Heller*, 554 U.S. at 622.  Plaintiffs chose to seek injunctive and declaratory relief with respect to eight separate categories of assault weapons.  D. Ct. Dkt. 9 at 41-42.  Having framed the complaint in that way, plaintiffs assumed the burden of proving that *each* of those categories regulates a weapon that is "'in common use' today for self-defense." *Alaniz*, 69 F.4th at 1128.

But plaintiffs do not even attempt to do so.  Even when addressing their numbers-only approach, plaintiffs provide no record citations regarding the prevalence of any particular assault-weapon configuration.  *See* AB 31.  They do (for the first time) offer rough estimates of the number of pistols and shotguns that qualify as assault weapons.  *See id.*  It can be inferred that plaintiffs' starting point for those figures is the estimate (from a firearm industry trade association that is one of plaintiffs' amici in this case) that "there are 24.4 million 'assault weapons' that are rifles nationally." *Id.*  But that manufacturing estimate is over-inclusive:  it includes AR- and AK-platform rifles that do not qualify as assault weapons, as well as prohibited assault weapons sold to law enforcement agencies or kept in unsold stock.  *See* 3-ER-519; 8-ER-1947; 1-ER-6.  Nor can estimates of the total number of semiautomatic firearms in circulation (AB 21) substitute for evidence specific to the particular assault-weapons configurations prohibited by Section 30515(a)(1) through (8).

11

In any event, plaintiffs fail to establish that the objective characteristics of those particular categories of weapons are suited to self-defense. The few points they make on that issue are unspecific, unpersuasive, and (again) unsupported by any citation to evidence in the record below.

For example, plaintiffs argue that the risk that assault-weapon rounds will "overpenetrate and pass through doors and drywall" to kill or maim innocent victims is common for "nearly all" firearms—and that assault weapons may be "*less*" deadly than "common handgun[s]" in this respect. AB 25. What the record shows is that the military-style rounds fired by assault weapons can penetrate car doors and *multiple* walls in "a conventional home with dry-wall walls," 7-ER-1493; *see* 7-ER-1502, 1509, 1515; they are designed to penetrate body armor that can stop most handgun rounds, *see, e.g.*, 5-ER-1147, 1159; and they can reach velocities in excess of 3,000 feet per second, when most centerfire handgun rounds reach only 1,500 feet per second, *see* 3-ER-376; 3-ER-601. When high-velocity rounds from assault weapons strike a human target, they can be "far more destructive compared to handguns because of their higher energy." 7-ER-1748; *see* 7-ER-1746–1751; 5-ER-1063–1064. Remarkably, plaintiffs do not cite any responsive record evidence, instead quoting extensively from a book entitled *America's Rifle: The Case for the AR-15* and an article by a conservative legal scholar. AB 24-26. But even that scholar acknowledges that rounds used in

12

assault rifles can defeat body armor designed to stop handgun and shotgun rounds, Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev. 1, 38-39 (2020), and his sources for concluding that handguns pose a greater "overpenetration" risk (*see, e.g.*, *id.* at 38 nn.171-172) are dubious.[5]

Plaintiffs also emphasize that AR-15s lack a fully automatic mode. AB 26. But they acknowledge (*id.*) "the fact that AR-15s are 'nearly identical' to" M16s in every other respect, *see infra* p. 17; and their implicit suggestion that *every* firearm that lacks fully automatic capacity is suitable for self-defense is untenable. And plaintiffs concede that the prohibited categories of assault weapons are defined based on features that increase the lethality of semiautomatic firearms, such as by allowing a mass shooter to "hide the flash from the barrel of a rifle" and "to fire more rounds." *Id.*; *see also* OB 26.[6] That does not make them suitable for self-defense. To the contrary, it establishes that assault weapons were "designed and developed for a specific military purpose—laying down a high volume of fire over a wide killing zone"—not self-defense. 6-ER-1423.

---

[5] One of those sources is a blog post by a firearms enthusiast who "got curious" and made "uncontrolled observation[s]" after "build[ing] some very small walls" and shooting rounds through them. *See* http://tinyurl.com/2ms47xph.

[6] Plaintiffs argue that those tactical features do not "impact[] the energy or penetration abilities of a round" from an assault weapon (AB 25), but that misses the point: the features exacerbate the danger of the weapons by enabling even more rapid and lethal fire and concealing the shooter. *See* 2-ER-163–166.

## C.  "Most Useful in Military Service"

Relatedly, the Supreme Court has observed that "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Heller*, 554 U.S. at 627.  Plaintiffs acknowledge (AB 15) that the Seventh Circuit recently relied on that principle to hold that a law restricting assault weapons is likely constitutional. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188-1197 (7th Cir. 2023).  That holding is supported by the objective characteristics of assault weapons and the history of their development. *See* OB 4-9, 13, 31-32.

Plaintiffs urge this Court to reject that holding.  AB 15.  But this Court "start[s] off inclined to follow the consistent decisions" of sister circuits and does "not lightly create a circuit split." *United States v. Dorsey*, 677 F.3d 944, 957 (9th Cir. 2012).  Plaintiffs do not present any persuasive reason for doing so here.  The Seventh Circuit did not "misread[]" *Heller* or *Bruen*, AB 15, and it did not conclude that just "because a firearm is used by the military, it could not *also* be in common use for lawful purposes by civilians," AB 16.  The court instead focused on the character of the particular weapons at issue and followed the Supreme Court's instruction that "machineguns," "M-16 rifles," and other "like" weapons "that are most useful in military service" may "be banned." *Heller*, 554 U.S. at 624, 627.

14

And plaintiffs concede that the AR-15 and the M16 "share the same core design," "rely on the same patented operating system," and "can use the same ammunition, which they shoot with the same velocity at the same range."  AB 18. Plaintiffs nonetheless assert that because the defined assault weapons are not capable of automatic fire, it is "wrongheaded" to characterize them as "most useful in military service."  *Id.*  But they identify no authority supporting their view that the "constitutionally relevant distinction" is the capacity for fully automatic fire, *id.*, and do not respond to the State's evidence that U.S. military personnel are instructed to use select-fire weapons like the M16 in *semiautomatic* mode, for greater accuracy in combat.  *See* 2-ER-163; 3-ER-600; OB 26 n.11.[7]

## II. CALIFORNIA'S RESTRICTIONS ON THE CHALLENGED CATEGORIES OF ASSAULT WEAPONS ARE CONSISTENT WITH THIS NATION'S HISTORICAL TRADITION

Even if this Court were to hold or assume that the assault weapons at issue here are presumptively protected, the challenged restrictions are permissible because they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 597 U.S. at 19.  Throughout our Nation's history, governments have restricted or prohibited especially dangerous weapons technologies after they began to imperil public safety—while

---

[7] Plaintiffs invoke (AB 18) the Supreme Court's decision in *Staples v. United States*, 511 U.S. 600 (1994), which was not a Second Amendment case and does not support the constitutional line they propose.

at the same time preserving a wide range of weapons for self-defense. California's assault-weapons restrictions fit comfortably within that tradition. *See* OB 33-55.

Plaintiffs disagree, but their arguments badly misunderstand the analytical framework required by *Bruen*. They first attempt to sidestep *Bruen*'s historical inquiry altogether, urging the Court to ignore every one of "the historical laws collected by the State." AB 6; *see* AB 32. When they eventually address that history, they advance a misguided understanding of *Bruen*'s analogical inquiry that would improperly turn the Second Amendment into "a regulatory straightjacket" (597 U.S. at 30) and prohibit governments from carrying forward the longstanding tradition of prohibiting excessively dangerous weapons.

### A. Even If the Second Amendment Presumptively Protects These Assault Weapons, *Bruen*'s Historical Inquiry and "More Nuanced" Approach Would Apply

Plaintiffs assert that it is "unnecessary for this Court to even examine" the historical record, AB 6, because the "Court's analysis can and should . . . end" with a ruling in their favor based on their numbers-only approach, AB 32. But they identify no judicial authority supporting that startling understanding of *Bruen*.[8] What *Bruen* held—quite clearly—is that if a plaintiff establishes that "the

---

[8] The only source plaintiffs cite for the proposition that history is irrelevant "in arms-ban cases" is an online article written by a sympathetic litigator. Smith, *What Part of 'In Common Use' Don't You Understand?* (Sept. 27, 2023), http://tinyurl.com/5h6ydhyk. In any event, the features-based prohibitions at issue

Constitution presumptively protects" a weapon, then the government has an opportunity to "demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation." The Supreme Court has not "already . . . decided" (AB 32) how its historical framework applies to every prohibition on especially dangerous weapons. To the contrary, *Bruen* did not "decide anything about the kinds of weapons that people may possess." 597 U.S. at 72 (Alito, J., concurring).

What *Bruen* did stress is that "[w]hile the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 554 U.S. at 27. This is exactly the type of case that calls for that nuanced approach, as multiple courts have recognized. OB 34 (collecting cases). The categories of assault weapons at issue here represent dramatic technological changes from what was available in 1791 and 1868, and they have contributed to an unprecedented rise in the number of shootings in which lone gunmen use them to murder tens or scores of innocent civilians in minutes. *See id.* at 33-36. Because no government would have had any reason to address those issues in 1791 or 1868, *Bruen*'s analogical inquiry must be conducted at a higher level of

---

here are not an "absolute ban" (AB 32) on any general class of firearms. *See infra* pp. 29-30; Giffords Amicus Br. 16-17.

generality. *Cf. McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (governments do not "regulate for problems that do not exist").

Plaintiffs nonetheless insist that "this case does not involve a technological or social change that softens the analysis in any way." AB 33. But they offer no response to the evidence and authority explaining the profound technological differences between modern assault weapons and the weapons available in the relevant historical periods. *See* OB 34-35. It is "beyond reasonable dispute" that there has been "'dramatic technological change' from" the weapons available in those eras to "a modern AR-15," with its "radical increases in muzzle velocity, range, accuracy, and functionality." *Capen v. Campbell*, __ F. Supp. 3d __, 2023 WL 8851005, at *12 (D. Mass. Dec. 21, 2023). Plaintiffs merely contend that other "semiautomatic firearms" (not at issue here) also incorporate substantial technological advancements when compared to historical firearms. AB 34. But that hardly establishes that a nuanced approach is inappropriate in this case.

As to modern societal concerns, plaintiffs do not dispute the State's evidence that mass shootings committed by lone gunmen have spiked in recent years, or that assault weapons have contributed directly to that unprecedented modern concern. 3-ER-603–604; OB 35-36. Plaintiffs instead cite articles (each one from outside the record) indicating that semiautomatic handguns are "the weapons of choice for criminals generally," and that "ordinary semiautomatic handguns, and not 'assault

18

weapons,' are the most common firearm used in mass shootings." AB 35. While that may have been true at one point, "the proportion of gun massacres involving assault weapons has increased significantly" since the 1980s, particularly in recent years, 6-ER-1336, 1340, and the use of assault weapons in those incidents contributed to substantially more deaths and injuries, 6-ER-1343; *see* 5-ER-1028. Indeed, 75 percent of the mass shootings resulting in double-digit fatalities between 2012 and 2022 involved assault weapons. 3-ER-516; *see also* 6-ER-1340 (67 percent in mass shootings resulting in six or more fatalities between 2017 and 2020).

To apply a nuanced analytical approach based on these considerations is not "to 'engage in independent means-end scrutiny under the guise of an analogical inquiry.'" AB 35. It is instead to recognize that the "regulatory challenges posed by" assault weapons are not "the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. The search for historical precursors to illuminate the relevant historical tradition must be conducted in a manner that is sensitive to that dynamic. *See id.* at 27-28.

## B. California's Restrictions Are Consistent with the Historical Tradition of Regulating Especially Dangerous Weapons

When plaintiffs finally address the historical evidence, they again misunderstand (or ignore) the proper analytical framework governing their claims.

1. Plaintiffs acknowledge (AB 40) the long tradition, pre-dating the founding, "of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see Bruen*, 597 U.S. at 21. As Blackstone put it, "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace . . . and is particularly prohibited." 4 Blackstone, *Commentaries on the Laws of England* 148 (1769); *see Bruen*, 597 U.S. at 41-42 (discussing historical restrictions on especially dangerous weapons like crossbows and launcegays).

But plaintiffs misunderstand that tradition, characterizing it as a two-part test that prohibited banning any weapon unless it was both exceedingly dangerous and numerically unusual. *See* AB 12, 40-41. That view cannot be squared with Blackstone or the other historical evidence. The same founding-era treatise that plaintiffs invoke (AB 42) identified certain dangerous weapons that were properly "restrain[ed]" without regard to their numerical prevalence (*e.g.*, particular weapons such as "*cross-bows*" that "favour the design of murderers"), and it described arms that could *not* be banned based on their suitability for self-defense (*i.e.*, "*proper arms for defence*"). Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 18 (1782). Plaintiffs quote a separate passage of the same treatise observing that the sovereign could "'*require the exercise* of ALL MEN in the use of the present fashionable weapons,

20

the *musquet and bayonet*.'"  AB 42 (quoting Sharp, *Tracts* 15).  They argue that this language somehow establishes that even exceedingly dangerous weapons were protected once there were a sufficient number in circulation.  *Id.*  But the quoted passage says nothing of the sort.  In context, it is clear that the treatise viewed traditional "musquets" and "bayonets" as permissible because they were viewed, based on objective characteristics, as "proper arms for defence."

Plaintiffs also fail to support their contention that the King was only allowed to ban weapons like "launcegays and crossbows" because there were not that many of them in the kingdom.  AB 42-43.  For example, plaintiffs claim that England's "anti-crossbow law was borne primarily out of Henry VIII's concern that preferences for other weapons would 'threaten[] Englishmen's proficiency with the longbow.'"  AB 43 (citations omitted).  But that does not reflect that crossbows were numerically "unusual"; indeed, it suggests the opposite.  *See also* Schwoerer, *Gun Culture in Early Modern England* 55 (2016) (explaining that Henry VIII "blamed" "the decline in archery" at the time on "'the newfangle[d] and wanton pleasure that men now have in using of crossbows and handguns'").

The better understanding of history and precedent is that the tradition recognized in *Heller* allowed the prohibition of weapons that "pose[d] substantial dangers far beyond those inherent in the design of ordinary firearms" and were "not suitable for ordinary self-defense purposes."  *Capen*, 2023 WL 8851005, at

21

*16; *see Teter*, 76 F.4th at 950 ("uniquely dangerous propensities"). The phrase "dangerous and unusual" as a shorthand for that tradition is a hendiadys: a rhetorical device where "two terms separated by a conjunction work together as a single complex expression." Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016). In "dangerous and unusual," "unusual" conveys some heightened "level of lethality or capacity for injury" that makes a particular type of weapon "especially dangerous," *Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*), __ F. Supp. 3d __, 2023 WL 4975979, at *16 (D. Conn. Aug. 3, 2023), not a numerical limit that bars prohibitions on a weapon as soon as a minimum number are in circulation.[9]

2. Plaintiffs also misunderstand the temporal scope of the broader historical inquiry. In their view, "1791 is the critical date," and a historical analogue from 1840 is "too late in time to help the State." AB 39, 46. Neither *Heller* nor *Bruen* limited its historical inquiry in that way. The Supreme Court considered English history reaching back hundreds of years in *Heller*, *see, e.g.*, 554 U.S. at 592-594, as well as American history "from immediately after" 1791 "through the end of the 19th century," *id.* at 605. And *Bruen* confirmed that English traditions "long

---

[9] While plaintiffs assert that the Supreme Court has embraced their reading, they cite only a concurring view that was never adopted by the Court. AB 12; *see also NAGR*, 2023 WL 4975979, at *16.

22

predat[ing]" the Second Amendment may "illuminate the scope of the right" if they "prevailed up to" 1791, and that post-ratification evidence can also help "settle the meaning" of the Constitution. 597 U.S. at 34-35; *see also* Everytown Amicus Br. 6-22. It is "implausible"—to say the least—"that the public understanding" of the right to bear arms "would arise" only in 1791, and equally "implausible" that it "would promptly dissipate whenever [the founding] era gave way to another." *Antonyuk v. Nigrelli*, __ F.4th __, 2023 WL 8518003, at *15 (2d Cir. Dec. 8, 2023).

3. The next error in plaintiffs' analysis is one that *Bruen* expressly warned against. Plaintiffs insist that the State must identify historical precursors that "were directed at the same problem as its 'assault weapons' ban," and that "chose the same method to deal with the problem." AB 50. They even dismiss "bans on possession" of certain firearms as "irrelevant" on the ground that "these firearms are *not* the same as semiautomatic firearms." AB 49. In *Bruen*, the Supreme Court foresaw that an approach like plaintiffs' would improperly convert the Second Amendment into "a regulatory straightjacket"—and therefore stressed that the government need not identify "a historical *twin*" or "a dead ringer" for the challenged law. 597 U.S. at 30. The State need only identify "historical precursors" that are "analogous enough to pass constitutional muster." *Id.*

Plaintiffs' misconception of *Bruen* infects every aspect of their historical analysis. The historical record establishes a long national tradition of restricting especially dangerous weapons, weapons configurations, and weapons accessories as they proliferate and imperil public safety. *See* OB 37-47. But plaintiffs refuse to acknowledge that forest and instead seek to distinguish each one of the trees.

For example, plaintiffs reject any analogy "to anti-trap gun laws" or "colonial and early American regulation of gunpowder" on the ground that those laws did not prohibit "a type of firearm." AB 45. But those precursors show that one of the regulatory challenges preoccupying the founding generation was weapons configurations and weapons-related practices that posed a dire threat to the lives of innocent civilians. *See* OB 41-43. With that concern in mind, colonial legislatures enacted solutions that plainly burdened the right of self-defense. Trap-guns were banned because they were considered "most dangerous," *e.g.*, 1763-1775 N.J. Laws 346, ch. 539, § 10—even though users "typically" employed them for defensive purposes, 4-ER-673. And to address the risk of mass fatalities from explosions or fires, gunpowder laws effectively placed a ceiling on the number of

rounds that each household could fire by limiting the weight of gunpowder that could be stored in the home. OB 42.[10]

When it came to particular weapons that posed an unusual threat to public safety, like Bowie knives and slungshots, early legislatures imposed restrictions that significantly curtailed their use or that prohibited them altogether. *See* OB 43-44. Plaintiffs suggest (AB 48) that no State banned Bowie knives, but they ignore a 1837 Georgia law making it unlawful "to sell, or offer to sell" a "Bowie" knife, "or to keep, or have [one] about their person or elsewhere." 1837 Ga. Acts 90, § 1; *see* 3-ER-583. And they minimize or ignore laws that substantially restricted the use of Bowie knives, such as a Tennessee law that banned their sale, *see* 1837-1838 Tenn. Pub. Act 200, ch. 137, § 1, and an Alabama law that taxed them at a prohibitive rate, *see* 1837 Ala. Acts 7, § 2.

As to slungshots, plaintiffs concede that "some anti-slungshot laws were fairly stringent." AB 49; *see* 4-ER-669, 731–734; *see, e.g.*, 1849 N.Y. Laws 403 (banning the sale and possession of "slung shot[s]"); 1849 Vt. Acts & Resolves 26 (same); 1850 Mass. Acts 401, § 2 (banning the manufacture and sale of "slung

---

[10] *Heller* observed that colonial gunpowder restrictions "do not remotely burden the right to self-defense as much as an absolute ban on handguns," which are the "quintessential self-defense weapon." 554 U.S. at 629, 632. But "[t]he same" is *not* "true" here. AB 46. Section 30515 is not a ban on all handguns (or long guns, or semiautomatic weapons). *See infra* p. 30.

shot[s]"). Plaintiffs' only response is to suggest that those laws are not relevant because slungshots were especially prone to dangerous and criminal misuse. *See* AB 49. But that is precisely why they are evidence of a historical tradition that is relevant to this case.

Plaintiffs barely address nineteenth-century restrictions on firearms, which are further evidence of States responding to contemporary threats to public safety presented by emerging weapons that are especially dangerous at the time. OB 45 & n.22. They merely note that, under *Heller* and *Bruen*, those historical precursors do not support "the banning of" *all* pistols today, or a modern law preventing law-abiding citizens from carrying *any* handgun for self-defense outside the home. AB 49. That is correct, but it does not mean that those laws are irrelevant to examining whether modern laws that impose a far lesser burden are consistent with the tradition of legislative responses to especially dangerous firearms and other weapons.

Finally, plaintiffs show their true colors when they address the twentieth century laws that they concede "ban[ned] possession of certain firearms," AB 49, which were enacted in response to threats to public safety occasioned by especially dangerous firearms technologies, *see* OB 46-47; *see Bruen*, 597 U.S. at 66 n.28 ("20th-century historical evidence" may "provide insight into the meaning of the Second Amendment" where consistent with "earlier evidence"). Plaintiffs dismiss

26

those laws as "irrelevant because [those] firearms are *not* the same as semiautomatic firearms." AB 49. In fact, some of those laws did prohibit certain types of semiautomatic weapons. *See, e.g.*, 4-ER-738, 755, 758. More fundamentally, by insisting that the State identify historical analogues that address "the same" weapon as those covered by Section 30515 and that use "the same method" of regulation, AB 49, 50, plaintiffs are demanding a historical twin—in contravention of *Bruen*.

4. The record establishes a historical tradition of laws that imposed comparable burdens on the right to armed self-defense to Section 30515, and that were comparably justified. *See Bruen*, 597 U.S. at 29. Section 30515 prohibits only certain arms equipped with tactical features that are not oriented towards self-defense—and that make them exceptionally lethal as offensive weapons in the hands of mass shooters. It allows law-abiding citizens to continue possessing and using a wide-range of self-defense weapons, including semiautomatic handguns, semiautomatic rifles, and even "featureless" versions of AR- and AK-platform rifles and pistols. OB 47-51.

Plaintiffs accuse the State of "attempt[ing] to minimize the burden imposed by its law." AB 51. They cite *Heller* for the proposition that the "possibility of possessing *other* semiautomatic rifles, pistols, and shotguns" is irrelevant to the burden inquiry. *Id.* That misreads *Heller*. *See* OB 50 n.24. The Supreme Court

27

explained that the obvious and severe burden imposed by a complete "ban [on] the possession of handguns"—"the quintessential self-defense weapon"—was not lessened by the fact that "the possession of . . . long guns[] is allowed." *Heller*, 554 U.S. at 629. But California has not banned the possession of all handguns (or all semiautomatic handguns)—only specific categories of semiautomatic weapons with specific tactical features that make them exceptionally dangerous. OB 11-14. The continued availability of other semiautomatic handguns (and long guns) is of central relevance in assessing the extent of any burden on "a law-abiding citizen's right to armed self-defense." 597 U.S. at 29; *see, e.g.*, *NAGR*, 2023 WL 4975979, at *33.[11]

\*          \*          \*

Although plaintiffs do not quite admit it, the logical conclusion of their flawed analysis is that *no* prohibition of *any* weapon would ever be viewed as "consistent with the Nation's historical tradition." *Bruen*, 597 U.S. at 24; *see also* OB 55. After all, they assert that "1791 is the critical date," AB 39; that "*none* of the historical laws . . . from the Founding era" addressed the problem of especially dangerous weapons "by outright banning their possession," AB 51; and that the

---

[11] To state the point another way, the widespread availability of shotguns would surely not be viewed as irrelevant in assessing whether and to what extent a ban on *short-barreled* shotguns burdens the right to armed self-defense. *Cf. Heller*, 554 U.S. at 625.

only relevant historical analogues are those that used "the same method" of regulation, AB 50. That extreme position is out of step with text, history, and precedent. Certain types of especially dangerous weapons "may be banned," *Heller*, 554 U.S. at 627, and our Nation's historical traditions reflect that many such weapons have been banned. The challenged restrictions on the eight categories of assault weapons at issue in this case are consistent with the Second Amendment. This Court can and should reject plaintiffs' claim at either stage of *Bruen*'s framework (or both of them).

## III. THE DISTRICT COURT'S PERMANENT INJUNCTION AND JUDGMENT SHOULD REMAIN STAYED

So long as this appeal remains on its current expedited schedule, plaintiffs do not seek to lift the current stay of the district court's permanent injunction and judgment. AB 52. But they contend that, if the Court were to hold this appeal in abeyance pending its forthcoming en banc decision in *Duncan*, it should "reverse" the stay "so that [p]laintiffs can at least enjoy the judgment they won while awaiting this Court's review." *Id*. The State defers to this Court on how to manage its own docket in light of the similarities between this case and *Duncan*, which plaintiffs highlighted when they asked the district court to relate the two cases. OB 56. But in no circumstance would it be appropriate for the Court to lift the stay. The answering brief does not make any argument based on the factors governing a stay pending appeal. And those factors tilt sharply in favor of

29

maintaining the stay: the State is likely to prevail on the merits; lifting the stay would have dramatic, immediate, and potentially irreversible effects, C.A. Dkt. 6 at 10-24; and plaintiffs remain able to purchase, possess, and use a wide range of firearms while this Court resolves the appeal.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

Dated: January 8, 2024            Respectfully submitted,

                           *s/ John D. Echeverria*

                           ROB BONTA
                           *Attorney General of California*
                           MICHAEL J. MONGAN
                           *Solicitor General*
                           HELEN H. HONG
                           *Principal Deputy Solicitor General*
                           THOMAS S. PATTERSON
                           *Senior Assistant Attorney General*
                           MICA L. MOORE
                           *Deputy Solicitor General*
                           R. MATTHEW WISE
                           *Supervising Deputy Attorney General*
                           ANNA FERRARI
                           JOHN D. ECHEVERRIA
                           *Deputy Attorneys General*
                           *Attorneys for Defendants-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-2979

I am the attorney or self-represented party.

**This brief contains** 6,967 **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ John D. Echeverria **Date** January 8, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I certify that on January 8, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  January 8, 2024                              *s/ John D. Echeverria*