No. 23-2979

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES MILLER, et al.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as the
Attorney General of the State of California, et al.,
*Defendants-Appellants*,

Appeal from United States District Court
for the Southern District of California
Civil Case No. 3:19-cv-01537-BEN-JLB
The Honorable Roger T. Benitez, Judge

**SUPPLEMENTAL BRIEF FOR APPELLEES**

| | |
|---|---|
| John William Dillon | David H. Thompson |
| DILLON LAW GROUP, APC | Peter A. Patterson |
| 2647 Gateway Road | Clark L. Hildabrand |
| Suite 105, No. 255 | COOPER & KIRK, PLLC |
| Carlsbad, CA 92009 | 1523 New Hampshire Ave., NW |
| jdillon@dillonlawgp.com | Washington, D.C. 20036 |
| | (202) 220-9600 |
| George M. Lee | dthompson@cooperkirk.com |
| SEILER EPSTEIN LLP | |
| 4 Embarcadero Center | |
| 14th Floor | |
| San Francisco, CA 94111 | |
| (415) 979-0500 | |
| gml@sezalaw.com | |

*Counsel for Plaintiffs-Appellees*

April 23, 2025

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES................................................................................... ii

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................2

    I.    The Law at Issue Here Bans "Arms." ............................................................2

    II.   Neither of the Historical Traditions Identified in *Duncan* Support a Ban on Common Semiautomatic Firearms. ................................................................8

CONCLUSION ........................................................................................................12

# TABLE OF AUTHORITIES

**Cases**                           **Page(s)**

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ................................................................................... 7

*Duncan v. Bonta*,
 No. 23-55805, 2025 WL 867583 (9th Cir. Mar. 20, 2025) .................. 1, 3, 4, 7, 8, 9, 10, 12

**Codes**

Cal. Penal Code
 § 30515(a) ................................................................................................... 4
 § 30515(a)(2) .............................................................................................. 3
 § 30515(a)(5) .............................................................................................. 3

**Other Authorities**

*Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (last updated July 16, 2024), https://perma.cc/J2YT-YDXA ................................................................. 10

Benjamin M. Blau et al., *Guns, laws, and public shootings in the United States*, 48 APPLIED ECON. 1 (2016) ....................................................................... 11

NICHOLAS J. JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2021), https://perma.cc/8FAR-5Q3D, https://perma.cc/ASK9-GGDE ................................................ 4, 5

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994–2004*, *in* REDUCING GUN VIOLENCE IN AMERICA (2013) ........................................................................................................ 12

2 BENSON J. LOSSING, HISTORY OF NEW YORK CITY (Google Books ed. 1884) ............................................................................. 9, 10

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U.L.J. 193 (2018) ........ 6, 7

Daniel W. Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 CRIMINOLOGY & PUB. POL'Y 171 (2020) .............................................. 11, 12

## INTRODUCTION

In *Duncan v. Bonta*, No. 23-55805, 2025 WL 867583 (9th Cir. Mar. 20, 2025), this Court held that California's ban on magazines capable of holding more than ten rounds of ammunition was consistent with the Second Amendment for two reasons, neither of which supports the State here. It held first that "[l]arge-capacity magazines" were "optional accessories" rather than protected "arms" and, as "optional accessories," fall categorically outside the scope of the Second Amendment. *Id.* at *3. Second, the Court concluded that, even if "large-capacity magazines" are covered by the Amendment's text, California's ban was consistent with historical traditions regulating "exceptionally dangerous uses" of arms.

While Plaintiffs take issue with both of these holdings, even accepting them *arguendo*, neither of them compels a ruling for the State in this case. Taking *Duncan* as a given, as Plaintiffs do for purposes of this brief, California's ban on common semiautomatic firearms is *still* unconstitutional. Applying *Duncan*'s textual analysis yields a different result here: the rifles, pistols, and shotguns banned by California are "arms," not "optional accessories." Even if this Court accepts the State's characterization that California's ban operates as a ban on accessories, not arms, then the State would still need to show and this Court would be required to determine that each one of the "features" banned by California are "optional" under *Duncan*, which it will not be able to do. The textual point also renders much of *Duncan*'s historical

1

analysis, which rested primarily on a distinction between dangerous *arms* and dangerous *uses* of arms, irrelevant as well. To the extent *Duncan*'s historical conclusions can even be meaningfully applied here, they still do not favor the State, because there is no plausible reason why an "assault weapon" itself, rather than an assault weapon equipped with the magazines at issue in *Duncan*, is any more dangerous than any other type of semiautomatic firearm.

## ARGUMENT

### I. The Law at Issue Here Bans "Arms."

Beginning with *Bruen*'s textual analysis, *Duncan* held that "the plain text of the [Second] Amendment protects the right to bear 'Arms,' not accessories to firearms that are neither arms themselves nor necessary to the ordinary functioning of a firearm." 2025 WL 867583, at *7. And it further concluded that ammunition magazines are, under that conception of the term, "accessories." Finally, the Court decided that "[l]arge-capacity magazines are *optional* accessories to firearms, and firearms operate *as intended* without a large-capacity magazine." *Id.* at *3 (emphasis added). That same reasoning cannot be extended to this case. For one, the State acknowledges that at least "[s]ome of the categories [of banned weapons] challenged by plaintiffs address features that are inherent to the defined assault weapon." Appellants' Opening Br., Doc. 25 at 22 (Dec. 2, 2023) ("State Br.") centerfire rifles less than 30 inches. But even where the State claims that the ban is really a ban on

2

features, not firearms, it is wrong. *See id.* at 11–12. (citing the provisions that ban, for example, rifles with "a pistol grip" or "thumbhole" or "telescoping stock"). Unlike the law in *Duncan* that targeted the possession of magazines themselves, California's "assault weapon" ban is aptly named in just one respect: it bans *weapons*, not parts. It is not a crime to have a "pistol grip" or "telescoping stock," it is a crime to have a semiautomatic *rifle* with those features. And a *rifle*, it is indisputable, is an "arm."[1]

Furthermore, even if it were appropriate to consider this a ban on particular *features* of firearms and not firearms themselves—and the statutory text defies such a reading—*Duncan* itself suggests that these items cannot be considered "optional accessories" because they are actual *parts* of firearms, not interchangeable cartridges for holding ammunition. As Plaintiffs explained in their brief, attempting to draw a line between "optional" and "inherent" parts of a firearm is an exercise in futility. *See* Resp. Br. for Appellees, Doc. 41 at 8 (Dec. 22, 2023) ("Pls.' Br."). *Duncan*'s approach to the issue was unique. It looked at the function served by a modern item—ammunition magazines—to see what, if anything, served a similar function at the Founding. Because it viewed the most similar Founding-era items as "cartridge

---

[1] This is the way the ban works even when its target overlaps with the magazine ban at issue in *Duncan*. *See* Cal. Penal Code §§ 30515(a)(2), (5) (defining "assault weapon" to include semiautomatic pistols and rifles "with a fixed magazine that has the capacity to accept more than 10 rounds"). To be sure, under *Duncan*, the magazine on such a firearm may be independently banned by the law at issue there.

3

cases and cartridge boxes" for carrying extra ammunition, *Duncan* then asked whether "cartridge boxes" were considered "arms" at the Founding and held that they would instead have been considered "accoutrements." *Duncan*, 2025 WL 867583, at *8. It was this fact—that the historically analogous parts were not "arms" but "accoutrements"—that brought magazines outside of the Amendment's "plain text," because, *Duncan* concluded, the Founders chose "to protect the right to bear 'arms,' not 'arms and accoutrements.' " *Id.* at *9.

Following that analysis here leads to a different result. For instance, California's ban on semiautomatic firearms targets rifles with "a pistol grip that protrudes conspicuously beneath the action of the weapon," "a thumbhole stock," a "folding or telescoping stock," a "flash suppressor," or a "forward pistol grip." Cal. Penal Code § 30515(a). In this case, an illustration might be helpful to emphasize the critical differences between these firearm parts and ammunition magazines. Below is an example image of an AR-15 style semiautomatic rifle with several of the banned features. It has a "pistol grip that protrudes conspicuously beneath the action of the weapon" just behind the trigger, as well as a "forward pistol grip" that protrudes beneath the barrel. *Id.* It also has an adjustable ("telescoping") stock, and a "flash suppressor" on the end of the barrel. It is notably pictured without a magazine equipped at all:

4



NICHOLAS J. JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 1996 (3d ed. 2021), https://perma.cc/8FAR-5Q3D. The image below is of a Kentucky long rifle that represents the modern firearm technology of 1776 that gave American marksman a significant advantage over the British regulars.



*Id.* at 2202, https://perma.cc/ASK9-GGDE. Even though the visual differences between these arms are obvious, the underlying purpose of each is fundamentally the same: to accurately fire bullets at a target. As a result, the basic functions of their features are the same too, even if the modern firearm represents a significant improvement on its predecessor.

Conducting a comparison of the sort that *Duncan* did with magazines reveals that each of the features used in California's definition of an "assault weapon" would undoubtedly have been treated as part of the "arm" itself at the Founding. The adjustable stock of the AR-15 not only performs the same function as the wooden stock of the Kentucky rifle by giving the user a way to brace the firearm against his shoulder, but also improves on the design by allowing a single firearm to be safely operated by individuals of different sizes. *See* E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U.L.J. 193, 232 (2018). The pistol grip also performs part of the stock's function on the Founding-era predecessor. The AR-15, as can be seen in the illustration above, has a straight-line design; the centerline of the barrel is continuous with the stock. The Kentucky rifle, like other long guns available at the Founding, was constructed with the centerline of the barrel at an angle from the stock. *See id.* at 229. Although the Kentucky rifle's design allows the stock to double as a handgrip for the trigger hand, it causes recoil to direct the front end of the barrel up after a shot is fired. The AR-15 is specifically designed to avoid this problem and transfer recoil straight back, and so it is also specifically designed and intended to function with a pistol grip (or a feature that performs an equivalent function, like a thumbhole stock) to allow the shooter to properly grip the firearm with the trigger hand. *Id.* A "forward pistol grip" similarly just gives a user something to hold onto with the non-trigger hand to stabilize the firearm, just like the wood in which the

6

barrel is seated in the Kentucky rifle. Again, this improves on the design by increasing the user's ability to safely operate the firearm. And a "flash suppressor" sits at the end of the barrel and controls the expulsion of gasses and reduces muzzle flash, which can blind a shooter defending himself in a nighttime setting. *See id.* at 233. This is essentially a technological improvement to the barrel beyond what was available at the Founding.

In each case, because they are *part* of the firearm, they are "necessary to the ordinary operation of the weapon." *Duncan*, 2025 WL 867583, at *10. One cannot "ordinar[ily] operat[e]" a rifle without some means of bracing it against the shoulder or gripping it with the trigger and non-trigger hands. The State should not be heard to object that these features perform their jobs *better* or differently than their predecessors did—that is a given. If Kentucky rifles were more effective and user friendly than AR-15s, they would be the most popular rifle in America. That they are in disuse and the AR-15 is the most preferred long gun in the country is proof that these features perform their functions more reliably and efficiently than any Founding-era arm. *District of Columbia v. Heller* rejected as "bordering on the frivolous," the argument "that only those arms in existence in the 18th century are protected by the Second Amendment." 554 U.S. 570, 582 (2008). Rather, the Second Amendment's plain text encompasses "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*; *see also*

7

*Duncan*, 2025 WL 867583, at *8. The point, under *Duncan*, is that these predecessor parts were indisputably parts of the arms themselves, and therefore, even if California's ban on "assault weapons" is incorrectly considered to be a ban on certain firearm *features*, it implicates the plain text of the Second Amendment and the ban is presumptively unconstitutional.

## II. Neither of the Historical Traditions Identified in *Duncan* Support a Ban on Common Semiautomatic Firearms.

When it comes to bans on types of arms, the Supreme Court has already done the necessary historical analysis, and it has derived the principal that arms "in common use" are categorically protected and cannot be banned. *See, e.g.*, Pls.' Br. at 11–14. *Duncan* dealt with items that the court concluded were not arms, so its analysis does not foreclose Plaintiffs' argument in this context. The Court should affirm on the historical basis laid out in Plaintiffs' brief.

Even if this Court does consider *Duncan*'s historical analysis relevant, as with its textual analysis, the historical limitations on the right *Duncan* purported to identify do not intersect with this case. *Duncan* claimed to identify two historical principles in which it grounded its analysis. First, it held that Founding-era gunpowder storage laws were evidence of a "tradition of regulating a component necessary to the firing of a firearm in order to prevent or mitigate devastating harm caused or exacerbated by that component." *Duncan*, 2025 WL 867583, at *19. And based on laws restricting the setting of trap guns and restricting Bowie knives in

8

some way (most often through restrictions on their carriage or enacting enhanced penalties for their misuse), the *Duncan* court also identified a tradition of restricting "especially dangerous uses of weapons." *Id.*

Neither of these traditions is relevant here. First consider the principle that "especially dangerous uses of weapons" may be banned. *Duncan* "emphasize[d] repeatedly," that it was not outlining a tradition of banning dangerous weapons, but "a tradition of banning especially dangerous <u>uses</u> of weapons once the perils of those <u>uses</u> become clear." *Id.* at *19 n.9 (emphasis in original); *see also id.* ("The principal dissent repeatedly mischaracterizes the relevant tradition as a ban on 'especially dangerous weapons.'"). No less than its textual analysis, *Duncan*'s reliance on this historical tradition hinged on the conclusion that magazines are not themselves arms but merely accessories to arms, altering how they are *used*. Because the same cannot be said in this case, this tradition is irrelevant here.

Second, both traditions required a showing of unusual dangerousness flowing specifically from the banned firearm "use" or "component." The gunpowder storage laws, the panel said, were there to "prevent or mitigate devastating harm caused or exacerbated by that component" (there, gunpowder). Improper storage could have ruinous effects on the largely wooden and highly flammable cities of the time. *See, e.g.*, 2 BENSON J. LOSSING, HISTORY OF NEW YORK CITY 500–02 (Google Books ed. 1884) (noting that the Great New York City Fire of 1845 began in a whale oil store,

9

but was greatly exacerbated when it reached a warehouse improperly storing "a great quantity of saltpetre," a key ingredient in black powder). *Duncan* found that the magazine-capacity restrictions at issue in that case targeted a similar source of extraordinary harm: mass shootings. Specifically, the Court held that "[l]arge-capacity magazines exacerbate the harm caused by mass shootings, and limiting magazine capacity thus prevents or mitigates harm caused by mass shootings." *Duncan*, 2025 WL 867583, at *18.

That relationship does not exist here. *See* Pls.' Br. at 34–36. California has argued otherwise, but it is wrong. It claimed for instance, that the use of so-called "assault weapons" in mass shootings "contributed to substantially more deaths and injuries," Appellants' Reply Br., Doc. 56 at 19 (Jan. 8, 2024) (citing 6-ER-1343 and 5-ER-1028), that 75 percent of mass shootings resulting in double digit fatalities between 2012 and 2022 involved alleged "assault weapons," *id.* (citing 3-ER-516), and that 67 percent resulting in six or more fatalities between 2017 and 2020 involved them, *id.* (citing 3-ER-516). But these assertions are problematic for several reasons. First, they are primarily based on the expert report of Louis Klarevas, whose research in this area has been rejected as "likely biased" by the RAND Corporation. *See Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND C<small>ORP</small>. (last updated July 16, 2024), https://perma.cc/J2YT-YDXA. Second, the State does not disaggregate the use of so-called "large capacity

magazines" from the use of so-called "assault weapons." In fact, in Professor Klarevas's chart of compiled "mass shootings resulting in double-digit fatalities" detailing 30 such events from 1949 to the present, *every single one* of the shootings involving an alleged "assault weapon" also involved a banned magazine. *See* 3-ER-516. Ditto for the larger chart of alleged mass shooting incidents assembled by the State's other expert, Lucy P. Allen: *every one* of them involving an alleged "assault weapon" for which the chart includes magazine data involved the use of a "large capacity magazine" as well. *See* 5-ER-1038. As such, there is no evidence, even accepting the State's submissions, which Plaintiffs have otherwise disputed, *see* Pls.' Br. at 34–36, that suggests that the "assault weapons" themselves contribute to the number or severity of injuries in mass shootings.

This is consistent with the broader body of evidence studying the impact of "assault weapons" on events like this. *See, e.g.*, Benjamin M. Blau et al., *Guns, laws, and public shootings in the United States*, 48 APPLIED ECON. 1, 14 (2016) ("When taking a closer look at the incidents themselves, our multivariate results show that the use of assault weapons is not generally associated with an increase in the number of victims or the number of fatalities."); Daniel W. Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 CRIMINOLOGY & PUB. POL'Y 171, 188 (2020) ("[M]ost mass shootings do not involve assault rifles," and "bans on assault weapons

11

had no clear effects on either the incidence of mass shootings or on the incidence of victim fatalities from mass shootings."); Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994–2004*, 168, in REDUCING GUN VIOLENCE IN AMERICA (2013) ("It is unknown whether further restrictions on the outward features of semi-automatic weapons … will produce measurable benefits beyond those of restricting magazine capacity."). The question for this Court, even if it applies *Duncan* in the broadest possible manner is whether there is anything specifically about the assault weapons themselves, *equipped with compliant magazines*, to which the damage caused by mass shootings committed with them can be attributed. *See* 2025 WL 867583, at \*19. There is nothing supporting such a finding.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: April 23, 2025

Respectfully submitted,

  *s/ David H. Thompson*

David H. Thompson
Peter A. Patterson
Clark L. Hildabrand
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

13

John William Dillon
DILLON LAW GROUP, APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, CA 92009
jdillon@dillonlawgp.com

George M. Lee
SEILER EPSTEIN LLP
4 Embarcadero Center
14th Floor
San Francisco, CA 94111
(415) 979-0500
gml@sezalaw.com

*Counsel for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-2979

I am the attorney or self-represented party.

**This brief contains** 2,781 **words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

● complies with the length limit designated by court order dated 03/24/2025.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/David H. Thompson   **Date** 04/23/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

Form 8                                                                                              Rev. 12/01/22

14

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit on April 23, 2025, by using the appellate ACMS system. I hereby certify that service will be accomplished on April 23, 2025, by the appellate ACMS system on all parties or their counsel.

Dated: April 23, 2025

/s/*David H. Thompson*
David H. Thompson
*Counsel for Plaintiffs- Appellees*